# EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

BP p.l.c., a public limited company of England and Wales
Additional Parties Attachment form is attached

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

People of the State of California, acting by and through the San Francisco City Attorney Dennis J. Herrera

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* San Francisco County Superior Court
Civic Center Courthouse - Civil Division
400 McAllister Street, San Francisco, CA 94102

CASE NUMBER:
*(Número del Caso):* CGC-17-561370

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Dennis J. Herrera, City Atty, City Hall, 1 Dr. Carlton B. Goodlett Pl., San Francisco, CA 94102 415-554-4748

DATE: 09/19/2017 CLERK OF THE COURT Clerk, by MEREDITH GRIER, Deputy
*(Fecha)* *(Secretario)* *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: Chevron Corporation, a Delaware corporation

under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify)*:

4. ☑ by personal delivery on *(date)*:



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| People of the State of California v. BP p.l.c., et al. | |

**INSTRUCTIONS FOR USE**

- This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
- If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff ☑ Defendant ☐ Cross-Complainant ☐ Cross-Defendant

Chevron Corporation, a Delaware corporation

ConocoPhillips Company, a Delaware corporation

Exxon Mobil Corporation, a New Jersey corporation

Royal Dutch Shell plc, a public limited company of England and Wales

Does 1 through 10



Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Dennis J. Herrera, City Attorney for City of San Francisco, SBN 139669
Ronald P. Flynn, SBN 184186
Yvonne R. Mere, SBN 173594
City Hall, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102
TELEPHONE NO.: 415-554-4748 FAX NO.: 415-554-4715
ATTORNEY FOR (Name): People of the State of California

FOR COURT USE ONLY

ENDORSED FILED
Superior Court of California County of San Francisco
SEP 19 2017
CLERK OF THE COURT
BY: MEREDITH GRIER
Deputy Clerk

FAXED

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, California 94102
BRANCH NAME: Civic Center Courthouse - Civil Division

CASE NAME:
People of the State of California v. BP p.l.c. et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: CGC-17-561370 |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [✓] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (*not specified above*) (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   - a. [✓] Large number of separately represented parties
   - b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   - c. [✓] Substantial amount of documentary evidence
   - d. [✓] Large number of witnesses
   - e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   - f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought (*check all that apply*): a. [✓] monetary b. [✓] nonmonetary; declaratory or injunctive relief ABATEMENT FUND c. [ ] punitive
4. Number of causes of action (*specify*): One: public nuisance on behalf of the people of the State of California
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: September 19, 2017
Dennis J. Herrera
(TYPE OR PRINT NAME) (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **FEB-21-2018**

**TIME:** **10:30AM**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 610 twenty-five (25) days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at www.sfsuperiorcourt.org under Online Services.**

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**
(SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400 McAllister Street, Room 103
San Francisco, CA 94102
(415) 551-3869

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

DENNIS J. HERRERA, State Bar #139669
City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA, State Bar #238896
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone: (415) 554-4748
Facsimile: (415) 554-4715
Email: brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

[Other Counsel Listed on Signature Page]

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

**UNLIMITED JURISDICTION**

THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney DENNIS J. HERRERA,

Plaintiff and Real Party in Interest,

v.

BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS COMPANY, a Delaware corporation, EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,

Defendants.

Case No. CGC-17-561370

**PLAINTIFF'S NOTICE OF APPLICATION AND APPLICATION TO DESIGNATE CIVIL ACTION AS A COMPLEX CASE**

Hearing Date: Not Specified
Hearing Judge: Karnow
Time: Not Specified
Place: Dept. 304

Date Action Filed: September 19, 2017
Trial Date: Not yet set

**NOTICE**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT, pursuant to California Rule of Court 3.403 and San Francisco Superior Court Local Rule 3.6(C)(2), Plaintiff, the People of the State of California ("the People"), seeks an Order from this Court declaring that the above-captioned civil action is a complex case within the meaning of California Rule of Court 3.400 and assigning the case to Department 304 or Department 305 for all purposes.

The People's motion is made on the grounds that this case will require exceptional judicial management to avoid placing unnecessary burdens on the Court or the litigants, to expedite the case and keep costs reasonable, and to promote effective decision making by the Court, the parties, and counsel. (Cal. R. Ct. 3.400(a).) The People's motion is based on this Notice and the following Application, and on the pleadings filed in the action to date. Attached to this Notice and Application as Exhibit A is a copy of the Civil Cover Sheet filed by the People with their Complaint. Attached as Exhibit B is a copy of the People's Complaint.

**APPLICATION**

**INTRODUCTION**

The People bring this action against Defendants BP p.l.c. ("BP"), Chevron Corporation ("Chevron"), ConocoPhillips Company ("ConocoPhillips"), Exxon Mobil Corporation ("Exxon"), Royal Dutch Shell plc ("Shell"), and Does 1-10 (collectively, "Defendants"), seeking an abatement fund to address the ongoing, severe public nuisance of global warming-induced sea level rise. Global warming and its attendant acceleration of sea level rise is caused by named and unnamed Defendants' production and sale of fossil fuel products in massive quantities over several decades. Defendants are substantial contributors to this nuisance. Because their public nuisance claim will require exceptional judicial management, the People ask this Court to determine that the action is a complex case under California Rule of Court 3.400 and to assign the case to the Court's Complex Civil Litigation Department.

## FACTUAL AND PROCEDURAL BACKGROUND

On behalf of the People, San Francisco City Attorney Dennis J. Herrera filed this action on September 19, 2017, to abate a public nuisance through establishment of an abatement fund. (*See* Cal. Civ. Proc. Code § 731; *see also* Ex. B, ¶¶ 1, 99.) The People allege that Defendants are multinational oil and gas companies and the world's five largest investor-owned producers of fossil fuel products over a long period of time. (Ex. B, ¶¶ 2, 10.) The People allege that historical and ongoing production of fossil fuels by these five Defendants has substantially contributed to the accumulation of carbon dioxide and other greenhouse gases in the atmosphere, and to the corresponding warming of the Earth's surface temperature. (*Id.* ¶¶ 3, 10, 85.) The People further allege that this global warming has harmed and is harming the People through accelerated sea level rise and attendant flooding risks that must be abated through costly and complicated climate adaptation efforts and infrastructure. (*Id.* ¶¶ 86-93.) The People seek relief in the form of an abatement fund by which to pay for the necessary abatement of these past and ongoing global warming harms. (*Id.* ¶ 99.)

## ARGUMENT

This action by the People is a "complex case" because it will require "exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision making by the court, the parties, and counsel." (Cal. R. Ct. 3.400(a).) The People's public nuisance claim implicates at least three of the five non-exclusive factors that the Court must consider in deciding whether the case is complex. (*See* Cal. R. Ct. 3.400(b).)

**Numerous pretrial motions that will be time-consuming to resolve.** The People anticipate, based upon their counsel's experience in litigating environmental cases against these same parties or their affiliates, that Defendants will engage in substantial motion practice in this case. Defendants are large, multinational corporations with much at stake. (Ex. B, ¶¶ 10, 53, 56.) Defendants are expected to put up a vigorous defense using numerous motions and arguments that will require the Court's time and attention to address. The likely volume and complexity of pretrial motion practice in this case warrants a complex designation. (Cal. R. Ct. 3.400(b)(1).)

**Large number of witnesses and substantial amount of documentary evidence.** Resolution of the People's claim will require management of numerous factual and expert witnesses, and a significant volume of documentary evidence, put forth by the People. As set forth in their Complaint, the People allege, based upon internal industry documents that recently have come to light, that Defendants were aware that they were contributing to global warming and its attendant sea level rise harms since the late 1970s and early 1980s, if not earlier, yet continued to engage in fossil fuel production for decades afterwards, thus knowingly causing harm to coastal cities like San Francisco. (Ex. B., ¶¶ 57-62, 55.) In addition, the Defendants are large corporations with multiple departments and numerous employees involved in the events at issue. The long period of time at issue in the case and the large number of persons involved in the relevant events means there will be a large number of percipient witnesses and a very substantial quantity of documentary evidence. The scientific issues in the case will also entail a substantial number of expert witnesses. These facts also warrant a complex designation. (Cal. R. Ct. 3.400(b)(2).)

**Multiple separately represented parties.** This case will further entail at least six separately represented parties. Again, based upon counsel's past litigation against these Defendants or their affiliates, it is expected that each Defendant will retain separate counsel. This factor thus further weighs in favor of a complex designation. (Cal. R. Ct. 3.400(b)(3).)

In sum, this case warrants designation as complex because it involves or is likely to involve extensive motion practice; management of numerous witnesses and a large volume of documentary evidence; and a large number of separately represented parties. (Cal. R. Ct. 3.400(b).)

## CONCLUSION

The People's action to abate the public nuisance of global warming will require special judicial management to avoid unnecessary burdens on the Court, minimize costs to the parties, and promote effective decision making. The People therefore ask the Court to designate this case as complex under California Rule of Court 3.403 and Local Rule 3.6(C)(2).

Dated: September 20, 2017

DENNIS J. HERRERA
City Attorney
RONALD P. FLYNN
Chief Deputy City Attorney
YVONNE R. MERÉ
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA
MATTHEW D. GOLDBERG
Deputy City Attorneys

By /s/ *Dennis J. Herrera*
DENNIS J. HERRERA
City Attorney

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

Of Counsel

STEVE W. BERMAN (*pro hac vice* application to be submitted)
steve@hbsslaw.com
EMERSON HILTON (*pro hac vice* application to be submitted)
emersonh@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Ave. Suite 3300
Seattle, WA 98101
Tel. (206) 623-7292
Fax (206) 623-0594

SHANA E. SCARLETT (bar no. 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel. (510) 725-3000
Fax (510) 725-3001

MATTHEW F. PAWA (*pro hac vice* application to be submitted)
mattp@hbsslaw.com
BENJAMIN A. KRASS (*pro hac vice* application to be submitted)
benk@hbsslaw.com
WESLEY KELMAN (*pro hac vice* application to be submitted)
wesk@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1280 Centre Street, Suite 230
Newton Centre, Massachusetts 02459
Tel.: (617) 641-9550
Fax: (617) 641-9551

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

# EXHIBIT A

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Dennis J. Herrera, City Attorney for City of San Francisco, SBN 139669
Ronald P. Flynn, SBN 184186
Yvonne R. Mere, SBN 173594
City Hall, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102
TELEPHONE NO.: 415-554-4748 FAX NO.: 415-554-4715
ATTORNEY FOR (Name): People of the State of California

FOR COURT USE ONLY

ENDORSED FILED
Superior Court of California County of San Francisco
SEP 19 2017
CLERK OF THE COURT
BY: MEREDITH GRIER
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, California 94102
BRANCH NAME: Civic Center Courthouse - Civil Division

CASE NAME:
People of the State of California v. BP p.l.c. et al.

**CIVIL CASE COVER SHEET**

[✓] Unlimited (Amount demanded exceeds $25,000)
[ ] Limited (Amount demanded is $25,000 or less)

**Complex Case Designation**
[ ] Counter [ ] Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: CGC-17-561370
JUDGE:
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[✓] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (*not specified above*) (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (*check all that apply*): a. [✓] monetary b. [✓] nonmonetary; declaratory or injunctive relief ABATEMENT FUND c. [ ] punitive
4. Number of causes of action (*specify*): One: public nuisance on behalf of the people of the State of California
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: September 19, 2017
Dennis J. Herrera
(TYPE OR PRINT NAME)

(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

CM-010

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

# EXHIBIT B

DENNIS J. HERRERA, State Bar #139669
City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA, State Bar #238896
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone: (415) 554-4748
Facsimile: (415) 554-4715
Email: brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

[Other Counsel Listed on Signature Page]

ENDORSED
FILED
Superior Court of California
County of San Francisco

SEP 19 2017

CLERK OF THE COURT
BY: MEREDITH GRIER
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

**UNLIMITED JURISDICTION**

THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney DENNIS J. HERRERA,

Plaintiff and Real Party in Interest,

vs.

BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS COMPANY, a Delaware corporation, EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,

Defendants.

Case No.: CGC-17-561370

**COMPLAINT FOR PUBLIC NUISANCE**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

- A. Plaintiff ..... 6
- B. Defendants ..... 6
- C. Defendants' Connections To California ..... 10

IV. FOSSIL FUELS ARE THE PRIMARY CAUSE OF GLOBAL WARMING. ..... 12

V. DEFENDANTS HAVE PRODUCED MASSIVE QUANTITIES OF FOSSIL FUELS AND HAVE CONTINUED TO DO SO EVEN AS GLOBAL WARMING HAS BECOME GRAVELY DANGEROUS. ..... 16

VI. DEFENDANTS HAVE PRODUCED MASSIVE AMOUNTS OF FOSSIL FUELS DESPITE HAVING FULL KNOWLEDGE FROM THEIR IN-HOUSE SCIENTIFIC STAFF, OR FROM THE API, THAT FOSSIL FUELS WOULD CAUSE GLOBAL WARMING. ..... 18

VII. DESPITE THEIR EARLY KNOWLEDGE THAT GLOBAL WARMING WAS REAL AND POSED GRAVE THREATS, DEFENDANTS PROMOTED FOSSIL FUELS FOR PERVASIVE USE WHILE DOWNPLAYING THE REALITY AND RISKS OF GLOBAL WARMING. ..... 23

- A. Defendants Borrowed The Big Tobacco Playbook In Order To Promote Their Products. ..... 24
- B. Defendants' Direct Promotion Of Fossil Fuels. ..... 28

VIII. SAN FRANCISCO WILL INCUR SERIOUS CLIMATE CHANGE INJURIES THAT WILL REQUIRE BILLIONS IN EXPENDITURES TO ABATE THE GLOBAL WARMING NUISANCE ..... 31

IX. CAUSE OF ACTION: PUBLIC NUISANCE ON BEHALF OF THE PEOPLE ..... 37

X. RELIEF REQUESTED ..... 39

Plaintiff, the People of the State of California ("the People"), by and through San Francisco City Attorney Dennis J. Herrera, brings this action against Defendants BP p.l.c. ("BP"), Chevron Corporation ("Chevron"), ConocoPhillips Company ("ConocoPhillips"), Exxon Mobil Corporation ("Exxon"), and Royal Dutch Shell plc ("Shell") (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. Global warming is here and it is harming San Francisco now. Global warming causes accelerated sea level rise through thermal expansion of ocean water and melting of land-based ice. Sea levels are rising at rates unprecedented in the history of human civilization due to global warming.[1] Global warming-induced sea level rise is already causing flooding of low-lying areas of San Francisco, increased shoreline erosion, and salt water impacts to San Francisco's water treatment system.[2] The rapidly rising sea level along the Pacific coast and in San Francisco Bay, moreover, poses an imminent threat of catastrophic storm surge flooding because any storm would be superimposed on a higher sea level.[3] This threat to human safety and to public and private property is becoming more dire every day as global warming reaches ever more dangerous levels and sea level rise accelerates. The City and County of San Francisco ("San Francisco" or "City") must take abatement action now to protect public and private property from this looming threat by building sea walls and other sea level rise adaptation infrastructure. Exhibits 1 and 2[4] to

---

[1] Griggs et al., Rising Seas in California: an update on sea-level rise science, California Ocean Science Trust, at 8 (Apr. 2017) ("Rising Seas in California"), *available at* http://www.opc.ca.gov/webmaster/ftp/pdf/docs/rising-seas-in-california-an-update-on-sea-level-rise-science.pdf.

[2] San Francisco Sea Level Rise Action Plan at 6 (Mar. 2016), *available at* http://default.sfplanning.org/plans-and-programs/planning-for-the-city/sea-level-rise/160309_SLRAP_Executive_Summary_EDreduced.pdf.

[3] Rising Seas in California at 16-17 (Apr. 2017); Climate Change Impacts in the United States: The Third National Climate Assessment, southwest chapter at 469-70 (2014), *available at* http://nca2014.globalchange.gov/system/files_force/downloads/low/NCA3_Full_Report_20_Southwest_LowRes.pdf?download=1.

[4] San Francisco Sea Level Action Plan, at 2-7 & 2-9 (March 2016), *available at* http://default.sfplanning.org/plans-and-programs/planning-for-the-city/sea-level-rise/160309_SLRAP_Final_ED.pdf.

this Complaint, showing flood events' projected intrusion into San Francisco as a result of global warming, demonstrate just how stark the threat is.

2. This egregious state of affairs is no accident. Rather, it is an unlawful public nuisance of the first order. Defendants are the five largest investor-owned fossil fuel corporations in the world as measured by their historic production of fossil fuels. The use of fossil fuels – oil, natural gas and coal – is the primary source of the greenhouse gas pollution that causes global warming, a point that scientists settled years ago.[5] Defendants have produced massive amounts of fossil fuels for many years. And recent disclosures of internal industry documents demonstrate that they have done so despite knowing – since at least the late 1970s and early 1980s if not earlier – that massive fossil fuel usage would cause dangerous global warming. It was at that time that scientists on their staffs or with whom they consulted through their trade association, the American Petroleum Institute ("API"), investigated the science and warned them in stark terms that fossil fuel usage would cause global warming at a rate unprecedented in the history of human civilization and present risks of "catastrophic" harm in coming decades.

3. Defendants took these stark warnings and proceeded to double-down on fossil fuels. Most of the carbon dioxide now in the atmosphere as a result of combustion of Defendants' fossil fuels is likely attributable to their recent production – *i.e.*, to fossil fuels produced by Defendants since 1980. Even today, with the global warming danger level at a critical phase, Defendants continue to engage in massive fossil fuel production and execute long-term business plans to continue and even expand their fossil fuel production for decades into the future.

4. The global warming-induced sea level rise from <u>past</u> fossil fuel usage is an irreversible condition on any relevant time scale: it will last hundreds or even thousands of years. Defendants' planned production of fossil fuels into the <u>future</u> will exacerbate global warming,

[5] *See, e.g.*, Carbon Dioxide and Climate: A Scientific Assessment, Report of an Ad Hoc Study Group on Carbon Dioxide and Climate to the Climate Research Board, Assembly of Mathematical and Physical Sciences, National Research Council (1979), at vii, 4-6, *available at* https://www.nap.edu/catalog/12181/carbon-dioxide-and-climate-a-scientific-assessment.

accelerate sea level rise even further, and require greater and more costly abatement actions to protect San Francisco.

5. Defendants, notably, did not simply produce fossil fuels. They engaged in large-scale, sophisticated advertising and public relations campaigns to promote pervasive fossil fuel usage and to portray fossil fuels as environmentally responsible and essential to human well-being – even as they knew that their fossil fuels would contribute, and subsequently were contributing, to dangerous global warming and associated accelerated sea level rise. These promotional efforts continue through today even in the face of overwhelming scientific evidence that fossil fuels are altering the climate and global warming has become an existential threat to modern life.

6. Defendants' promotion of fossil fuels has also entailed denying mainstream climate science or downplaying the risks of global warming. During the 1990s and early 2000s, Defendants stole a page from the Big Tobacco playbook and sponsored public relations campaigns, either directly or through the API or other groups, to deny and discredit the mainstream scientific consensus on global warming, downplay the risks of global warming, and even to launch unfounded attacks on the integrity of leading climate scientists. "Uncertainty" of the science became the constantly repeated mantra of this Big Oil PR campaign just as "Doubt is our product" was the Big Tobacco PR theme. Emphasizing "uncertainty" in climate science, directly or through the API, is still a focus of Defendants' efforts to promote their products even though Defendants are well aware that the fundamental scientific facts of global warming are not in dispute and are a cause of grave danger through sea level rise.

7. The purpose of all this promotion of fossil fuels and efforts to undermine mainstream climate science was, like all marketing, to increase sales and protect market share. It succeeded.

8. And now it will cost billions of dollars to build sea walls and other infrastructure to protect human safety and public and private property in San Francisco from global warming-induced sea level rise. A recent report by the California government has rung the alarm bell as loudly as possible: "Previously underappreciated glaciological processes, examined in the research of the last five years, have the potential to greatly increase the probability of extreme global sea-

level rise (6 feet or more) within this century" under business-as usual fossil fuel production and usage.[6] Translation: the planet's enormous ice caps on Greenland and Antarctica are beginning to melt, like their much smaller but more numerous cousins, the mountain glaciers, have been doing for many years, and slide into the ocean. This new dynamic is fundamentally increasing the risk of catastrophic sea level rise. The report projects a risk of as much as ten feet of additional sea level rise along San Francisco's coastline by 2100, which would be catastrophic.[7] Nearer-term risks include 0.3 to as much as 0.8 feet of additional sea level rise by 2030,[8] which itself will require the building of sea walls and other costly infrastructure given the dynamics of storm surge and regular high tide flooding.

9. This new information shows that the costs of dealing with global warming-induced sea level—already immense—will be staggering for the public entities that must protect their people and their coastlines. Even before the latest projections of accelerating sea-level rise, San Francisco has already taken action to adapt. In 2016, San Francisco adopted an action plan establishing a framework for assessing San Francisco's exposure to sea level rise and identifying actions the City must take to prevent sea level rise damage. The plan's vision is to make San Francisco a "more resilient city in the face of immediate and long-term threats of sea level rise, by taking measures to protect and enhance public and private assets, natural resources, and quality of life for all." The plan recommends that San Francisco conduct assessments to identify properties and infrastructure vulnerable to sea level rise, and develop and implement adaptation plans to protect them by raising infrastructure, building flood barriers and other infrastructure, and taking other measures. San Francisco is in the process of doing so for identified vulnerable areas such as Ocean Beach and the San Francisco Port. As set forth in the action plan, continuing Bayside sea level rise from global warming places at risk at least $10 billion dollars of public property within San Francisco and as much as $39 billion of private property. The magnitude of the actions needed

[6] Rising Seas in California at 16.

[7] *Id.* at 26.

[8] *Id.*

to abate harms from sea level rise, and the amount of property at risk, will increase in light of the rapidly accelerating sea level rise and the increased scientific understanding of sea level rise processes as set forth in the 2017 report.

10. Defendants are substantial contributors to the public nuisance of global warming that is causing injury to the People and thus are jointly and severally liable. Defendants' cumulative production of fossil fuels over many years places each of them among the top sources of global warming pollution in the world. Upon information and belief, Defendants are, respectively, the first (Chevron), second (Exxon), fourth (BP), sixth (Shell) and ninth (ConocoPhillips) largest cumulative producers of fossil fuels worldwide from the mid Nineteenth Century to present; most of Defendants' global warming pollution from the usage of their fuels has accumulated in the atmosphere since 1980. Defendants, moreover, are qualitatively different from other contributors to the harm given their in-house scientific resources, early knowledge of global warming, commercial promotions of fossil fuels as beneficent even in light of their knowledge to the contrary, and efforts to protect their fossil fuel market by downplaying the risks of global warming.

11. The People seek an order requiring Defendants to abate the global warming-induced sea level rise nuisance to which they have contributed by funding an abatement program to build sea walls and other infrastructure that is urgently needed to protect human safety and public and private property in San Francisco. The People do <u>not</u> seek to impose liability on Defendants for their direct emissions of greenhouse gases and do <u>not</u> seek to restrain Defendants from engaging in their business operations. This case is, fundamentally, about shifting the costs of abating sea level rise harm – one of global warming's gravest harms – back onto the companies. After all, it is Defendants who have profited and will continue to profit by knowingly contributing to global warming, thereby doing all they can to help create and maintain a profound public nuisance.

## II. JURISDICTION AND VENUE

12. Jurisdiction is proper in this Court because Defendants have contributed to the creation of a public nuisance in San Francisco, and the San Francisco City Attorney has the right and authority to seek abatement of that nuisance on behalf of the People of the State of California.

13. Venue is proper in this county in accordance with section 392(a)(1) of the Code of Civil Procedure because the People allege injuries to real property located in this county.

## III. PARTIES

### A. Plaintiff

14. Plaintiff, the People of the State of California, by and through the San Francisco City Attorney Dennis J. Herrera, brings this suit pursuant to Code of Civil Procedure section 731, and Civil Code sections 3479, 3480, 3491, and 3494, to abate the public nuisance caused by Defendants.

### B. Defendants

15. Defendant BP is a public limited company registered in England and Wales with its headquarters in London, England, doing business in California. BP was created in 1998 as a result of a merger between the Amoco Corporation ("Amoco"), a former U.S. corporation, and the British Petroleum Company p.l.c. BP is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas and fossil fuel products.

16. BP controls company-wide climate change policies and fossil fuel production.[9] BP, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. BP also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. BP's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

///

///

[9] BP Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 1, *available at* https://www.cdp.net/en/companies.

17. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant BP is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

18. Defendant Chevron is a Delaware Corporation with its principal place of business located in San Ramon, California. Chevron and its predecessors had their headquarters in San Francisco from 1879 to 2001. Chevron is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas and fossil fuel products.

19. Chevron controls company-wide climate change policies and fossil fuel production.[10] Chevron, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. Chevron also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. Chevron's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

20. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Chevron is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

21. Defendant ConocoPhillips is a Delaware Corporation with its principal place of business located in Houston, Texas, doing business in California. ConocoPhillips is a multinational oil and gas company that produces, markets, and sells oil and natural gas and for many years also refined and sold finished oil products.

///

///

[10] Chevron Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 2, *available at* https://www.cdp.net/en/companies.

22. ConocoPhillips controls company-wide climate change policies and fossil fuel production.[11] ConocoPhillips, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. ConocoPhillips also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. ConocoPhillips's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

23. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant ConocoPhillips is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

24. Defendant Exxon is a New Jersey corporation with its principal place of business located in Irving, Texas, doing business in the State of California. Exxon is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas and fossil fuel products and, as recently as 2009 produced, marketed and sold coal.

25. Exxon controls company-wide climate change policies and fossil fuel production.[12] Exxon, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. Exxon also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. Exxon's management, direction, conduct and/or control is exercised through a variety of means, including through its employees and/or agents'

[11] ConocoPhillips Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 2, *available at* https://www.cdp.net/en/companies.

[12] Exxon Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 1, *available at* https://www.cdp.net/en/companies.

implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

26. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Exxon is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

27. Defendant Shell is a public limited company registered in England and Wales with its headquarters in The Hague, Netherlands, doing business in California. Shell is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas and fossil fuel products.

28. Shell controls company-wide climate change policies and fossil fuel production.[13] Shell, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. Shell also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. Shell's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

29. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Shell is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

30. Defendants DOES ONE through TEN are sued herein under fictitious names. Plaintiff does not at this time know the true names or capacities of said defendants, but prays that the same may be alleged when ascertained.

///

[13] Shell Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 2, *available at* https://www.cdp.net/en/companies.

C. **Defendants' Connections To California.**

31. Defendants have contributed to the creation of a public nuisance – global warming-induced sea level rise – causing severe harms and threatening catastrophic harms in San Francisco.

32. Each Defendant, directly and through its subsidiaries, substantially participates in the process by which raw crude oil is extracted from the ground, refined into fossil fuel products and delivered, marketed, and sold to California residents for use.

33. BP, through its subsidiaries, owns and/or operates port facilities in California for receipt of crude oil. BP, through its subsidiaries, also produces oil in Alaska, and upon information and belief, BP, through its subsidiaries, transports some of this crude oil to California. In addition, BP operates 275 ARCO-licensed and-branded gasoline stations in California, including stations located in San Francisco. BP offers credit cards to consumers on its interactive website to promote sales of gasoline and other products at its branded gasoline stations. BP's web site maintains a page of "BP Amoco Stations Near Me" for California listing virtually every municipality in California and hundreds of such gas stations. BP promotes gasoline sales by offering, consumers, through its interactive web site, twenty-five cents off every gallon of BP-branded gasoline for every $100 spent on a BP Visa® Credit Card or BP Credit Card for the first ninety days a consumer's account is open.

34. Chevron, through its subsidiaries, produces oil in California, owns and/or operates port facilities in California for receipt of crude oil, owns and operates two refineries where crude oil is refined into finished fossil fuel products including gasoline, and owns and operates approximately nine gasoline terminals in California. A gasoline terminal consists of enormous aboveground storage tanks that hold gasoline for distribution to retail gasoline stations and consumers. Chevron owns and operates the Richmond gasoline refinery and related terminals in the San Francisco Bay Area. Chevron, through its subsidiaries, also produces oil in Alaska, and upon information and belief, some of this crude oil is supplied to California. There also are numerous Chevron-branded gasoline stations in California, including in San Francisco. Chevron offers credit cards to consumers through its interactive website, to promote sales of gasoline and other products at its branded gasoline stations. Chevron promotes gasoline sales by offering

consumers three cents per gallon in fuel credits "every fill-up, every time at Chevron and Texaco stations."

35. ConocoPhillips, through its subsidiaries, owns and/or operates port facilities in California for receipt of crude oil, and previously owned and operated a refinery based in both Rodeo and Arroyo Grande, California, from 2001 to 2012, where crude oil was refined into finished fossil fuel products including gasoline. ConocoPhillips, through its subsidiaries, also produces oil in Alaska, and transports some of this crude oil to California, including San Francisco.

36. Exxon, through its subsidiaries, produces oil in California, owns and/or operates port facilities in California for receipt of crude oil, and previously owned and operated a refinery in California until July 1, 2016, where crude oil was refined into finished fossil fuel products including gasoline. Exxon owned the Benicia gasoline refinery for 30 years until 2000. Exxon, through its subsidiaries, also produces oil in Alaska, and upon information and belief, Exxon, through its subsidiaries, transports some of this crude oil to California. There also are numerous Exxon-branded gasoline stations in California, including in San Francisco and the greater Bay Area. Exxon offers credit cards to consumers, through its interactive website, to promote sales of gasoline and other products at its branded gasoline stations. Exxon promotes gasolines sales by offering consumers twenty-five cents off every gallon of Synergy™ gasoline at Exxon™ or Mobil™ stations for the first two months and then six cents off every gallon of Synergy gasoline at Exxon- and Mobil-branded stations.

37. Shell, through its subsidiaries, owns and/or operates port facilities in California for receipt of crude oil, owns and operates a refinery in California where crude oil is refined into finished fossil fuel products including gasoline, transports crude oil through a pipeline within California, and owns and operates approximately six gasoline terminals in California. Since 1915, Shell has owned a gasoline refinery in Martinez, California, thirty miles northeast of San Francisco. There are numerous Shell-branded gasoline stations in California, including in San Francisco. Shell offers credit cards to consumers on its interactive website to promote sales of gasoline and other products at its branded gasoline stations. Shell promotes gasolines sales by

offering consumers, through its interactive web site, twenty-five cents off every gallon of Shell Fuel for the first two months after they open an account.

## IV. FOSSIL FUELS ARE THE PRIMARY CAUSE OF GLOBAL WARMING.

38. Production of fossil fuels for combustion causes global warming. When used as intended, fossil fuels release greenhouse gases, including carbon dioxide ($CO_2$) and methane, which trap atmospheric heat and increase global temperatures. Carbon dioxide is by far the most important greenhouse gas because of the combustion of massive amounts of fossil fuels.

39. Scientists have known for many years that the use of fossil fuels emits carbon dioxide and that carbon dioxide is a greenhouse gas. In 1896, Svante Arrhenius, a Nobel-prize winning scientist, published calculations projecting temperature increases that would be caused by increased carbon dioxide concentrations in the atmosphere due to the burning of fossil fuels.[14]

40. By 1957, scientists at the Scripps Institute published a warning in the peer-reviewed literature that global warming "may become significant during future decades if industrial fuel combustion continues to rise exponentially" and that "[h]uman beings are now carrying out a large scale geophysical experiment" on the entire planet.[15]

41. In 1960, scientist Charles D. Keeling published results establishing that atmospheric carbon dioxide concentrations were in fact rising.[16]

42. By 1979, the National Academy of Sciences, which is charged with providing independent, objective scientific advice to the United States government, concluded that there was "incontrovertible evidence" that carbon dioxide levels were increasing in the atmosphere as a result of fossil fuel use, and predicted that a doubling of atmospheric carbon dioxide would cause an

---

[14] Arrhenius, Svante (1896). "On the Influence of Carbonic Acid in the Air Upon the Temperature of the Ground." *Philosophical Magazine and Journal of Science* 41: 237-76, *available at* http://www.rsc.org/images/Arrhenius1896_tcm18-173546.pdf.

[15] Revelle, Roger, and Hans E. Suess (1957). "Carbon Dioxide Exchange between Atmosphere and Ocean and the Question of an Increase of Atmospheric $CO_2$ During the Past Decades." *Tellus* 9: 18-27, *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.2153-3490.1957.tb01849.x/epdf.

[16] Keeling, Charles D. (1960). "The Concentration and Isotopic Abundances of Carbon Dioxide in the Atmosphere." *Tellus* 12: 200-203, *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.2153-3490.1960.tb01300.x/epdf.

increase in global surface temperatures of between 1.5 °C and 4.5 °C [2.7 °F and 8.1 °F], with a probable increase of 3 °C [5.4 °F].[17]

43. In 1988, NASA scientist Dr. James E. Hansen testified to the U.S. Senate's Energy and Natural Resources Committee that "[t]he greenhouse effect has been detected, and it is changing our climate now."[18]

44. More recent research has confirmed and expanded on these earlier findings. In 1988, the United Nations established the Intergovernmental Panel on Climate Change ("IPCC") to assess the scientific and technical information relevant to global warming, and to provide advice to all parties to the U.N. Framework Convention on Climate Change, including the United States. The IPCC issues periodic assessment reports, which have become the standard scientific references on global warming. As Defendant Exxon has put it, the IPCC is "the leading international scientific authority on climate change."

45. In 1990, the IPCC issued its First Assessment Report ("FAR"). It stated that "we are certain" that "emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases," including carbon dioxide and methane, and that "these increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface."[19] The IPCC's FAR also predicted that a "Business-as-Usual" scenario (*i.e.*, a future in which fossil fuel production and associated emissions continue to increase) would cause global mean temperature during the next century to increase at a rate "greater than that seen over the past 10,000 years," and "will result in a likely increase in global mean temperature of about 1 °C [1.8 °F] above the present value by 2025 and 3 °C [5.4 °F] before

[17] *See* Carbon Dioxide and Climate: A Scientific Assessment, Report of an Ad Hoc Study Group on Carbon Dioxide and Climate to the Climate Research Board, Assembly of Mathematical and Physical Sciences, National Research Council (1979), at vii, 16, *available at* https://www.nap.edu/catalog/12181/carbon-dioxide-and-climate-a-scientific-assessment.

[18] https://www.scribd.com/doc/260149292/Transcript-of-pivotal-climate-change-hearing-1988.

[19] https://www.ipcc.ch/ipccreports/far/wg_I/ipcc_far_wg_I_spm.pdf, at Executive Summary xi.

the end of the next century" – higher than temperatures have been in the last 150,000 years.[20] The FAR also predicted that business-as-usual would result in substantial sea level rise by 2100.[21]

46. The FAR further stated "with confidence" that continued emissions of carbon dioxide "at present rates would commit us to increased concentrations for centuries ahead," and that immediate reductions were required to stabilize carbon dioxide concentrations.

47. In 1995, in its Second Assessment Report ("SAR"), the IPCC concluded that the "balance of evidence suggests a discernible human influence on global climate." This causal finding was profoundly important as confirmation that human-caused global warming had now been detected. By 2001, the IPCC strengthened its causal conclusion, stating that it was "likely" (an IPCC term of art meaning a 66% to 90% chance of being true) that temperature increases already observed were attributable to human activity.[22] The U.S. National Academy of Sciences reviewed this finding and concluded that it was accurate.[23]

48. The IPCC issued its most recent report, the Fifth Assessment, in 2013-14. It states that it is "extremely likely" (95 to 100 percent likely) that "human influence has been the dominant cause of the observed warming since the mid-20th century."[24]

49. The increase in atmospheric carbon dioxide caused by the combustion of fossil fuels has been clearly documented – and measured. Carbon dioxide from fossil fuels has a chemical fingerprint and is the culprit; natural sources of carbon dioxide were in balance prior to the use of fossil fuels and are not a cause of the global warming problem. Today, due primarily to the combustion of fossil fuels produced by Defendants and others, the atmospheric level of carbon dioxide is 410 ppm, higher than at any time during human civilization and likely higher than any

---

[20] *Id.* at Executive Summary xi and xxviii.

[21] *Id.* at Executive Summary xi.

[22] IPCC, Third Assessment Report, Working Group I, Summary for Policymakers at 10, *available at* https://www.ipcc.ch/ipccreports/tar/wg1/pdf/WG1_TAR-FRONT.PDF.

[23] National Academy of Sciences, Commission on Geosciences, Environment and Resources, Climate Change Science: An Analysis of Some Key Questions, summary at 1 (2001), *available at* https://download.nap.edu/cart/download.cgi?record_id=10139.

[24] IPCC, Climate Change 2013, The Physical Science Basis, Summary for Policymakers at 17, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.

level in millions of years.[25] The result has been dramatic planetary warming: sixteen of earth's seventeen warmest years in the 136-year period of global temperature measurements have occurred since 2001, and 2016 was the warmest year on record.[26] As of July 2017, there were 391 months in a row that were warmer than the 20th century average.[27] The years 2014, 2015, and 2016 were the three hottest years ever recorded in California since modern temperature records were first taken in 1895.[28] California has warmed over 2 °F since 1895.[29]

50. Scientists typically use "double $CO_2$," or twice the pre-industrial level of atmospheric carbon dioxide concentration, as a standard reference for considering the warming impact of increased greenhouse gases. Double $CO_2$ is 550 ppm. According to the IPCC, double $CO_2$ will cause the global average surface air temperature to increase by 1.5 to 4.5 °C [2.7 to 8.1 °F] over the pre-industrial level, a rate of warming that is unprecedented in the history of human civilization. By comparison, at the depths of the last ice age, 20,000 years ago, the global average temperature of the Earth was only seven to eleven degrees Fahrenheit cooler than today. Globally, approximately 1 °C [1.8 °F] of the temperature rise already has occurred, due primarily to carbon dioxide and methane emissions from the combustion and use of fossil fuels.

51. Ongoing and future warming caused by past and ongoing use of massive quantities of fossil fuels will cause increasingly severe harm to San Francisco through accelerating sea level rise. In 2013, the IPCC projected that between 2081 and 2100, the global average surface temperature will have increased by 4.7 °F to 8.6 °F under business-as-usual, *i.e.*, with continued

---

[25] Brian Kahn, We Just Breached the 410 PPM Threshold for $CO_2$, Scientific American (Apr. 21, 2017), *available at* https://www.scientificamerican.com/article/we-just-breached-the-410-ppm-threshold-for-co2/.

[26] Rising Seas in California at 14.

[27] NOAA, Global Climate Report, July 2017, *available at* https://www.ncdc.noaa.gov/sotc/global/201707.

[28] NOAA, National Centers for Environmental Information, *available at* https://www.ncdc.noaa.gov/temp-and-precip/climatological-rankings/index.php?periods%5B%5D=12&parameter=tavg&state=4&div=0&month=12&year=2016#ranks-form.

[29] NOAA, National Climatic Data Center, *available at* https://www.ncdc.noaa.gov/temp-and-precip/state-temps/; *see also* https://www.nytimes.com/2015/08/21/science/climate-change-intensifies-california-drought-scientists-say.html?mcubz=0.

massive levels of fossil fuel production. Global warming causes sea level rise by melting glaciers and sea ice, and by causing seawater to expand.[30] This acceleration of sea level rise is unprecedented in the history of human civilization. Since 1990, the rate of sea level rise has more than doubled and it continues to accelerate. The rate of ice loss from the Greenland and Antarctic Ice Sheets is increasing, and these ice sheets soon will become the primary contributor to global sea level rise. With production of fossil fuels continuing on its business-as-usual trajectory, the resulting warming presents a risk of "rapidly accelerating and effectively irreversible ice loss." The melting of even a portion of the West Antarctic Ice Sheet, the "most vulnerable major ice sheet in a warming global climate," will cause especially severe impacts in California. Rapid ice sheet loss on Antarctica due to global warming risks a sea level rise in California of ten feet by 2100.[31] This would be catastrophic for San Francisco.

52. The Earth's climate can undergo an abrupt and dramatic change when a radiative forcing agent, such as carbon dioxide, causes the climate system to reach a tipping point. Defendants' massive production of fossil fuels increases the risk of reaching that tipping point, triggering a sudden and potentially catastrophic change in climate. The rapidity of an abrupt climate shift would magnify all the adverse effects of global warming. Crossing a tipping point threshold also could lead to rapid disintegration of ice sheets on Greenland and/or Antarctica, resulting in large and rapid increases in sea level rise.

## V. DEFENDANTS HAVE PRODUCED MASSIVE QUANTITIES OF FOSSIL FUELS AND HAVE CONTINUED TO DO SO EVEN AS GLOBAL WARMING HAS BECOME GRAVELY DANGEROUS.

53. For many years, Defendants have produced massive quantities of fossil fuels that, when combusted, emit carbon dioxide, the most important greenhouse gas. Additionally, one of Defendants' primary fossil fuel products, natural gas, is composed of methane, which is the second most important greenhouse gas and which, as Defendants know, routinely escapes into the atmosphere from facilities operated by Defendants' customers and also consumers. The

---

[30] IPCC, Climate Change 2013, The Physical Science Basis, Summary for Policymakers at 11, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.

[31] Rising Seas in California at 3-4, 13.

greenhouse gases from the usage of defendants' fossil fuels remain in the atmosphere for long periods of time: a substantial portion of carbon dioxide emissions remains in the atmosphere for over 1,000 years after they are emitted.[32] As noted above, Defendants have produced such vast quantities of fossil fuels that they are five of the ten largest producers in all of history, with most of the carbon dioxide that has built up in the atmosphere from the use of their products dating from 1980 or later. The cumulative greenhouse gases in the atmosphere attributable to each Defendant has increased the global temperature and contributed to sea level rise, including in San Francisco.

54. Once Defendants produce fossil fuels by, for example, extracting oil from the ground, those fossil fuels are used exactly as intended and emit carbon dioxide.

55. Despite their internal warnings, an overwhelming scientific consensus on the unfolding imminent catastrophe, and actual gravely dangerous impacts from global warming, Defendants to this day maintain high levels of fossil fuel production. This production will intensify future warming and San Francisco's injuries from sea level rise.

56. Defendants' conduct will continue to cause ongoing and increasingly severe sea level rise harms to San Francisco because Defendants are committed to a business model of massive fossil fuel production that they know causes a gravely dangerous rate of global warming. The following graph from a 2015 study published in the peer-reviewed scientific literature demonstrates the grave indifference Defendants BP, Shell, and Exxon have for human safety and welfare.

///

///

///

///

///

///

[32] IPCC, Climate Change 2013, The Physical Science Basis, Summary for Policymakers at 28, https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.




The graph compares BP, Exxon and Shell's projections of worldwide total future emissions[33] – projections upon which they make long-term business plans – to the IEA ("International Energy Agency") 450 emissions trajectory necessary to prevent global warming from exceeding a 2 °C increase over the pre-industrial temperature.[34] The 2 °C level of global warming is widely considered to be a red line of highly dangerous global warming. Upon information and belief, all Defendants base their long-term business plans upon similar projections.

## VI. DEFENDANTS HAVE PRODUCED MASSIVE AMOUNTS OF FOSSIL FUELS DESPITE HAVING FULL KNOWLEDGE FROM THEIR IN-HOUSE SCIENTIFIC STAFF, OR FROM THE API, THAT FOSSIL FUELS WOULD CAUSE GLOBAL WARMING.

57. For decades, Defendants have known that their fossil fuel products pose risks of "severe" and even "catastrophic" impacts on the global climate through the work and warnings of their own scientists or through their trade association. Yet each Defendant decided to continue its conduct and commit itself to massive fossil fuel production. This was a deliberate decision to

---

[33] In gigatons of carbon per year.

[34] Frumhoff, et al., The climate responsibilities of industrial carbon producers, Climatic Change, at 167 (2015), *available at* https://link.springer.com/article/10.1007/s10584-015-1472-5,

place company profits ahead of human safety and well-being and property, and to foist onto the public the costs of abating and adapting to the public nuisance of global warming.

58. The American Petroleum Institute ("API") is a national trade association that represents the interests of America's oil and natural gas industry. At all relevant times, Defendants, their corporate predecessors and/or their operating subsidiaries over which they exercise substantial control, have been members of the API. On information and belief, the API has acted as Defendants' agent with respect to global warming, received funding from Defendants for the API's global warming initiatives, and shared with Defendants the information on global warming described herein.

59. Beginning in the 1950s, the API repeatedly warned its members that fossil fuels posed a grave threat to the global climate. These warnings have included, for example, an admission in 1968 in an API report predicting that carbon dioxide emissions were "almost certain" to produce "significant" temperature increases by 2000, and that these emissions were almost certainly attributable to fossil fuels. The report warned of "major changes in the earth's environment" and a "rise in sea levels," and concluded: "there seems to be no doubt that the potential damage to our environment could be severe."[35] Similar warnings followed in the ensuing decades, including reports commissioned by the API in the 1980s that there was "scientific consensus" that catastrophic climate change would ensue unless API members changed their business models, and predictions that sea levels would rise considerably, with grave consequences, if atmospheric concentrations of $CO_2$ continued to increase.

60. The API's warnings to Defendants included:

a) In 1951, the API launched a project to research air pollution from petroleum products, and attributed atmospheric carbon to fossil fuel sources.[36] By 1968, the API's scientific

[35] E. Robinson & R.C. Robbins, Final Report, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, SRI Project PR-6755, prepared for American Petroleum Institute, at 109-110, *available at* https://www.smokeandfumes.org/#/documents/document16.

[36] Charles A. Jones (1958) A Review of the Air Pollution Research Program of the Smoke and Fumes Committee of the American Petroleum Institute, Journal of the Air Pollution Control Association, 8:3, 268-272, DOI: 10.1080/00966665.1958.10467854, *available at* https://www.smokeandfumes.org/#/documents/document9.

consultant reported to the API that carbon dioxide emissions were "almost certain" to produce "significant" temperature increases by 2000, and that these emissions were almost certainly attributable to fossil fuels. The report warned of "major changes in the earth's environment" and a "rise in sea levels," and concluded: "there seems to be no doubt that the potential damage to our environment could be severe."[37]

b) In 1980, an API task force on climate change invited Dr. J.A. Laurman, a "recognized expert in the field of $CO_2$ and climate," to make a presentation to the API $CO_2$ and Climate Task Force. Attendees to the presentation included scientists and executives from Texaco (a predecessor to Chevron), Exxon, and SOHIO (a predecessor to BP). Dr. Laurman informed the API task force that there was a "Scientific Consensus on the Potential for Large Future Climatic Response to Increased $CO_2$ Levels." He further informed the API task force in his presentation that, though the exact temperature increases were difficult to predict, the "physical facts agree on the probability of large effects 50 years away." His own temperature forecast was of a 2.5 °C [4.5 °F] rise by 2038, which would likely have "MAJOR ECONOMIC CONSEQUENCES," and a 5 °C [9 °F] rise by 2067, which would likely produce "GLOBALLY CATASTROPHIC EFFECTS." He also suggested that, despite uncertainty, "THERE IS NO LEEWAY" in the time for acting. API minutes show that the task force discussed topics including "the technical implications of energy source changeover," "ground rules for energy release of fuels and the cleanup of fuels as they relate to $CO_2$ creation," and researching "the Market Penetration Requirements of Introducing a New Energy Source into World Wide Use."[38]

(c) In March 1982, an API-commissioned report showed the average increase in global temperature from a doubling of atmospheric concentrations of $CO_2$ and projected, based upon computer modeling, global warming of between 2 °C and 3.5 °C [3.6 °F to 6.3 °F]. The report

---

[37] E. Robinson & R.C. Robbins, Final Report, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, SRI Project PR-6755, prepared for American Petroleum Institute, at 109-110, *available at* https://www.smokeandfumes.org/#/documents/document16.

[38] $CO_2$ and Climate Task Force, Minutes of Meeting, at 1-2 & Attachment B, *available at* http://insideclimatenews.org/sites/default/files/documents/AQ-9%20Task%20Force%20Meeting%20%281980%29.pdf.

projected potentially "serious consequences for man's comfort and survival," and noted that "the height of the sea level can increase considerably."[39]

61. In addition to the API information, some of the Defendants produced their own internal analyses of global warming. For example, newly disclosed documents demonstrate that Exxon internally acknowledged in the late 1970s and early 1980s that its products posed a "catastrophic" threat to the global climate, and that fossil fuel use would have to be strictly limited to avoid severe harm.

a) Exxon management was informed by its scientists in 1977 that there was an "overwhelming[]" consensus that fossil fuels were responsible for atmospheric carbon dioxide increases. The presentation summarized a warning from a recent international scientific conference that "IT IS PREMATURE TO LIMIT USE OF FOSSIL FUELS BUT THEY SHOULD NOT BE ENCOURAGED." The scientist warned management in a summary of his talk: "Present thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might become critical."[40]

b) In a 1979 Exxon internal memo, an Exxon scientist calculated that 80% of fossil fuel reserves would need to remain in the ground and unburned to avoid greater than a doubling of atmospheric carbon dioxide.[41]

c) In a 1981 internal Exxon memo, a scientist and director at the Exxon Research and Engineering Company warned that "it is distinctly possible" that $CO_2$ emissions "will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)."[42]

---

[39] http://insideclimatenews.org/sites/default/files/documents/API%201982%20Climate%20models%20and%20CO2%20warming.pdf at 5.

[40] https://insideclimatenews.org/system/files_force/documents/James%20Black%201977%20Presentation.pdf?download=1 at 2.

[41] http://insideclimatenews.org/sites/default/files/documents/CO2%20and%20Fuel%20Use%20Projections.pdf at 5.

[42] http://insideclimatenews.org/sites/default/files/documents/%2522Catastrophic%2522%20Effects%20Letter%20%281981%29.pdf.

d) A year later, the same scientist wrote another memo to Exxon headquarters, which reported on a "clear scientific consensus" that "a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of (3.0 ± 1.5) °C [2.7 °F to 8.1 °F]."[43] The clear scientific consensus was based upon computer modeling, which Exxon would later attack as unreliable and uncertain in an effort to undermine public confidence in climate science.[44] The memo continued: "There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere."

e) In November 1982, an Exxon internal report to management warned that "substantial climatic changes" could occur if the average global temperature rose "at least 1 °C [1.8 °F] above [1982] levels," and that "[m]itigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion." The report then warns Exxon management that "there are some potentially catastrophic events that must be considered," including the risk that "if the Antarctic ice sheet which is anchored on land should melt, then this could cause a rise in sea level on the order of 5 meters." The report includes a graph demonstrating the expected future global warming from the "$CO_2$ effect" demonstrating a sharp departure from the "[r]ange of natural fluctuations." This graph is attached hereto as Exhibit 3.[45]

f) By 1983, Exxon had created its own climate models, which confirmed the main conclusions from the earlier memos. Starting by at least the mid-1980s, Exxon used its own climate models and governmental ones to gauge the impact that climate change would have on its own business operations and subsequently took actions to protect its own business assets based upon these modeling results.[46]

---

[43] Cohen memo to Natkin at 1 (Sept. 2, 1982), *available at* http://insideclimatenews.org/documents/consensus-co2-impacts-1982.

[44] *See infra* ¶ 76.

[45] M. B. Glaser, Memo to R.W. Cohen et al. on "$CO_2$ Greenhouse Effect," Nov. 12, 1982, at 2, 12-13, 28, *available at* http://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf.

[46] http://graphics.latimes.com/exxon-arctic/.

62. Exxon's early research and understanding of the global warming impacts of its business was not unique among Defendants. For example, at least as far back as 1970, Defendants Shell and BP began funding scientific research in England to examine the possible future climate changes from greenhouse gas emissions.[47] Shell produced a film on global warming in 1991, in which it admitted that there had been a "marked increase [in global temperatures] in the 1980s" and that the increase "does accord with computer models based on the known atmospheric processes and predicted buildup of greenhouse gases."[48] It acknowledged a "serious warning" that had been "endorsed by a uniquely broad consensus of scientists" in 1990. In the film, Shell further admits that by 2050 continued emissions of greenhouse gases at high levels would cause a global average temperature increase of 1.5 to 4 °C [2.7 to 7.2 °F]; that one meter of sea level rise was likely in the next century; that "this could be disastrous;" and that there is a "possibility of change faster than at any time since the end of the ice age, change too fast, perhaps, for life to adapt without severe dislocation."

## VII. DESPITE THEIR EARLY KNOWLEDGE THAT GLOBAL WARMING WAS REAL AND POSED GRAVE THREATS, DEFENDANTS PROMOTED FOSSIL FUELS FOR PERVASIVE USE WHILE DOWNPLAYING THE REALITY AND RISKS OF GLOBAL WARMING.

63. Defendants have extensively promoted fossil fuel use in massive quantities through affirmative advertising for fossil fuels and downplaying global warming risks. First, Defendants promoted massive use of fossil fuels by misleading the public about global warming by emphasizing the uncertainties of climate science and through the use of paid denialist groups and individuals – a striking resemblance to Big Tobacco's propaganda campaign to deceive the public about the adverse health effects of smoking. Defendants' campaign inevitably encouraged fossil fuel consumption at levels that were (as Defendants knew) certain to severely harm the public. Second, Defendants' fossil fuel promotions through frequent advertising for their fossil fuel products, including promotions claiming that consumption at current and even expanded levels is

[47] Sir Solly Zuckerman, Chief Scientist, Letter to Vice Chancellor, University of Bath, 9th May 1970, PRO ref CAB 163/272 #122885, "Long-term climate changes and their effects."

[48] https://www.youtube.com/watch?v=0VOWi8oVXmo.

"responsible" or even "respectful" of the environment, have encouraged continued fossil fuel consumption at massive levels that Defendants knew would harm the public.[49]

### A. Defendants Borrowed The Big Tobacco Playbook In Order To Promote Their Products.

64. Notwithstanding Defendants' early knowledge of climate change, Defendants have engaged in advertising and public relations campaigns intended to promote their fossil fuel products by downplaying the harms and risks of global warming. Initially, the campaign tried to show that global warming was not occurring. More recently, the campaign has sought to minimize the risks and harms from global warming. The campaign's purpose and effect has been to help Defendants continue to produce fossil fuels and sell their products on a massive scale. This campaign was executed in large part by front groups funded by Defendants, either directly or through the API, and through statements made by Defendants directly.

65. One front group was the Global Climate Coalition ("GCC"). The GCC operated between 1989 and 2002. Its members included the API, and predecessors or subsidiaries of Defendants. William O'Keefe, former president of the GCC, was also a former executive of the API.[50]

66. The GCC spent millions of dollars on campaigns to discredit climate science, including $13 million on one ad campaign alone. The GCC distributed a video to hundreds of journalists, which claimed that carbon dioxide emissions would increase crop production and feed the hungry people of the world.[51]

67. However, internal GCC documents admitted that their "contrarian" climate theories were unfounded. In December 1995, the GCC's Science and Technology Advisory Committee

---

[49] ConocoPhillips, the changing energy landscape, *available at* http://www.conocophillips.com/who-we-are/our-company/spirit-values/responsibility/Pages/the-changing-energy-landscape.aspx; Chevron TV ad (2009), https://www.youtube.com/watch?v=-KyjTGMVTkA.

[50] Jeff Nesmith, *Industry Promotes Skeptical View of Global Warming*, Cox News Service, May 28, 2003, *available at* http://www.heatisonline.org/contentserver/objecthandlers/index.cfm?ID=4450&Method=Full.

[51] http://www.sourcewatch.org/index.php/Global_Climate_Coalition.

("GCC-STAC"), whose members included employees of Mobil Oil Corporation (an Exxon predecessor) and the API, drafted a primer on the science of global warming for GCC members. The primer concluded that the GCC's contrarian theories "do not offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change." Due to this inconvenient conclusion, at its next meeting, in January 1996, the GCC-STAC decided simply to drop this seven-page section of the report. Nonetheless, for years afterward, the GCC and its members continued to tout their contrarian theories about global warming, even though the GCC had admitted internally these arguments were invalid.

68. In February 1996, an internal GCC presentation stated that a doubling of carbon dioxide levels over pre-industrial concentrations would occur by 2100 and cause "an average rate of warming [that] would probably be greater than any seen in the past 10,000 years." The presentation noted "potentially irreversible" impacts that could include "significant loss of life."

69. Certain Defendants also funded another front group in the 1990s, the Global Climate Science Communications Team ("GCSCT"). GCSCT members included Exxon, Chevron, and the API.[52] A 1998 GCSCT task force memo outlined an explicit strategy to invest millions of dollars to manufacture uncertainty on the issue of global warming, directly emulating a similar disinformation campaign by the tobacco industry. The memo stated: "*Victory Will Be Achieved When*," among other things, "*Average citizens 'understand' (recognize) uncertainties in climate science*," public "*recognition of uncertainty becomes part of the 'conventional wisdom.'*" and the "*Media 'understands' (recognizes) uncertainties in climate science.*"[53] The plan stated that progress would be measured by the percentage of new articles that raise questions about climate change.

70. Over at least the last nineteen years, Exxon in particular has paid researchers and front groups to create uncertainties about basic climate change science and used denialist groups to

[52] https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

[53] Global Climate Science Communications: Action Plan, Apr. 3, 1998, *available at* https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

attack well-respected scientists. These were calculated business decisions by Exxon to undermine climate change science and bolster production of fossil fuels.[54]

71. Between 1998 and 2014, Exxon paid millions of dollars to organizations to promote disinformation on global warming. During the early- to mid-1990s, Exxon directed some of this funding to Dr. Fred Seitz, Dr. Fred Singer, and/or Seitz and Singer's Science and Environmental Policy Project ("SEPP") in order to launch repeated attacks on mainstream climate science and IPCC conclusions, even as Exxon scientists participated in the IPCC.[55] Seitz, Singer, and SEPP had previously been paid by the tobacco industry to create doubt in the public mind about the hazards of smoking.[56] Seitz and Singer were not climate scientists.

72. Exxon's promotion of fossil fuels also entailed the funding of denialist groups that attacked well-respected scientists Dr. Benjamin Santer and Dr. Michael Mann, maligning their characters and seeking to discredit their scientific conclusions with media attacks and bogus studies in order to undermine the IPCC's 1995 and 2001 conclusion that human-driven global warming is now occurring.

73. One of Defendants' most frequently used denialists has been an aerospace engineer named Wei Hock Soon. Between 2001 and 2012, various fossil fuel interests, including Exxon and the API, paid Soon over $1.2 million.[57] Soon was the lead author of a 2003 article, which argued that the climate had not changed significantly. The article was widely promoted by other denial

---

[54] http://insideclimatenews.org/news/15092015/Exxons-own-research-confirmed-fossil-fuels-role-in-global-warming; Jeffrey Ball, Exxon Chief Makes A Cold Calculation on Global Warming, The Wall Street Journal, June 14, 2005, *available at* https://www.wsj.com/articles/SB111870440192558569.

[55] Union of Concerned Scientists, *Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science*, Jan. 2007, *available at* http://www.ucsusa.org/assets/documents/global_warming/exxon_report.pdf; http://www.exxonsecrets.org/html/orgfactsheet.php?id=65.

[56] http://www.sourcewatch.org/index.php/S._Fred_Singer; http://www.sourcewatch.org/index.php/Frederick_Seitz.

[57] Justin Gillis & John Schwartz, Deeper Ties to Corporate Cash for Doubtful Climate Researcher, *New York Times* (Feb. 21, 2015), *available at* https://www.nytimes.com/2015/02/22/us/ties-to-corporate-cash-for-climate-change-researcher-Wei-Hock-Soon.html?mcubz=1.

groups funded by Exxon, including via "Tech Central Station," a website supported by Exxon.[58] Soon published other bogus "research" in 2009, attributing global warming to solar activity, for which Exxon paid him $76,106.[59] This 2009 grant was made several years after Exxon had publicly committed not to fund global warming deniers.[60]

74. Until recently, the API's website referred to global warming as "possible man-made warming" and claimed that the human contribution is "uncertain." The API removed this statement from its web site in 2016 when journalistic investigations called attention to the API's misleading statements on global warming and its 1970s/1980s task force on global warming.

75. In 2000, Exxon took out an advertisement on the Op-Ed page of the *New York Times* entitled "Unsettled Science." The advertisement claimed that "scientists remain unable to confirm" the proposition that "humans are causing global warming."[61] This was six years after the IPCC had confirmed the causal link between planetary warming and anthropogenic greenhouse gas emissions – a historic moment in climate science – and some 18 years after Exxon itself had admitted in a 1982 internal memoranda to corporate headquarters that there was "a clear scientific consensus" that greenhouse gas emissions would cause temperatures to rise.

76. On May 27, 2015, at Exxon's annual shareholder meeting, then-CEO Rex Tillerson misleadingly downplayed global warming's risks by stating that climate models used to predict future impacts were unreliable: "What if everything we do it turns out our models were really lousy and we achieved all of our objectives and it turned out the planet behaved differently because the models just weren't good enough to predict it?" But as noted above, in 1982 Exxon's scientific staff stated, based upon the climate models, that there was a "clear scientific consensus" with respect to the level of projected future global warming and starting shortly thereafter Exxon relied

[58] Smoke, Mirrors & Hot Air at 13-14.

[59] https://www.documentcloud.org/documents/682765-willie-soon-foia-grants-chart-02-08-2011.html.

[60] http://www.socialfunds.com/shared/reports/1211896380_ExxonMobil_2007_Corporate_Citizenship_Report.pdf.

[61] https://assets.documentcloud.org/documents/705605/xom-nyt-2000-3-23-unsettledscience.pdf.

upon the projections of climate models, including its own climate models, in order to protect its own business assets.

77. Until recently, Exxon's website continued to emphasize the "uncertainty" of global warming science and impacts: "current scientific understanding provides limited guidance on the likelihood, magnitude, or time frame" of events like temperature extremes and sea level rise.[62] Exxon's insistence on crystal-ball certainty was clear misdirection, since Exxon knew that the fundamentals of climate science were well settled and showed global warming to present a clear and present danger.[63]

**B. Defendants' Direct Promotion Of Fossil Fuels.**

78. Defendants continue to promote massive fossil fuel use by the public notwithstanding that global warming is happening, that global warming is primarily caused by their fossil fuels, and that global warming is causing severe injuries. Defendants promote the massive use of fossil fuels through advertisements lauding fossil fuels as "responsible" and "respectful" to the environment, identifying fossil fuels as the only way to sustain modern standards of living, and promoting sales of their fossil fuels without qualification. Defendants and/or their U.S. subsidiaries are members of the API. The API also promotes the benefits of fossil fuel products on behalf of Defendants and its other members.[64] Defendants' message to consumers is that fossil fuels may continue to be burned in massive quantities without risking significant injuries.

79. Defendants bombard the public and consumers with the following advertisements, although these are a mere sliver of Defendants' extensive campaigns. Defendants' advertisements must be understood in their proper context – as following Defendants' substantial early knowledge

---

[62] Formerly found at http://corporate.exxonmobil.com/en/current-issues/climate-policy/meeting-global-needs/managing-climate-change-business-risks.

[63] *See* IPCC, Climate Change 2014, Impacts, Adaptation, and Vulnerability, Summary for Policymakers, *available at* http://www.ipcc.ch/pdf/assessment-report/ar5/wg2/ar5_wgII_spm_en.pdf.

[64] API, Consumer Information, *available at* http://www.api.org/oil-and-natural-gas/consumer-information.

on global warming risks and impacts, and following a decades-long campaign of misleading statements on global warming that primed the pump for massive use of their fossil fuel products.

a) Exxon's "Lights Across America" website advertisement states that natural gas is "helping dramatically reduce America's emissions"[65] even though natural gas is a fossil fuel causing widespread planetary warming and harm to coastal cities like San Francisco and the use of natural gas competes with wind and solar, which have no greenhouse gas emissions.

b) In 2017, Shell's CEO promoted massive fossil fuel use by stating that the fossil fuel industry could play a "crucial role" in lifting people out of poverty.[66] A Shell website promotion states: "We are helping to meet the world's growing energy demand while limiting $CO_2$ emissions, by delivering more cleaner-burning natural gas."[67]

c) BP touts natural gas on its website as "a vital lower carbon energy source" and as playing a "crucial role" in a transition to a lower carbon future.[68] BP promotes continued massive fossil fuel use as enabling two billion people to be lifted out of poverty.[69]

d) Chevron's website implores the public that "we produce safe, reliable energy products for people around the world."[70] Chevron also promotes massive use of fossil fuels as the key to lifting people out of poverty: "Reliable and affordable energy is necessary for improving standards of living, expanding the middle class and lifting people out of poverty. Oil and natural gas will continue to fulfill a significant portion of global energy demand for decades to come –

[65] https://www.youtube.com/watch?v=tMu1CBjXfq4&list=PLIrXlHj7zayYGaExfTp_B4t6gqTtkGf9A&index=6 (at 0:46).

[66] Shell CEO speech, Mar. 9, 2017, *available at* http://www.shell.com/media/speeches-and-articles/2017/deliver-today-prepare-for-tomorrow.html.

[67] Shell United States, Transforming Natural Gas, *available at* http://www.shell.us/energy-and-innovation/transforming-natural-gas.html.

[68] https://www.bp.com/content/dam/bp/en/corporate/pdf/sustainability-report/group-reports/bp-sustainability-report-2016.pdf; http://www.bp.com/energytransition/shifting-towards-gas.html.

[69] BP energy outlook, *available at* http://www.bp.com/en/global/corporate/energy-economics/energy-outlook.html.

[70] Chevron, Products and Services, *available at* https://www.chevron.com/operations/products-services.

even in a carbon-constrained scenario."[71] A prior Chevron advertisement still available on the web promotes Chevron fossil fuels on a massive scale by stating that "our lives demand oil."[72]

e) ConocoPhillips promotes its fossil fuel products by stating that it "responsibly suppl[ies] the energy that powers modern life."[73] Similarly, ConocoPhillips has the following advertising slogan on its website: "Providing energy to improve quality of life."[74]

80. Contrary to Defendants' claims that the use of massive amounts of fossil fuels is required to lift people out of poverty, the IPCC has concluded: "Climate change will exacerbate multidimensional poverty in most developing countries . . . . [and] will also create new poverty pockets in countries with increasing inequality, in both developed and developing countries."[75]

81. Defendants BP and Exxon have also used long-term energy forecasts and similar reports to promote their products under the guise of expert, objective analysis. These forecasts have repeatedly sought to justify heavy reliance on fossil fuels by overstating the cost of renewable energy.

82. Defendants' energy forecasts are aimed in substantial part at consumers and are promoted to the public through their respective websites and other direct media. Exxon continues to promote its annual "Outlook for Energy" reports in videos currently available on the internet. But Exxon's energy "analyses" are self-serving means of promoting fossil fuels and undercutting non-dangerous renewable energy and clean technologies. For example, Exxon has claimed in a recent forecast that natural gas is a cheaper way to reduce carbon dioxide emissions than wind or solar power while BP has claimed that solar and wind power will be more expensive in 2050 than

[71] Chevron, managing climate change risks, *available at* https://www.chevron.com/corporate-responsibility/climate-change/managing-climate-risk.

[72] Chevron TV ad (2009), *available at* https://www.youtube.com/watch?v=-KyjTGMVTkA.

[73] ConocoPhillips, the changing energy landscape, *available at* http://www.conocophillips.com/who-we-are/our-company/spirit-values/responsibility/Pages/the-changing-energy-landscape.aspx.

[74] ConocoPhillips, Producing energy, *available at* http://www.conocophillips.com/what-we-do/producing-energy/Pages/default.aspx.

[75] IPCC, Climate Change 2014: Impacts, Adaptation, and Vulnerability, at 797, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg2/WGIIAR5-Chap13_FINAL.pdf.

natural gas or coal even though wind and solar are already cheaper than natural gas or coal in some circumstances.[76] Exxon and BP also have understated in recent "forecasts" the expected market share of electric vehicles even as electric vehicle technology has taken off, prices have dropped and GM announced (in 2015) that it was investing billions in electric cars because the "future is electric."[77]

83. Defendants' reports also promote their fossil fuel products by warning consumers of supposed downsides to reducing fossil fuel use and carbon dioxide emissions. For example, Exxon's most recent report claims that the costs of carbon dioxide reductions are "ultimately borne by consumers and taxpayers."

84. These reports by BP and Exxon, and a similar one by Shell, predict massive increases in fossil fuel use over roughly the next 15 years.[78] This is part of a larger strategy of "mak[ing] the case for the necessary role of fossil fuels," as BP's chief executive stated in a moment of candor in 2015.[79]

## VIII. SAN FRANCISCO WILL INCUR SERIOUS CLIMATE CHANGE INJURIES THAT WILL REQUIRE BILLIONS IN EXPENDITURES TO ABATE THE GLOBAL WARMING NUISANCE.

85. According to a 2012 California governmental report, by 2050, California is projected to warm by approximately 2.7° F above the average temperature in 2000, regardless of

---

[76] http://cdn.exxonmobil.com/~/media/global/files/outlook-for-energy/2017/2017-outlook-for-energy.pdf, at 31; http://www.bp.com/content/dam/bp/pdf/technology/bp-technology-outlook.pdf, at 18.

[77] http://cdn.exxonmobil.com/~/media/global/files/outlook-for-energy/2017/2017-outlook-for-energy.pdf, at 18; https://www.bp.com/content/dam/bp/pdf/energy-economics/energy-outlook-2017/bp-energy-outlook-2017.pdf, at 47; General Motors, Press Release, *GM Employees on Mission to Transform Transportation* (May 7, 2015), *available at* http://media.gm.com/media/us/en/gm/company_info/facilities/assembly/orion.detail.html/content/Pages/news/us/en/2015/may/0507-sustainability-report.html.

[78] http://www.shell.com/energy-and-innovation/the-energy-future/scenarios/new-lenses-on-the future/_jcr_content/par/relatedtopics.stream/1448477051486/08032d761ef7d81a4d3b1b6df8620c1e9a64e564a9548e1f2db02e575b00b765/scenarios-newdoc-english.pdf.

[79] http://www.bp.com/en/global/corporate/media/speeches/2015-annual-general-meeting-group-chief-executive.html.

the level of future emissions, a rate of warming three times greater than over the last century.[80] By 2100, California's average temperatures could increase by 8.6 °F, if not more.[81] San Francisco's average annual temperatures are currently projected to increase by up to 5.5 °F by 2100.[82] San Francisco's average summertime high temperature (based upon 1986-2005 data) is projected to increase from 68.61 °F to 76.17 °F by 2100, making San Francisco's summers similar to those now experienced in Rancho Palos Verdes, California, approximately 400 miles south of San Francisco.[83] Continued production of massive amounts of fossil fuels will exacerbate global warming, increase sea level rise and result in grave harm to San Francisco.

86. Global warming has caused and continues to cause accelerated sea level rise in San Francisco Bay and the adjacent ocean with severe, and potentially catastrophic, consequences for San Francisco. Scientists recently concluded that coastal California is already experiencing impacts from accelerated sea level rise, including "more extensive coastal flooding during storms, periodic tidal flooding, and increased coastal erosion."[84] In the last 100 years, the California coast has experienced sea level rise of 6.7 to 7.9 inches.[85]

87. Storms with their attendant surges and flooding occur on top of and superimposed on sea level rise, causing storm surges to be greater, extend farther inland, and cause more extensive damage – including greater inundation and flooding of public and private property in San

---

[80] Our Changing Climate 2012, Vulnerability & Adaptation to the Increasing Risks from Climate Change in California, at 2, *available at* http://www.energy.ca.gov/2012publications/CEC-500-2012-007/CEC-500-2012-007.pdf.

[81] *Id.*

[82] S.F. Dept. of Public Health, San Francisco's Climate and Health Adaptation Framework at 8 (2017), *available at* https://extxfer.sfdph.org/gis/ClimateHealth/Reports%20and%20 Research/SFDPH_ClimateHealthAdaptFramework2017a.pdf.

[83] Climate Central, *available at* http://www.climatecentral.org/news/summer-temperatures-co2-emissions-1001-cities-16583 (Aug. 1, 2014).

[84] Rising Seas in California at 3.

[85] Climate Change Impacts in the United States: The Third National Climate Assessment, southwest chapter at 469 (2014), *available at* http://nca2014.globalchange.gov/system/files_force/ downloads/low/NCA3_Full_Report_20_Southwest_LowRes.pdf?download=1.

Francisco.[86] By 2050, for example, a "100-year flood" in San Francisco is expected to occur on average once every year and by 2100 to occur 92 times per year – or almost twice per *week*.[87] A 100-year flood event normally – that is, without global warming – has a 1% chance of happening every year. Under this same scenario, the 500-year storm surge flood would occur, by 2050, once every four years and, by 2100, 42 times per year – or almost once per week.[88] Even with lower levels of future fossil fuel production, there will be substantial increases in flood frequencies in San Francisco due to past and ongoing fossil fuel combustion.[89]

88. Accelerated sea level rise in California is causing and will continue to cause inundation of both public and private property located within San Francisco. San Francisco is extremely vulnerable to accelerated sea level rise, storm surges, and inundation because it is surrounded by water on three sides – the Pacific Ocean to the west and San Francisco Bay to the north and east.[90] Rising bay and coastal water levels are already affecting San Francisco through coastal flooding of low-lying shorelines, increased shoreline erosion, and salt water impacts on its wastewater treatment systems.[91] Sea levels in and around San Francisco rose approximately eight inches during the past century and accelerated due to global warming.[92] But with accelerated sea level rise, they are currently projected to increase by up to 24 inches by 2050 and 66 inches by 2100, if not higher.[93] Storm surge added on top of these greatly elevated sea levels could produce a

---

[86] San Francisco Sea Level Rise Action Plan, Executive Summary at 4 (2016) ("SLR Plan Executive Summary"), *available at* http://default.sfplanning.org/plans-and-programs/planning-for-the-city/sea-level-rise/160309_SLRAP_Executive_Summary_EDreduced.pdf.

[87] Buchanan, et al., Amplification of flood frequencies with local sea level rise and emerging flood regimes, Environmental Research Letters (2017), supplementary material table 6.

[88] *Id.*

[89] *Id.* at supplementary material table 5.

[90] *See* S.F. Dept. of Public Health, San Francisco's Climate and Health Adaptation Framework at 8 (2017), *available at* https://extxfer.sfdph.org/gis/ClimateHealth/Reports%20and%20 Research/SFDPH_ClimateHealthAdaptFramework2017a.pdf.

[91] SLR Plan Executive Summary at 9.

[92] S.F. Dept. of Public Health, San Francisco's Climate and Health Adaptation Framework at 8 (2017), *available at* https://extxfer.sfdph.org/gis/ClimateHealth/Reports%20and%20Research /SFDPH_ClimateHealthAdaptFramework2017a.pdf.

[93] *Id.* at 9.

combined rise of up to 66 inches by 2050 and 108 inches by 2100.[94] As sea level rises, average daily high tides will extend further inland and cause more extensive flooding.[95] Without adaptation measures, daily tides could permanently inundate six percent of San Francisco's land by 2100.[96] And all of these projections are an understatement in light of a new, 2017 report that sea level is likely to rise faster than projected and could reach as much as a catastrophic ten feet by the end of the century.[97]

89. San Francisco must adapt now to ongoing sea level rise to abate ongoing damage to property, facilities, and equipment, with risks of increasingly severe damage in the future. In particular, San Francisco must improve, protect, move, and build infrastructure to adapt now to past and ongoing sea level rise. For example:

a) San Francisco is planning to fortify its Seawall to protect itself from sea level rise. The Seawall is the foundation of over three miles of San Francisco waterfront stretching from Fisherman's Wharf to Mission Creek. In 2016, San Francisco Mayor Edwin M. Lee announced an initial investment of $8 million over the next two years to initiate City efforts to fortify the Seawall.[98] Short-term seawall upgrades are expected to cost more than $500 million. Long-term upgrades to the seawall are projected to cost $5 billion.[99]

b) A significant portion of the combined sewer and storm water infrastructure on the west side of San Francisco is at severe risk of shoreline erosion caused by sea level rise. This infrastructure, including the Westside Transport Box, Westside Pump Station, Lake Merced Tunnel, and the Oceanside Water Pollution Control Plant, is located along Ocean Beach on San Francisco's western shore. Most of this infrastructure, including much of the Oceanside plant, is

---

[94] *Id.*

[95] San Francisco Sea Level Rise Action Plan, at 2-3 (2016), http://default.sfplanning.org/plans-and-programs/planning-for-the-city/sea-level-rise/160309_SLRAP_Final_ED.pdf.

[96] *Id.*

[97] Rising Seas in California.

[98] http://sfmayor.org/article/mayor-lee-invests-seawall-protect-city.

[99] https://sfseawall.files.wordpress.com/2017/01/seawall-fact-sheet.pdf; http://onesanfrancisco.org/sites/default/files/2017-06/Agenda%20Item%206%20-%20Seawall%20Presentation.pdf.

located underground. Because San Francisco has a city-wide combined sewer system – designed to handle both storm water and sewer water – this infrastructure is large in size and scale. Sea level rise and corresponding shoreline erosion threatens to damage this infrastructure. As a result, San Francisco has helped to develop plans to protect this infrastructure at an estimated cost of approximately $350 million.[100] The costs and logistics of relocating this infrastructure would be far greater.

c) Shoreline erosion along Ocean Beach also threatens roads, pathways, private properties, and buildings along the shore – all of which San Francisco's citizens have long used and enjoyed. Protecting these properties through construction of a seawall and/or other shoreline armoring infrastructure will be extremely expensive. San Francisco's plan for protecting its combined sewer infrastructure along Ocean Beach calls for closing a portion of the Great Highway south of Sloat Boulevard.[101]

d) Sea level rise also interferes with San Francisco's stormwater infrastructure through inundation of the City's stormwater outfalls along the ocean and San Francisco Bay.[102] As a result of sea level rise, 27 of San Francisco's 29 stormwater discharge locations between the Golden Gate Bridge and the City's southern border on San Francisco Bay will be underwater daily by 2050 or before.[103] As those outfalls are more frequently submerged by sea water, they cannot be used to discharge stormwater as intended, causing backups in the system and flooding elsewhere in San Francisco. Saltwater intrusion into San Francisco's water treatment facilities also interferes with effective treatment function at those facilities, reducing their capacity and causing further backups. Stormwater system outfalls cannot simply be elevated because that would interfere with the hydraulic gradient of the entire system. As a result, San Francisco is developing costly plans to protect its stormwater outfalls and water treatment facilities with backflow preventers and pumping

---

[100] Office of the Mayor (2012), Mayor Lee Celebrates SPUR Ocean Beach Master Plan, *available at* http://sfmayor.org/article/mayor-lee-celebrates-spur-ocean-beach-master-plan.

[101] *See* Ocean Beach Master Plan, at III-19 and executive summary at 6.

[102] SLR Plan at 2-5.

[103] CSD Backflow Prevention and Monitoring, 263.

equipment. To address current and short-term impacts of sea level rise on its Bayside stormwater system outfalls, for example, San Francisco has developed an interim backflow prevention plan projected to cost a minimum of $10 million. Long-term backflow prevention at these outfalls, and at others, will cost more.

90. San Francisco faces other ongoing and likely injuries as a result of sea level rise, including threats to Port infrastructure and operations, a risk of saltwater intrusion into the City's groundwater wells used for drinking water, and both direct and indirect impacts to public health, housing and city services.[104] Sea level rise, storm surges, and flood inundation induced by global warming will disproportionately impact some of San Francisco's most vulnerable residents, including those in the Bayview/Hunters Point neighborhood.[105] The same sea level rise also threatens some of San Francisco's most iconic and valuable buildings. For example, the Ferry Building would be temporarily flooded during a 100-year extreme tide today, but could be flooded every day after 36 inches of sea level rise.[106] Each of these ongoing and likely injuries, and others, requires San Francisco to plan for and implement costly protections.

91. San Francisco is already experiencing, and working to abate, current harms caused by sea level rise. But while harms to San Francisco and its residents have commenced, additional far more severe injuries will occur in the future if prompt action is not taken to protect San Francisco and its residents from rising sea levels. Indeed, the sea level rise harms inflicted on San Francisco by global warming are insidious partly because they are projected to continue, and to worsen, far into the future. Pervasive fossil fuel combustion and greenhouse gas emissions to date will cause ongoing and future harms regardless of future fossil fuel combustion or future greenhouse gas emissions. Future production and use of fossil fuels will exacerbate sea level rise and require even greater expenditures to abate the injuries. San Francisco must plan for and adapt

[104] S.F. Dept. of Public Health, San Francisco's Climate and Health Adaptation Framework at 12 (2017), *available at* https://extxfer.sfdph.org/gis/ClimateHealth/Reports%20and%20Research/SFDPH_ClimateHealthAdaptFramework2017a.pdf.

[105] *Id.* at 14.

[106] SLR Plan Executive Summary at 2-5.

to sea level rise future harms now to ensure that abatement of ongoing and future sea level rise harms is done most efficiently and effectively and in order to protect human well-being and public and private property before it is too late. Additionally, the significant infrastructure needed to abate global warming requires long lead times for planning, financing, and implementation. Planning to abate the known and projected adverse effects of global warming on San Francisco and its citizens remains underway, and will continue. Sea level rise impacts in the future are imminent in the context of planning for and carrying out large-scale, complex infrastructure projects to protect San Francisco from sea level rise.

92. Sea level rise, storm surges, and flooding caused by global warming threaten not only the physical infrastructure and property of San Francisco and its citizens, but also the safety, lives, daily way of life, sense of community, and security of San Francisco residents.[107] A severe storm surge coupled with higher sea levels caused by global warming could occur at any time, potentially resulting in the loss of life and extensive damage to public and private property. The risk of catastrophic sea level rise harm to San Francisco and its citizens will increase, just as rising sea levels will continue to cause regular damage, the longer concrete action is not taken to abate the harms and effects of sea level rise.

93. Building infrastructure to protect San Francisco and its residents, will, upon information and belief, cost billions of dollars.

## IX. CAUSE OF ACTION: PUBLIC NUISANCE ON BEHALF OF THE PEOPLE

94. The People incorporate by reference the preceding paragraphs.

95. The People of the State of California, acting by and through the San Francisco City Attorney, bring this claim seeking abatement pursuant to California public nuisance law, including section 731 of the Code of Civil Procedure, and sections 3479, 3480, 3491, and 3494 of the Civil Code.

96. Defendants' production and promotion of massive quantities of fossil fuels, and their promotion of those fossil fuels' pervasive use, has caused, created, assisted in the creation of,

[107] Rising Seas in California at 6.

contributed to, and/or maintained and continues to cause, create, assist in the creation of, contribute and/or maintain to global warming-induced sea level rise, a public nuisance in San Francisco. Defendants, both individually and collectively, are substantial contributors to the global warming-induced sea level rise and the People's attendant injuries and threatened injuries. The People's injuries and threatened injuries from each Defendant's contributions to global warming are indivisible injuries. Each Defendant's past and ongoing conduct is a direct and proximate cause of the People' injuries and threatened injuries. Defendants each should have known that this dangerous global warming with its attendant harms on coastal cities like San Francisco would occur before it even did occur, and each Defendant in fact did have such knowledge. Each Defendant has at all relevant times been aware, and continues to be aware, that the inevitable emissions of greenhouse gases from the fossil fuels it produces combines with the greenhouse gas emissions from fossil fuels produced by the other Defendants, among others, to result in dangerous levels of global warming with grave harms for coastal cities like San Francisco. Defendants were aware of this dangerous global warming, and of its attendant harms on coastal cities like San Francisco, even before those harms began to occur. Defendants' conduct constitutes a substantial and unreasonable interference with and obstruction of public rights and property, including, *inter alia*, the public rights to health, safety and welfare of San Francisco residents and other citizens whose safety and lives are at risk from increased storm surge flooding and whose public and private property, is threatened with widespread damage from global warming-induced sea level rise, greater storm surges, and flooding.

97. Defendants, individually and collectively, are substantial contributors to global warming and to the injuries and threatened injuries suffered by the People. Defendants have caused or contributed to accelerated sea level rise from global warming, which has and will continue to injure public property and land located in the City of San Francisco, through increased inundation, storm surges, and flooding, and which threatens the safety and lives of San Francisco residents. Defendants have inflicted and continue to inflict injuries upon the People that require the People to incur extensive costs to protect public and private property, against increased sea level rise, inundation, storm surges, and flooding.

98. Defendants have promoted the use of fossil fuels at unsafe levels even though they should have known and in fact have known for many years that global warming threatened severe and even catastrophic harms to coastal cities like San Francisco. Defendants promoted fossil fuels and fossil fuel products for unlimited use in massive quantities with knowledge of the hazard that such use would create.

99. Defendants are jointly and severally liable to the People for committing a public nuisance. The People seek an order of abatement requiring Defendants to fund a climate change adaptation program for San Francisco consisting of the building of sea walls, raising the elevation of low-lying property and buildings and building such other infrastructure as is necessary for San Francisco to adapt to climate change.[108]

## X. RELIEF REQUESTED

**WHEREFORE,** the People pray for judgment and an order against each Defendant, jointly and severally, as follows:

1. Finding Defendants BP, Chevron, ConocoPhillips, Exxon, and Shell jointly and severally liable for causing, creating, assisting in the creation, of, contributing to, and/or maintaining a public nuisance;

2. Ordering an abatement fund remedy to be paid for by Defendants to provide for infrastructure in San Francisco necessary for the People to adapt to global warming impacts such as sea level rise;

3. Awarding attorneys' fees as permitted by law;

4. Awarding costs and expenses as permitted by law;

5. Awarding pre- and post-judgment interest as permitted by law; and

6. Awarding such other relief as this Court deems just and proper.

///

///

///

[108] The People also do not seek abatement with respect to any federal land.

Dated: September 19, 2017

DENNIS J. HERRERA
City Attorney
RONALD P. FLYNN
Chief Deputy City Attorney
YVONNE R. MERÉ
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA
MATTHEW D. GOLDBERG
Deputy City Attorneys

By [signature]
DENNIS J. HERRERA
City Attorney

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

*Of Counsel*

[*Counsel Listed in Alphabetical Order*]

STEVE W. BERMAN (*pro hac vice* application to be submitted)
steve@hbsslaw.com
EMERSON HILTON (*pro hac vice* application to be submitted)
emersonh@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Ave. Suite 3300
Seattle, WA 98101
Tel. (206) 623-7292
Fax (206) 623-0594

SHANA E. SCARLETT (bar no. 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel. (510) 725-3000
Fax (510) 725-3001

MATTHEW F. PAWA (*pro hac vice* application to be submitted)
mattp@hbsslaw.com
BENJAMIN A. KRASS (*pro hac vice* application to be submitted)
benk@hbsslaw.com
WESLEY KELMAN (*pro hac vice* application to be submitted)
wesk@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1280 Centre Street, Suite 230
Newton Centre, Massachusetts 02459
Tel.: (617) 641-9550
Fax: (617) 641-9551

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

Exhibit 1: Map showing San Francisco sea level rise vulnerability zone

Source: San Francisco Sea Level Rise Action Plan, p. 2-7 (March 2016)




*NOTE: Zone represents upper range (unlikely, but possible), end-of-century projections for permanent SLR inundation (up to 66 inches) plus temporary flooding due to a 100-year extreme storm (up to 42 inches) for a total of 108 inches above today's average high tide.*

Map Disclaimer: The inundation maps and the associated analyses are intended as planning level tools to illustrate the potential for inundation and coastal flooding under a variety of future sea level rise and storm surge scenarios. The maps depict possible future inundation that could occur if nothing is done to adapt or prepare for sea level rise over the next century. The maps do not represent the exact location of flooding. The maps relied on a 1-m digital elevation model created from LiDAR data collected in 2010 and 2011. Although care was taken to capture all relevant topographic features and coastal structures that may impact coastal inundation, it is possible that structures narrower than the 1-m horizontal map scale may not be fully represented. The maps are based on model outputs and do not account for all of the complex and dynamic San Francisco Bay processes or future conditions such as erosion, subsidence, future construction or shoreline protection upgrades, or other changes to San Francisco Bay or Open Coast. For more context about the maps and analyses, including a description of the data and methods used, please see the Climate Stressors and Impacts Report: Bayside Sea Level Rise Inundation Mapping Technical Memorandum, March 2014 and FEMA Open California Coast Sea Level Rise Pilot Study, San Francisco County. 2015.

Data Source: Bayside—SFPUC SSIP Inundation Mapping, 2015. Westside—FEMA Sea Level Rise Pilot Study, 2015

Exhibit 2: Map showing sea level rise vulnerability zone
– Downtown to Central Bayshore detail

Source: San Francisco Sea Level Rise Action Plan, p. 2-7 (March 2016)

## SLR VULNERABILITY ZONE—DOWNTOWN TO CENTRAL BAYSHORE DETAIL
THROUGH END-OF-CENTURY WITHOUT ANY ADAPTATION MEASURES OR ACTIONS




Data Source: Bayside—SFPUC SSIP Inundation Mapping, 2015. Westside—FEMA Sea Level Rise Pilot Study, 2015.

*NOTE: Zone represents upper range (unlikely, but possible), end-of-century projections for permanent SLR inundation (up to 66 inches) plus temporary flooding due to a 100-year extreme storm (up to 42 inches) for a total of 108 inches above today's MHHW.*

***See Appendix for complete set of San Francisco SLR Vulnerability Zone maps and public land ownership information.***

Exhibit 3: "Range of Global Mean Temperature From 1850 to the Present with the Projected Instantaneous Climatic Response to Increasing CO2 Concentrations"

Source: M.B. Glaser, Memo for Exxon management (Nov. 12, 1982), pp. 1, 28

EXXON RESEARCH AND ENGINEERING COMPANY
P.O. BOX 101, FLORHAM PARK, NEW JERSEY 07932

M. B. GLASER
Manager
Environmental Affairs Programs

Cable: ENGREXXON, N.Y.

November 12, 1982

$CO_2$ "Greenhouse" Effect

82EAP 266

TO: See Distribution List Attached

Attached for your information and guidance is briefing material on the $CO_2$ "Greenhouse" Effect which is receiving increased attention in both the scientific and popular press as an emerging environmental issue. A brief summary is provided along with a more detailed technical review prepared by CPPD.

The material has been given wide circulation to Exxon management and is intended to familiarize Exxon personnel with the subject. It may be used as a basis for discussing the issue with outsiders as may be appropriate. However, it should be restricted to Exxon personnel and not distributed externally.

Very truly yours,

M.B. Glaser

M. B. GLASER

MBG:rva

Attachments

H. N. WEINBERG
NOV 15 1982

Figure 9

Range of Global Mean Temperature From 1850 to the Present with the Projected Instantaneous Climatic Response to Increasing $CO_2$ Concentrations.



DENNIS J. HERRERA, State Bar #139669
City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA, State Bar #238896
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone: (415) 554-4748
Facsimile: (415) 554-4715
Email: brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

[Other Counsel Listed on Signature Page]

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

**UNLIMITED JURISDICTION**

THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney DENNIS J. HERRERA,

Plaintiff and Real Party in Interest,

v.

BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS COMPANY, a Delaware corporation, EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,

Defendants.

Case No. CGC-17-561370

**[PROPOSED] ORDER GRANTING APPLICATION FOR APPROVAL OF COMPLEX LITIGATION DESIGNATION**

Hearing Date: Not Specified
Hearing Judge: Karnow
Time: Not Specified
Place: Dept. 304

Date Action Filed: September 19, 2017
Trial Date: Not yet set

**WHEREAS**, Plaintiff the People of the State of California's Application to Designate Civil Action as a Complex Case was heard on ___________________, 2017, in Department 304, pursuant to San Francisco Superior Court Local Rule 3.6(C)(2), Judge Curtis E.A. Karnow presiding; and

**WHEREAS**, a Complaint was filed by Plaintiff the People of the State of California in the San Francisco County Superior Court on September 19, 2017, and the fee required by Government Code § 70616 has been tendered; and

**WHEREAS**, this case is likely to involve extensive motion practice, a substantial amount of documentary evidence and a large number of percipient and expert witnesses, and a large number of separately represented parties; and

**WHEREAS**, this case therefore requires exceptional judicial management to avoid placing unnecessary burdens on the Court or the litigants and to expedite the case, to keep costs reasonable, and to promote effective decision making by the Court, the parties, and counsel;

**IT IS HEREBY ORDERED** that this case is complex within the meaning of California Rule of Court 3.400 and is hereby assigned, for all purposes, including discovery and trial, to Department ______ designated to hear Complex Civil Litigation.

**SO ORDERED:**

Dated ______________ __, 2017 By: ________________________________________

Hon. Curtis E. A. Karnow
Judge of the Superior Court

# Superior Court of California, County of San Fra

## Alternative Dispute Resolution Program Information Package

The plaintiff must serve a copy of the ADR information package on each defendant along with the complaint. (CRC 3.221(c))

**WHAT IS ADR?**
Alternative Dispute Resolution (ADR) is the term used to describe the various optic for settling a dispute without a trial. There are many different ADR processes, the mc forms of which are mediation, arbitration and settlement conferences. In ADR, trainei people decide disputes or help parties decide disputes themselves. They can he resolve disputes without having to go to court.

**WHY CHOOSE ADR?**
"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate in an early settlement conference, mediation, arbitration, early neutral evaluation or some alternative dispute resolution process prior to trial." (Local Rule 4)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money,** including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

**HOW DO I PARTICIPATE IN ADR?**
Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet) at the clerk's office located at 400 McAllister Street, Room 103;
- Indicating your ADR preference on the Case Management Statement (also attached to this packet); or
- Contacting the court's ADR office (see below) or the Bar Association of San Francisco's ADR Services at 415-782-8905 or www.sfbar.org/adr for more information.

**For more information about ADR programs or dispute resolution alternatives, contact:**

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
415-551-3869

***Or, visit the court ADR website at www.sfsuperiorcourt.org***

The San Francisco Superior Court offers different types of ADR processes for general civil matters; each ADR program is described in the subsections below:

**1) SETTLEMENT CONFERENCES**

The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute early in the litigation process.

**(A) THE BAR ASSOCIATION OF SAN FRANCISCO (BASF) EARLY SETTLEMENT PROGRAM (ESP):** ESP remains as one of the Court's ADR programs (see Local Rule 4.3) but parties must select the program – the Court no longer will order parties into ESP.

**Operation:** Panels of pre-screened attorneys (one plaintiff, one defense counsel) each with at least 10 years' trial experience provide a minimum of two hours of settlement conference time, including evaluation of strengths and weakness of a case and potential case value. On occasion, a panelist with extensive experience in both plaintiff and defense roles serves as a sole panelist. BASF handles notification to all parties, conflict checks with the panelists, and full case management. The success rate for the program is 78% and the satisfaction rate is 97%. Full procedures are at: www.sfbar.org/esp.

**Cost:** BASF charges an administrative fee of $295 per party with a cap of $590 for parties represented by the same counsel. Waivers are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see enclosed brochure.

**(B) MANDATORY SETTLEMENT CONFERENCES:** Parties may elect to apply to the Presiding Judge's department for a specially-set mandatory settlement conference. See Local Rule 5.0 for further instructions. Upon approval of the Presiding Judge, the court will schedule the conference and assign the case for a settlement conference.

**2) MEDIATION**

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO,** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending.

**Operation:** Experienced professional mediators, screened and approved, provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. The BASF website contains photographs, biographies, and videos of the mediators as well as testimonials to assist with the selection process. BASF staff handles conflict checks and full case management. Mediators work with parties to arrive at a mutually agreeable solution. The success rate for the program is 64% and the satisfaction rate is 99%.

**Cost:** BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the administrative fee are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see the enclosed brochure.

**(B) JUDICIAL MEDIATION** provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at anytime throughout the litigation process.

**Operation:** Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge for the Judicial Mediation program.

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may elect any private mediator of their choice; the selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

3) ARBITRATION

An arbitrator is neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A) JUDICIAL ARBITRATION:** When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.

**Operation:** Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.2 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after the filing of a complaint. There is no cost to the parties for judicial arbitration.

**(B) PRIVATE ARBITRATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF TO ENROLL IN THE LISTED BASF PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF.

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: FAX NO. *(Optional)*: | |
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*: | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF** | |
| STREET ADDRESS: | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE: | |
| BRANCH NAME: | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |
| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
| *(Check one)*: ☐ **UNLIMITED CASE** (Amount demanded exceeds $25,000) ☐ **LIMITED CASE** (Amount demanded is $25,000 or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date: Time: Dept.: Div.: Room:

Address of court *(if different from the address above)*:

☐ **Notice of Intent to Appear by Telephone, by *(name)*:**

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted **jointly** by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and date by which they may be served)*:

4. **Description of case**
   a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
a. ☐ **The trial has been set for** *(date):*
b. ☐ **No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint** *(if not, explain):*

c. Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a. ☐ days *(specify number):*
b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a. Attorney:
b. Firm:
c. Address:
d. Telephone number:
e. E-mail address:
f. Fax number:
g. Party represented:
☐ Additional representation is described in Attachment 8.

9. **Preference**
☐ This case is entitled to preference *(specify code section):*

10. **Alternative dispute resolution (ADR)**

a. **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.

(1) For parties represented by counsel: Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.

(2) For self-represented parties: Party ☐ has ☐ has not reviewed the ADR information package identified in rule 3.221.

b. **Referral to judicial arbitration or civil action mediation** (if available).

(1) ☐ This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.

(2) ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

(3) ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10\. c. Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or have already participated in *(check all that apply and provide the specified information):*

| | The party or parties completing this form are willing to participate in the following ADR processes *(check all that apply)*: | If the party or parties completing this form in the case have agreed to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation)*: |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled<br>☐ Mediation session scheduled for *(date)*:<br>☐ Agreed to complete mediation by *(date)*:<br>☐ Mediation completed on *(date)*: |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled<br>☐ Settlement conference scheduled for *(date)*:<br>☐ Agreed to complete settlement conference by *(date)*:<br>☐ Settlement conference completed on *(date)*: |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled<br>☐ Neutral evaluation scheduled for *(date)*:<br>☐ Agreed to complete neutral evaluation by *(date)*:<br>☐ Neutral evaluation completed on *(date)*: |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled<br>☐ Judicial arbitration scheduled for *(date)*:<br>☐ Agreed to complete judicial arbitration by *(date)*:<br>☐ Judicial arbitration completed on *(date)*: |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled<br>☐ Private arbitration scheduled for *(date)*:<br>☐ Agreed to complete private arbitration by *(date)*:<br>☐ Private arbitration completed on *(date)*: |
| (6) Other *(specify)*: | ☐ | ☐ ADR session not yet scheduled<br>☐ ADR session scheduled for *(date)*:<br>☐ Agreed to complete ADR session by *(date)*:<br>☐ ADR completed on *(date)*: |

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**11. Insurance**

a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:

b. Reservation of rights: ☐ Yes ☐ No

c. ☐ Coverage issues will significantly affect resolution of this case *(explain)*:

**12. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.

☐ Bankruptcy ☐ Other *(specify)*:

Status:

**13. Related cases, consolidation, and coordination**

a. ☐ There are companion, underlying, or related cases.

(1) Name of case:
(2) Name of court:
(3) Case number:
(4) Status:

☐ Additional cases are described in Attachment 13a.

b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party)*:

**14. Bifurcation**

☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

**15. Other motions**

☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

**16. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| --- | --- |
| DEFENDANT/RESPONDENT: | |

17. **Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

18. **Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

19. **Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

20. Total number of pages attached *(if any):* ________

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_______________________________ (TYPE OR PRINT NAME) ▶ _______________________________ (SIGNATURE OF PARTY OR ATTORNEY)

_______________________________ (TYPE OR PRINT NAME) ▶ _______________________________ (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

## The Early Settlement Program:

- Helps you resolve cases **quickly** and **economically**
- Has been a trusted program for over **20 years**
- Boasts a **78% settlement rate** and **97% satisfaction rate**

## Early Settlement provides:

- Panels of experienced trial attorneys (all with at least **10 years of experience**)
- **Three free hours** of settlement conference time per case, including one hour of preparation time
- Panelists who are matched with the case's type of law
- **Low administrative fee** of $295/party, capped at $590 for parties represented by the same counsel

Do you have a case filed in San Francisco Superior Court and want to settle sooner than your trial date?

Learn more about the Early Settlement Program—scan the QR Code or visit www.sfbar.org/adr/esp

Consider The Bar Association of San Francisco

# Early Settlement Program

## Vhat is ESP?

he Bar Association of San Francisco's **arly Settlement Program** (ESP) available as one of San Francisco uperior Court's Alternative Dispute esolution (ADR) programs (Local Rule .3).

SP is a **highly successful** ADR rogram that handles cases in areas f law such as business, personal ijury, employment, labor, civil rights, iscrimination, insurance, malpractice, ındlord/tenant, and many others.

SP is **unique** in that the panelists, helping you move toward settlement, ın provide you confidential feedback oout their evaluation of your case, cluding opinions as to potential ıse value.

ɔr more information as well as the ɔmplete Policies & Procedures, go to: **vww.sfbar.org/esp**

## Who are the Panelists?

They are experienced attorneys with at least 10 years of trial experience. Panels consist of one plaintiff and one defense attorney. Sometimes an attorney who is experienced in both types of representation serves as a solo panelist.

## Costs

There is a $295 administrative fee per party, capped at $590 for multiple parties represented by the same attorney, to pay for the cost of running this program. If you have a fee waiver with the Superior Court, your fee will be waived by the ESP program.

## Contact

- email esp@sfbar.org
- phone 415-982-1600
- fax 415-989-0381

## Steps:

The forms you need can be found at **www.sfbar.org/esp**, or email adr@sfbar.org or call 415-782-8905 for a packet to be sent to you.

1. Please complete the ESP Agreement and return it to BASF via email at adr@sfbar.org or by fax to 415-989-0381. You don't have to get the other parties to sign, just send yours.
2. When all parties have signed the ESP Agreement, you will be sent the Notice of ESP, along with an invoice.
3. There is a $295 administrative fee per party, with a cap of $590 for multiple parties represented by the same attorney. You can pay by check, money order or credit card.
4. Send your administrative fee by fax, email or mail to: BASF / ESP, 301 Battery Street, Third Floor, San Francisco, California 94111.
5. When BASF receives the fees from all parties, your matter will be assigned to a panelist (or panel of 2), who you will work with to set the date, time and location for your conference.
6. If you must reschedule your ESP conference date, work with the other side and your panelist(s) to set the new date. BASF does not need to be notified.
7. Before your conference, provide a copy of your description of the dispute to all parties and panelists. BASF does not need a copy.
8. If the matter is settled in your ESP conference, congratulations!
9. If the matter is not settled in your ESP conference, your initial court date remains the same.

## Experienced mediators are available in the following areas

Business
Civil Rights
Commercial
Construction
Contracts
Disability
Discrimination
Education
Employment/Workplace
Environmental
Family
Family-Certified Specialists
Fee Disputes
Financial
Government
Insurance
Intellectual Property
Intra-Organizational
Labor
Landlord/Tenant
Land Use
LGBT Issues
Malpractice: Legal-Medical-Professional
Partnership Dissolutions
Personal Injury
Probate/Trust
Products Liability
Real Estate
Securities
Taxation
Uninsured Motorist
And more...

# TESTIMONIALS

"This was the third attempt to mediate this case, and the BASF mediator was far and away the best mediator. I dare say that we would not have settled today but for his efforts."

*George Yuhas, Esq.*
*Orrick, Herrington & Sutcliffe LLP*

"We had an excellent experience and, after 8 1/2 hours of mediation, [the BASF mediator] settled a very difficult case involving claims against four clients of ours by a wealthy investor who claimed inadequate disclosure was made."

*Robert Charles Friese, Esq.*
*Shartsis Friese LLP*

"When the other side made their offer, I thought there was no way we would reach an agreement – we were too far apart, but the mediator brought us together. He saved me a lot of time and aggravation by facilitating a settlement. Thanks!"

*Leslie Caplan*
*Global Warming Campaign Manager*
*Bluewater Network*

"BASF staff was very helpful – stayed on the task and kept after a hard to reach party. The mediator was great!"

*Mark Abelson, Esq.*
*Campagnoli, Abelson & Campagnoli*

"The [BASF] mediator was excellent! He was effective with some strong, forceful personalities."

*Denise A. Leadbetter, Esq.*
*Zacks, Utrecht & Leadbetter*

PROCEDURES, PODCASTS, FORMS, MEDIATOR BIOGRAPHIES AND PHOTOGRAPHS:
**www.sfbar.org/mediation**

**adr@sfbar.org or**
**415-982-1600**

FOR OUTSTANDING ADR SERVICES
Voted into the **Hall of Fame** In The Recorder's 'Best of' Poll
5 YEARS IN A ROW
2010 – 2014

# MEDIATION SERVICES

THE BAR ASSOCIATION OF
SAN FRANCISCO

## WHAT IS BASF'S MEDIATION SERVICE?

The Bar Association of San Francisco's Mediation Services is a private mediation service which will assist you with almost any type of dispute, from simple contract disputes to complex commercial matters.

## WHO ARE THE MEDIATORS?

They are established mediators who have private mediation practices and have met our extensive experience requirements. By going through BASF you receive the services of these highly qualified mediators at a great value.

## HOW DO I LEARN MORE ABOUT THE MEDIATORS?

BASF's website at www.sfbar.org/mediation provides bios, photos and hourly rates of mediators. You can search by name or by area of law needed for your case. BASF staff is always available to assist you with selection or to answer questions.

## HOW MUCH DOES THE SERVICE COST?

A $295 per party administrative fee is paid to BASF at the time the Consent to Mediate form is filed. This fee covers the first hour of mediator preparation time and the first two hours of session time. Time beyond that is paid at the mediator's normal hourly rate.

## HOW IS THE MEDIATOR CHOSEN?

You may request a specific mediator from our website (www.sfbar.org/mediation) and indicate your choice on the BASF Consent to Mediate form, or you may indicate on the form that you would like BASF staff to assist with the selection.

## WHY SHOULD I GO THROUGH BASF? CAN'T I JUST CALL THE MEDIATOR DIRECTLY?

BASF mediators have agreed to provide three free hours as a service to BASF. If you go directly to one of our mediators, you do not qualify for the free hours unless you notify us. Once you have filed with us, you will talk directly to the mediator to ask questions and to set a convenient mediation date and time.

## HOW LONG IS THE MEDIATION SESSION?

The time spent in mediation will vary depending on your dispute. BASF mediators are dedicated to reaching a settlement, whether you need a few hours or several days.

## WHO CAN USE THE SERVICE?

BASF mediation can be utilized by anyone and is NOT limited to San Francisco residents or issues. Also, the service may be used before a court action is filed or at any time during a court action.

## OUR CASE IS FILED IN COURT. HOW DO WE USE BASF'S MEDIATION SERVICES?

When you file the San Francisco Superior Court's Stipulation to ADR form, check the box indicating "Mediation Services of BASF." Then complete BASF's Consent to Mediate form found on our website and file it with us. (If the matter was filed in a different county, please check with that court for the appropriate process.)

## WE ARE ON A DEADLINE; HOW QUICKLY CAN WE MEDIATE?

Once all parties have filed all the paperwork, BASF can normally have you in touch with the mediator within a day or two. If there is a deadline, BASF staff will give the matter top priority.

## WHAT TYPES OF DISPUTES CAN I MEDIATE?

BASF mediators are trained in 30+ areas of law. If you don't see the area you need on our website or in this brochure, contact us; it is very likely we can match your need with one of our panelists.

## MORE INFORMATION

Visit our website (www.sfbar.org/mediation) where you can search by name or by area of law. For personal assistance, please call 415-982-1600.

# EJT-001-INFO Expedited Jury Trial Information Sheet

This information sheet is for anyone involved in a civil lawsuit who will be taking part in an **expedited jury trial**—a trial that is shorter and has a smaller jury than a traditional jury trial.

You can find the law and rules governing expedited jury trials in Code of Civil Procedure sections 630.01–630.29 and in rules 3.1545–3.1553 of the California Rules of Court. You can find these at any county law library or online. The statutes are online at *http://leginfo.legislature.ca.gov/faces/codes.xhtml*. The rules are at *www.courts.ca.gov/rules*.

## (1) What is an expedited jury trial?

An expedited jury trial is a short trial, generally lasting only one or two days. It is intended to be quicker and less expensive than a traditional jury trial.

As in a traditional jury trial, a jury will hear your case and will reach a decision about whether one side has to pay money to the other side. An expedited jury trial differs from a regular jury trial in several important ways:

- **The trial will be shorter.** Each side has 5 hours to pick a jury, put on all its witnesses, show the jury its evidence, and argue its case.
- **The jury will be smaller.** There will be 8 jurors instead of 12.
- **Choosing the jury will be faster.** The parties will exercise fewer challenges.

## (2) What cases have expedited jury trials?

- **Mandatory expedited jury trials.** All limited civil cases—cases where the demand for damages or the value of property at issue is $25,000 or less—come within the *mandatory expedited jury trial* procedures. These can be found in the Code of Civil Procedure, starting at section 630.20. Unless your case is an unlawful detainer (eviction) action, or meets one of the exceptions set out in the statute, it will be within the expedited jury trial procedures. These exceptions are explained more in (7) below.
- **Voluntary expedited jury trials.** If your civil case is not a limited civil case, or even if it is, you can choose to take part in a *voluntary expedited jury trial*, if all the parties agree to do so. Voluntary expedited jury trials have the same shorter time frame and smaller jury that the mandatory ones do, but have one other important aspect—**all parties must waive their rights to appeal.** In order to help keep down the costs of litigation, there are no appeals following a *voluntary* expedited jury trial except in very limited circumstances. These are explained more fully in (9).

## (3) Will the case be in front of a judge?

The trial will take place at a courthouse and a judge, or, if you agree, a temporary judge (a court commissioner or an experienced attorney that the court appoints to act as a judge) will handle the trial.

## (4) Does the jury have to reach a unanimous decision?

No. Just as in a traditional civil jury trial, only three-quarters of the jury must agree in order to reach a decision in an expedited jury trial. With 8 people on the jury, that means that at least 6 of the jurors must agree on the verdict in an expedited jury trial.

## (5) Is the decision of the jury binding on the parties?

Generally, yes, but not always. A verdict from a jury in an expedited jury trial is like a verdict in a traditional jury trial. The court will enter a judgment based on the verdict, the jury's decision that one or more defendants will pay money to the plaintiff or that the plaintiff gets no money at all.

But parties in an expedited jury trial, like in other kinds of trials, are allowed to make an agreement before the trial that guarantees that the defendant will pay a certain amount to the plaintiff even if the jury decides on a lower payment or no payment. That agreement may also put a cap on the highest amount that a defendant has to pay, even if the jury decides on a higher amount. These agreements are known as "high/low agreements." You should discuss with your attorney whether you should enter into such an agreement in your case and how it will affect you.

## (6) How else is an expedited jury trial different?

The goal of the expedited jury trial process is to have shorter and less expensive trials.

- The cases that come within the mandatory expedited jury trial procedures are all limited civil actions, and they must proceed under the limited discovery and

pretrial rules that apply to those actions. See Code of Civil Procedure sections 90–100.

- The voluntary expedited jury trial rules set up some special procedures to help those cases have shorter and less expensive trials. For example, the rules require that several weeks before the trial takes place, the parties show each other all exhibits and tell each other what witnesses will be at the trial. In addition, the judge will meet with the attorneys before the trial to work out some things in advance.

The other big difference is that the parties in either kind of expedited jury trial can make agreements about how the case will be tried so that it can be tried quickly and effectively. These agreements may include what rules will apply to the case, how many witnesses can testify for each side, what kind of evidence may be used, and what facts the parties already agree to and so do not need the jury to decide. The parties can agree to modify many of the rules that apply to trials generally or to any pretrial aspect of the expedited jury trials.

## (7) Do I have to have an expedited jury trial if my case is for $25,000 or less?

Not always. There are some exceptions.

- The mandatory expedited jury trial procedures do not apply to any unlawful detainer or eviction case.
- Any party may ask to opt out of the procedures if the case meets any of the criteria set out in Code of Civil Procedure section 630.20(b), all of which are also described in item 2 of the *Request to Opt Out of Mandatory Expedited Jury Trial* (form EJT-003). Any request to opt out must be made on that form, and it must be made within a certain time period, as set out in Cal. Rules of Court, rule 3.1546(c). Any opposition must be filed within 15 days after the request has been served.

*The remainder of this information sheet applies only to voluntary expedited jury trials.*

## (8) Who can take part in a voluntary expedited jury trial?

The process can be used in any civil case that the parties agree may be tried in one or two days. To have a voluntary expedited jury trial, both sides must want one. Each side must agree to all the rules described in (1), and to waive most appeal rights. The agreements between the parties must be put into writing in a document called *[Proposed] Consent Order for Voluntary Expedited Jury Trial*, which will be submitted to the court for approval. (Form EJT-020 may be used for this.) The court must issue the consent order as proposed by the parties unless the court finds good cause why the action should not proceed through the expedited jury trial process.

## (9) Why do I give up most of my rights to an appeal in a voluntary expedited jury trial?

To keep costs down and provide a faster end to the case, all parties who agree to take part in a voluntary expedited jury trial must agree to waive the right to appeal the jury verdict or decisions by the judicial officer concerning the trial unless one of the following happens:

- Misconduct of the judicial officer that materially affected substantial rights of a party;
- Misconduct of the jury; or
- Corruption or fraud or some other bad act that prevented a fair trial.

In addition, parties may not ask the judge to set the jury verdict aside, except on those same grounds. Neither you nor the other side will be able to ask for a new trial on the grounds that the jury verdict was too high or too low, that legal mistakes were made before or during the trial, or that new evidence was found later.

## (10) Can I change my mind after agreeing to a voluntary expedited jury trial?

No, unless the other side or the court agrees. Once you and the other side have agreed to take part in a voluntary expedited jury trial, that agreement is binding on both sides. It can be changed only if both sides want to change it or stop the process or if a court decides there are good reasons the voluntary expedited jury trial should not be used in the case. This is why it is important to talk to your attorney before agreeing to a voluntary expedited jury trial. This information sheet does not cover everything you may need to know about voluntary expedited jury trials. It only gives you an overview of the process and how it may affect your rights. **You should discuss all the points covered here and any questions you have about expedited jury trials with an attorney before agreeing to a voluntary expedited jury trial.**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and address)<br><br>TELEPHONE NO.:<br>ATTORNEY FOR (Name): | FOR COURT USE ONLY |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, CA 94102-4514 | |
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |
| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER:<br><br>**DEPARTMENT 610** |

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Early Settlement Program of the Bar Association of San Francisco (BASF)** - Pre-screened experienced attorneys provide a minimum of 2 hours of settlement conference time for a BASF administrative fee of $295 per party. Waivers are available to those who qualify. BASF handles notification to all parties, conflict checks with the panelists, and full case management. www.sfbar.org/esp

☐ **Mediation Services of BASF** - Experienced professional mediators, screened and approved, provide one hour of prepa and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is ch at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org

Judge Requested (see list of Judges currently participating in the program): ______________________

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days ☐ 90-120 days ☐ Other (please specify) ________

☐ **Other ADR process (describe)** ______________________________

2) **The parties agree that the ADR Process shall be completed by (date):** ______________________

3) **Plaintiff(s) and Defendant(s) further agree as follows:**

_______________________________________________

| | |
|---|---|
| Name of Party Stipulating | Name of Party Stipulating |
| Name of Party or Attorney Executing Stipulation | Name of Party or Attorney Executing Stipulation |
| Signature of Party or Attorney | Signature of Party or Attorney |
| ☐ Plaintiff ☐ Defendant ☐ Cross-defendant | ☐ Plaintiff ☐ Defendant ☐ Cross-defendant |
| Dated: ______________ | Dated: ______________ |

☐ ***Additional signature(s) attached***

DENNIS J. HERRERA, State Bar #139669
City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA, State Bar #238896
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone: (415) 554-4748
Facsimile: (415) 554-4715
Email: brittany.feitelberg@sfgov.org

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

[Other Counsel Listed on Signature Page]

ENDORSED
FILED
Superior Court of California
County of San Francisco

SEP 19 2017

CLERK OF THE COURT
BY: MEREDITH GRIER
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

**UNLIMITED JURISDICTION**

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney DENNIS J. HERRERA,<br><br>Plaintiff and Real Party in Interest,<br><br>vs.<br><br>BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS COMPANY, a Delaware corporation, EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,<br><br>Defendants. | Case No.: CGC-17-561370<br><br>**COMPLAINT FOR PUBLIC NUISANCE** |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

A. Plaintiff ..... 6

B. Defendants ..... 6

C. Defendants' Connections To California ..... 10

IV. FOSSIL FUELS ARE THE PRIMARY CAUSE OF GLOBAL WARMING ..... 12

V. DEFENDANTS HAVE PRODUCED MASSIVE QUANTITIES OF FOSSIL FUELS AND HAVE CONTINUED TO DO SO EVEN AS GLOBAL WARMING HAS BECOME GRAVELY DANGEROUS ..... 16

VI. DEFENDANTS HAVE PRODUCED MASSIVE AMOUNTS OF FOSSIL FUELS DESPITE HAVING FULL KNOWLEDGE FROM THEIR IN-HOUSE SCIENTIFIC STAFF, OR FROM THE API, THAT FOSSIL FUELS WOULD CAUSE GLOBAL WARMING ..... 18

VII. DESPITE THEIR EARLY KNOWLEDGE THAT GLOBAL WARMING WAS REAL AND POSED GRAVE THREATS, DEFENDANTS PROMOTED FOSSIL FUELS FOR PERVASIVE USE WHILE DOWNPLAYING THE REALITY AND RISKS OF GLOBAL WARMING ..... 23

A. Defendants Borrowed The Big Tobacco Playbook In Order To Promote Their Products ..... 24

B. Defendants' Direct Promotion Of Fossil Fuels ..... 28

VIII. SAN FRANCISCO WILL INCUR SERIOUS CLIMATE CHANGE INJURIES THAT WILL REQUIRE BILLIONS IN EXPENDITURES TO ABATE THE GLOBAL WARMING NUISANCE ..... 31

IX. CAUSE OF ACTION: PUBLIC NUISANCE ON BEHALF OF THE PEOPLE ..... 37

X. RELIEF REQUESTED ..... 39

Plaintiff, the People of the State of California ("the People"), by and through San Francisco City Attorney Dennis J. Herrera, brings this action against Defendants BP p.l.c. ("BP"), Chevron Corporation ("Chevron"), ConocoPhillips Company ("ConocoPhillips"), Exxon Mobil Corporation ("Exxon"), and Royal Dutch Shell plc ("Shell") (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. Global warming is here and it is harming San Francisco now. Global warming causes accelerated sea level rise through thermal expansion of ocean water and melting of land-based ice. Sea levels are rising at rates unprecedented in the history of human civilization due to global warming.[1] Global warming-induced sea level rise is already causing flooding of low-lying areas of San Francisco, increased shoreline erosion, and salt water impacts to San Francisco's water treatment system.[2] The rapidly rising sea level along the Pacific coast and in San Francisco Bay, moreover, poses an imminent threat of catastrophic storm surge flooding because any storm would be superimposed on a higher sea level.[3] This threat to human safety and to public and private property is becoming more dire every day as global warming reaches ever more dangerous levels and sea level rise accelerates. The City and County of San Francisco ("San Francisco" or "City") must take abatement action now to protect public and private property from this looming threat by building sea walls and other sea level rise adaptation infrastructure. Exhibits 1 and 2[4] to

---

[1] Griggs et al., Rising Seas in California: an update on sea-level rise science, California Ocean Science Trust, at 8 (Apr. 2017) ("Rising Seas in California"), *available at* http://www.opc.ca.gov/webmaster/ftp/pdf/docs/rising-seas-in-california-an-update-on-sea-level-rise-science.pdf.

[2] San Francisco Sea Level Rise Action Plan at 6 (Mar. 2016), *available at* http://default.sfplanning.org/plans-and-programs/planning-for-the-city/sea-level-rise/160309_SLRAP_Executive_Summary_EDreduced.pdf.

[3] Rising Seas in California at 16-17 (Apr. 2017); Climate Change Impacts in the United States: The Third National Climate Assessment, southwest chapter at 469-70 (2014), *available at* http://nca2014.globalchange.gov/system/files_force/downloads/low/NCA3_Full_Report_20_Southwest_LowRes.pdf?download=1.

[4] San Francisco Sea Level Action Plan, at 2-7 & 2-9 (March 2016), *available at* http://default.sfplanning.org/plans-and-programs/planning-for-the-city/sea-level-rise/160309_SLRAP_Final_ED.pdf.

this Complaint, showing flood events' projected intrusion into San Francisco as a result of global warming, demonstrate just how stark the threat is.

2. This egregious state of affairs is no accident. Rather, it is an unlawful public nuisance of the first order. Defendants are the five largest investor-owned fossil fuel corporations in the world as measured by their historic production of fossil fuels. The use of fossil fuels – oil, natural gas and coal – is the primary source of the greenhouse gas pollution that causes global warming, a point that scientists settled years ago.[5] Defendants have produced massive amounts of fossil fuels for many years. And recent disclosures of internal industry documents demonstrate that they have done so despite knowing – since at least the late 1970s and early 1980s if not earlier – that massive fossil fuel usage would cause dangerous global warming. It was at that time that scientists on their staffs or with whom they consulted through their trade association, the American Petroleum Institute ("API"), investigated the science and warned them in stark terms that fossil fuel usage would cause global warming at a rate unprecedented in the history of human civilization and present risks of "catastrophic" harm in coming decades.

3. Defendants took these stark warnings and proceeded to double-down on fossil fuels. Most of the carbon dioxide now in the atmosphere as a result of combustion of Defendants' fossil fuels is likely attributable to their recent production – *i.e.*, to fossil fuels produced by Defendants since 1980. Even today, with the global warming danger level at a critical phase, Defendants continue to engage in massive fossil fuel production and execute long-term business plans to continue and even expand their fossil fuel production for decades into the future.

4. The global warming-induced sea level rise from past fossil fuel usage is an irreversible condition on any relevant time scale: it will last hundreds or even thousands of years. Defendants' planned production of fossil fuels into the future will exacerbate global warming,

[5] *See, e.g.*, Carbon Dioxide and Climate: A Scientific Assessment, Report of an Ad Hoc Study Group on Carbon Dioxide and Climate to the Climate Research Board, Assembly of Mathematical and Physical Sciences, National Research Council (1979), at vii, 4-6, *available at* https://www.nap.edu/catalog/12181/carbon-dioxide-and-climate-a-scientific-assessment.

accelerate sea level rise even further, and require greater and more costly abatement actions to protect San Francisco.

5. Defendants, notably, did not simply produce fossil fuels. They engaged in large-scale, sophisticated advertising and public relations campaigns to promote pervasive fossil fuel usage and to portray fossil fuels as environmentally responsible and essential to human well-being – even as they knew that their fossil fuels would contribute, and subsequently were contributing, to dangerous global warming and associated accelerated sea level rise. These promotional efforts continue through today even in the face of overwhelming scientific evidence that fossil fuels are altering the climate and global warming has become an existential threat to modern life.

6. Defendants' promotion of fossil fuels has also entailed denying mainstream climate science or downplaying the risks of global warming. During the 1990s and early 2000s, Defendants stole a page from the Big Tobacco playbook and sponsored public relations campaigns, either directly or through the API or other groups, to deny and discredit the mainstream scientific consensus on global warming, downplay the risks of global warming, and even to launch unfounded attacks on the integrity of leading climate scientists. "Uncertainty" of the science became the constantly repeated mantra of this Big Oil PR campaign just as "Doubt is our product" was the Big Tobacco PR theme. Emphasizing "uncertainty" in climate science, directly or through the API, is still a focus of Defendants' efforts to promote their products even though Defendants are well aware that the fundamental scientific facts of global warming are not in dispute and are a cause of grave danger through sea level rise.

7. The purpose of all this promotion of fossil fuels and efforts to undermine mainstream climate science was, like all marketing, to increase sales and protect market share. It succeeded.

8. And now it will cost billions of dollars to build sea walls and other infrastructure to protect human safety and public and private property in San Francisco from global warming-induced sea level rise. A recent report by the California government has rung the alarm bell as loudly as possible: "Previously underappreciated glaciological processes, examined in the research of the last five years, have the potential to greatly increase the probability of extreme global sea-

level rise (6 feet or more) within this century" under business-as usual fossil fuel production and usage.[6] Translation: the planet's enormous ice caps on Greenland and Antarctica are beginning to melt, like their much smaller but more numerous cousins, the mountain glaciers, have been doing for many years, and slide into the ocean. This new dynamic is fundamentally increasing the risk of catastrophic sea level rise. The report projects a risk of as much as ten feet of additional sea level rise along San Francisco's coastline by 2100, which would be catastrophic.[7] Nearer-term risks include 0.3 to as much as 0.8 feet of additional sea level rise by 2030,[8] which itself will require the building of sea walls and other costly infrastructure given the dynamics of storm surge and regular high tide flooding.

9. This new information shows that the costs of dealing with global warming-induced sea level—already immense—will be staggering for the public entities that must protect their people and their coastlines. Even before the latest projections of accelerating sea-level rise, San Francisco has already taken action to adapt. In 2016, San Francisco adopted an action plan establishing a framework for assessing San Francisco's exposure to sea level rise and identifying actions the City must take to prevent sea level rise damage. The plan's vision is to make San Francisco a "more resilient city in the face of immediate and long-term threats of sea level rise, by taking measures to protect and enhance public and private assets, natural resources, and quality of life for all." The plan recommends that San Francisco conduct assessments to identify properties and infrastructure vulnerable to sea level rise, and develop and implement adaptation plans to protect them by raising infrastructure, building flood barriers and other infrastructure, and taking other measures. San Francisco is in the process of doing so for identified vulnerable areas such as Ocean Beach and the San Francisco Port. As set forth in the action plan, continuing Bayside sea level rise from global warming places at risk at least $10 billion dollars of public property within San Francisco and as much as $39 billion of private property. The magnitude of the actions needed

[6] Rising Seas in California at 16.

[7] *Id.* at 26.

[8] *Id.*

to abate harms from sea level rise, and the amount of property at risk, will increase in light of the rapidly accelerating sea level rise and the increased scientific understanding of sea level rise processes as set forth in the 2017 report.

10. Defendants are substantial contributors to the public nuisance of global warming that is causing injury to the People and thus are jointly and severally liable. Defendants' cumulative production of fossil fuels over many years places each of them among the top sources of global warming pollution in the world. Upon information and belief, Defendants are, respectively, the first (Chevron), second (Exxon), fourth (BP), sixth (Shell) and ninth (ConocoPhillips) largest cumulative producers of fossil fuels worldwide from the mid Nineteenth Century to present; most of Defendants' global warming pollution from the usage of their fuels has accumulated in the atmosphere since 1980. Defendants, moreover, are qualitatively different from other contributors to the harm given their in-house scientific resources, early knowledge of global warming, commercial promotions of fossil fuels as beneficent even in light of their knowledge to the contrary, and efforts to protect their fossil fuel market by downplaying the risks of global warming.

11. The People seek an order requiring Defendants to abate the global warming-induced sea level rise nuisance to which they have contributed by funding an abatement program to build sea walls and other infrastructure that is urgently needed to protect human safety and public and private property in San Francisco. The People do <u>not</u> seek to impose liability on Defendants for their direct emissions of greenhouse gases and do <u>not</u> seek to restrain Defendants from engaging in their business operations. This case is, fundamentally, about shifting the costs of abating sea level rise harm – one of global warming's gravest harms – back onto the companies. After all, it is Defendants who have profited and will continue to profit by knowingly contributing to global warming, thereby doing all they can to help create and maintain a profound public nuisance.

## II. JURISDICTION AND VENUE

12. Jurisdiction is proper in this Court because Defendants have contributed to the creation of a public nuisance in San Francisco, and the San Francisco City Attorney has the right and authority to seek abatement of that nuisance on behalf of the People of the State of California.

13. Venue is proper in this county in accordance with section 392(a)(1) of the Code of Civil Procedure because the People allege injuries to real property located in this county.

## III. PARTIES

### A. Plaintiff

14. Plaintiff, the People of the State of California, by and through the San Francisco City Attorney Dennis J. Herrera, brings this suit pursuant to Code of Civil Procedure section 731, and Civil Code sections 3479, 3480, 3491, and 3494, to abate the public nuisance caused by Defendants.

### B. Defendants

15. Defendant BP is a public limited company registered in England and Wales with its headquarters in London, England, doing business in California. BP was created in 1998 as a result of a merger between the Amoco Corporation ("Amoco"), a former U.S. corporation, and the British Petroleum Company p.l.c. BP is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas and fossil fuel products.

16. BP controls company-wide climate change policies and fossil fuel production.[9] BP, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. BP also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. BP's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

///

///

[9] BP Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 1, *available at* https://www.cdp.net/en/companies.

17. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant BP is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

18. Defendant Chevron is a Delaware Corporation with its principal place of business located in San Ramon, California. Chevron and its predecessors had their headquarters in San Francisco from 1879 to 2001. Chevron is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas and fossil fuel products.

19. Chevron controls company-wide climate change policies and fossil fuel production.[10] Chevron, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. Chevron also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. Chevron's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

20. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Chevron is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

21. Defendant ConocoPhillips is a Delaware Corporation with its principal place of business located in Houston, Texas, doing business in California. ConocoPhillips is a multinational oil and gas company that produces, markets, and sells oil and natural gas and for many years also refined and sold finished oil products.

///

///

[10] Chevron Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 2, *available at* https://www.cdp.net/en/companies.

22. ConocoPhillips controls company-wide climate change policies and fossil fuel production.[11] ConocoPhillips, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. ConocoPhillips also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. ConocoPhillips's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

23. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant ConocoPhillips is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

24. Defendant Exxon is a New Jersey corporation with its principal place of business located in Irving, Texas, doing business in the State of California. Exxon is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas and fossil fuel products and, as recently as 2009 produced, marketed and sold coal.

25. Exxon controls company-wide climate change policies and fossil fuel production.[12] Exxon, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. Exxon also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. Exxon's management, direction, conduct and/or control is exercised through a variety of means, including through its employees and/or agents'

[11] ConocoPhillips Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 2, *available at* https://www.cdp.net/en/companies.

[12] Exxon Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 1, *available at* https://www.cdp.net/en/companies.

implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

26. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Exxon is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

27. Defendant Shell is a public limited company registered in England and Wales with its headquarters in The Hague, Netherlands, doing business in California. Shell is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas and fossil fuel products.

28. Shell controls company-wide climate change policies and fossil fuel production.[13] Shell, through its employees and/or agents, manages, directs, conducts and/or controls operations relating to its subsidiaries' participation in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold to consumers. Shell also exercises control over company-wide decisions on production and use of fossil fuel reserves considering climate change impacts. Shell's management, direction, conduct and/or control is exercised through a variety of means, including through its employees' and/or agents' implementation of policies, procedures, and programs relating to climate change generally and to production of fossil fuels specifically.

29. As a result of its management, direction, conduct and/or control of operations relating to company-wide climate change policies and fossil fuel production, Defendant Shell is responsible for its subsidiaries' past and current production and promotion of fossil fuel products.

30. Defendants DOES ONE through TEN are sued herein under fictitious names. Plaintiff does not at this time know the true names or capacities of said defendants, but prays that the same may be alleged when ascertained.

///

[13] Shell Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at 2, *available at* https://www.cdp.net/en/companies.

### C. Defendants' Connections To California.

31. Defendants have contributed to the creation of a public nuisance – global warming-induced sea level rise – causing severe harms and threatening catastrophic harms in San Francisco.

32. Each Defendant, directly and through its subsidiaries, substantially participates in the process by which raw crude oil is extracted from the ground, refined into fossil fuel products and delivered, marketed, and sold to California residents for use.

33. BP, through its subsidiaries, owns and/or operates port facilities in California for receipt of crude oil. BP, through its subsidiaries, also produces oil in Alaska, and upon information and belief, BP, through its subsidiaries, transports some of this crude oil to California. In addition, BP operates 275 ARCO-licensed and-branded gasoline stations in California, including stations located in San Francisco. BP offers credit cards to consumers on its interactive website to promote sales of gasoline and other products at its branded gasoline stations. BP's web site maintains a page of "BP Amoco Stations Near Me" for California listing virtually every municipality in California and hundreds of such gas stations. BP promotes gasoline sales by offering, consumers, through its interactive web site, twenty-five cents off every gallon of BP-branded gasoline for every $100 spent on a BP Visa® Credit Card or BP Credit Card for the first ninety days a consumer's account is open.

34. Chevron, through its subsidiaries, produces oil in California, owns and/or operates port facilities in California for receipt of crude oil, owns and operates two refineries where crude oil is refined into finished fossil fuel products including gasoline, and owns and operates approximately nine gasoline terminals in California. A gasoline terminal consists of enormous aboveground storage tanks that hold gasoline for distribution to retail gasoline stations and consumers. Chevron owns and operates the Richmond gasoline refinery and related terminals in the San Francisco Bay Area. Chevron, through its subsidiaries, also produces oil in Alaska, and upon information and belief, some of this crude oil is supplied to California. There also are numerous Chevron-branded gasoline stations in California, including in San Francisco. Chevron offers credit cards to consumers through its interactive website, to promote sales of gasoline and other products at its branded gasoline stations. Chevron promotes gasoline sales by offering

consumers three cents per gallon in fuel credits "every fill-up, every time at Chevron and Texaco stations."

35. ConocoPhillips, through its subsidiaries, owns and/or operates port facilities in California for receipt of crude oil, and previously owned and operated a refinery based in both Rodeo and Arroyo Grande, California, from 2001 to 2012, where crude oil was refined into finished fossil fuel products including gasoline. ConocoPhillips, through its subsidiaries, also produces oil in Alaska, and transports some of this crude oil to California, including San Francisco.

36. Exxon, through its subsidiaries, produces oil in California, owns and/or operates port facilities in California for receipt of crude oil, and previously owned and operated a refinery in California until July 1, 2016, where crude oil was refined into finished fossil fuel products including gasoline. Exxon owned the Benicia gasoline refinery for 30 years until 2000. Exxon, through its subsidiaries, also produces oil in Alaska, and upon information and belief, Exxon, through its subsidiaries, transports some of this crude oil to California. There also are numerous Exxon-branded gasoline stations in California, including in San Francisco and the greater Bay Area. Exxon offers credit cards to consumers, through its interactive website, to promote sales of gasoline and other products at its branded gasoline stations. Exxon promotes gasolines sales by offering consumers twenty-five cents off every gallon of Synergy™ gasoline at Exxon™ or Mobil™ stations for the first two months and then six cents off every gallon of Synergy gasoline at Exxon- and Mobil-branded stations.

37. Shell, through its subsidiaries, owns and/or operates port facilities in California for receipt of crude oil, owns and operates a refinery in California where crude oil is refined into finished fossil fuel products including gasoline, transports crude oil through a pipeline within California, and owns and operates approximately six gasoline terminals in California. Since 1915, Shell has owned a gasoline refinery in Martinez, California, thirty miles northeast of San Francisco. There are numerous Shell-branded gasoline stations in California, including in San Francisco. Shell offers credit cards to consumers on its interactive website to promote sales of gasoline and other products at its branded gasoline stations. Shell promotes gasolines sales by

offering consumers, through its interactive web site, twenty-five cents off every gallon of Shell Fuel for the first two months after they open an account.

## IV. FOSSIL FUELS ARE THE PRIMARY CAUSE OF GLOBAL WARMING.

38. Production of fossil fuels for combustion causes global warming. When used as intended, fossil fuels release greenhouse gases, including carbon dioxide ($CO_2$) and methane, which trap atmospheric heat and increase global temperatures. Carbon dioxide is by far the most important greenhouse gas because of the combustion of massive amounts of fossil fuels.

39. Scientists have known for many years that the use of fossil fuels emits carbon dioxide and that carbon dioxide is a greenhouse gas. In 1896, Svante Arrhenius, a Nobel-prize winning scientist, published calculations projecting temperature increases that would be caused by increased carbon dioxide concentrations in the atmosphere due to the burning of fossil fuels.[14]

40. By 1957, scientists at the Scripps Institute published a warning in the peer-reviewed literature that global warming "may become significant during future decades if industrial fuel combustion continues to rise exponentially" and that "[h]uman beings are now carrying out a large scale geophysical experiment" on the entire planet.[15]

41. In 1960, scientist Charles D. Keeling published results establishing that atmospheric carbon dioxide concentrations were in fact rising.[16]

42. By 1979, the National Academy of Sciences, which is charged with providing independent, objective scientific advice to the United States government, concluded that there was "incontrovertible evidence" that carbon dioxide levels were increasing in the atmosphere as a result of fossil fuel use, and predicted that a doubling of atmospheric carbon dioxide would cause an

[14] Arrhenius, Svante (1896). "On the Influence of Carbonic Acid in the Air Upon the Temperature of the Ground." *Philosophical Magazine and Journal of Science* 41: 237-76, *available at* http://www.rsc.org/images/Arrhenius1896_tcm18-173546.pdf.

[15] Revelle, Roger, and Hans E. Suess (1957). "Carbon Dioxide Exchange between Atmosphere and Ocean and the Question of an Increase of Atmospheric $CO_2$ During the Past Decades." *Tellus* 9: 18-27, *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.2153-3490.1957.tb01849.x/epdf.

[16] Keeling, Charles D. (1960). "The Concentration and Isotopic Abundances of Carbon Dioxide in the Atmosphere." *Tellus* 12: 200-203, *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.2153-3490.1960.tb01300.x/epdf.

increase in global surface temperatures of between 1.5 °C and 4.5 °C [2.7 °F and 8.1 °F], with a probable increase of 3 °C [5.4 °F].[17]

43. In 1988, NASA scientist Dr. James E. Hansen testified to the U.S. Senate's Energy and Natural Resources Committee that "[t]he greenhouse effect has been detected, and it is changing our climate now."[18]

44. More recent research has confirmed and expanded on these earlier findings. In 1988, the United Nations established the Intergovernmental Panel on Climate Change ("IPCC") to assess the scientific and technical information relevant to global warming, and to provide advice to all parties to the U.N. Framework Convention on Climate Change, including the United States. The IPCC issues periodic assessment reports, which have become the standard scientific references on global warming. As Defendant Exxon has put it, the IPCC is "the leading international scientific authority on climate change."

45. In 1990, the IPCC issued its First Assessment Report ("FAR"). It stated that "we are certain" that "emissions resulting from human activities are substantially increasing the atmospheric concentrations of the greenhouse gases," including carbon dioxide and methane, and that "these increases will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface."[19] The IPCC's FAR also predicted that a "Business-as-Usual" scenario (*i.e.*, a future in which fossil fuel production and associated emissions continue to increase) would cause global mean temperature during the next century to increase at a rate "greater than that seen over the past 10,000 years," and "will result in a likely increase in global mean temperature of about 1 °C [1.8 °F] above the present value by 2025 and 3 °C [5.4 °F] before

---

[17] *See* Carbon Dioxide and Climate: A Scientific Assessment, Report of an Ad Hoc Study Group on Carbon Dioxide and Climate to the Climate Research Board, Assembly of Mathematical and Physical Sciences, National Research Council (1979), at vii, 16, *available at* https://www.nap.edu/catalog/12181/carbon-dioxide-and-climate-a-scientific-assessment.

[18] https://www.scribd.com/doc/260149292/Transcript-of-pivotal-climate-change-hearing-1988.

[19] https://www.ipcc.ch/ipccreports/far/wg_I/ipcc_far_wg_I_spm.pdf, at Executive Summary xi.

the end of the next century" – higher than temperatures have been in the last 150,000 years.[20] The FAR also predicted that business-as-usual would result in substantial sea level rise by 2100.[21]

46. The FAR further stated "with confidence" that continued emissions of carbon dioxide "at present rates would commit us to increased concentrations for centuries ahead," and that immediate reductions were required to stabilize carbon dioxide concentrations.

47. In 1995, in its Second Assessment Report ("SAR"), the IPCC concluded that the "balance of evidence suggests a discernible human influence on global climate." This causal finding was profoundly important as confirmation that human-caused global warming had now been detected. By 2001, the IPCC strengthened its causal conclusion, stating that it was "likely" (an IPCC term of art meaning a 66% to 90% chance of being true) that temperature increases already observed were attributable to human activity.[22] The U.S. National Academy of Sciences reviewed this finding and concluded that it was accurate.[23]

48. The IPCC issued its most recent report, the Fifth Assessment, in 2013-14. It states that it is "extremely likely" (95 to 100 percent likely) that "human influence has been the dominant cause of the observed warming since the mid-20th century."[24]

49. The increase in atmospheric carbon dioxide caused by the combustion of fossil fuels has been clearly documented – and measured. Carbon dioxide from fossil fuels has a chemical fingerprint and is the culprit; natural sources of carbon dioxide were in balance prior to the use of fossil fuels and are not a cause of the global warming problem. Today, due primarily to the combustion of fossil fuels produced by Defendants and others, the atmospheric level of carbon dioxide is 410 ppm, higher than at any time during human civilization and likely higher than any

---

[20] *Id.* at Executive Summary xi and xxviii.

[21] *Id.* at Executive Summary xi.

[22] IPCC, Third Assessment Report, Working Group I, Summary for Policymakers at 10, *available at* https://www.ipcc.ch/ipccreports/tar/wg1/pdf/WG1_TAR-FRONT.PDF.

[23] National Academy of Sciences, Commission on Geosciences, Environment and Resources, Climate Change Science: An Analysis of Some Key Questions, summary at 1 (2001), *available at* https://download.nap.edu/cart/download.cgi?record_id=10139.

[24] IPCC, Climate Change 2013, The Physical Science Basis, Summary for Policymakers at 17, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.

level in millions of years.[25] The result has been dramatic planetary warming: sixteen of earth's seventeen warmest years in the 136-year period of global temperature measurements have occurred since 2001, and 2016 was the warmest year on record.[26] As of July 2017, there were 391 months in a row that were warmer than the 20th century average.[27] The years 2014, 2015, and 2016 were the three hottest years ever recorded in California since modern temperature records were first taken in 1895.[28] California has warmed over 2 °F since 1895.[29]

50. Scientists typically use "double $CO_2$," or twice the pre-industrial level of atmospheric carbon dioxide concentration, as a standard reference for considering the warming impact of increased greenhouse gases. Double $CO_2$ is 550 ppm. According to the IPCC, double $CO_2$ will cause the global average surface air temperature to increase by 1.5 to 4.5 °C [2.7 to 8.1 °F] over the pre-industrial level, a rate of warming that is unprecedented in the history of human civilization. By comparison, at the depths of the last ice age, 20,000 years ago, the global average temperature of the Earth was only seven to eleven degrees Fahrenheit cooler than today. Globally, approximately 1 °C [1.8 °F] of the temperature rise already has occurred, due primarily to carbon dioxide and methane emissions from the combustion and use of fossil fuels.

51. Ongoing and future warming caused by past and ongoing use of massive quantities of fossil fuels will cause increasingly severe harm to San Francisco through accelerating sea level rise. In 2013, the IPCC projected that between 2081 and 2100, the global average surface temperature will have increased by 4.7 °F to 8.6 °F under business-as-usual, *i.e.*, with continued

[25] Brian Kahn, We Just Breached the 410 PPM Threshold for $CO_2$, Scientific American (Apr. 21, 2017), *available at* https://www.scientificamerican.com/article/we-just-breached-the-410-ppm-threshold-for-co2/.

[26] Rising Seas in California at 14.

[27] NOAA, Global Climate Report, July 2017, *available at* https://www.ncdc.noaa.gov/sotc/global/201707.

[28] NOAA, National Centers for Environmental Information, *available at* https://www.ncdc.noaa.gov/temp-and-precip/climatological-rankings/index.php?periods%5B%5D=12&parameter=tavg&state=4&div=0&month=12&year=2016#ranks-form.

[29] NOAA, National Climatic Data Center, *available at* https://www.ncdc.noaa.gov/temp-and-precip/state-temps/; *see also* https://www.nytimes.com/2015/08/21/science/climate-change-intensifies-california-drought-scientists-say.html?mcubz=0.

massive levels of fossil fuel production. Global warming causes sea level rise by melting glaciers and sea ice, and by causing seawater to expand.[30] This acceleration of sea level rise is unprecedented in the history of human civilization. Since 1990, the rate of sea level rise has more than doubled and it continues to accelerate. The rate of ice loss from the Greenland and Antarctic Ice Sheets is increasing, and these ice sheets soon will become the primary contributor to global sea level rise. With production of fossil fuels continuing on its business-as-usual trajectory, the resulting warming presents a risk of "rapidly accelerating and effectively irreversible ice loss." The melting of even a portion of the West Antarctic Ice Sheet, the "most vulnerable major ice sheet in a warming global climate," will cause especially severe impacts in California. Rapid ice sheet loss on Antarctica due to global warming risks a sea level rise in California of ten feet by 2100.[31] This would be catastrophic for San Francisco.

52. The Earth's climate can undergo an abrupt and dramatic change when a radiative forcing agent, such as carbon dioxide, causes the climate system to reach a tipping point. Defendants' massive production of fossil fuels increases the risk of reaching that tipping point, triggering a sudden and potentially catastrophic change in climate. The rapidity of an abrupt climate shift would magnify all the adverse effects of global warming. Crossing a tipping point threshold also could lead to rapid disintegration of ice sheets on Greenland and/or Antarctica, resulting in large and rapid increases in sea level rise.

## V. DEFENDANTS HAVE PRODUCED MASSIVE QUANTITIES OF FOSSIL FUELS AND HAVE CONTINUED TO DO SO EVEN AS GLOBAL WARMING HAS BECOME GRAVELY DANGEROUS.

53. For many years, Defendants have produced massive quantities of fossil fuels that, when combusted, emit carbon dioxide, the most important greenhouse gas. Additionally, one of Defendants' primary fossil fuel products, natural gas, is composed of methane, which is the second most important greenhouse gas and which, as Defendants know, routinely escapes into the atmosphere from facilities operated by Defendants' customers and also consumers. The

---

[30] IPCC, Climate Change 2013, The Physical Science Basis, Summary for Policymakers at 11, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.

[31] Rising Seas in California at 3-4, 13.

greenhouse gases from the usage of defendants' fossil fuels remain in the atmosphere for long periods of time: a substantial portion of carbon dioxide emissions remains in the atmosphere for over 1,000 years after they are emitted.[32] As noted above, Defendants have produced such vast quantities of fossil fuels that they are five of the ten largest producers in all of history, with most of the carbon dioxide that has built up in the atmosphere from the use of their products dating from 1980 or later. The cumulative greenhouse gases in the atmosphere attributable to each Defendant has increased the global temperature and contributed to sea level rise, including in San Francisco.

54. Once Defendants produce fossil fuels by, for example, extracting oil from the ground, those fossil fuels are used exactly as intended and emit carbon dioxide.

55. Despite their internal warnings, an overwhelming scientific consensus on the unfolding imminent catastrophe, and actual gravely dangerous impacts from global warming, Defendants to this day maintain high levels of fossil fuel production. This production will intensify future warming and San Francisco's injuries from sea level rise.

56. Defendants' conduct will continue to cause ongoing and increasingly severe sea level rise harms to San Francisco because Defendants are committed to a business model of massive fossil fuel production that they know causes a gravely dangerous rate of global warming. The following graph from a 2015 study published in the peer-reviewed scientific literature demonstrates the grave indifference Defendants BP, Shell, and Exxon have for human safety and welfare.

///

///

///

///

///

///

[32] IPCC, Climate Change 2013, The Physical Science Basis, Summary for Policymakers at 28, https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.




The graph compares BP, Exxon and Shell's projections of worldwide total future emissions[33] – projections upon which they make long-term business plans – to the IEA ("International Energy Agency") 450 emissions trajectory necessary to prevent global warming from exceeding a 2 °C increase over the pre-industrial temperature.[34] The 2 °C level of global warming is widely considered to be a red line of highly dangerous global warming. Upon information and belief, all Defendants base their long-term business plans upon similar projections.

## VI. DEFENDANTS HAVE PRODUCED MASSIVE AMOUNTS OF FOSSIL FUELS DESPITE HAVING FULL KNOWLEDGE FROM THEIR IN-HOUSE SCIENTIFIC STAFF, OR FROM THE API, THAT FOSSIL FUELS WOULD CAUSE GLOBAL WARMING.

57. For decades, Defendants have known that their fossil fuel products pose risks of "severe" and even "catastrophic" impacts on the global climate through the work and warnings of their own scientists or through their trade association. Yet each Defendant decided to continue its conduct and commit itself to massive fossil fuel production. This was a deliberate decision to

[33] In gigatons of carbon per year.

[34] Frumhoff, et al., The climate responsibilities of industrial carbon producers, Climatic Change, at 167 (2015), *available at* https://link.springer.com/article/10.1007/s10584-015-1472-5,

place company profits ahead of human safety and well-being and property, and to foist onto the public the costs of abating and adapting to the public nuisance of global warming.

58. The American Petroleum Institute ("API") is a national trade association that represents the interests of America's oil and natural gas industry. At all relevant times, Defendants, their corporate predecessors and/or their operating subsidiaries over which they exercise substantial control, have been members of the API. On information and belief, the API has acted as Defendants' agent with respect to global warming, received funding from Defendants for the API's global warming initiatives, and shared with Defendants the information on global warming described herein.

59. Beginning in the 1950s, the API repeatedly warned its members that fossil fuels posed a grave threat to the global climate. These warnings have included, for example, an admission in 1968 in an API report predicting that carbon dioxide emissions were "almost certain" to produce "significant" temperature increases by 2000, and that these emissions were almost certainly attributable to fossil fuels. The report warned of "major changes in the earth's environment" and a "rise in sea levels," and concluded: "there seems to be no doubt that the potential damage to our environment could be severe."[35] Similar warnings followed in the ensuing decades, including reports commissioned by the API in the 1980s that there was "scientific consensus" that catastrophic climate change would ensue unless API members changed their business models, and predictions that sea levels would rise considerably, with grave consequences, if atmospheric concentrations of $CO_2$ continued to increase.

60. The API's warnings to Defendants included:

a) In 1951, the API launched a project to research air pollution from petroleum products, and attributed atmospheric carbon to fossil fuel sources.[36] By 1968, the API's scientific

[35] E. Robinson & R.C. Robbins, Final Report, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, SRI Project PR-6755, prepared for American Petroleum Institute, at 109-110, *available at* https://www.smokeandfumes.org/#/documents/document16.

[36] Charles A. Jones (1958) A Review of the Air Pollution Research Program of the Smoke and Fumes Committee of the American Petroleum Institute, Journal of the Air Pollution Control Association, 8:3, 268-272, DOI: 10.1080/00966665.1958.10467854, *available at* https://www.smokeandfumes.org/#/documents/document9.

consultant reported to the API that carbon dioxide emissions were "almost certain" to produce "significant" temperature increases by 2000, and that these emissions were almost certainly attributable to fossil fuels. The report warned of "major changes in the earth's environment" and a "rise in sea levels," and concluded: "there seems to be no doubt that the potential damage to our environment could be severe."[37]

b) In 1980, an API task force on climate change invited Dr. J.A. Laurman, a "recognized expert in the field of $CO_2$ and climate," to make a presentation to the API $CO_2$ and Climate Task Force. Attendees to the presentation included scientists and executives from Texaco (a predecessor to Chevron), Exxon, and SOHIO (a predecessor to BP). Dr. Laurman informed the API task force that there was a "Scientific Consensus on the Potential for Large Future Climatic Response to Increased $CO_2$ Levels." He further informed the API task force in his presentation that, though the exact temperature increases were difficult to predict, the "physical facts agree on the probability of large effects 50 years away." His own temperature forecast was of a 2.5 °C [4.5 °F] rise by 2038, which would likely have "MAJOR ECONOMIC CONSEQUENCES," and a 5 °C [9 °F] rise by 2067, which would likely produce "GLOBALLY CATASTROPHIC EFFECTS." He also suggested that, despite uncertainty, "THERE IS NO LEEWAY" in the time for acting. API minutes show that the task force discussed topics including "the technical implications of energy source changeover," "ground rules for energy release of fuels and the cleanup of fuels as they relate to $CO_2$ creation," and researching "the Market Penetration Requirements of Introducing a New Energy Source into World Wide Use."[38]

(c) In March 1982, an API-commissioned report showed the average increase in global temperature from a doubling of atmospheric concentrations of $CO_2$ and projected, based upon computer modeling, global warming of between 2 °C and 3.5 °C [3.6 °F to 6.3 °F]. The report

[37] E. Robinson & R.C. Robbins, Final Report, Sources, Abundance, and Fate of Gaseous Atmospheric Pollutants, SRI Project PR-6755, prepared for American Petroleum Institute, at 109-110, *available at* https://www.smokeandfumes.org/#/documents/document16.

[38] $CO_2$ and Climate Task Force, Minutes of Meeting, at 1-2 & Attachment B, *available at* http://insideclimatenews.org/sites/default/files/documents/AQ-9%20Task%20Force%20Meeting%20%281980%29.pdf.

projected potentially "serious consequences for man's comfort and survival," and noted that "the height of the sea level can increase considerably."[39]

61. In addition to the API information, some of the Defendants produced their own internal analyses of global warming. For example, newly disclosed documents demonstrate that Exxon internally acknowledged in the late 1970s and early 1980s that its products posed a "catastrophic" threat to the global climate, and that fossil fuel use would have to be strictly limited to avoid severe harm.

a) Exxon management was informed by its scientists in 1977 that there was an "overwhelming[]" consensus that fossil fuels were responsible for atmospheric carbon dioxide increases. The presentation summarized a warning from a recent international scientific conference that "IT IS PREMATURE TO LIMIT USE OF FOSSIL FUELS BUT THEY SHOULD NOT BE ENCOURAGED." The scientist warned management in a summary of his talk: "Present thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might become critical."[40]

b) In a 1979 Exxon internal memo, an Exxon scientist calculated that 80% of fossil fuel reserves would need to remain in the ground and unburned to avoid greater than a doubling of atmospheric carbon dioxide.[41]

c) In a 1981 internal Exxon memo, a scientist and director at the Exxon Research and Engineering Company warned that "it is distinctly possible" that $CO_2$ emissions "will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)."[42]

---

[39] http://insideclimatenews.org/sites/default/files/documents/API%201982%20Climate%20 models%20and%20CO2%20warming.pdf at 5.

[40] https://insideclimatenews.org/system/files_force/documents/James%20Black%201977%20 Presentation.pdf?download=1 at 2.

[41] http://insideclimatenews.org/sites/default/files/documents/CO2%20and%20Fuel%20Use%20 Projections.pdf at 5.

[42] http://insideclimatenews.org/sites/default/files/documents/%2522Catastrophic%2522%20 Effects%20Letter%20%281981%29.pdf.

d) A year later, the same scientist wrote another memo to Exxon headquarters, which reported on a "clear scientific consensus" that "a doubling of atmospheric $CO_2$ from its pre-industrial revolution value would result in an average global temperature rise of (3.0 ± 1.5) °C [2.7 °F to 8.1 °F]."[43] The clear scientific consensus was based upon computer modeling, which Exxon would later attack as unreliable and uncertain in an effort to undermine public confidence in climate science.[44] The memo continued: "There is unanimous agreement in the scientific community that a temperature increase of this magnitude would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere."

e) In November 1982, an Exxon internal report to management warned that "substantial climatic changes" could occur if the average global temperature rose "at least 1 °C [1.8 °F] above [1982] levels," and that "[m]itigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion." The report then warns Exxon management that "there are some potentially catastrophic events that must be considered," including the risk that "if the Antarctic ice sheet which is anchored on land should melt, then this could cause a rise in sea level on the order of 5 meters." The report includes a graph demonstrating the expected future global warming from the "$CO_2$ effect" demonstrating a sharp departure from the "[r]ange of natural fluctuations." This graph is attached hereto as Exhibit 3.[45]

f) By 1983, Exxon had created its own climate models, which confirmed the main conclusions from the earlier memos. Starting by at least the mid-1980s, Exxon used its own climate models and governmental ones to gauge the impact that climate change would have on its own business operations and subsequently took actions to protect its own business assets based upon these modeling results.[46]

---

[43] Cohen memo to Natkin at 1 (Sept. 2, 1982), *available at* http://insideclimatenews.org/documents/consensus-co2-impacts-1982.

[44] *See infra* ¶ 76.

[45] M. B. Glaser, Memo to R.W. Cohen et al. on "$CO_2$ Greenhouse Effect," Nov. 12, 1982, at 2, 12-13, 28, *available at* http://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf.

[46] http://graphics.latimes.com/exxon-arctic/.

62. Exxon's early research and understanding of the global warming impacts of its business was not unique among Defendants. For example, at least as far back as 1970, Defendants Shell and BP began funding scientific research in England to examine the possible future climate changes from greenhouse gas emissions.[47] Shell produced a film on global warming in 1991, in which it admitted that there had been a "marked increase [in global temperatures] in the 1980s" and that the increase "does accord with computer models based on the known atmospheric processes and predicted buildup of greenhouse gases."[48] It acknowledged a "serious warning" that had been "endorsed by a uniquely broad consensus of scientists" in 1990. In the film, Shell further admits that by 2050 continued emissions of greenhouse gases at high levels would cause a global average temperature increase of 1.5 to 4 °C [2.7 to 7.2 °F]; that one meter of sea level rise was likely in the next century; that "this could be disastrous;" and that there is a "possibility of change faster than at any time since the end of the ice age, change too fast, perhaps, for life to adapt without severe dislocation."

## VII. DESPITE THEIR EARLY KNOWLEDGE THAT GLOBAL WARMING WAS REAL AND POSED GRAVE THREATS, DEFENDANTS PROMOTED FOSSIL FUELS FOR PERVASIVE USE WHILE DOWNPLAYING THE REALITY AND RISKS OF GLOBAL WARMING.

63. Defendants have extensively promoted fossil fuel use in massive quantities through affirmative advertising for fossil fuels and downplaying global warming risks. First, Defendants promoted massive use of fossil fuels by misleading the public about global warming by emphasizing the uncertainties of climate science and through the use of paid denialist groups and individuals – a striking resemblance to Big Tobacco's propaganda campaign to deceive the public about the adverse health effects of smoking. Defendants' campaign inevitably encouraged fossil fuel consumption at levels that were (as Defendants knew) certain to severely harm the public. Second, Defendants' fossil fuel promotions through frequent advertising for their fossil fuel products, including promotions claiming that consumption at current and even expanded levels is

[47] Sir Solly Zuckerman, Chief Scientist, Letter to Vice Chancellor, University of Bath, 9th May 1970, PRO ref CAB 163/272 #122885, "Long-term climate changes and their effects."

[48] https://www.youtube.com/watch?v=0VOWi8oVXmo.

"responsible" or even "respectful" of the environment, have encouraged continued fossil fuel consumption at massive levels that Defendants knew would harm the public.[49]

### A. Defendants Borrowed The Big Tobacco Playbook In Order To Promote Their Products.

64. Notwithstanding Defendants' early knowledge of climate change, Defendants have engaged in advertising and public relations campaigns intended to promote their fossil fuel products by downplaying the harms and risks of global warming. Initially, the campaign tried to show that global warming was not occurring. More recently, the campaign has sought to minimize the risks and harms from global warming. The campaign's purpose and effect has been to help Defendants continue to produce fossil fuels and sell their products on a massive scale. This campaign was executed in large part by front groups funded by Defendants, either directly or through the API, and through statements made by Defendants directly.

65. One front group was the Global Climate Coalition ("GCC"). The GCC operated between 1989 and 2002. Its members included the API, and predecessors or subsidiaries of Defendants. William O'Keefe, former president of the GCC, was also a former executive of the API.[50]

66. The GCC spent millions of dollars on campaigns to discredit climate science, including $13 million on one ad campaign alone. The GCC distributed a video to hundreds of journalists, which claimed that carbon dioxide emissions would increase crop production and feed the hungry people of the world.[51]

67. However, internal GCC documents admitted that their "contrarian" climate theories were unfounded. In December 1995, the GCC's Science and Technology Advisory Committee

---

[49] ConocoPhillips, the changing energy landscape, *available at* http://www.conocophillips.com/who-we-are/our-company/spirit-values/responsibility/Pages/the-changing-energy-landscape.aspx; Chevron TV ad (2009), https://www.youtube.com/watch?v=-KyjTGMVTkA.

[50] Jeff Nesmith, *Industry Promotes Skeptical View of Global Warming*, Cox News Service, May 28, 2003, *available at* http://www.heatisonline.org/contentserver/objecthandlers/index.cfm?ID=4450&Method=Full.

[51] http://www.sourcewatch.org/index.php/Global_Climate_Coalition.

("GCC-STAC"), whose members included employees of Mobil Oil Corporation (an Exxon predecessor) and the API, drafted a primer on the science of global warming for GCC members. The primer concluded that the GCC's contrarian theories "do not offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change." Due to this inconvenient conclusion, at its next meeting, in January 1996, the GCC-STAC decided simply to drop this seven-page section of the report. Nonetheless, for years afterward, the GCC and its members continued to tout their contrarian theories about global warming, even though the GCC had admitted internally these arguments were invalid.

68. In February 1996, an internal GCC presentation stated that a doubling of carbon dioxide levels over pre-industrial concentrations would occur by 2100 and cause "an average rate of warming [that] would probably be greater than any seen in the past 10,000 years." The presentation noted "potentially irreversible" impacts that could include "significant loss of life."

69. Certain Defendants also funded another front group in the 1990s, the Global Climate Science Communications Team ("GCSCT"). GCSCT members included Exxon, Chevron, and the API.[52] A 1998 GCSCT task force memo outlined an explicit strategy to invest millions of dollars to manufacture uncertainty on the issue of global warming, directly emulating a similar disinformation campaign by the tobacco industry. The memo stated: "*Victory Will Be Achieved When*," among other things, "*Average citizens 'understand' (recognize) uncertainties in climate science*," public "*recognition of uncertainty becomes part of the 'conventional wisdom.'*" and the "*Media 'understands' (recognizes) uncertainties in climate science.*"[53] The plan stated that progress would be measured by the percentage of new articles that raise questions about climate change.

70. Over at least the last nineteen years, Exxon in particular has paid researchers and front groups to create uncertainties about basic climate change science and used denialist groups to

---

[52] https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

[53] Global Climate Science Communications: Action Plan, Apr. 3, 1998, *available at* https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

attack well-respected scientists. These were calculated business decisions by Exxon to undermine climate change science and bolster production of fossil fuels.[54]

71. Between 1998 and 2014, Exxon paid millions of dollars to organizations to promote disinformation on global warming. During the early- to mid-1990s, Exxon directed some of this funding to Dr. Fred Seitz, Dr. Fred Singer, and/or Seitz and Singer's Science and Environmental Policy Project ("SEPP") in order to launch repeated attacks on mainstream climate science and IPCC conclusions, even as Exxon scientists participated in the IPCC.[55] Seitz, Singer, and SEPP had previously been paid by the tobacco industry to create doubt in the public mind about the hazards of smoking.[56] Seitz and Singer were not climate scientists.

72. Exxon's promotion of fossil fuels also entailed the funding of denialist groups that attacked well-respected scientists Dr. Benjamin Santer and Dr. Michael Mann, maligning their characters and seeking to discredit their scientific conclusions with media attacks and bogus studies in order to undermine the IPCC's 1995 and 2001 conclusion that human-driven global warming is now occurring.

73. One of Defendants' most frequently used denialists has been an aerospace engineer named Wei Hock Soon. Between 2001 and 2012, various fossil fuel interests, including Exxon and the API, paid Soon over $1.2 million.[57] Soon was the lead author of a 2003 article, which argued that the climate had not changed significantly. The article was widely promoted by other denial

[54] http://insideclimatenews.org/news/15092015/Exxons-own-research-confirmed-fossil-fuels-role-in-global-warming; Jeffrey Ball, Exxon Chief Makes A Cold Calculation on Global Warming, The Wall Street Journal, June 14, 2005, *available at* https://www.wsj.com/articles/SB111870440192558569.

[55] Union of Concerned Scientists, *Smoke, Mirrors & Hot Air: How ExxonMobil Uses Big Tobacco's Tactics to Manufacture Uncertainty on Climate Science*, Jan. 2007, *available at* http://www.ucsusa.org/assets/documents/global_warming/exxon_report.pdf; http://www.exxonsecrets.org/html/orgfactsheet.php?id=65.

[56] http://www.sourcewatch.org/index.php/S._Fred_Singer; http://www.sourcewatch.org/index.php/Frederick_Seitz.

[57] Justin Gillis & John Schwartz, Deeper Ties to Corporate Cash for Doubtful Climate Researcher, *New York Times* (Feb. 21, 2015), *available at* https://www.nytimes.com/2015/02/22/us/ties-to-corporate-cash-for-climate-change-researcher-Wei-Hock-Soon.html?mcubz=1.

groups funded by Exxon, including via "Tech Central Station," a website supported by Exxon.[58] Soon published other bogus "research" in 2009, attributing global warming to solar activity, for which Exxon paid him $76,106.[59] This 2009 grant was made several years after Exxon had publicly committed not to fund global warming deniers.[60]

74. Until recently, the API's website referred to global warming as "possible man-made warming" and claimed that the human contribution is "uncertain." The API removed this statement from its web site in 2016 when journalistic investigations called attention to the API's misleading statements on global warming and its 1970s/1980s task force on global warming.

75. In 2000, Exxon took out an advertisement on the Op-Ed page of the *New York Times* entitled "Unsettled Science." The advertisement claimed that "scientists remain unable to confirm" the proposition that "humans are causing global warming."[61] This was six years after the IPCC had confirmed the causal link between planetary warming and anthropogenic greenhouse gas emissions – a historic moment in climate science – and some 18 years after Exxon itself had admitted in a 1982 internal memoranda to corporate headquarters that there was "a clear scientific consensus" that greenhouse gas emissions would cause temperatures to rise.

76. On May 27, 2015, at Exxon's annual shareholder meeting, then-CEO Rex Tillerson misleadingly downplayed global warming's risks by stating that climate models used to predict future impacts were unreliable: "What if everything we do it turns out our models were really lousy and we achieved all of our objectives and it turned out the planet behaved differently because the models just weren't good enough to predict it?" But as noted above, in 1982 Exxon's scientific staff stated, based upon the climate models, that there was a "clear scientific consensus" with respect to the level of projected future global warming and starting shortly thereafter Exxon relied

[58] Smoke, Mirrors & Hot Air at 13-14.

[59] https://www.documentcloud.org/documents/682765-willie-soon-foia-grants-chart-02-08-2011.html.

[60] http://www.socialfunds.com/shared/reports/1211896380_ExxonMobil_2007_Corporate_Citizenship_Report.pdf.

[61] https://assets.documentcloud.org/documents/705605/xom-nyt-2000-3-23-unsettledscience.pdf.

upon the projections of climate models, including its own climate models, in order to protect its own business assets.

77. Until recently, Exxon's website continued to emphasize the "uncertainty" of global warming science and impacts: "current scientific understanding provides limited guidance on the likelihood, magnitude, or time frame" of events like temperature extremes and sea level rise.[62] Exxon's insistence on crystal-ball certainty was clear misdirection, since Exxon knew that the fundamentals of climate science were well settled and showed global warming to present a clear and present danger.[63]

**B. Defendants' Direct Promotion Of Fossil Fuels.**

78. Defendants continue to promote massive fossil fuel use by the public notwithstanding that global warming is happening, that global warming is primarily caused by their fossil fuels, and that global warming is causing severe injuries. Defendants promote the massive use of fossil fuels through advertisements lauding fossil fuels as "responsible" and "respectful" to the environment, identifying fossil fuels as the only way to sustain modern standards of living, and promoting sales of their fossil fuels without qualification. Defendants and/or their U.S. subsidiaries are members of the API. The API also promotes the benefits of fossil fuel products on behalf of Defendants and its other members.[64] Defendants' message to consumers is that fossil fuels may continue to be burned in massive quantities without risking significant injuries.

79. Defendants bombard the public and consumers with the following advertisements, although these are a mere sliver of Defendants' extensive campaigns. Defendants' advertisements must be understood in their proper context – as following Defendants' substantial early knowledge

---

[62] Formerly found at http://corporate.exxonmobil.com/en/current-issues/climate-policy/meeting-global-needs/managing-climate-change-business-risks.

[63] *See* IPCC, Climate Change 2014, Impacts, Adaptation, and Vulnerability, Summary for Policymakers, *available at* http://www.ipcc.ch/pdf/assessment-report/ar5/wg2/ar5_wgII_spm_en.pdf.

[64] API, Consumer Information, *available at* http://www.api.org/oil-and-natural-gas/consumer-information.

on global warming risks and impacts, and following a decades-long campaign of misleading statements on global warming that primed the pump for massive use of their fossil fuel products.

a) Exxon's "Lights Across America" website advertisement states that natural gas is "helping dramatically reduce America's emissions"[65] even though natural gas is a fossil fuel causing widespread planetary warming and harm to coastal cities like San Francisco and the use of natural gas competes with wind and solar, which have no greenhouse gas emissions.

b) In 2017, Shell's CEO promoted massive fossil fuel use by stating that the fossil fuel industry could play a "crucial role" in lifting people out of poverty.[66] A Shell website promotion states: "We are helping to meet the world's growing energy demand while limiting $CO_2$ emissions, by delivering more cleaner-burning natural gas."[67]

c) BP touts natural gas on its website as "a vital lower carbon energy source" and as playing a "crucial role" in a transition to a lower carbon future.[68] BP promotes continued massive fossil fuel use as enabling two billion people to be lifted out of poverty.[69]

d) Chevron's website implores the public that "we produce safe, reliable energy products for people around the world."[70] Chevron also promotes massive use of fossil fuels as the key to lifting people out of poverty: "Reliable and affordable energy is necessary for improving standards of living, expanding the middle class and lifting people out of poverty. Oil and natural gas will continue to fulfill a significant portion of global energy demand for decades to come –

[65] https://www.youtube.com/watch?v=tMu1CBjXfq4&list=PLIrXlHj7zayYGaExfTp_B4t6gqTtkGf9A&index=6 (at 0:46).

[66] Shell CEO speech, Mar. 9, 2017, *available at* http://www.shell.com/media/speeches-and-articles/2017/deliver-today-prepare-for-tomorrow.html.

[67] Shell United States, Transforming Natural Gas, *available at* http://www.shell.us/energy-and-innovation/transforming-natural-gas.html.

[68] https://www.bp.com/content/dam/bp/en/corporate/pdf/sustainability-report/group-reports/bp-sustainability-report-2016.pdf; http://www.bp.com/energytransition/shifting-towards-gas.html.

[69] BP energy outlook, *available at* http://www.bp.com/en/global/corporate/energy-economics/energy-outlook.html.

[70] Chevron, Products and Services, *available at* https://www.chevron.com/operations/products-services.

even in a carbon-constrained scenario."[71] A prior Chevron advertisement still available on the web promotes Chevron fossil fuels on a massive scale by stating that "our lives demand oil."[72]

e) ConocoPhillips promotes its fossil fuel products by stating that it "responsibly suppl[ies] the energy that powers modern life."[73] Similarly, ConocoPhillips has the following advertising slogan on its website: "Providing energy to improve quality of life."[74]

80. Contrary to Defendants' claims that the use of massive amounts of fossil fuels is required to lift people out of poverty, the IPCC has concluded: "Climate change will exacerbate multidimensional poverty in most developing countries . . . . [and] will also create new poverty pockets in countries with increasing inequality, in both developed and developing countries."[75]

81. Defendants BP and Exxon have also used long-term energy forecasts and similar reports to promote their products under the guise of expert, objective analysis. These forecasts have repeatedly sought to justify heavy reliance on fossil fuels by overstating the cost of renewable energy.

82. Defendants' energy forecasts are aimed in substantial part at consumers and are promoted to the public through their respective websites and other direct media. Exxon continues to promote its annual "Outlook for Energy" reports in videos currently available on the internet. But Exxon's energy "analyses" are self-serving means of promoting fossil fuels and undercutting non-dangerous renewable energy and clean technologies. For example, Exxon has claimed in a recent forecast that natural gas is a cheaper way to reduce carbon dioxide emissions than wind or solar power while BP has claimed that solar and wind power will be more expensive in 2050 than

[71] Chevron, managing climate change risks, *available at* https://www.chevron.com/corporate-responsibility/climate-change/managing-climate-risk.

[72] Chevron TV ad (2009), *available at* https://www.youtube.com/watch?v=-KyjTGMVTkA.

[73] ConocoPhillips, the changing energy landscape, *available at* http://www.conocophillips.com/who-we-are/our-company/spirit-values/responsibility/Pages/the-changing-energy-landscape.aspx.

[74] ConocoPhillips, Producing energy, *available at* http://www.conocophillips.com/what-we-do/producing-energy/Pages/default.aspx.

[75] IPCC, Climate Change 2014: Impacts, Adaptation, and Vulnerability, at 797, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg2/WGIIAR5-Chap13_FINAL.pdf.

natural gas or coal even though wind and solar are already cheaper than natural gas or coal in some circumstances.[76] Exxon and BP also have understated in recent "forecasts" the expected market share of electric vehicles even as electric vehicle technology has taken off, prices have dropped and GM announced (in 2015) that it was investing billions in electric cars because the "future is electric."[77]

83. Defendants' reports also promote their fossil fuel products by warning consumers of supposed downsides to reducing fossil fuel use and carbon dioxide emissions. For example, Exxon's most recent report claims that the costs of carbon dioxide reductions are "ultimately borne by consumers and taxpayers."

84. These reports by BP and Exxon, and a similar one by Shell, predict massive increases in fossil fuel use over roughly the next 15 years.[78] This is part of a larger strategy of "mak[ing] the case for the necessary role of fossil fuels," as BP's chief executive stated in a moment of candor in 2015.[79]

## VIII. SAN FRANCISCO WILL INCUR SERIOUS CLIMATE CHANGE INJURIES THAT WILL REQUIRE BILLIONS IN EXPENDITURES TO ABATE THE GLOBAL WARMING NUISANCE.

85. According to a 2012 California governmental report, by 2050, California is projected to warm by approximately 2.7° F above the average temperature in 2000, regardless of

[76] http://cdn.exxonmobil.com/~/media/global/files/outlook-for-energy/2017/2017-outlook-for-energy.pdf, at 31; http://www.bp.com/content/dam/bp/pdf/technology/bp-technology-outlook.pdf, at 18.

[77] http://cdn.exxonmobil.com/~/media/global/files/outlook-for-energy/2017/2017-outlook-for-energy.pdf, at 18; https://www.bp.com/content/dam/bp/pdf/energy-economics/energy-outlook-2017/bp-energy-outlook-2017.pdf, at 47; General Motors, Press Release, *GM Employees on Mission to Transform Transportation* (May 7, 2015), *available at* http://media.gm.com/media/us/en/gm/company_info/facilities/assembly/orion.detail.html/content/Pages/news/us/en/2015/may/0507-sustainability-report.html.

[78] http://www.shell.com/energy-and-innovation/the-energy-future/scenarios/new-lenses-on-the future/_jcr_content/par/relatedtopics.stream/1448477051486/08032d761ef7d81a4d3b1b6df8620c1e9a64e564a9548e1f2db02e575b00b765/scenarios-newdoc-english.pdf.

[79] http://www.bp.com/en/global/corporate/media/speeches/2015-annual-general-meeting-group-chief-executive.html.

the level of future emissions, a rate of warming three times greater than over the last century.[80] By 2100, California's average temperatures could increase by 8.6 °F, if not more.[81] San Francisco's average annual temperatures are currently projected to increase by up to 5.5 °F by 2100.[82] San Francisco's average summertime high temperature (based upon 1986-2005 data) is projected to increase from 68.61 °F to 76.17 °F by 2100, making San Francisco's summers similar to those now experienced in Rancho Palos Verdes, California, approximately 400 miles south of San Francisco.[83] Continued production of massive amounts of fossil fuels will exacerbate global warming, increase sea level rise and result in grave harm to San Francisco.

86. Global warming has caused and continues to cause accelerated sea level rise in San Francisco Bay and the adjacent ocean with severe, and potentially catastrophic, consequences for San Francisco. Scientists recently concluded that coastal California is already experiencing impacts from accelerated sea level rise, including "more extensive coastal flooding during storms, periodic tidal flooding, and increased coastal erosion."[84] In the last 100 years, the California coast has experienced sea level rise of 6.7 to 7.9 inches.[85]

87. Storms with their attendant surges and flooding occur on top of and superimposed on sea level rise, causing storm surges to be greater, extend farther inland, and cause more extensive damage – including greater inundation and flooding of public and private property in San

---

[80] Our Changing Climate 2012, Vulnerability & Adaptation to the Increasing Risks from Climate Change in California, at 2, *available at* http://www.energy.ca.gov/2012publications/CEC-500-2012-007/CEC-500-2012-007.pdf.

[81] *Id.*

[82] S.F. Dept. of Public Health, San Francisco's Climate and Health Adaptation Framework at 8 (2017), *available at* https://extxfer.sfdph.org/gis/ClimateHealth/Reports%20and%20 Research/SFDPH_ClimateHealthAdaptFramework2017a.pdf.

[83] Climate Central, *available at* http://www.climatecentral.org/news/summer-temperatures-co2-emissions-1001-cities-16583 (Aug. 1, 2014).

[84] Rising Seas in California at 3.

[85] Climate Change Impacts in the United States: The Third National Climate Assessment, southwest chapter at 469 (2014), *available at* http://nca2014.globalchange.gov/system/files_force/ downloads/low/NCA3_Full_Report_20_Southwest_LowRes.pdf?download=1.

Francisco.[86] By 2050, for example, a "100-year flood" in San Francisco is expected to occur on average once every year and by 2100 to occur 92 times per year – or almost twice per *week*.[87] A 100-year flood event normally – that is, without global warming – has a 1% chance of happening every year. Under this same scenario, the 500-year storm surge flood would occur, by 2050, once every four years and, by 2100, 42 times per year – or almost once per week.[88] Even with lower levels of future fossil fuel production, there will be substantial increases in flood frequencies in San Francisco due to past and ongoing fossil fuel combustion.[89]

88. Accelerated sea level rise in California is causing and will continue to cause inundation of both public and private property located within San Francisco. San Francisco is extremely vulnerable to accelerated sea level rise, storm surges, and inundation because it is surrounded by water on three sides – the Pacific Ocean to the west and San Francisco Bay to the north and east.[90] Rising bay and coastal water levels are already affecting San Francisco through coastal flooding of low-lying shorelines, increased shoreline erosion, and salt water impacts on its wastewater treatment systems.[91] Sea levels in and around San Francisco rose approximately eight inches during the past century and accelerated due to global warming.[92] But with accelerated sea level rise, they are currently projected to increase by up to 24 inches by 2050 and 66 inches by 2100, if not higher.[93] Storm surge added on top of these greatly elevated sea levels could produce a

---

[86] San Francisco Sea Level Rise Action Plan, Executive Summary at 4 (2016) ("SLR Plan Executive Summary"), *available at* http://default.sfplanning.org/plans-and-programs/planning-for-the-city/sea-level-rise/160309_SLRAP_Executive_Summary_EDreduced.pdf.

[87] Buchanan, et al., Amplification of flood frequencies with local sea level rise and emerging flood regimes, Environmental Research Letters (2017), supplementary material table 6.

[88] *Id.*

[89] *Id.* at supplementary material table 5.

[90] *See* S.F. Dept. of Public Health, San Francisco's Climate and Health Adaptation Framework at 8 (2017), *available at* https://extxfer.sfdph.org/gis/ClimateHealth/Reports%20and%20 Research/SFDPH_ClimateHealthAdaptFramework2017a.pdf.

[91] SLR Plan Executive Summary at 9.

[92] S.F. Dept. of Public Health, San Francisco's Climate and Health Adaptation Framework at 8 (2017), *available at* https://extxfer.sfdph.org/gis/ClimateHealth/Reports%20and%20Research /SFDPH_ClimateHealthAdaptFramework2017a.pdf.

[93] *Id.* at 9.

combined rise of up to 66 inches by 2050 and 108 inches by 2100.[94] As sea level rises, average daily high tides will extend further inland and cause more extensive flooding.[95] Without adaptation measures, daily tides could permanently inundate six percent of San Francisco's land by 2100.[96] And all of these projections are an understatement in light of a new, 2017 report that sea level is likely to rise faster than projected and could reach as much as a catastrophic ten feet by the end of the century.[97]

89. San Francisco must adapt now to ongoing sea level rise to abate ongoing damage to property, facilities, and equipment, with risks of increasingly severe damage in the future. In particular, San Francisco must improve, protect, move, and build infrastructure to adapt now to past and ongoing sea level rise. For example:

a) San Francisco is planning to fortify its Seawall to protect itself from sea level rise. The Seawall is the foundation of over three miles of San Francisco waterfront stretching from Fisherman's Wharf to Mission Creek. In 2016, San Francisco Mayor Edwin M. Lee announced an initial investment of $8 million over the next two years to initiate City efforts to fortify the Seawall.[98] Short-term seawall upgrades are expected to cost more than $500 million. Long-term upgrades to the seawall are projected to cost $5 billion.[99]

b) A significant portion of the combined sewer and storm water infrastructure on the west side of San Francisco is at severe risk of shoreline erosion caused by sea level rise. This infrastructure, including the Westside Transport Box, Westside Pump Station, Lake Merced Tunnel, and the Oceanside Water Pollution Control Plant, is located along Ocean Beach on San Francisco's western shore. Most of this infrastructure, including much of the Oceanside plant, is

---

[94] *Id.*

[95] San Francisco Sea Level Rise Action Plan, at 2-3 (2016), http://default.sfplanning.org/plans-and-programs/planning-for-the-city/sea-level-rise/160309_SLRAP_Final_ED.pdf.

[96] *Id.*

[97] Rising Seas in California.

[98] http://sfmayor.org/article/mayor-lee-invests-seawall-protect-city.

[99] https://sfseawall.files.wordpress.com/2017/01/seawall-fact-sheet.pdf; http://onesanfrancisco.org/sites/default/files/2017-06/Agenda%20Item%206%20-%20Seawall%20Presentation.pdf.

located underground. Because San Francisco has a city-wide combined sewer system – designed to handle both storm water and sewer water – this infrastructure is large in size and scale. Sea level rise and corresponding shoreline erosion threatens to damage this infrastructure. As a result, San Francisco has helped to develop plans to protect this infrastructure at an estimated cost of approximately $350 million.[100] The costs and logistics of relocating this infrastructure would be far greater.

c) Shoreline erosion along Ocean Beach also threatens roads, pathways, private properties, and buildings along the shore – all of which San Francisco's citizens have long used and enjoyed. Protecting these properties through construction of a seawall and/or other shoreline armoring infrastructure will be extremely expensive. San Francisco's plan for protecting its combined sewer infrastructure along Ocean Beach calls for closing a portion of the Great Highway south of Sloat Boulevard.[101]

d) Sea level rise also interferes with San Francisco's stormwater infrastructure through inundation of the City's stormwater outfalls along the ocean and San Francisco Bay.[102] As a result of sea level rise, 27 of San Francisco's 29 stormwater discharge locations between the Golden Gate Bridge and the City's southern border on San Francisco Bay will be underwater daily by 2050 or before.[103] As those outfalls are more frequently submerged by sea water, they cannot be used to discharge stormwater as intended, causing backups in the system and flooding elsewhere in San Francisco. Saltwater intrusion into San Francisco's water treatment facilities also interferes with effective treatment function at those facilities, reducing their capacity and causing further backups. Stormwater system outfalls cannot simply be elevated because that would interfere with the hydraulic gradient of the entire system. As a result, San Francisco is developing costly plans to protect its stormwater outfalls and water treatment facilities with backflow preventers and pumping

---

[100] Office of the Mayor (2012), Mayor Lee Celebrates SPUR Ocean Beach Master Plan, *available at* http://sfmayor.org/article/mayor-lee-celebrates-spur-ocean-beach-master-plan.

[101] *See* Ocean Beach Master Plan, at III-19 and executive summary at 6.

[102] SLR Plan at 2-5.

[103] CSD Backflow Prevention and Monitoring, 263.

equipment. To address current and short-term impacts of sea level rise on its Bayside stormwater system outfalls, for example, San Francisco has developed an interim backflow prevention plan projected to cost a minimum of $10 million. Long-term backflow prevention at these outfalls, and at others, will cost more.

90. San Francisco faces other ongoing and likely injuries as a result of sea level rise, including threats to Port infrastructure and operations, a risk of saltwater intrusion into the City's groundwater wells used for drinking water, and both direct and indirect impacts to public health, housing and city services.[104] Sea level rise, storm surges, and flood inundation induced by global warming will disproportionately impact some of San Francisco's most vulnerable residents, including those in the Bayview/Hunters Point neighborhood.[105] The same sea level rise also threatens some of San Francisco's most iconic and valuable buildings. For example, the Ferry Building would be temporarily flooded during a 100-year extreme tide today, but could be flooded every day after 36 inches of sea level rise.[106] Each of these ongoing and likely injuries, and others, requires San Francisco to plan for and implement costly protections.

91. San Francisco is already experiencing, and working to abate, current harms caused by sea level rise. But while harms to San Francisco and its residents have commenced, additional far more severe injuries will occur in the future if prompt action is not taken to protect San Francisco and its residents from rising sea levels. Indeed, the sea level rise harms inflicted on San Francisco by global warming are insidious partly because they are projected to continue, and to worsen, far into the future. Pervasive fossil fuel combustion and greenhouse gas emissions to date will cause ongoing and future harms regardless of future fossil fuel combustion or future greenhouse gas emissions. Future production and use of fossil fuels will exacerbate sea level rise and require even greater expenditures to abate the injuries. San Francisco must plan for and adapt

---

[104] S.F. Dept. of Public Health, San Francisco's Climate and Health Adaptation Framework at 12 (2017), *available at* https://extxfer.sfdph.org/gis/ClimateHealth/Reports%20and%20Research/SFDPH_ClimateHealthAdaptFramework2017a.pdf.

[105] *Id.* at 14.

[106] SLR Plan Executive Summary at 2-5.

to sea level rise future harms now to ensure that abatement of ongoing and future sea level rise harms is done most efficiently and effectively and in order to protect human well-being and public and private property before it is too late. Additionally, the significant infrastructure needed to abate global warming requires long lead times for planning, financing, and implementation. Planning to abate the known and projected adverse effects of global warming on San Francisco and its citizens remains underway, and will continue. Sea level rise impacts in the future are imminent in the context of planning for and carrying out large-scale, complex infrastructure projects to protect San Francisco from sea level rise.

92. Sea level rise, storm surges, and flooding caused by global warming threaten not only the physical infrastructure and property of San Francisco and its citizens, but also the safety, lives, daily way of life, sense of community, and security of San Francisco residents.[107] A severe storm surge coupled with higher sea levels caused by global warming could occur at any time, potentially resulting in the loss of life and extensive damage to public and private property. The risk of catastrophic sea level rise harm to San Francisco and its citizens will increase, just as rising sea levels will continue to cause regular damage, the longer concrete action is not taken to abate the harms and effects of sea level rise.

93. Building infrastructure to protect San Francisco and its residents, will, upon information and belief, cost billions of dollars.

## IX. CAUSE OF ACTION: PUBLIC NUISANCE ON BEHALF OF THE PEOPLE

94. The People incorporate by reference the preceding paragraphs.

95. The People of the State of California, acting by and through the San Francisco City Attorney, bring this claim seeking abatement pursuant to California public nuisance law, including section 731 of the Code of Civil Procedure, and sections 3479, 3480, 3491, and 3494 of the Civil Code.

96. Defendants' production and promotion of massive quantities of fossil fuels, and their promotion of those fossil fuels' pervasive use, has caused, created, assisted in the creation of,

[107] Rising Seas in California at 6.

contributed to, and/or maintained and continues to cause, create, assist in the creation of, contribute and/or maintain to global warming-induced sea level rise, a public nuisance in San Francisco. Defendants, both individually and collectively, are substantial contributors to the global warming-induced sea level rise and the People's attendant injuries and threatened injuries. The People's injuries and threatened injuries from each Defendant's contributions to global warming are indivisible injuries. Each Defendant's past and ongoing conduct is a direct and proximate cause of the People' injuries and threatened injuries. Defendants each should have known that this dangerous global warming with its attendant harms on coastal cities like San Francisco would occur before it even did occur, and each Defendant in fact did have such knowledge. Each Defendant has at all relevant times been aware, and continues to be aware, that the inevitable emissions of greenhouse gases from the fossil fuels it produces combines with the greenhouse gas emissions from fossil fuels produced by the other Defendants, among others, to result in dangerous levels of global warming with grave harms for coastal cities like San Francisco. Defendants were aware of this dangerous global warming, and of its attendant harms on coastal cities like San Francisco, even before those harms began to occur. Defendants' conduct constitutes a substantial and unreasonable interference with and obstruction of public rights and property, including, *inter alia*, the public rights to health, safety and welfare of San Francisco residents and other citizens whose safety and lives are at risk from increased storm surge flooding and whose public and private property, is threatened with widespread damage from global warming-induced sea level rise, greater storm surges, and flooding.

97. Defendants, individually and collectively, are substantial contributors to global warming and to the injuries and threatened injuries suffered by the People. Defendants have caused or contributed to accelerated sea level rise from global warming, which has and will continue to injure public property and land located in the City of San Francisco, through increased inundation, storm surges, and flooding, and which threatens the safety and lives of San Francisco residents. Defendants have inflicted and continue to inflict injuries upon the People that require the People to incur extensive costs to protect public and private property, against increased sea level rise, inundation, storm surges, and flooding.

98. Defendants have promoted the use of fossil fuels at unsafe levels even though they should have known and in fact have known for many years that global warming threatened severe and even catastrophic harms to coastal cities like San Francisco. Defendants promoted fossil fuels and fossil fuel products for unlimited use in massive quantities with knowledge of the hazard that such use would create.

99. Defendants are jointly and severally liable to the People for committing a public nuisance. The People seek an order of abatement requiring Defendants to fund a climate change adaptation program for San Francisco consisting of the building of sea walls, raising the elevation of low-lying property and buildings and building such other infrastructure as is necessary for San Francisco to adapt to climate change.[108]

## X. RELIEF REQUESTED

**WHEREFORE**, the People pray for judgment and an order against each Defendant, jointly and severally, as follows:

1. Finding Defendants BP, Chevron, ConocoPhillips, Exxon, and Shell jointly and severally liable for causing, creating, assisting in the creation, of, contributing to, and/or maintaining a public nuisance;

2. Ordering an abatement fund remedy to be paid for by Defendants to provide for infrastructure in San Francisco necessary for the People to adapt to global warming impacts such as sea level rise;

3. Awarding attorneys' fees as permitted by law;

4. Awarding costs and expenses as permitted by law;

5. Awarding pre- and post-judgment interest as permitted by law; and

6. Awarding such other relief as this Court deems just and proper.

///

///

///

[108] The People also do not seek abatement with respect to any federal land.

Dated: September 19, 2017

DENNIS J. HERRERA
City Attorney
RONALD P. FLYNN
Chief Deputy City Attorney
YVONNE R. MERÉ
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA
MATTHEW D. GOLDBERG
Deputy City Attorneys

By ______________________
DENNIS J. HERRERA
City Attorney

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

*Of Counsel*

[*Counsel Listed in Alphabetical Order*]

STEVE W. BERMAN (*pro hac vice* application to be submitted)
steve@hbsslaw.com
EMERSON HILTON (*pro hac vice* application to be submitted)
emersonh@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Ave. Suite 3300
Seattle, WA 98101
Tel. (206) 623-7292
Fax (206) 623-0594

SHANA E. SCARLETT (bar no. 217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Tel. (510) 725-3000
Fax (510) 725-3001

MATTHEW F. PAWA (*pro hac vice* application to be submitted)
mattp@hbsslaw.com
BENJAMIN A. KRASS (*pro hac vice* application to be submitted)
benk@hbsslaw.com
WESLEY KELMAN (*pro hac vice* application to be submitted)
wesk@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1280 Centre Street, Suite 230
Newton Centre, Massachusetts 02459
Tel.: (617) 641-9550
Fax: (617) 641-9551

Attorneys for Plaintiff
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney
DENNIS J. HERRERA

Exhibit 1: Map showing San Francisco sea level rise vulnerability zone

Source: San Francisco Sea Level Rise Action Plan, p. 2-7 (March 2016)




*NOTE: Zone represents upper range (unlikely, but possible), end-of-century projections for permanent SLR inundation (up to 66 inches) plus temporary flooding due to a 100-year extreme storm (up to 42 inches) for a total of 108 inches above today's average high tide.*

Map Disclaimer: The inundation maps and the associated analyses are intended as planning level tools to illustrate the potential for inundation and coastal flooding under a variety of future sea level rise and storm surge scenarios. The maps depict possible future inundation that could occur if nothing is done to adapt or prepare for sea level rise over the next century. The maps do not represent the exact location of flooding. The maps relied on a 1-m digital elevation model created from LiDAR data collected in 2010 and 2011. Although care was taken to capture all relevant topographic features and coastal structures that may impact coastal inundation, it is possible that structures narrower than the 1-m horizontal map scale may not be fully represented. The maps are based on model outputs and do not account for all of the complex and dynamic San Francisco Bay processes or future conditions such as erosion, subsidence, future construction or shoreline protection upgrades, or other changes to San Francisco Bay or Open Coast. For more context about the maps and analyses, including a description of the data and methods used, please see the Climate Stressors and Impacts Report: Bayside Sea Level Rise Inundation Mapping Technical Memorandum, March 2014 and FEMA Open California Coast Sea Level Rise Pilot Study, San Francisco County, 2015.

Data Source: Bayside—SFPUC SSIP Inundation Mapping, 2015. Westside—FEMA Sea Level Rise Pilot Study, 2015

Exhibit 2: Map showing sea level rise vulnerability zone
– Downtown to Central Bayshore detail

Source: San Francisco Sea Level Rise Action Plan, p. 2-7 (March 2016)

## SLR VULNERABILITY ZONE—DOWNTOWN TO CENTRAL BAYSHORE DETAIL
THROUGH END-OF-CENTURY WITHOUT ANY ADAPTATION MEASURES OR ACTIONS




Data Source: Bayside—SFPUC SSIP Inundation Mapping, 2015. Westside—FEMA Sea Level Rise Pilot Study, 2015.

*NOTE: Zone represents upper range (unlikely, but possible), end-of-century projections for permanent SLR inundation (up to 66 inches) plus temporary flooding due to a 100-year extreme storm (up to 42 inches) for a total of 108 inches above today's MHHW.*
***See Appendix for complete set of San Francisco SLR Vulnerability Zone maps and public land ownership information.***

Exhibit 3: "Range of Global Mean Temperature From 1850 to the Present with the Projected Instantaneous Climatic Response to Increasing CO2 Concentrations"

Source: M.B. Glaser, Memo for Exxon management (Nov. 12, 1982), pp. 1, 28

EXXON RESEARCH AND ENGINEERING COMPANY
P.O. BOX 101, FLORHAM PARK, NEW JERSEY 07932

M. B. GLASER
Manager
Environmental Affairs Programs

Cable: ENGREXXON, N.Y.

November 12, 1982

$CO_2$ "Greenhouse" Effect

82EAP 266

TO: See Distribution List Attached

Attached for your information and guidance is briefing material on the $CO_2$ "Greenhouse" Effect which is receiving increased attention in both the scientific and popular press as an emerging environmental issue. A brief summary is provided along with a more detailed technical review prepared by CPPD.

The material has been given wide circulation to Exxon management and is intended to familiarize Exxon personnel with the subject. It may be used as a basis for discussing the issue with outsiders as may be appropriate. However, it should be restricted to Exxon personnel and not distributed externally.

Very truly yours,

M. B. Glaser

M. B. GLASER

MBG:rva

Attachments

H. N. WEINBERG

NOV 15 1982

Figure 9

Range of Global Mean Temperature From 1850 to the Present with the Projected Instantaneous Climatic Response to Increasing $CO_2$ Concentrations.



# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO

400 MCALLISTER STREET, SAN FRANCISCO, CA 94102-4514

THE PEOPLE OF THE STATE OF CALIFORNIA

PLAINTIFF (S)

VS.

BP P.L.C., A PUBLIC LIMITED COMPANY OF ENGLAND AND et al

DEFENDANT (S)

**Department 304**

**NO. CGC-17-561370**

**Order Granting Complex Designation and for Single Assignment**

TO: ALL COUNSEL AND PARTIES IN PROPRIA PERSONA

The Application for Approval of Complex Designation filed Sep-21-2017, in the above-entitled action, is GRANTED. Complex Designation is APPROVED and it is hereby ordered that this entire action be assigned for all purposes to the Complex Litigation Department, Judge CURTIS E.A. KARNOW, Department 304, of the California Superior Court for the County of San Francisco at 400 McAllister Street, San Francisco, CA 94102.

The CASE MANAGEMENT CONFERENCE previously set for Feb-21-2018 in Dept.610 is canceled and a new case management conference is set for Nov-28-2017 at 9:00 am in Department 304. Counsel is expected to appear in person for this initial case management conference. A JOINT case management statement must be filed and an endorsed copy thereof delivered to Department 304 no later than four (4) court days prior to the case management conference.

Any pending motions previously set for hearing in the Law and Motion or Discovery Departments should be taken off calendar and new courtesy copies forwarded to Department 304 for possible re-setting at the time of the case management conference. All court dates must be reserved in advance with the Clerk of the Court. The Clerk of the Court in Department 304 may be contacted at (415) 551-3729.

Counsel for plaintiff shall provide a copy of this order and notice to all counsel of record and/or parties In Propria Persona that are not listed in the attached certificate of service.

All counsel should read and be familiar with the "User's Manual for Dept.304" located online at: http://www.sfsuperiorcourt.org/divisions/civil/litigation

This case is now subject to mandatory e-filing and e-service pursuant to Local Rule 2.10. For e-filing registration, training information and service list assistance, contact the Court's approved e-filing & e-service provider at (888)529-7587.

DATED: SEP-29-2017

Curtis Karnow

JUDGE

CERTIFICATE OF SERVICE BY MAIL

I, the undersigned, certify that I am an employee of the Superior Court of California, County of San Francisco and not a party to the above-entitled cause and that on SEP-29-2017 I served the attached Order Granting Complex Designation and for Single Assignment by placing a copy thereof in an envelope addressed to all parties to this action as listed below. I then placed the envelope in the outgoing mail at 400 McAllister Street, San Francisco, CA 94102, on the date indicated above for collection, sealing of the envelope, attachment of required prepaid postage, and mailing on that date, following standard court practice.

Dated : SEP-29-2017 By: DANIAL LEMIRE

DENNIS JOSE HERRERA (139669)
CITY ATTORNEY
1390 MARKET ST., 6TH FLOOR
SAN FRANCISCO, CA 94102

CM-015

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
Dennis J. Herrera, City Attorney for City of San Francisco, SBN 139669
Yvonne R. Mere, SBN 173594
Matthew D. Goldberg, SBN 240776
City Hall, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102
TELEPHONE NO.: 415-554-4285 FAX NO. *(Optional)*: 415-437-4644
E-MAIL ADDRESS *(Optional)*: matthew.goldberg@sfgov.org
ATTORNEY FOR *(Name)*: Plaintiff People of the State of California

FOR COURT USE ONLY

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**10/04/2017**
Clerk of the Court
BY: JUDITH NUNEZ
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Francisco
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, California 94102
BRANCH NAME: Civic Center Courthouse - Civil Division

PLAINTIFF/PETITIONER: People of the State of California

DEFENDANT/RESPONDENT: BP p.l.c. et al.

CASE NUMBER: CGC-17-561370

JUDICIAL OFFICER: Karnow

DEPT.: 304

## NOTICE OF RELATED CASE

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: People of the State of California v. BP p.l.c. et al.
   b. Case number: RG17875889
   c. Court: ☐ same as above
      ☑ other state or federal court *(name and address)*: Alameda County Superior Court, State of California
   d. Department: Civil Division, Department 23
   e. Case type: ☐ limited civil ☑ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:
   f. Filing date: 09/19/2017
   g. Has this case been designated or determined as "complex?" ☑ Yes ☐ No
   h. Relationship of this case to the case referenced above *(check all that apply)*:
      ☑ involves the same parties and is based on the same or similar claims.
      ☑ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☐ involves claims against, title to, possession of, or damages to the same property.
      ☑ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
      ☐ Additional explanation is attached in attachment 1h
   i. Status of case:
      ☑ pending
      ☐ dismissed ☐ with ☐ without prejudice
      ☐ disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: ☐ same as above
      ☐ other state or federal court *(name and address)*:
   d. Department:

CM-015

| PLAINTIFF/PETITIONER: People of the State of California<br>DEFENDANT/RESPONDENT: BP p.l.c. et al. | CASE NUMBER:<br>CGC-17-561370 |
|---|---|

2. *(continued)*
   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:
   f. Filing date:
   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No
   h. Relationship of this case to the case referenced above *(check all that apply)*:
      ☐ involves the same parties and is based on the same or similar claims.
      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☐ involves claims against, title to, possession of, or damages to the same property.
      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
      ☐ Additional explanation is attached in attachment 2h
   i. Status of case:
      ☐ pending
      ☐ dismissed ☐ with ☐ without prejudice
      ☐ disposed of by judgment

3. a. Title:
   b. Case number:
   c. Court: ☐ same as above
      ☐ other state or federal court *(name and address)*:
   d. Department:
   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify)*:
   f. Filing date:
   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No
   h. Relationship of this case to the case referenced above *(check all that apply)*:
      ☐ involves the same parties and is based on the same or similar claims.
      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☐ involves claims against, title to, possession of, or damages to the same property.
      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
      ☐ Additional explanation is attached in attachment 3h
   i. Status of case:
      ☐ pending
      ☐ dismissed ☐ with ☐ without prejudice
      ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: ______

Date: October 3, 2017

Matthew D. Goldberg
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015

| PLAINTIFF/PETITIONER: People of the State of California | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: BP p.l.c. et al. | CGC-17-561370 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

***(NOTE: You cannot serve the* Notice of Related Case *if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)***

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):* Business
   Hagens Berman Sobol Shapiro LLP
   715 Hearst Avenue, Suite 202, Berkeley, CA 94710

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*
   a. [ ] deposited the sealed envelope with the United States Postal Service.
   b. [X] placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:
   a. on *(date):* October 4, 2017
   b. from *(city and state):* Berkeley, California

4. The envelope was addressed and mailed as follows: SEE ATTACHED FORM POS-030(P)
   a. Name of person served:
      Street address:
      City:
      State and zip code:
   b. Name of person served:
      Street address:
      City:
      State and zip code:
   c. Name of person served:
      Street address:
      City:
      State and zip code:
   d. Name of person served:
      Street address:
      City:
      State and zip code:

[X] Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

BRIAN MILLER ▶ [signature]

(TYPE OR PRINT NAME OF DECLARANT) (SIGNATURE OF DECLARANT)

POS-030(P)

| SHORT TITLE: People of the State of California v. BP p.l.c. et al. | CASE NUMBER: CGC-17-561370 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)

*(This Attachment is for use with form POS-030)*

**NAME AND ADDRESS OF EACH PERSON SERVED BY MAIL:**

| Name of Person Served | Address *(number, street, city, and zip code)* |
|---|---|
| Chevron Corporation | 2710 Gateway Oaks Drive, Suite 150N<br>Sacramento, CA 95833 |
| ConocoPhillips Company | 2710 Gateway Oaks Drive, Suite 150N<br>Sacramento, CA 95833 |
| Exxon Mobil Corporation | 2710 Gateway Oaks Drive, Suite 150N<br>Sacramento, CA 95833 |
| BP America Inc. as general manager for BP p.l.c. | 818 W. 7th Street, Suite 930<br>Los Angeles, CA 90017 |
| Shell Oil Company as general manager for Royal Dutch Shell plc | 818 W. 7th Street, Suite 930<br>Los Angeles, CA 90017 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |