Theodore J. Boutrous, Jr. (SBN 132099)
  tboutrous@gibsondunn.com
Andrea E. Neuman (SBN 149733)
  aneuman@gibsondunn.com
William E. Thomson (SBN 187912)
  wthomson@gibsondunn.com
Ethan D. Dettmer (SBN 196046)
  edettmer@gibsondunn.com
Joshua S. Lipshutz (SBN 242557)
  jlipshutz@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

Herbert J. Stern (*pro hac vice*)
  hstern@sgklaw.com
Joel M. Silverstein (*pro hac vice*)
  jsilverstein@sgklaw.com
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
Florham Park, NJ 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

*Attorneys for Defendant Chevron Corporation*

Neal S. Manne (SBN 94101)
  nmanne@susmangodfrey.com
Johnny W. Carter (*pro hac vice*)
  jcarter@susmangodfrey.com
Erica Harris (*pro hac vice* pending)
  eharris@susmangodfrey.com
Steven Shepard (*pro hac vice*)
  sshepard@susmangodfrey.com
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  713.651.9366
Facsimile:  713.654.6666

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Oakland City Attorney BARBARA J. PARKER, <br><br> Plaintiff and Real Party in Interest, <br><br> v. <br><br> BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS COMPANY, a Delaware corporation, EXXONMOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10, <br><br> Defendants. | First Filed Case:  No. 3:17-cv-6011-WHA <br> Related Case:     No. 3:17-cv-6012-WHA <br><br> **DEFENDANTS' CORRECTED JOINT OPPOSITION TO MOTION TO REMAND** <br><br> Case No. 3:17-cv-6011-WHA <br><br> <u>HEARING</u> <br><br> DATE: JANUARY 25, 2018 <br><br> TIME: 8:00 AM <br><br> LOCATION: COURTROOM 12, 19TH FLOOR <br><br> THE HONORABLE WILLIAM H. ALSUP |

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney DENNIS J. HERRERA, | Case No. 3:17-cv-6012-WHA |
|        Plaintiff and Real Party in Interest, | |
|     v. | |
| BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS COMPANY, a Delaware corporation, EXXONMOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10, | |
|        Defendants. | |

*[Additional Counsel Listed on Signature Page]*

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................. 1

II.     LEGAL STANDARDS.......................................................................... 4

III.    ARGUMENT ....................................................................................... 5

        A.      Plaintiffs' Claims Arise, If at All, Under Federal Common Law .............................. 5

                1.      Under *AEP* and *Kivalina*, Public Nuisance Claims Based on Global Warming Are Governed by Federal Common Law........................................... 5

                2.      This Case Falls Squarely Within *AEP* and *Kivalina* ....................................... 7

                3.      Plaintiffs' Efforts to Distinguish *AEP* and *Kivalina* Are Unavailing .............. 8

                4.      Federal Common Law Is Not an "Ordinary Preemption Defense"; It Provides an Independent Basis for Federal-Question Jurisdiction ................. 11

                5.      Even If Federal Common Law Has Been Displaced by Statute, that Does Not Create State Common Law Claims.................................................. 12

        B.      These Cases Raise Disputed, Substantial Federal Interests Under *Grable* ................ 13

                1.      Plaintiffs' Claims Necessarily Raise Multiple Federal Issues ....................... 14

                        a.      Plaintiffs' Claims Have a Significant Impact on Foreign Affairs ............................................................................. 14

                        b.      Plaintiffs' Claims Require Federal-Law-Based Cost-Benefit Analyses ........................................................................... 16

                        c.      Plaintiffs' Claims Are a Collateral Attack on Federal Decisions ........................................................................... 19

                        d.      Plaintiffs' Promotion Claims Implicate Federal Law Duties to Disclose ......................................................................... 20

                2.      The Federal Issues Are Disputed and Substantial.......................................... 22

                3.      Federal Jurisdiction Does Not Upset Principles of Federalism ..................... 23

        C.      The Actions Are Removable Because They Are Completely Preempted by Federal Law.................................................................................... 25

        D.      The Actions Are Removable Because They Are Based on Defendants' Activities on Federal Lands and at the Direction of the Federal Government........... 29

Gibson, Dunn &
Crutcher LLP

1               1.     The Actions Are Removable Under the Outer Continental Shelf Lands Act ........................................................................................... 29

2.     The Actions Are Removable As Arising From Acts on Federal Enclaves ....................................................................................... 33

3.     The Actions Are Removable Under the Federal Officer Removal Statute ........................................................................................ 34

E.     The Actions Are Removable Under the Bankruptcy Removal Statute ...................... 38

IV.    CONCLUSION ............................................................................................................. 40

Page(s)

**Cases**

*Aetna Health Inc. v. Davila,*
542 U.S. 200 (2004) ..................................................................................4, 26, 29

*Am. Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011) ........................................5, 6, 7, 8, 9, 10, 13, 18, 19, 27, 29

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ...............................................................2, 14, 15, 24, 25

*Am. Motorcycle Ass'n v. Superior Court,*
20 Cal. 3d 578 (1978) ........................................................................................39

*Amoco Prod. Co. v. Sea Robin Pipeline Co.,*
844 F.2d 1202 (5th Cir. 1988)......................................................................30, 32

*Ange v. Templer,*
418 F. Supp. 2d 1169 (N.D. Cal. 2006) ...........................................................14

*ANR Pipeline Co. v. Conoco, Inc.,*
646 F. Supp. 439 (W.D. Mich. 1986) ..........................................................31, 32

*ARCO Envtl. Remediation L.L.C. v. Dep't of Health & Envtl. Quality,*
213 F.3d 1108 (9th Cir. 2000).............................................................................4

*Arizona v. Manypenny,*
451 U.S. 232 (1981) .........................................................................................34

*Asante Techs., Inc. v. PMC-Sierra, Inc.,*
164 F. Supp. 2d 1142 (N.D. Cal. 2001) ...........................................................28

*Azhocar v. Coastal Marine Servs., Inc.,*
2013 WL 2177784 (S.D. Cal. May 20, 2013) ..................................................33

*Bader Farms, Inc. v. Monsanto Co.,*
2017 WL 633815 (E.D. Mo. Feb. 16, 2017)................................................19, 21

*Ballard v. Ameron Int'l Corp.,*
2016 WL 6216194 (N.D. Cal. Oct. 25, 2016) ..................................................33

*Banco Nacional de Cuba v. Sabbatino,*
376 U.S. 398 (1964) ..........................................................................................14

*Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.,*
850 F.3d 714 (5th Cir. 2017)..............................................3, 18, 19, 20, 21, 23

*Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., LLC,*
29 F. Supp. 3d 808 (E.D. La. 2014) ..................................................................32

*Beneficial Nat'l Bank v. Anderson,*
539 U.S. 1 (2003) ..............................................................................................25

*Bennett v. Sw. Airlines Co.,*
484 F.3d 907 (7th Cir. 2007)........................................................................20, 22

Gibson, Dunn &
Crutcher LLP

*Benson v. Russell's Cuthand Creek Ranch, Ltd.*,
    183 F. Supp. 3d 795 (E.D. Tex. 2016) ...................................................................37

*Botsford v. Blue Cross & Blue Shield of Mont. Inc.*,
    314 F.3d 390 (9th Cir. 2002)......................................................................28, 29

*Boyeson v. S.C. Elec. & Gas Co.*,
    2016 WL 1578950 (D.S.C. Apr. 20, 2016) ...............................................................21

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) .................................................................................2, 16

*Buckman Co. v. Pls.' Legal Comm.*,
    531 U.S. 341 (2001) ...................................................................................21

*Cal. Dump Truck Owners Ass'n v. Nichols*,
    784 F.3d 500 (9th Cir. 2015)......................................................................24, 27

*Cal. Shock Trauma Air Rescue v. State Comp. Ins. Fund*,
    636 F.3d 538 (9th Cir. 2011)..........................................................................14

*California v. Gen. Motors Corp.*,
    2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ...................................................2, 25

*California v. Watt*,
    668 F.2d 1290 (D.C. Cir. 1981) ......................................................................36

*Cerny v. Marathon Oil Corp.*,
    2013 WL 5560483 (W.D. Tex. Oct. 7, 2013) ..........................................................28

*Chevron U.S.A., Inc. v. United States*,
    110 Fed. Cl. 747 (2013) ...............................................................................35

*In re Circular Thermostat*,
    2005 WL 2043022 (N.D. Cal. Aug. 24, 2005) ........................................................14

*City & Cty. of S.F. v. PG&E Corp.*,
    433 F.3d 1115 (9th Cir. 2006).........................................................................40

*City of Milwaukee v. Illinois*,
    451 U.S. 304 (1981) .....................................................................................9

*Connecticut v. Am. Elec. Power Co.*,
    582 F.3d 309 (2d Cir. 2009).............................................................................6

*Cont'l Ins. Co. v. Kawasaki Kisen Kasha Ltd.*,
    542 F. Supp. 2d 1031 (N.D. Cal. 2008) ...............................................................28

*N.C. ex rel. Cooper v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010)........................................................10, 27, 28, 29

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ................................................................................14, 15

*Cty. of Santa Clara v. Astra USA, Inc.*,
    401 F. Supp. 2d 1022 (N.D. Cal. 2005) ............................................................21, 22

*In re Deepwater Horizon*,
    745 F.3d 157 (5th Cir. 2014)....................................................................5, 30, 31

Gibson, Dunn &
Crutcher LLP

*Durham v. Lockheed Martin Corp.*,
    445 F.3d 1247 (9th Cir. 2006) .................................................................4, 5, 33, 34

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
    26 F.3d 563 (5th Cir. 1994) ..................................................................................30, 32

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938) .........................................................................................................5

*Ethridge v. Harbor House Rest.*,
    861 F.2d 1389 (9th Cir. 1988) ...................................................................................4

*Evangelatos v. Superior Court*,
    44 Cal. 3d 1188 (1988) ...............................................................................................39

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ......................................................................................................4

*Fadhliah v. Societe Air Fr.*,
    987 F. Supp. 2d 1057 (C.D. Cal. 2013) ...............................................................28

*In re Fietz*,
    852 F.2d 455 (9th Cir. 1988) ...............................................................................5, 38

*Fossen v. Blue Cross & Blue Shield of Mont., Inc.*,
    660 F.3d 1102 (9th Cir. 2011) .................................................................................28

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
    463 U.S. 1 (1983) .....................................................................................................4, 25

*Gaus v. Miles, Inc.*,
    980 F.2d 564 (9th Cir. 1992) .....................................................................................4

*Gingery v. City of Glendale*,
    831 F.3d 1222 (9th Cir. 2016) .................................................................................23

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*,
    865 F.3d 1237 (9th Cir. 2017) .............................................................5, 34, 37, 38

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
    545 U.S. 308 (2005) ...........................................3, 13, 14, 21, 23, 24, 25

*Grynberg Prod. Corp. v. British Gas, p.l.c.*,
    817 F. Supp. 1338 (E.D. Tex. 1993) ......................................................................23

*Gully v. First Nat'l Bank in Meridian*,
    299 U.S. 109 (1936) ....................................................................................................13

*Gunn v. Minton*,
    568 U.S. 251 (2013) ................................................................................13, 22, 23

*Gutierrez v. Mobil Oil Corp.*,
    798 F. Supp. 1280 (W.D. Tex. 1992) ....................................................................28

*Hall v. N. Am. Van Lines, Inc.*,
    476 F.3d 683 (9th Cir. 2007) ...................................................................................28

*Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit*,
    874 F.2d 332 (6th Cir. 1989) ............................................................................10, 28

*In re High-Tech Emp. Antitrust Litig.*,
    856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...................................................33

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ...........................................................................23

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972) .............................................................3, 6, 7, 11

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ...........................................................10, 11, 13, 27

*Jones v. Union Pac. R.R. Co.*,
    79 Cal. App. 4th 1053 (2000) ...........................................................20

*K2 Am. Corp. v. Roland Oil & Gas, LLC*,
    653 F.3d 1024 (9th Cir. 2011) ..........................................................22

*Klausner v. Lucas Film Entm't Co., Ltd.*,
    2010 WL 1038228 (N.D. Cal. Mar. 19, 2010) ...........................................33, 34

*Or. ex rel. Kroger v. Johnson & Johnson*,
    832 F. Supp. 2d 1250 (D. Or. 2011) ...................................................19, 24

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012) .........................................................................24

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
    754 F.2d 1223 (5th Cir. 1985) ..........................................................30, 32

*Legg v. Wyeth*,
    428 F.3d 1317 (11th Cir. 2005) .............................................................4

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ..........................................................34, 37

*Cal. ex rel. Lockyer v. Dynegy, Inc.*,
    375 F.3d 831 (9th Cir. 2004) ...............................................................19

*Cal. ex rel. Lockyer v. Powerex Corp.*,
    2006 WL 997717 (E.D. Cal. Apr. 14, 2006) .............................................18, 19

*Luther v. Countrywide Home Loans Servicing LP*,
    533 F.3d 1031 (9th Cir. 2008) ..............................................................4

*Marin Gen. Hosp. v. Modesto & Empire Traction Co.*,
    581 F.3d 941 (9th Cir. 2009) ...............................................................29

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................7, 24

*McKay v. City & Cty. of S.F.*,
    2016 WL 7425927 (N.D. Cal. Dec. 23, 2016) ..........................................20, 24

*Merrell Dow Pharms. Inc. v. Thompson*,
    478 U.S. 804 (1986) .........................................................................19

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
    488 F.3d 112 (2d Cir. 2007) ...............................................................19

Gibson, Dunn &
Crutcher LLP

*Metro. Life Ins. Co. v. Taylor*,
    481 U.S. 58 (1987) ............................................................................................................3

*In re Miles*,
    430 F.3d 1083 (9th Cir. 2005) ........................................................................................28

*Nat. Res. Def. Council, Inc. v. Hodel*,
    865 F.2d 288 (D.C. Cir. 1988) ........................................................................................37

*Nat'l Audubon Soc'y v. Dep't of Water & Power*,
    869 F.2d 1196 (9th Cir. 1988) ......................................................................................9, 11

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*,
    471 U.S. 845 (1985) ......................................................................................................2, 11

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009) ............................................................................7

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    696 F.3d 849 (9th Cir. 2012)..........................................................2, 5, 6, 7, 9, 13, 19

*Nevada v. Bank of Am. Corp.*,
    672 F.3d 661 (9th Cir. 2012) ..........................................................................................25

*New Eng. Legal Found. v. Costle*,
    666 F.2d 30 (2d Cir. 1981) ..............................................................................................27

*New SD, Inc. v. Rockwell Int'l Corp.*,
    79 F.3d 953 (9th Cir. 1996) ..........................................................................................5, 12

*In re NSA Telecomms. Records Litig.*,
    483 F. Supp. 2d 934 (N.D. Cal. 2007) ..........................................................................22

*Parke v. Cardsystems Sols., Inc.*,
    2006 WL 2917604 (N.D. Cal. Oct. 11, 2006) ................................................................39

*Parra v. PacifiCare of Ariz., Inc.*,
    715 F.3d 1146 (9th Cir. 2013) ..........................................................................................8

*Patrickson v. Dole Food Co.*,
    251 F.3d 795 (9th Cir. 2001) ..........................................................................................11

*People v. ConAgra Grocery Prods. Co.*,
    ___ Cal. App. 4th ___, 2017 WL 5437485 (Nov. 14, 2017) ..........................................9

*Perez v. Consol. Tribal Health Project, Inc.*,
    2013 WL 1191242 (N.D. Cal. Mar. 21, 2013) ................................................................37

*Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*,
    559 F.3d 772 (8th Cir. 2009)..........................................................................................20

*Provincial Gov't of Marinduque v. Placer Dome, Inc.*,
    582 F.3d 1083 (9th Cir. 2009)........................................................................................11

*Ronquille v. Aminoil Inc.*,
    2014 WL 4387337 (E.D. La. Sept. 4, 2014) ..................................................................31

*Rosseter v. Indus. Light & Magic*,
    2009 WL 210452 (N.D. Cal. Jan. 27, 2009) ..................................................................33

*Ruppel v. CBS Corp.*,
    701 F.3d 1176 (7th Cir. 2012)................................................................37

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
    472 F.3d 882 (D.C. Cir. 2006)................................................................26

*Sam L. Majors Jewelers v. ABX, Inc.*,
    117 F.3d 922 (5th Cir. 1997)................................................................12

*San Diego Gas & Elec. Co. v. Super. Ct.*,
    13 Cal. 4th 893 (1996)................................................................16, 19

*Sasson v. Sokoloff (In re Sasson)*,
    424 F.3d 864 (9th Cir. 2005)................................................................38

*Savoie v. Huntington Ingalls, Inc.*,
    817 F.3d 457 (5th Cir. 2016)................................................................37

*Shanks v. Dressel*,
    540 F.3d 1082 (9th Cir. 2008)................................................................22

*Smallwood v. Ill. Cent. R. Co.*,
    385 F.3d 568 (5th Cir. 2004)................................................................4

*Sprint Commc'ns, Inc. v. Jacobs*,
    134 S. Ct. 584 (2013)................................................................40

*Stiefel v. Bechtel Corp.*,
    497 F. Supp. 2d 1138 (S.D. Cal. 2007)................................................................33

*Stutes v. Gulfport Energy Corp.*,
    2017 WL 4286846 (W.D. La. June 30, 2017)................................................................32

*Sullivan v. First Affiliated Sec., Inc.*,
    813 F.2d 1368, 1370 (9th Cir. 1987)................................................................13

*Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*,
    87 F.3d 150 (5th Cir. 1996)................................................................31

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981)................................................................5, 12, 13, 18

*United Offshore Co. v. S. Deepwater Pipeline Co.*,
    899 F.2d 405 (5th Cir. 1990)................................................................32

*United States v. Pink*,
    315 U.S. 203 (1942)................................................................23

*United States v. Standard Oil Co.*,
    332 U.S. 301 (1947)................................................................3, 5, 16

*United States v. Standard Oil Co. of Cal.*,
    545 F.2d 624 (9th Cir. 1976)................................................................35

*Virginia v. United States*,
    74 F.3d 517 (4th Cir. 1996)................................................................27

*Washington v. Monsanto Co.*,
    2017 WL 3492132 (W.D. Wash. July 28, 2017)................................................................34

*Watson v. Philip Morris Cos., Inc*,
    551 U.S. 142 (2007)................................................................................36, 38

*Wayne v. DHL Worldwide Express*,
    294 F.3d 1179 (9th Cir. 2002)......................................................................12

*Willingham v. Morgan*,
    395 U.S. 402 (1969)......................................................................................34

*In re Wilshire Courtyard*,
    729 F.3d 1279 (9th Cir. 2013)................................................................38, 39

*Wilson v. S. Cal. Edison Co.*,
    234 Cal. App. 4th 123 (2015)......................................................................16

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
    164 F.3d 123 (2d Cir. 1999).........................................................................11

*Worth v. Universal Pictures, Inc.*,
    5 F. Supp. 2d 816 (C.D. Cal. 1997)............................................................28

## Statutes

5 U.S.C. § 553.....................................................................................................26

10 U.S.C. § 7422.................................................................................................36

16 U.S.C. § 1451.................................................................................................17

28 U.S.C. § 1334.......................................................................................4, 5, 38

28 U.S.C. § 1367...................................................................................................4

28 U.S.C. § 1441.................................................................................................12

28 U.S.C. § 1442...........................................................................................4, 34

28 U.S.C. § 1452.....................................................................................4, 38, 40

30 U.S.C. § 21a....................................................................................................17

30 U.S.C. § 1201..................................................................................................17

42 U.S.C. §§ 4321-70..........................................................................................17

42 U.S.C. § 6201 *et seq.*.......................................................................................18

42 U.S.C. § 6231..................................................................................................36

42 U.S.C. § 6234..................................................................................................36

42 U.S.C. § 6240..................................................................................................36

42 U.S.C. § 7401..........................................................................................17, 26

42 U.S.C. § 7602..................................................................................................25

42 U.S.C. § 7604.............................................................................................24, 25

42 U.S.C. § 7607.................................................................................24, 25, 26, 27

42 U.S.C. § 13384................................................................................................16

42 U.S.C. § 13389................................................................................................17

Gibson, Dunn &
Crutcher LLP

43 U.S.C. § 1331 ..................................................................................................29

43 U.S.C. § 1344 ..................................................................................................36

43 U.S.C. § 1349 ..............................................................................................4, 29

43 U.S.C. § 1701 ..................................................................................................17

43 U.S.C. § 1802 ............................................................................................32, 37

Cal. Civ. Code § 3479 ..........................................................................................20

Cal. Civ. Code § 3482 ..........................................................................19, 20, 26

Pub. L. No. 94–258, 90 Stat. 303 (1976) ............................................................36

Pub. L. No. 105-276, 112 Stat. 2461 (1998) .......................................................15

Pub. L. No. 106-74, 113 Stat. 1047 (1999) .........................................................15

Pub. L. No. 106-377, 114 Stat. 1441 (2000) .......................................................15

## Regulations

10 C.F.R. § 626.6 ..................................................................................................18

30 C.F.R. § 250.180 ..............................................................................................36

30 C.F.R. § 550.120 ........................................................................................17, 18

30 C.F.R. § 745.13 ..........................................................................................17, 18

43 C.F.R. § 3101.1-2 ......................................................................................17

43 C.F.R. § 3162.1 ..........................................................................................17, 18

## Constitutional Provisions

U.S. CONST. art. I § 8, cl. 17 .................................................................................5

## Other Authorities

CACI 2022 Private Nuisance—Balancing-Test Factors—Seriousness of Harm and
   Public Benefit ..................................................................................................16

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ..........................17

RESTATEMENT (SECOND) OF TORTS (1979) .....................................................16, 19

S. Res. 98, 105th Cong. (1997) ............................................................................15

Gibson, Dunn &
Crutcher LLP

# I.    INTRODUCTION

These cases belong in federal court.  At their core, they are federal lawsuits that necessarily raise federal questions.  Plaintiffs—two California cities represented by the same private law firm—seek to reshape the Nation's longstanding national economic and foreign policies by holding five energy producers liable for harms alleged to have been caused by worldwide fossil fuel production and global greenhouse gas emissions by countless nonparties.  Through selective pleading and strategic omission, Plaintiffs endeavor to deprive Defendants of a federal forum.  But Plaintiffs cannot avoid the comprehensive role federal law plays in their core allegations.[1]

These cases implicate longstanding federal government policies, concerning matters of uniquely national importance, including the Nation's supply of energy and the global environment.  Because a stable energy supply is critical for the preservation of our general welfare, economy, and national security, Congress since the nineteenth century has enacted laws to promote the production of fossil fuels.  For nearly half a century, the federal government has aimed to decrease our country's reliance on foreign oil imports.[2]  The federal government has opened up federal lands and coastal areas to fossil fuel extraction, established strategic petroleum reserves, contracted with fossil fuel providers to develop those resources, and consumed a large volume of fossil fuels, with the Department of Defense being the largest consumer of fossil fuels in the United States.  During this time, the U.S. has enacted a series of environmental statutes and regulations designed to strike the appropriate—and evolving—balance between protecting the environment and ensuring the energy supply needed to serve our economic and national security needs.  The U.S. has also engaged in extensive, ongoing negotiations with other countries to craft a workable international framework for responding to global warming, carefully researching and evaluating how government regulation and international commitments could affect the economy, national security, and foreign relations without crippling economic growth.  Yet this lawsuit takes issue with all of these federal decisions, threatening to upend the fed-

---

[1]  A number of Defendants contend that personal jurisdiction is lacking over them and that process and service of process were insufficient.  These Defendants do not waive these objections, and will move to dismiss on these grounds at the appropriate time.

[2]  *See, e.g.*, Thomson Decl. ¶¶ 8–17 & Exs. 6–15 (excerpting and attaching exemplar statements).

eral government's longstanding energy and environmental policies and "compromis[ing] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" on the issue of climate change. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003).

At bottom, this case is about *global* emissions. Plaintiffs allege that the worldwide use of fossil fuels is "the primary source of the greenhouse gas pollution that causes global warming" and that "the inevitable emissions of greenhouse gases from the fossil fuels" produced by Defendants, "among others," "result in dangerous levels of global warming with grave harms for coastal cities." Compl. ¶¶ 2, 95.[3] Importantly, Plaintiffs' claims are not limited to harms caused by fossil fuels extracted, sold, marketed, or used in California. Instead, their claims depend on Defendants' nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only entities such as the U.S. government and military, but also hospitals, schools, manufacturing facilities, and individual households. Moreover, adjudicating these claims requires ruling on whether the benefits of using fossil fuels are outweighed by the costs, not just to Plaintiffs' local jurisdictions, or even to California, but throughout the U.S. and worldwide. Plaintiffs are thus wrong to suggest their claims do not "require construction of any of the litany of federal laws" addressing fossil fuel exploration, production, promotion, and use. Motion to Remand ("Mot.") 3. After all, Plaintiffs target *global* warming, and the transnational conduct that term entails, which is why earlier, similar lawsuits were brought in federal court under federal law, and why, when they were dismissed, those plaintiffs did not pursue the claims in state courts. *See, e.g.*, *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012); *California v. Gen. Motors Corp.*, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007). Removal here was proper.

***First,*** **federal common law necessarily governs Plaintiffs' claims**. Even "[p]ost-*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Kivalina*, 696 F.3d at 855. Decades of Supreme Court law hold that cases like this one, which raise "uniquely federal interests," "are governed exclusively by federal law." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). Federal courts have original jurisdiction over "'claims founded upon federal common law,'" and so removal is proper. *Nat'l Farmers*

---

[3] Citations to "Compl." refer to the Complaint filed in No. 17-cv-6011, unless otherwise noted.

Gibson, Dunn &
Crutcher LLP

*Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 850 (1985) (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")). That is true regardless whether these claims are ultimately viable; for now, the only question before this Court is whether this uniquely federal case belongs in federal court. *See United States v. Standard Oil Co.*, 332 U.S. 301, 309–10 (1947) ("state law" cannot "control" where "the question is one of federal policy," due to "considerations of federal supremacy in the performance of federal functions, [and] of the need for uniformity")

**Second**, suits facially alleging only state-law claims "arise under" federal law if the **"state-law claim[s] necessarily raise a stated federal issue,** actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005). Plaintiffs seek to supplant federal domestic and foreign policy on greenhouse gas emissions to hold a handful of energy producers liable for the alleged consequences of rising ocean levels on a discrete portion of the U.S. coast. As a result, an element of their state-law nuisance claim unavoidably questions the reasonableness of the balance struck by federal law between carbon-producing and non-carbon-producing energy sources. Moreover, greenhouse gas emissions, global warming, and sea level rise are not unique to Plaintiffs, California, or even the United States. Thus, "the scope and limitations of a complex federal regulatory framework are at stake in this case, and disposition of . . . whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other." *Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 725 (5th Cir. 2017).

**Third**, Plaintiffs' claims are completely preempted by the Clean Air Act ("CAA") and **other federal statutes**, which provide an exclusive federal remedy for stricter regulation of nationwide and worldwide greenhouse gas emissions. Federal courts have jurisdiction over state-law claims where "the extraordinary preemptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987). Congress allows parties to seek stricter nationwide emission standards by petitioning EPA, the exclusive means by which a party can seek such relief. But Plaintiffs' claims go far beyond the authority the CAA reserves to the states to regulate

certain emissions within their own borders, and they seek to impose liability for worldwide or national emissions. Because these claims would "duplicate[], supplement[], or supplant[]" federal law, they are completely preempted. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209, 217 (2004).

**Fourth**, this Court has jurisdiction under various jurisdiction-granting statutes and doctrines, including (1) the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b); (2) the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1); (3) federal enclave jurisdiction, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006); and (4) the bankruptcy removal statutes, 28 U.S.C. §§ 1334(b) and 1452(a).

## II.  LEGAL STANDARDS

"The removal process was created by Congress to protect defendants." *Legg v. Wyeth*, 428 F.3d 1317, 1325 (11th Cir. 2005). "[T]he Federal courts should not sanction devices intended to prevent the removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction." *Smallwood v. Ill. Cent. R.R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (en banc). A removing party has the initial burden of showing that removal is proper. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (per curiam). But once the defendant makes that showing, it is the plaintiff's "burden to prove that an express exception to removal exists." *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031, 1034 (9th Cir. 2008). Because district courts have supplemental jurisdiction over related claims, 28 U.S.C. § 1367(a), all that is required for proper removal is federal jurisdiction over a single claim. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005).

A plaintiff "cannot defeat removal by masking or 'artfully pleading' a federal claim as a state claim." *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1395, 1403 (9th Cir. 1988). Under the artful-pleading doctrine, federal jurisdiction exists "(1) where federal law completely preempts state law; (2) where the claim is necessarily federal in character; or (3) where the right to relief depends on the resolution of a substantial, disputed federal question." *ARCO Envtl. Remediation L.L.C. v. Dep't of Health & Envtl. Quality*, 213 F.3d 1108, 1114 (9th Cir. 2000) (citations omitted); *see also Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–11 (1983).

As a consequence, removal jurisdiction exists over what a complaint labels "purely state law claims" if federal common law actually governs the dispute, because "[w]hen federal law applies, . . . it follows that the question arises under federal law, and federal question jurisdiction exists." *New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953, 954–55 (9th Cir. 1996).

Further, various statutes have their own removal standards. Courts broadly construe the right to removal under OCSLA, the federal officer removal statute, and the federal enclave doctrine. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) (breadth of federal OCSLA jurisdiction reflects the Act's "expansive substantive reach"); *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) (federal officer removal "interpret[ed] . . . broadly in favor of removal"); *Durham*, 445 F.3d at 1250 (federal enclave); *see also* U.S. CONST. art. I § 8, cl. 17. And 28 U.S.C. § 1334(b) confers jurisdiction over proceedings "related to" bankruptcy which "could conceivably have any effect on the estate being administered in bankruptcy." *In re Fietz*, 852 F.2d 455, 456–57 (9th Cir. 1988) (emphasis omitted).

## III.   ARGUMENT

### A.   Plaintiffs' Claims Arise, If at All, Under Federal Common Law

Supreme Court and Ninth Circuit precedent confirm that Plaintiffs' global-warming-based public nuisance claims are governed by federal common law. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421–22 (2011) ("*AEP*"); *Kivalina*, 696 F.3d at 855–56; *see also Standard Oil*, 332 U.S. at 305–06. Because federal common law governs these claims regardless how they are pleaded, these actions are within this Court's original jurisdiction.

#### 1.   Under *AEP* and *Kivalina*, Public Nuisance Claims Based on Global Warming Are Governed by Federal Common Law

Although "[t]here is no federal general common law," *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), there remain "some limited areas" in which the governing legal rules will be supplied, not by state law, but by "what has come to be known as 'federal common law.'" *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Standard Oil*, 332 U.S. at 308). One such area is where "our federal system does not permit the controversy to be resolved under state law" because the subject matter implicates "uniquely federal interests," including where "*the interstate or international nature of the controversy makes it inappropriate for state law to control.*" *Id.* at 640–

41 (emphasis added).  Common law actions involving "'air and water in their ambient or interstate aspects,'" such as this one, are thus governed by "'federal common law,'" and, indeed, federal common law defines the underlying cause of action.  *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103).

Public nuisance claims asserting global-warming-related injuries necessarily arise from activities or emissions in all 50 states and globally, and thus the Supreme Court and Ninth Circuit have found them to be governed by federal common law.  *See AEP*, 564 U.S. at 421–22 (states' global-warming public nuisance claim); *Kivalina*, 696 F.3d at 855–56 (Alaskan village's public nuisance claim for global-warming related injuries).  As the Supreme Court explained, a public nuisance claim alleging pollution from multiple states involves "an overriding federal interest in the need for a uniform rule of decision" and calls "for applying federal law."  *Milwaukee I*, 406 U.S. at 105 n.6.  Thus, such claims arise under federal common law, which defines the elements for asserting any such cause of action.  *See Kivalina*, 696 F.3d at 855–56 (outlining several of the elements that would be required to plead and prove a "public nuisance" claim "[u]nder federal common law").

*AEP*.  In *AEP*, plaintiffs, including eight states, sued five electric utilities, contending that "defendants' carbon-dioxide emissions" substantially contributed to global warming and "created a 'substantial and unreasonable interference with public rights,' in violation of the federal common law of interstate nuisance, or, in the alternative, of state tort law."  564 U.S. at 418.  Like Plaintiffs here, the *AEP* plaintiffs "alleged that public lands, infrastructure, and health were at risk from climate change," and they sought to hold defendants liable for contributing to climate change.  *Id.*  The district court dismissed the claims as raising nonjusticiable political questions, but the Second Circuit reversed, holding that federal common law governed and that plaintiffs had stated a claim.  *Id.* at 419; *see also Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 321–32, 350–71 (2d Cir. 2009).

The Supreme Court agreed that "federal common law" governs a public nuisance claim involving "'air and water in their ambient or interstate aspects,'" and it flatly rejected the notion that global-warming nuisance claims could be governed by state law rather than uniform federal law: "[B]orrowing the law of a particular State would be inappropriate."  *AEP*, 564 U.S. at 421–22.

Gibson, Dunn & Crutcher LLP

*Kivalina.* In *Kivalina*, the Ninth Circuit held that federal common law governed a public nuisance claim nearly identical to Plaintiffs' here. 696 F.3d at 855–56. An Alaskan village asserted a public nuisance claim for damages to village property and infrastructure as a result of "sea levels ris[ing]" and other impacts allegedly resulting from the defendant energy companies' "emissions of large quantities of greenhouse gases." *Id*. at 853–54. The village asserted this public nuisance claim under federal common law and, in the alternative, state law. *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009). The district court dismissed the federal claims and declined to exercise supplemental jurisdiction over the state law claims. 696 F.3d at 854–55.

On appeal, a threshold issue was whether federal common law applied to plaintiffs' nuisance case. The Ninth Circuit, relying on *AEP*, held that it did: "[F]ederal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id*. at 855 (citing *AEP* and *Milwaukee I*). Given the interstate and transnational character of any claim asserting damage from the worldwide accumulation of carbon dioxide emissions, the suit fell within the rule that "transboundary pollution suits" are governed by "federal common law." *Id*.

**2.      This Case Falls Squarely Within *AEP* and *Kivalina***

Under *AEP* and *Kivalina*, federal common law governs Plaintiffs' public nuisance claims. *Kivalina* confirmed that claims like these are governed by federal common law because they inherently implicate interstate and international concerns that invoke uniquely federal interests and responsibilities. *Kivalina*, 696 F.3d at 855–56; *see also Massachusetts v. EPA*, 549 U.S. 497, 519–20 (2007) (holding that the sovereign prerogatives to force other states' reductions in greenhouse gas emissions, negotiate emissions treaties, and in some circumstances exercise the police power to reduce motor-vehicle emissions are lodged in the federal government).

Plaintiffs' public nuisance claims, which inherently require a global assessment of the reasonableness of Defendants' worldwide production, sale, and use of fossil fuels, are quintessential "transboundary pollution suits," *Kivalina*, 696 F.3d at 855, and are therefore governed by federal common law. Indeed, Plaintiffs' global-warming-related claims are facially based on the worldwide accumulation of greenhouse gas emissions over the course of decades and even centuries, resulting in part

from the use of fossil fuel products extracted by Defendants anywhere in the world and consumed anywhere in the world. *See, e.g.*, Compl. ¶¶ 2, 10, 15–29, 32, 52, 53.[4]

Adjudicating Plaintiffs' claims would necessarily require determining "what amount of carbon dioxide emissions is unreasonable" in light of what is "practical, feasible and economically viable." *See AEP*, 564 U.S. at 428. Given the nature of the phenomena at the crux of Plaintiffs' claims and the boundless scope of potential defendants and plaintiffs, this is a task different from a viable "abatement" action under state nuisance law. Any judgment as to whether Defendants' contribution to worldwide emissions constitutes "a substantial and unreasonable interference with and obstruction of public rights and property," Compl. ¶ 95, raises an inherently federal question implicating the federal government's unique interests and role in setting national and international policy regarding energy, the environment, the economy, and national security. *See AEP*, 564 U.S. at 427.

### 3. Plaintiffs' Efforts to Distinguish *AEP* and *Kivalina* Are Unavailing

Plaintiffs contend that federal common law cannot govern their claims because they assert that Defendants are *indirectly* liable for the worldwide emissions of other persons who used Defendants' fossil fuel products, Mot. 8–10, and no federal common law precedent has ever recognized any such indirect liability claim. This contention fails for the simple reason that it mixes up the threshold question whether federal common law standards *govern* Plaintiffs' claims with the separate and subsequent question whether, under those standards, Plaintiffs have stated a viable cause of action. *AEP* draws precisely this distinction, by first deciding that the interstate nature of the controversy required application of federal common law (and that it would be "inappropriate" to borrow state law as the federal rule of decision), before turning to the separate question of whether the defendants were correct that the plaintiffs had failed to state a claim for relief under federal common law standards. 564 U.S. at 421–23. Here, as in *AEP*, federal common law governs Plaintiffs' public nuisance claims be-

---

[4] Defendants do not concede that, as a substantive matter, Plaintiffs have adequately pleaded that each Defendant is liable for the actions of its separate subsidiaries and affiliates. For purposes of assessing this Court's *jurisdiction*, however, the substantive adequacy of the Complaints is irrelevant. *See Parra v. PacifiCare of Ariz., Inc.*, 715 F.3d 1146, 1151 (9th Cir. 2013). Accordingly, for purposes of this motion only, Defendants assume *arguendo* Plaintiffs' theory and, in describing the actions of "Defendants" herein, Defendants include the actions of their subsidiaries and affiliates.

cause they rest on the inherently transnational phenomenon of *global* warming, to which the world-wide emissions resulting from Defendants' fossil fuel products have allegedly substantially contributed. *See id*. at 421–22. That Plaintiffs seek to apply a novel theory of indirect liability to this interstate and international pollution controversy does not change its inherently federal character.

*Kivalina* confirms this point. There, the plaintiff alleged that the defendants were indirectly liable for each other's emissions under the theory that the defendants had "conspir[ed] to mislead the public about the science of global warming." 696 F.3d at 854. The Ninth Circuit held—and the plaintiff conceded—that this derivative theory of indirect liability was "dependent upon the success" of the underlying public nuisance claim. *Id*. at 858. Accordingly, both claims were equally governed by federal common law, and the failure of the substantive nuisance claim on displacement grounds therefore meant that the "civil conspiracy claim falls with the substantive claim." *Id.* As here, the fact that no federal common law precedent had yet recognized the plaintiffs' novel theory of indirect liability did not eliminate the controversy's inherently transboundary nature.[5]

Plaintiffs also try to distinguish *AEP* and *Kivalina* on the ground that neither decision expressly addressed the plaintiffs' contentions that they had viable *alternative* remedies under state common law. Mot. 12. Plaintiffs contend that *AEP* and *Kivalina* leave open the possibility that *some* global-warming-based public nuisance claims might be governed by state law. *Id.* 10–13. For many reasons, Plaintiffs are wrong.

*First*, the decision that federal common law applies to a particular cause of action *necessarily* reflects a determination that state law does *not* apply. "[I]f federal common law exists, it is because state law cannot be used." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 n.7 (1981); *see also Nat'l Audubon Soc'y v. Dep't of Water & Power*, 869 F.2d 1196, 1204 (9th Cir. 1988) (same); *id.* at 1204–05 ("true interstate disputes [concerning pollution] *require* application of federal common law," to

---

[5] Plaintiffs cite cases recognizing state-law nuisance claims for the promotion and sales of "dangerous" products, Mot. 8, but these cases are inapposite because Plaintiffs' claims and injuries are based on much more. It is the uniquely federal interests in interstate pollution that give rise to federal common law here. In the lead paint cases, for example, there was no claim that application of lead paint in buildings in other states combined with the application of lead paint in California to create a worldwide phenomenon akin to global warming; on the contrary, the claim was simply that the defendants were ultimately liable for applications of lead paint in California buildings that created noxious conditions in those very same California buildings. *People v. ConAgra Grocery Prods. Co.*, ___ Cal. App. 4th ___, 2017 WL 5437485, at *1 (Nov. 14, 2017).

"the exclusion of state law") (emphasis added). Accordingly, by holding that a global-warming-related public nuisance claim was governed by federal common law, *AEP* and *Kivalina* necessarily establish that state law *cannot* be applied. Thus, despite the state-law label Plaintiffs put on their claims, they are *necessarily* governed by federal common law.

*Second*, *AEP* held that "borrowing the law of a particular State would be *inappropriate*" to adjudicate an interstate and transnational global-warming public nuisance claim; such a claim could *only* be governed by a uniform "*federal* rule of decision." 564 U.S. at 422 (emphasis added).

*Third*, insofar as the Court in *AEP* declined to address whether plaintiffs could assert separate state-law claims under "the law of each State where the defendants operate power plants," 564 U.S. at 429, that theory is not viable here. *AEP* referenced a narrow theory based on *International Paper Co. v. Ouellette*, 479 U.S. 481, 492–94 (1987), which held that, in displacing federal common law remedies, the Clean Water Act ("CWA") preserved the possibility that state common law could be applied to further limit a defendant's emissions *within that source state*. *See also N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 306 (4th Cir. 2010) (*Ouellette* analysis applies to the CAA). But "the CWA precludes a court from applying the law of an affected State against an out-of-state source." *Ouellette*, 479 U.S. at 494. Moreover, because "interstate pollution is primarily a matter of federal law," *id.* at 492, no other state common law remedies (beyond regulation of in-state sources) were permissible.

Plaintiffs have not pleaded a claim falling within *Ouellette*'s narrow confines—nor could they. Plaintiffs do not allege that they were injured as a result of localized conduct to which they seek to apply the law of the source state. Rather, Plaintiffs have pleaded *omnibus* public nuisance claims uniformly addressing all production and emissions in all jurisdictions—*i.e.*, they have pleaded *precisely* the claim that *AEP* and *Kivalina* held must be governed by federal common law.[6] Nor could they do otherwise given the nature of the phenomena at issue. Plaintiffs' claims rest on allegations that "[t]he cumulative greenhouse gases in the atmosphere attributable to each Defendant"

---

[6] For the same reason, *Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit*, 874 F.2d 332 (6th Cir. 1989) (cited at Mot. 14), is inapposite. There, the plaintiff sought only to apply non-preempted Michigan state law to emissions made by Michigan entities in Michigan that then flowed into Canada, *id.* at 343–44, thereby bringing the case within the narrow ambit for state-law regulation of in-state source emissions permitted by *Ouellette*.

caused by their "worldwide" extraction and production of fossil fuels "has increased the global temperature and contributed to sea level rise" in Oakland and San Francisco.  Compl. ¶¶ 10, 32, 52. Their claimed injuries necessarily hinge on the collective effect of worldwide emissions, thereby implicating the kind of "interstate dispute previously recognized as requiring resolution under federal law," such that it is "inappropriate for state law to control." *Nat'l Audubon*, 869 F.2d at 1204.[7]

### 4. Federal Common Law Is Not an "Ordinary Preemption Defense"; It Provides an Independent Basis for Federal-Question Jurisdiction

Because Plaintiffs' public nuisance claims are governed by federal common law, it is well established that those claims "aris[e] under the 'laws' of the United States within the meaning of § 1331(a)." *Milwaukee I*, 406 U.S. at 99; *see also Nat'l Farmers*, 471 U.S. at 850 (citations omitted) (§ 1331 grants federal courts original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin"); *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 126 (2d Cir. 1999) ("It is beyond dispute that if federal common law governs a case, that case presents a federal question within the subject matter jurisdiction of the federal courts . . . .").[8]

Plaintiffs' contention that Defendants' argument is a non-jurisdictional "ordinary preemption defense," Mot. 13, that does not support removal under the "well-pleaded complaint rule" misunderstands the nature of that rule and federal common law more generally, Mot. 14–15.  The well-pleaded complaint rule provides that "federal jurisdiction exists only when a federal question is presented on

---

[7] Moreover, allowing Plaintiffs' claims to be governed by state law would permit every other plaintiff alleging injury due to global warming to proceed under one or all of the nation's fifty different state laws.  Such a result would run counter to *Ouellette*, which warned against subjecting out-of-state sources "to a variety of" "vague and indeterminate" state common law "nuisance standards" and allowing states to "do indirectly what they could not do directly—regulate the conduct of out-of-state sources." *Ouellette*, 479 U.S. at 495–96 (citations omitted).  As the Solicitor General explained in *AEP*, "resolving such claims would require each court to consider numerous and far-reaching technological, economic, scientific, and policy issues" to decide "whether and to what extent each defendant should be deemed liable under general principles of nuisance law for some share of the injuries associated with global climate change." Br. for the TVA as Resp't. Supporting Pet'rs, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011) (No. 10-174), 2011 WL 317143, at *37.  Such consideration could lead to "widely divergent results" based on "different assessments of what is 'reasonable.'" *Id.*

[8] Plaintiffs wrongly invoke inapposite cases in which federal common law merely could have applied to a specific *defense*, but did not based on the facts of the case. *See, e.g.*, Mot. 14–15 (citing *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1089 (9th Cir. 2009) (act of state doctrine was insufficient, without more, to support removal where none of the referenced conduct of foreign sovereign was actually part of plaintiff's claims); *Patrickson v. Dole Food Co.*, 251 F.3d 795, 800 (9th Cir. 2001) (same).  By contrast, here, as in *Milwaukee I*, the *cause of action* arises (if at all) under federal common law and therefore supports federal question jurisdiction. 406 U.S. at 99.

Gibson, Dunn & Crutcher LLP

the face of the plaintiff's properly pleaded complaint." *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183 (9th Cir. 2002) (citation omitted). But that doctrine does not prevent removal here because a federal question *is* presented on the face of Plaintiffs' complaint. *See id.* at 1184–85 (recognizing that a claim "for loss of or damage to goods by interstate common carriers by air" would "arise under federal common law" but concluding that the plaintiff's "package was not lost or damaged"). As explained above, Plaintiffs' claims, which seek to use state courts to adjudicate claimed injuries from interstate, transboundary greenhouse gas emissions, sound only in federal law. Accordingly, these actions may be removed. 28 U.S.C. § 1441(a).

Plaintiffs' efforts to cloak this interstate and transboundary emissions suit with an erroneous state-law label are of no moment. The Ninth Circuit has held that a federal common law claim improperly labeled as a state law claim is subject to removal. *See, e.g.*, *New SD*, 79 F.3d at 954–55 (holding that removal jurisdiction existed over plaintiff's purported "purely state law claims" because "[w]hen federal law applies, . . . it follows that the question arises under federal law"); *Wayne*, 294 F.3d at 1184 (noting that despite pleading state law claims, "[f]ederal jurisdiction would exist in this case if the claims arise under federal common law"); *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928–29 (5th Cir. 1997) (removal of state-law negligence claim was appropriate because "federal common law governed the liability of air carriers for lost or damaged goods").

### 5. Even If Federal Common Law Has Been Displaced by Statute, that Does Not Create State Common Law Claims

Plaintiffs wrongly assert that, because *AEP* and *Kivalina* held that federal common law remedies were displaced by the comprehensive remedial scheme of the CAA, state law may fully take the place of the now-displaced federal common law. Mot. 10–14. This argument would turn *Erie* on its head. A claim is governed by federal common law when, *inter alia*, it implicates "uniquely federal interests" that make it "inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 640–41. The fact that Congress then enacts a statutory scheme that so comprehensively addresses the subject as to leave no room for federal common law innovation does not somehow mean that *state* common law is now appropriately applied. If anything, enactment of a comprehensive federal statutory framework in an area already recognized as being governed by federal common law underscores the federal character of the field, reinforcing the notion that it is "inappropriate for state law to control" except to the

Gibson, Dunn & Crutcher LLP

extent that Congress authorizes it. *Id.*[9]  As noted in *Ouellette*, "it is clear that the only state suits that remain available are those specifically preserved by the Act." 479 U.S. at 492.  Plaintiffs' reliance on inapposite cases in which Congress creates a federal statutory scheme that occupies an area previously governed by *state* law only underscores Plaintiffs' error.  Mot. 11 (quoting *Sullivan v. First Affiliated Sec., Inc.*, 813 F.2d 1368, 1370, 1372–73 (9th Cir. 1987) (securities regulation)).  Accordingly, Plaintiffs' nuisance claims can arise only under federal common law—not state law.

**B.    These Cases Raise Disputed, Substantial Federal Interests Under *Grable***

The Court should deny Plaintiffs' remand motion because the claims depend on the resolution of substantial, disputed federal questions relating to the extraction, processing, promotion, and consumption of global energy resources.  The Supreme Court has "recognized for nearly 100 years that in certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues." *Grable*, 545 U.S. at 312.

"[F]ederal jurisdiction over a state law claim will lie if a federal issue is:  (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 313–14).  Applying this test "calls for a 'common-sense accommodation of judgment to [the] kaleidoscopic situations' that present a federal issue" and thus "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312–13 (quoting *Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 117 (1936)); *see also* R.H. Fallon, Jr. et al., Hart & Wechsler's The Federal Courts & the Federal System 832 (7th ed. 2015) (under *Grable*, the Court exercises discretion "to tailor jurisdiction to the practical needs of the particular situation").  Plaintiffs' claims are inextricably bound up with uniquely federal interests involving national security, foreign affairs, energy policy, and environmental regulation.  If these cases do not "justify resort to the experience, solicitude, and hope of uniformity that a federal forum

---

[9] Contrary to Plaintiffs' insinuation, Mot. 12–13, neither *AEP* nor *Kivalina* adopted Plaintiffs' novel position.  The *AEP* Court merely noted that the scope of the claims available under state law, if any, had not been briefed and would not be addressed.  *See* 564 U.S. at 429.  Nothing in the Court's opinion suggests that state law may *substitute* for federal common law whenever Congress displaces federal common law.  Judge Pro's comment that the village could try to "pursue whatever remedies it may have under state law to the extent their claims are not preempted" says nothing about the actual existence and scope of any state law remedies.  *Kivalina*, 696 F.3d at 866 (Pro, J., concurring).

offers on federal issues," *Grable*, 545 U.S. at 312, it is hard to imagine one that does.

**1.  Plaintiffs' Claims Necessarily Raise Multiple Federal Issues**

Plaintiffs argue that their claims concerning the extraction and promotion of fossil fuel energy do not necessarily raise federal issues because, supposedly, federal law is not "part of [Plaintiffs'] affirmative claim." Mot. 19.  But Plaintiffs' claims have a significant impact on foreign affairs, necessarily depend on the reasonableness of Defendants' actions under federal cost-benefit analyses, are thinly veiled attacks on federal foreign relations and regulatory decisions, and implicate duties to disclose imposed by federal statutes and regulations.[10]  Any one of these issues suffices under *Grable*.

**a.  Plaintiffs' Claims Have a Significant Impact on Foreign Affairs**

Plaintiffs' claims raise substantial federal issues because they have far "more than incidental effect on foreign affairs." *Garamendi*, 539 U.S. at 418; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–81 (2000).  Because Plaintiffs' claims implicate the "exercise of state power that touches on foreign relations" in a significant way, the state law basis "must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Garamendi*, 539 U.S. at 413 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)).

How to address climate change has been the subject of international negotiations for decades, from the adoption of the United Nations Framework Convention on Climate Change in 1992 through the adoption of the Paris Agreement in 2016, and to this day.  As President Obama declared in 2013:

> Just as no country is immune from the impacts of climate change, no country can meet this challenge alone.  That is why it is imperative for the United States to couple action at home with leadership internationally.  America must help forge a truly global solution to this global challenge by galvanizing international action to significantly reduce emissions, prepare for climate impacts, and drive progress through the international negotiations.[11]

The United States's role in these delicate negotiations has evolved over time but has always

---

[10] That the Complaints raise these important federal issues renders inapt the cases on which Plaintiffs rely.  *See* Mot. 16–18 (citing *Cal. Shock Trauma Air Rescue v. State Comp. Ins. Fund*, 636 F.3d 538, 541 (9th Cir. 2011) ("potential response to a defense" not sufficient); *Ange v. Templer*, 418 F. Supp. 2d 1169 (N.D. Cal. 2006); *In re Circular Thermostat*, 2005 WL 2043022 (N.D. Cal. Aug. 24, 2005)).

[11] Thomson Decl., Ex. 16.

sought to balance environmental policy with robust economic growth. After President Clinton signed the Kyoto Protocol in 1997, for example, the U.S. Senate rejected it 95-0, out of concern it would cause serious harm to the economy and did not regulate the emissions of developing nations. *See* S. Res. 98, 105th Cong. (1997). Congress enacted a series of laws barring EPA from implementing the Protocol. *See* Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000). President Trump cited similar economic concerns when he withdrew the U.S. from the Paris Agreement. Thomson Decl., Ex. 17.

Plaintiffs here seek to replace these international negotiations and Congressional and Executive decisions with their own preferred foreign policy, using the ill-suited tools of California common law and private litigation. Indeed, Plaintiffs' claims not only ignore corporate separateness but purport to reach all of Defendants' (and their affiliated companies') production, the majority of which takes place overseas and certainly outside of California. *See* Thomson Decl. ¶¶ 3–7 & Exs. 1–5. Even when *states* have made similar efforts, enacting laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role.

In *Crosby*, for example, Massachusetts passed a law barring state entities from transacting with companies doing business in Burma—an effort to spur that country to improve its human rights record. 530 U.S. at 366–70. But because the law "undermine[d] the President's capacity . . . for effective diplomacy" by "compromis[ing] the very capacity of the President to speak for the Nation," the Supreme Court struck it down. *Id.* at 381, 388. As the Court explained, "the President's maximum power to persuade rests on his capacity to bargain for the benefits of access to the entire national economy without exception for enclaves fenced off willy-nilly by inconsistent political tactics." *Id.* In other words, the Court held, "the President's effective voice" on matters of foreign affairs must not "be obscured by state or local action." *Id.* Likewise, in *Garamendi*, the Court invalidated California's statutory effort to encourage Holocaust reparations by European insurance carriers based on "the likelihood that state legislation will produce . . . more than incidental effect in conflict with express foreign policy of the National Government…." 539 U.S. at 420. "Quite simply," the Court explained, "if the California law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Id.* at 424 (alterations omitted).

Gibson, Dunn & Crutcher LLP

States and local governments have roles to play in combatting climate change. *See infra* Section III.C. But where, as here, state common law is used in litigation against private companies in a way that may substantially affect U.S. foreign policy, there is no denying the "uniquely federal" nature of the lawsuit. *Boyle*, 487 U.S. at 504. The "federal judicial power" must remain "unimpaired for dealing independently, wherever necessary or appropriate, with essentially federal matters" like the ones at issue here. *See Standard Oil*, 332 U.S. at 307.

### b. Plaintiffs' Claims Require Federal-Law-Based Cost-Benefit Analyses

Plaintiffs' nuisance claims also require determining whether the harms caused by Defendants' conduct in extracting, refining, and promoting fossil fuels outweigh the benefits of that conduct to society. *See San Diego Gas & Elec. Co. v. Super. Ct.*, 13 Cal. 4th 893, 938 (1996) (an element of a nuisance claim is that the defendant's conduct was "unreasonable" because "the gravity of the harm outweighs the social utility of the defendant's conduct") (citing RESTATEMENT (SECOND) OF TORTS §§ 826–31 (1979)) ("Restmt."); *see also* Compl. ¶ 95 (claiming that "Defendants' conduct constitutes a substantial and unreasonable interference with and obstruction of public rights and property").[12]

But Congress has *already* weighed the costs and benefits of fossil fuels, directing federal agencies to permit—and even promote—maximum production of fossil fuels while balancing environmental protection, including protection from greenhouse gas impacts. For decades, federal law has required agencies to weigh the costs and benefits of fossil fuel extraction. *See, e.g.*, 42 U.S.C. § 13384 ("[T]he Secretary shall transmit a report to Congress containing a comparative assessment of

---

[12] Plaintiffs are incorrect that California law has an "alternate" test for unreasonableness—whether the harm is "severe and greater than the [plaintiff] should be required to bear without compensation"—that does not require cost-benefit analysis. Mot. 31 (quoting *Wilson v. S. Cal. Edison Co.*, 234 Cal. App. 4th 123, 162 (2015)). As the Restatement makes clear, this "alternate" test is just another iteration of the "general rules . . . established for the guidance of trial courts and juries in weighing gravity against utility"—the necessarily federal inquiry at play here. Restmt. § 826 cmt. e. Indeed, no California court has ever applied this supposed "alternate" test, nor has any court ever found any alleged harm to be so severe that it did not need to weigh the utility of a defendant's conduct in making a determination of reasonableness. *Wilson* is not to the contrary. It is a private nuisance case that did not even adopt the "alternate" test proposed by Plaintiffs, but instead required the trial court to adopt jury instructions that balanced the gravity of the harm against the utility of the defendant's conduct. *See Wilson*, 234 Cal. App. 4th at 163–64. Indeed, California's standard Civil Jury Instructions cite *Wilson* as authority *requiring* courts to give a balancing instruction to juries in nuisance cases. *See* CACI 2022 Private Nuisance—Balancing-Test Factors—Seriousness of Harm and Public Benefit.

alternative policy mechanisms for reducing the generation of greenhouse gases. Such assessment shall include a short-run and long-run analysis of the social, economic, energy, environmental, competitive, and agricultural costs and benefits, including costs and benefits for jobs and competition, and the practicality" of various "mechanisms" for reducing greenhouse gases); *id.* § 13389(c)(1).[13] Thus, federal law requires exactly the kind of cost-benefit analysis Plaintiffs would have the state court do.

And these Congressional directives have regulatory teeth. All federal agencies must assess the costs and benefits of significant regulations, where applicable, and impose a regulation "only upon a reasoned determination that the benefits . . . justify its costs." Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). But energy production regulation has even more detailed cost-benefit analysis standards. For example, the Bureau of Land Management requires federal oil and gas lessees to drill "in a manner which . . . results in maximum ultimate economic recovery of oil and gas with minimum waste," 43 C.F.R. § 3162.1(a), but reserves the power to impose "reasonable measures" to "minimize adverse impacts to other resource values," including ecological values, *id.* § 3101.1-2. Likewise, regulations governing offshore oil and gas drilling require regulation of leases to maximize recovery of energy resources and prevent waste, while minimizing damage to the environment. *See* 30 C.F.R. § 550.120. And the Interior Secretary must seek "maximum economic recovery" from federal leases, *id.* § 745.13(j), and must also ensure state mining agencies' compliance with federal laws and regulations, including environmental laws like the CAA, *id.* § 745.13(b).

Moreover, the federal government actively participates in promoting fossil fuel exploration and use through its regulatory, taxing, and purchasing powers. For example, as noted above, several

---

[13] A non-exhaustive list of federal laws calling for this balancing include: Clean Air Act, 42 U.S.C. § 7401(c) (intent "to encourage or otherwise promote reasonable . . . governmental actions . . . for pollution prevention"); Mining and Minerals Policy Act, 30 U.S.C. § 21a (intent to encourage "economic development of domestic mineral resources" including oil and gas balanced with "environmental needs"); Coastal Zone Management Act, 16 U.S.C. § 1451 (balancing "[t]he national objective of attaining a greater degree of energy self-sufficiency" with "[i]mportant ecological . . . values in the coastal zone"); Federal Lands Policy Management Act, 43 U.S.C. § 1701(a) (requiring "the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals" including oil and gas while "protect[ing] the quality of . . . ecological, environmental, air and atmospheric, water resource, and archeological values"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 (finding that coal mining is "essential to the national interest" but must be balanced by "effort[s] . . . to prevent or mitigate adverse environmental effects"); National Environmental Policy Act, 42 U.S.C. §§ 4321–70 (requiring disclosure and evaluation of known or foreseeable environmental impacts of federal action, including permitting of private conduct).

Gibson, Dunn & Crutcher LLP

federal regulatory regimes require maximum economic recovery, or minimization of waste, of regulated energy resources. *See, e.g.*, 43 C.F.R. § 3162.1; 30 C.F.R. § 745.13(j); *id.* § 550.120. The government also maintains the Strategic Petroleum Reserve, purchasing fuel from producers, including some Defendants here. *See* 10 C.F.R. § 626.6. It loans fuel to consumer-facing distributors, again including some Defendants here, to ensure adequacy of domestic fuel supplies. *See* Energy Policy and Conservation Act of 1975, 42 U.S.C. § 6201 *et seq.*; Thomson Decl., Ex. 18.

Federal law would necessarily govern the cost-benefit analysis required by Plaintiffs' nuisance claims. Adjudicating these claims would require interpretation of federal regulations and federal agencies' balance between energy and environmental needs, and assessment of Defendants' compliance with the same. The Fifth Circuit recently held that similar claims give rise to federal jurisdiction. *See Tenn. Gas.*, 850 F.3d at 720. The Fifth Circuit determined that a state agency's "state law causes of action" against energy companies for alleged ecological harms "necessarily raise federal issues sufficient to justify federal jurisdiction." *Id.* at 721, 725–26. There, as here, the plaintiff argued that its claims rested on state law that "set[] forth" requirements that were "apparently similar" to federal standards. *Id.* at 722–23. The Fifth Circuit rejected that argument, as the plaintiff cited no case in which a state court had used the state law on which the plaintiff relied "as the basis for the tort liability that the Board would need to establish." *Id.* at 723. Plaintiffs' effort to distinguish this case, Mot. 17 n.6, fails because they identify no basis for concluding that California law does or could supply adequate standards for determining which persons in the world may be held liable for the effects of global warning. And, as explained above, *supra* at 9 n.5, the California Court of Appeal's decision in *ConAgra* is inapposite because it dealt with a product (lead paint) the use of which was not alleged to have interstate effects. Accordingly, any basis for liability "would have to be drawn from federal law." *Tenn. Gas*, 850 F.3d at 723.

Even if the cost-benefit analyses required by Plaintiffs' claims were not "uniquely" federal, *see Tex. Indus.*, 451 U.S. at 640; *AEP*, 564 U.S. at 421, it satisfies *Grable* because it implicates "significant" federal issues. Plaintiffs cannot avoid this fact by trying to obscure necessary federal questions raised by their claims: "The artful pleading doctrine keeps a plaintiff from defeating removal by omitting to plead necessary federal questions in a complaint." *Cal. ex rel. Lockyer v. Powerex*

*Corp.*, 2006 WL 997717, at *2 (E.D. Cal. Apr. 14, 2006) (citations omitted), *aff'd*, 274 F. App'x 574 (9th Cir. 2008); *see also Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 840–41 (9th Cir. 2004) (as amended). The artful-pleading rule applies when the claim depends "on the resolution of a substantial, disputed federal question." *Powerex*, 2006 WL 997717, at *2. In fact, Plaintiffs admit that a federal issue can be "embedded" in a state-law claim even when the complaint does not expressly invoke that issue. Mot. 20. When, as here, "the complaint is fairly read to require [the] kind of determination" that turns on federal law, it "presents a substantial, disputed federal question," and "removal [is] appropriate." *Powerex*, 2006 WL 997717, at *3.[14]

### c.   Plaintiffs' Claims Are a Collateral Attack on Federal Decisions

Federal jurisdiction under *Grable* also exists where, as here, a suit amounts to a "collateral attack" on a federal agency's regulatory decisions. *Bader Farms, Inc. v. Monsanto Co.*, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017). This principle is particularly salient in public nuisance cases, where courts are hesitant to find that conduct undertaken pursuant to "a comprehensive set of legislative acts or administrative regulations" is actionable. Restmt. § 821B cmt. f; *see San Diego Gas*, 13 Cal. 4th at 938 (relying on Restatement to define nuisance tort); *see also* Cal. Civ. Code § 3482 ("Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."). For good reason: In the context of a comprehensive scheme of regulation, nuisance claims amount to "a collateral attack on an entire regulatory scheme . . . premised on the notion that [the scheme] provides inadequate protection." *Tenn. Gas*, 850 F.3d at 724.

In general, Plaintiffs' public nuisance claims seek a different balancing of social harms and benefits than that struck by Congress, pursuant to a comprehensive scheme of federal statutes and

---

[14] Neither *In re Methyl Tertiary Butyl Ether Products Liability Litig.*, 488 F.3d 112 (2d Cir. 2007) ("*MTBE*"), nor *Oregon ex rel. Kroger v. Johnson & Johnson*, 832 F. Supp. 2d 1250 (D. Or. 2011), supports Plaintiffs' position. *See* Mot. 18 n.10. The *MTBE* court did not consider *Grable* and instead applied *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804 (1986). *See MTBE*, 488 F.3d at 135. And the *Kroger* court noted the likely presence of at least one necessary federal issue, but held that other *Grable* requirements were not met in light of Supreme Court decisions permitting similar claims under state law. *See Kroger*, 832 F. Supp. 2d at 1256–57 (relying on *Merrell Dow's* conclusion that federal issues in state tort suits against drug manufacturers generally do not support federal jurisdiction). More fundamentally, those cases do not support Plaintiffs because this case involves national and international environmental regulation—a matter "meet for federal law governance." *AEP*, 564 U.S. at 422; *see also Kivalina*, 696 F.3d at 855 (federal law "includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution").

Gibson, Dunn &
Crutcher LLP

regulations that both promote and constrain production and promotion of fossil fuel energy. Federal court jurisdiction over these claims, which attack the merits of that balancing, is required under *Grable*. *See id.* at 725 (removal under *Grable* appropriate where "the scope and limitations of a complex federal regulatory framework are at stake" in state law claims). Plaintiffs do not address this argument in their motion to remand, or the many decisions supporting it.[15]

And in particular, Plaintiffs plead nuisance under California Civil Code § 3479, which defines the claim in part as "[a]nything which . . . *unlawfully* obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway." Cal. Civ. Code § 3479 (emphasis added); *see* Compl. ¶ 94. Thus, proving unlawfulness is part of Plaintiffs' cause of action. California law further provides that "nothing done or maintained under the express authority of a statute can be deemed a nuisance," Cal. Civ. Code § 3482, including under federal regulations promulgated under federal statutes. *Jones v. Union Pac. R.R. Co.*, 79 Cal. App. 4th 1053, 1067–68 (2000) (examining whether a nuisance claim was barred by § 3482 because the conduct allegedly giving rise to the alleged nuisance was authorized by federal regulations). Accordingly, Plaintiffs' nuisance claims necessarily raise substantial federal questions as to whether and to what extent the levels of global emissions to which Plaintiffs allege Defendants substantially contributed exceed the levels authorized by the CAA and other EPA regulations.

### d. Plaintiffs' Promotion Claims Implicate Federal Law Duties to Disclose

Plaintiffs' claim—that Defendants waged a "public relations campaign . . . to deny and discredit the mainstream scientific consensus on global warming" to "increase sales," "protect market share," and, ultimately, avoid regulation—necessarily turns on federal issues. Compl. ¶¶ 6–7. Be-

---

[15] *See Pet Quarters, Inc. v. Depository Tr. & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (complaint "presents a substantial federal question because it directly implicates actions taken by" a federal agency); *McKay v. City & Cty. of S.F.*, 2016 WL 7425927, at \*4–6 (N.D. Cal. Dec. 23, 2016) (denying remand and finding *Grable* jurisdiction because state-law claims were "tantamount to asking the Court to second guess the validity of the FAA's decision"); *cf. Bennett v. Sw. Airlines Co.*, 484 F.3d 907, 909 (7th Cir. 2007) (recognizing that *Grable* approved of federal jurisdiction "when the state proceeding amounted to a collateral attack on a federal agency's action"). Plaintiffs do not meaningfully engage this line of authority. *See* Mot. 17 nn.6 & 7. Plaintiffs' description of the *Pet Quarters* claim as attacking "the entire 'existence' of a federal program," *id.* 17 n.6, supports federal jurisdiction over their attack on federal regulation of fossil fuels.

Gibson, Dunn & Crutcher LLP

cause Defendants' purported goal, according to plaintiffs, was to fool federal agencies and avoid regulation, showing that Defendants misled federal regulators is central to Plaintiffs' theory. *Id.* ¶¶ 7–8.

Put another way, Plaintiffs' claims rest on the premise that Defendants had a duty to inform federal regulators about known harms; that their statements were material to the regulators' decision not to curtail Defendants' conduct; and that Defendants' omissions made regulators unable to perform their duties. These questions of duty, materiality, and foreseeable impact are necessarily governed by the federal law regulating Defendants' conduct. Federal law governs claims of fraud on federal agencies, and "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also Grable*, 545 U.S. at 314–15 (removal of state law claim challenging compatibility of agency action with federal statute).

Moreover, Plaintiffs' causation theory necessarily turns on the effect of Defendants' purportedly misleading "public relations campaign" on federal regulators. *See* Notice of Removal ("NOR") ¶ 31; *see also* Compl. ¶¶ 6–8, 56, 63. To understand if Defendants' alleged misrepresentations and omissions affected their relationship with their federal regulators will require the Court to construe federal law to determine what regulators should have been told and how they would have responded. *See Tenn. Gas*, 850 F.3d at 723 (finding necessary and disputed federal issue because state tort claims could not "be resolved without a determination whether multiple federal statutes create a duty of care that does not otherwise exist under state law"); *Bader Farms*, 2017 WL 633815, at *3 (denying remand where plaintiff alleged federal agency failed to regulate "due to defendant's fraudulent concealment," since federal law "identifies the duty to provide information [to federal regulators] and the materiality of that information"); *Boyeson v. S.C. Elec. & Gas Co.*, 2016 WL 1578950, at *5 (D.S.C. Apr. 20, 2016) (removal proper where "allegations of negligence appear on their face to not reference federal law, [but] federal issues are cognizable as the source for the duty of care…").

This Court reached a similar conclusion in *County of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022 (N.D. Cal. 2005). There, Santa Clara sued pharmaceutical companies in state court,

Gibson, Dunn & Crutcher LLP

alleging that the companies had overcharged for drugs. *Id.* at 1024. To skirt the federal statutes, regulations, and contracts controlling what the companies could lawfully charge—and so to avoid litigating in federal court—the County argued that its claims required only a determination whether the companies "acted unfairly and fraudulently when they allegedly 'misrepresented and failed to disclose . . . the true facts regarding their prices.'" *Id.* at 1026. This Court concluded that federal-question jurisdiction under *Grable* supported removal because "there is simply no way to ignore federal law." *Id.* at 1027. Because federal law is the standard by which Plaintiffs' allegations of duty, materiality, and causation must be judged, federal jurisdiction is proper.

### 2. The Federal Issues Are Disputed and Substantial

Plaintiffs cannot deny that the federal questions presented here are actually disputed. The Complaints make that dispute plain. *See, e.g.*, Compl. ¶¶ 6–8, 56, 95. Plaintiffs mischaracterize their complaints, saying that they "have no quarrel with any of the federal statutes or executive orders" cited in the Notices of Removal. Mot. 20. But Plaintiffs' entire pleading is a collateral attack on federal energy policy that expressly encouraged the conduct Plaintiffs now claim constitutes a public nuisance. *See supra* Section III.B.1(a)–(c).[16]

The necessary federal questions raised in this case are substantial issues warranting a federal forum under *Grable*. The Court must consider "the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. The issues here are of great importance: This case sits at the intersection of federal energy and environmental regulations, and implicates foreign policy and national security. The substantiality inquiry is satisfied when the federal issues in a case concern even one of those subjects.[17] That the federal issues in this case concern all three subjects leaves no doubt that the

---

[16] The two cases Plaintiffs cite—*Shanks v. Dressel*, 540 F.3d 1082 (9th Cir. 2008), and *K2 Am. Corp. v. Roland Oil & Gas, LLC*, 653 F.3d 1024 (9th Cir. 2011)—have no bearing here. In *Shanks*, a neighborhood's listing on the National Register of Historic Places was "not controverted," and the plaintiff's "state-law claim turn[ed] entirely on Spokane's compliance with its own municipal code," rather than "the construction or application of federal law." 540 F.3d at 1093. In *K2*, the terms of the lease at issue were not in dispute. 653 F.3d at 1031–32. The court stressed that "the requirement of an actual dispute about the federal law is especially important in suits involving rights to land acquired under a law of the United States." *Id.* at 1032 (citations omitted).

[17] *See Bennett*, 484 F.3d at 910 (*Grable* "thought a federal forum especially appropriate for contests arising from a federal agency's performance of duties under federal law, doubly so given the effect on the federal Treasury"); *In re NSA Telecomms. Records Litig.*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (national security; ruling that state-law privacy claims conferred federal jurisdiction because of

issues are substantial enough to support federal jurisdiction under *Grable*.

Plaintiffs' effort to hold five large energy companies liable for the effects of global climate change, contrary to decades of federal policy under which Defendants' conduct was lawful and encouraged, would have effects far beyond California. The issues are of great "importance . . . to the federal system as a whole," making federal jurisdiction appropriate. *Gunn*, 568 U.S. at 260. As in *Tennessee Gas*, "the validity of [Plaintiffs'] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." 850 F.3d at 724. "The implications for the federal regulatory scheme of the sort of holding that [Plaintiffs] seek[] would be significant, and thus the issues are substantial." *Id.*

### 3. Federal Jurisdiction Does Not Upset Principles of Federalism

Federal jurisdiction here is fully "consistent with congressional judgment about the sound division of labor between state and federal courts." *Grable*, 545 U.S. at 313. Federal jurisdiction comports with principles of federalism because the issues embedded in Plaintiffs' claims are traditional federal issues: specifically, regulation of vital national resources, foreign policy and national security, and federal revenue collection. Federal courts are the traditional forums for adjudicating such claims. The sheer volume of significant federal issues that must be adjudicated if Plaintiffs' claims proceed reinforces the propriety of federal jurisdiction here. *See* NOR ¶ 33.

In fact, permitting state courts to hear these claims would threaten the balance in federal-state relations. "Power over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink*, 315 U.S. 203, 233 (1942). State governments must yield to the federal government in foreign affairs so that this exclusively national power is "entirely free from local interference." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941); *see also Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016) ("It is well established that the federal government holds the exclusive authority to administer foreign affairs."). Even more so should foreign policy matters be free from state *judicial* interference. Indeed, it would be inappropriate for the Supreme Court—let

the application of the state secrets doctrine); *Grynberg Prod. Corp. v. British Gas, p.l.c.*, 817 F. Supp. 1338, 1356 (E.D. Tex. 1993) ("[Q]uestions of international relations are almost always substantial.").

Gibson, Dunn &
Crutcher LLP

alone a state court—"to judge the wisdom of the National Government's [foreign] policy; dissatisfaction should be addressed to the President or, perhaps, Congress." *Garamendi*, 539 U.S. at 427.

Plaintiffs do not deny that the "abatement" they seek is intended to have a regulatory effect on Defendants' worldwide conduct. "[S]tate regulation can be . . . effectively exerted through an award of damages, and [t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012). But the "sovereign prerogatives" to force reductions in greenhouse gas emissions, negotiate emissions agreements, and exercise the police power to reduce emissions "are now lodged in the Federal Government." *Massachusetts*, 549 U.S. at 519. Plaintiffs seek to hold Defendants liable for "knowingly misle[ading] the American public *and the world* about the dangers of fossil-fuel drive climate change." Thomson Decl., Ex. 19 (emphasis added). The "balance of federal and state judicial responsibilities" requires a federal forum here. *Grable*, 545 U.S. at 314. And Plaintiffs' claim that "courts often reject *Grable* jurisdiction over traditional state torts," Mot. 20, ignores that Congress intended federal courts to resolve claims substantially similar to those asserted here.[18]

Congress has made clear that collateral challenges to CAA emissions standards belong exclusively in federal court. *See, e.g.*, 42 U.S.C. § 7607(b)(1). The CAA was designed to "channel[] review of final EPA action exclusively to the court of appeals, regardless of how the grounds for review are framed." *Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 506 (9th Cir. 2015) (emphasis omitted). Similarly, Congress vested the federal judiciary with jurisdiction to hear private enforcement actions under the CAA. *See* 42 U.S.C. § 7604(a). Thus, this case is different than *Kroger*, where the court addressed a statute that did *not* provide federal courts with jurisdiction to hear challenges akin to those brought by the plaintiffs. Mot. 20 (citing *Kroger*, 832 F. Supp. 2d at 1258); *see also, e.g.*, *McKay*, 2016 WL 7425927, at *5 (finding removal proper where state law claims were based on pollution by changed flight paths over residences, because retaining jurisdiction "would reinforce the proper division between state and federal regulation of air flight" and remanding

---

[18] *Grable* rejected the notion that because no federal cause of action was available, "no federal jurisdiction" existed. 545 U.S. at 317. While the absence of a federal claim might weigh against federal jurisdiction in a "garden variety state tort" suit, *id.* at 318, this is not such a case. As in *Grable*, granting a federal forum here would not entail "threatening structural consequences," *id.* at 319, for the federal system.

would result in state court "potentially . . . examining the validity of federal regulations").

Plaintiffs wrongly assert that "[t]he potential for disrupting the 'federal-state balance' is higher [because] a state is the plaintiff." Mot. 20–21. The CAA expressly authorizes a state to "commence a civil action on [its] own behalf" in federal court to enforce or challenge federal emissions standards, as Plaintiffs do here. 42 U.S.C. § 7604; *see also id.* §§ 7602(e), 7607(b)(1). Where a state challenges agency action promulgating emissions standards, federal jurisdiction is exclusive. *Id.* § 7607(b)(1). Requiring a federal forum to entertain Plaintiffs' claims is therefore consistent with "Congress's intended division of labor between state and federal courts." *Grable*, 545 U.S. at 319. And nothing in *Grable* suggests that this basis of removal is unavailable where a state challenges emission standards via a public nuisance lawsuit. Rather, removal is proper where, as here, an "overriding federal interest" is served. *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012).

**C.    The Actions Are Removable Because They Are Completely Preempted by Federal Law**

Complete preemption occurs when federal law has a "preemptive force . . . so powerful as to displace entirely any state cause of action," such that "any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law," even if it asserts only state-law claims. *Franchise Tax Bd.*, 463 U.S. at 23–24. For the reasons set forth above, *supra* at 14–16, litigating in state court the inherently transnational activity challenged by these complaints would inevitably intrude on the foreign affairs power of the federal government and is completely preempted. *See Garamendi*, 539 U.S. at 418 ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict."); *see also Gen. Motors Corp.*, 2007 WL 2726871, at *14 (dismissing claims against automakers because the federal government "ha[s] made foreign policy determinations regarding the United States' role in the international concern about global warming," and a "global warming nuisance tort would have an inextricable effect on . . . foreign policy").

In addition, Plaintiffs' claims are completely preempted by the Clean Air Act, which "provide[s] the exclusive cause of action for the claim asserted." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). Permitting a state-law cause of action here "would pose an obstacle to the purposes and objectives of Congress" by "duplicat[ing], supplement[ing], or supplant[ing] the [preemptive]

civil enforcement remedy." *Aetna Health*, 542 U.S. at 209, 217 (citations omitted).

Plaintiffs say their claims are outside the CAA because they are "nuisance claim[s] for an abatement fund." Mot. 24. But Plaintiffs allege that "immediate reductions [a]re required to stabilize carbon dioxide concentrations," Compl. ¶ 46, and any state-law liability would necessarily require a finding that billions of actors exceeded some "acceptable" or "reasonable" global cap on emissions as a result of Defendants' promotion of fossil fuels, which led to climate change and higher ocean levels. Even to determine whether an abatement fund were warranted, a court would have to determine the level at which global emissions became actionable. *See* Cal. Civ. Code § 3482 ("Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance.").

The Clean Air Act provides the exclusive cause of action for regulation of nationwide emissions. The CAA establishes a system by which federal and state resources are deployed to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). At the heart of this system are the emission limits set by EPA, which reflect the CAA's dual goals of protecting both public health and welfare and the nation's productive capacity. Specific statutory provisions authorize or require emission standards to be set if certain findings are made, and such standards must comport with the statutory criteria set by Congress, consistent with the dual goals of the Act.

Once set, the CAA provides specific procedures for any person, including private parties and state and local governments, to challenge or change nationwide emissions standards. 42 U.S.C. § 7607(b), (d). Indeed, the State of California and local governments within California recently have exercised these rights on numerous occasions. *See, e.g.*, *State of New York et al. v. EPA et al.*, Case No. 17-1185 (D.C. Cir. filed Aug. 1, 2017) (challenge filed by 15 states—including California—to EPA decision extending deadline for promulgating initial area designations for the 2015 ozone national ambient air quality standards ("NAAQS")); *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882 (D.C. Cir. 2006) (challenge brought by local air quality management district and several states to EPA's 2004 ozone NAAQS implementation rule). In addition, a party can petition EPA to set new emissions standards or modify existing ones. 5 U.S.C. § 553(e). If unhappy with the results, the party may seek review in federal court. 42 U.S.C. § 7607(b)(1) (request for review "may be filed

only in the United States Court of Appeals . . . if such action is based on a determination of nation-wide scope or effect"); *see also AEP*, 564 U.S. at 425 ("States and private parties may petition for a rulemaking on the matter, and EPA's response will be reviewable in federal court.").

These procedures are the exclusive means for judicial review. 42 U.S.C. § 7607(e). The CAA "'channels review of final EPA action exclusively to the courts of appeals, *regardless of how the grounds for review are framed.*'" *Cal. Dump Truck*, 784 F.3d at 506 (emphasis in original) (quoting *Virginia v. United States*, 74 F.3d 517, 523 (4th Cir. 1996)). Following this logic, the Second Circuit rejected an action "alleg[ing] that [a power company] maintained a common law nuisance by burning oil containing 2.8% sulphur" when the "use of high sulphur fuel was authorized specifically by the EPA" because "[a]ll claims against the validity of performance standards approved by final decision of the Administrator must be addressed to the courts of appeals on direct appeal." *New Eng. Legal Found. v. Costle*, 666 F.2d 30, 31, 33 (2d Cir. 1981).

Although the CAA's cooperative federalism approach authorizes states to establish standards and set certain requirements in state implementation plans for the purpose of attaining and maintaining NAAQS, those standards can only be applied within state boundaries. "Application of an affected State's law to an out-of-state source . . . would undermine the important goals of efficiency and predictability" underlying the federal regulatory system. *See Ouellette*, 479 U.S. at 496. This is the core insight of *Ouellette*, which held that Vermont landowners could not sue under Vermont law for harm from water pollution discharged by a New York source. *Id.* at 487. Applying Vermont law to the New York source "would compel the source to adopt different control standards and a different compliance schedule from those approved by the EPA, even though the affected State had not engaged in the same weighing of the costs and benefits." *Id.* at 495. "The inevitable result of such suits would be that Vermont and other States could do indirectly what they could not do directly—regulate the conduct of out-of-state sources," and defendants "would have to change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Id.*

The Fourth Circuit described the problem: "If courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult to determine what standards govern." *N.C. ex rel. Cooper*, 615 F.3d

Gibson, Dunn & Crutcher LLP

at 298. "An EPA-sanctioned state permit may set one standard, a judge in a nearby state another, and a judge in another state a third. Which standard is the hapless source to follow?" *Id.* at 302. Indeed, there would be no effective *federal* standard.

Plaintiffs' arguments are unpersuasive. *First*, in arguing against CAA preemption, Plaintiffs accuse Defendants of "purport[ing] to locate the necessary clear manifestation of a congressional intent to federalize the People's state-law claims in CAA sections 304(a) and 307(b)," which they claim have no preemptive force. Mot. 22. But as explained above, the CAA's *comprehensive administrative scheme*, not just those two clauses, completely preempts these claims. Complete preemption applies where, as here, Congress "sets forth a comprehensive civil enforcement scheme that completely preempts state-law causes of action within the scope of these civil enforcement provisions." *Fossen v. Blue Cross & Blue Shield of Mont., Inc.*, 660 F.3d 1102, 1107 (9th Cir. 2011) (alterations omitted).

*Second*, Plaintiffs note that the Supreme Court has so far recognized complete preemption in only three contexts. Mot. 22. But federal courts in California have found many statutes to completely preempt state-law causes of action.[19] Plaintiffs point to cases that declined to find the CAA completely preempted the particular state-law claims asserted in those cases. *See* Mot. 23 & n.13. But those cases challenged in-state emissions. *See, e.g.*, *Her Majesty the Queen*, 874 F.2d at 343 ("[P]laintiffs are suing a Michigan facility under Michigan law"); *Cerny v. Marathon Oil Corp.*, 2013 WL 5560483, at *8 (W.D. Tex. Oct. 7, 2013) ("[S]ource state nuisance claims are not preempted"); *Gutierrez v. Mobil Oil Corp.*, 798 F. Supp. 1280, 1284 (W.D. Tex. 1992) ("[S]tates have the right and jurisdiction to regulate activities occurring within the confines of the state").

*Third*, Plaintiffs contend that their claim is not preempted because "the CAA does not provide 'the exclusive cause of action' for air pollution" given that it "expressly preserves state law." Mot. 22. This misreads the CAA's savings clauses. As explained earlier, the CAA permits only a limited

---

[19] *See, e.g.*, *Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 688–89 (9th Cir. 2007) (Carmack Amendment); *In re Miles*, 430 F.3d 1083, 1092 (9th Cir. 2005) (Section 303(i) of the Bankruptcy Code); *Botsford v. Blue Cross & Blue Shield of Mont. Inc.*, 314 F.3d 390, 399 (9th Cir. 2002) (Federal Employees Health Benefits Act); *Fadhliah v. Societe Air Fr.*, 987 F. Supp. 2d 1057, 1061 (C.D. Cal. 2013) (Montreal Convention); *Cont'l Ins. Co. v. Kawasaki Kisen Kasha Ltd.*, 542 F. Supp. 2d 1031, 1037 (N.D. Cal. 2008) (federal maritime law and Carriage of Goods by Sea Act); *Asante Techs., Inc. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142, 1152 (N.D. Cal. 2001) (U.N. Convention on Contracts for the International Sale of Goods); *Worth v. Universal Pictures, Inc.*, 5 F. Supp. 2d 816, 823 (C.D. Cal. 1997) (Copyright Act).

Gibson, Dunn & Crutcher LLP

role for state common law and it cannot extend to the sort of inherently multi-state and multi-national emissions issues that Plaintiffs seek to address here. The CAA "entrusts such complex balancing to EPA in the first instance, in combination with state regulators." *AEP*, 564 U.S. at 427. This is sensible: "The expert agency is surely better equipped to do the job than individual . . . judges issuing ad hoc, case-by-case injunctions." *Id.* at 428. "Where Congress has chosen to grant states an extensive role in the [CAA's] regulatory regime . . . , field and conflict preemption principles caution at a minimum against according states a wholly different role and allowing state nuisance law to contradict joint federal-state rules so meticulously drafted." *N.C. ex rel. Cooper*, 615 F.3d at 303.[20]

**D. The Actions Are Removable Because They Are Based on Defendants' Activities on Federal Lands and at the Direction of the Federal Government**

**1. The Actions Are Removable Under the Outer Continental Shelf Lands Act**

This Court has jurisdiction over these cases under OCSLA, 43 U.S.C. § 1331, *et seq.*, which grants federal district courts original jurisdiction over actions that "aris[e] out of, or in connection with . . . *any operation* conducted on the outer Continental Shelf which *involves exploration, development, or production* of the minerals, of the subsoil and seabed of the [OCS], or which involves rights to such minerals." 43 U.S.C. § 1349(b) (emphasis added). Plaintiffs do not dispute that Defendants[21] have significant operations on the OCS. Moreover, Plaintiffs allege that *all* of Defendants' extraction and production activities—including those on the OCS—were a factor that caused Plaintiffs' injuries. *See, e.g.*, Compl. ¶¶ 3, 10, 52, 56. Accordingly, both elements of OCSLA jurisdiction are satisfied: (1) Defendants' complained-of activities "constituted an 'operation' 'conducted on the [OCS]' that

---

[20] Plaintiffs' reliance on *Marin General Hospital v. Modesto & Empire Traction Co.*, 581 F.3d 941 (9th Cir. 2009), is misplaced. There, plaintiffs' claims were not preempted by ERISA because they related to a separate, oral contract outside the scope of the ERISA plan, creating an "independent legal duty." *Id.* at 950–51. Here, however, Plaintiffs' claims fall squarely within the scope of the CAA. Plaintiffs' position that there can never be complete preemption if there is an independent legal duty is "nothing short of bizarre," see Mot. 24, as every complete preemption case necessarily entails an alleged violation of an independent legal duty under state law, which is displaced by operation of the federal law. *See, e.g.*, *Aetna Health*, 542 U.S. at 204 (finding state law claims completely preempted by ERISA); *Botsford*, 314 F.3d at 399 (finding state-law fraud claim completely preempted by Federal Employees Health Benefits Act).

[21] As noted earlier, in assessing its removal jurisdiction, the Court must assume *arguendo* that Plaintiffs are correct in contending that all of the actions of Defendants' various subsidiaries and affiliates (some of which occurred on the OCS and in federal enclaves) may be imputed to the parent companies that Plaintiffs have chosen to sue. *See supra* at 7 n.4. Several of the actual Defendants sued here (as opposed to their affiliates) deny that they have any such operations in the OCS or in the U.S.

involved the exploration and production of minerals," and (2) the "case 'arises out of, or in connection with' the operation." *Deepwater Horizon*, 745 F.3d at 163.

Defendants easily satisfy the first prong of OCSLA's jurisdictional test. Defendants and/or their affiliates operate a large share of the "more than 5,000 active oil and gas leases on nearly 27 million OCS acres" administered by the Department of the Interior ("DOI") under OCSLA. NOR ¶ 52. Defendants historically have produced a substantial volume of oil and gas from the OCS—federal data suggests as much as a third of domestic production in some years. *Id.*[22] Plaintiffs target this conduct, alleging that Defendants have caused a public nuisance by "engag[ing] in massive fossil fuel production." Compl. ¶¶ 3, 52, 55. Plaintiffs acknowledge that their claims sweep in all of Defendants' production, which necessarily includes substantial production on the OCS. *See* Mot. 25 (acknowledging that Plaintiffs' claims are "not dependent on any one subset of defendants' fossil fuel production activities"). The allegedly tortious activities thus necessarily include operations conducted on the OCS that involve the "exploration and production of minerals." *Deepwater Horizon*, 745 F.3d at 163.

Plaintiffs claim the first element for OCSLA jurisdiction fails because these cases do not "involv[e] injuries caused by a single catastrophic oil spill from a blowout on a platform on the OCS." Mot. 25. But OCSLA jurisdiction is not reserved for oil-spill cases, and courts have adopted a "broad reading of the jurisdictional grant of section 1349." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994); *see also Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228–29 (5th Cir. 1985) (OCSLA jurisdiction in dispute over nonpayment of contract for construction of OCS platform); *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1203–04 (5th Cir. 1988) (OCSLA jurisdiction in contract dispute over sale of natural gas from the OCS).

Defendants also satisfy the second prong of OCSLA's jurisdictional test, because under Plaintiffs' own theory, their claims "arise[] out of or in connection with" OCS operations. *Deepwater*

---

[22] In 2005, a DOI official testified before Congress that leases on the OCS accounted for 30 percent of America's domestic oil production. Thomson Decl., Ex. 20. For example, BOEM data suggests that active producing leases on the OCS associated with subsidiaries or affiliates of Defendants Chevron, Shell, Exxon, and BP are lessees or operators have produced over 4 billion barrels of crude oil and over 29 billion MCF of natural gas. Couvillion Decl. ¶¶ 9, 12 & Ex. C.

*Horizon*, 745 F.3d at 163.  Plaintiffs' theory of causation is as follows:  (1) "Defendants have produced massive quantities of fossil fuels that, when combusted, emit carbon dioxide, the most important greenhouse gas"; (2) the "greenhouse gases from the usage of defendants' fossil fuels remain in the atmosphere for long periods of time"; and (3) the "cumulative greenhouse gases in the atmosphere attributable to each Defendant has increased the global temperature and contributed to sea level rise[.]"  Compl. ¶ 52.  Based on Plaintiffs' allegations, their alleged injuries necessarily arise out of, or in connection with, the substantial OCS extraction.  Compl. ¶¶ 3, 52, 55.  The fact that Plaintiffs' alleged injuries "occurred because of the [Defendants'] 'operations' in exploring for and producing oil on the [OCS] cannot be contested."  *See Deepwater Horizon*, 745 F.3d at 163.  Thus, unless Plaintiffs disavow their own theory of the case, they cannot contest this element.

Plaintiffs argue that OCSLA's second prong is not satisfied unless Defendants can show that Plaintiffs "would have suffered *no* global warming injury . . . in the absence of defendants' operations on the OCS."  Mot. 25 (emphasis added).  But, taking Plaintiffs' theory as true, some portion of their injuries—*i.e.*, some amount of sea-level rise—is attributable to Defendants' fossil-fuel extraction on the OCS.  Having alleged that Defendants' "massive" worldwide production of fossil fuels caused their injuries, Plaintiffs cannot claim the substantial portion of that production occurring on the OCS did *not* cause their injuries.  The "arises out of, or in connection with" test "implies a broad jurisdictional grant under § 1349," and by Plaintiffs' own causal theory, some portion of their alleged injuries would not have occurred absent Defendants' operations on the OCS.  *Tenn. Gas Pipeline v. Hous. Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996); *see also Ronquille v. Aminoil Inc.*, 2014 WL 4387337, at *2 (E.D. La. Sept. 4, 2014) (finding second prong satisfied because "*at least part* of the work that Plaintiff allege[d] caused his exposure to asbestos arose out of or in connection with Shell's OCS operations" (emphasis added)).

Plaintiffs again seek to have it both ways by arguing that OCSLA removal cannot be based on downstream "sales and consumption" of oil extracted on the OCS and that removal here would "open federal courts to all kinds of cases having any connection at all to fossil fuels that originated from production on the OCS."  Mot. 26 (citing *ANR Pipeline Co. v. Conoco, Inc.*, 646 F. Supp. 439, 444 (W.D. Mich. 1986)).  Unlike in *ANR Pipeline* and the other cases Plaintiffs cite, Plaintiffs claim that

Defendants created a public nuisance by *extracting* fossil fuels, including from the OCS. Indeed, Plaintiffs deliberately opted *not* to sue the downstream emitters—including themselves—who purchased and used the fossil fuels. Because the allegations are focused on fossil-fuel *production*, finding OCSLA jurisdiction here would not open the courts to run-of-the-mill breach-of-contract cases only "remotely" connected to "offshore wells." *See ANR Pipeline*, 646 F. Supp. at 444.[23]

Courts have also held that OCSLA provides federal jurisdiction over any dispute that could "alter[]the progress of production activities on the OCS" and thus "threaten[] to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS." *Amoco Prod. Co.*, 844 F.2d at 1210; *see also EP Operating*, 26 F.3d at 570 (applying "impaired recovery" test); *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 407 (5th Cir. 1990) (same). Here, Plaintiffs seek potentially billions of dollars in abatement funds to provide for infrastructure purportedly made necessary by the alleged nuisance. *See* Compl., Relief Requested. That extraordinary relief would discourage substantial OCS production and impact the future viability of the federal OCS leasing program, potentially costing the federal government hundreds of millions of dollars. Because this action could substantially interfere with OCSLA's congressionally-mandated goal of obtaining the largest "total recovery of the federally-owned minerals" underlying the OCS, *Amoco Prod. Co.*, 844 F.2d at 1210, it falls within the "legal disputes . . . relating to resource development on the [OCS]" that Congress intended to be heard in the federal courts, *Laredo Offshore*, 754 F.2d at 1228. *See* 43 U.S.C. §§ 1802(1), (2).

---

[23] Plaintiffs' reliance on *ANR Pipeline* is thus misplaced. There, the plaintiff sought a declaration that it was not required to purchase natural gas from the defendant under certain offshore and onshore Gas Purchase contracts due to a *force majeure*. 646 F. Supp. at 440. The defendant removed under OCSLA, but the court remanded the declaratory judgment action because it disagreed that the anticipated breach-of-contract action would necessarily arise under OCSLA. *Id.* at 444. The court did "not believe that Congress intended that every offshore contract for the *sale* and/or resale of natural gas be looked at as a contract which involves the exploration, development or production of minerals of the subsoil and seabed of the OCS." *Id. ANR Pipeline* thus has no bearing on this case, which does not involve a contract for the sale of offshore gas, but rather involves the extraction of fossil-fuel on the OCS. The other cases cited by Plaintiffs are similarly inapposite. *See Stutes v. Gulfport Energy Corp.*, 2017 WL 4286846, at *9 (W.D. La. June 30, 2017) (granting motion to remand where "[i]t was undisputed that . . . *none* of the operations that gave rise to the alleged violations . . . occurred on the OCS" (emphasis added)); *Bd. of Comm'rs of the Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., LLC*, 29 F. Supp. 3d 808, 837, 864 (E.D. La. 2014) (declining to find OCSLA jurisdiction where plaintiffs limited the complaint to non-OCS oil and gas activities allegedly causing erosion).

### 2. The Actions Are Removable As Arising From Acts on Federal Enclaves

Plaintiffs base their claims on conduct and injuries suffered on federal enclaves. "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham*, 445 F.3d at 1250; *see also Klausner v. Lucas Film Entm't Co., Ltd.*, 2010 WL 1038228, at *4 (N.D. Cal. Mar. 19, 2010) (identifying where the "alleged unlawful acts took place" and holding that federal enclave doctrine applied).

Defendants have long engaged in producing and promoting fossil fuels on federal enclaves. *See, e.g.*, Compl. ¶¶ 2–5. Plaintiffs do not challenge the federal enclave status of the property at issue in these cases, and Defendants maintained production operations on federal enclaves and promoted the use of fossil fuels across the country, including on military bases and other federal enclaves. For example, Standard Oil Co. (Chevron's predecessor) operated Elk Hills Naval Petroleum Reserve (the "Reserve"), a federal enclave, for most of the twentieth century. *See* NOR, Ex. H; Thomson Decl., Exs. 21–23 (Executive Order and California statutes relating to federal jurisdiction); *see also infra* Section III.D.3; *Azhocar v. Coastal Marine Servs., Inc.*, 2013 WL 2177784, at *1 (S.D. Cal. May 20, 2013) (federal enclaves include military bases, federal facilities, and national forests and parks).

Federal enclave jurisdiction will lie as long as "pertinent events" on which liability is based took place on a federal enclave. *See Rosseter v. Indus. Light & Magic*, 2009 WL 210452, at *2 (N.D. Cal. Jan. 27, 2009); *see also Stiefel v. Bechtel Corp.*, 497 F. Supp. 2d 1138, 1148 (S.D. Cal. 2007); *Klausner*, 2010 WL 1038228, at *1, *4 (finding federal enclave jurisdiction for employment discrimination claim where "alleged unlawful acts" took place on the federal enclave even though plaintiffs' employment was based elsewhere). Plaintiffs' reliance on *Ballard v. Ameron International Corp.*, 2016 WL 6216194 (N.D. Cal. Oct. 25, 2016), is misplaced. Federal jurisdiction over a claim is proper even if conduct occurs both inside and outside of a federal enclave if the "federal interest" in regulating the conduct at issue is high enough. *See id.* at *3. Unlike in *Ballard*, where the defendant did not "offer[] any facts" to establish the requisite federal interest, *id.*, Defendants here have identified a plethora of federal interests, from federalism to foreign affairs. *See supra* Sections III.A–B. Similarly, *In re High-Tech Employee Antitrust Litigation* is distinguishable because unlike here, no elements of the claim occurred on a federal enclave. 856 F. Supp. 2d 1103, 1126 (N.D. Cal. 2012).

Federal jurisdiction is also proper here because Plaintiffs allege injuries to federal enclaves within their territory. Plaintiffs broadly assert damages to all of the property within their boundaries, *see* Compl. ¶¶ 84–91; SF Compl. ¶¶ 85–92, which includes federal enclaves, including the Presidio, which is waterfront property. *See Klausner*, 2010 WL 1038228, at *2–3.[24]

### 3. The Actions Are Removable Under the Federal Officer Removal Statute

These actions are also removable under the Federal Officer Removal Statute (28 U.S.C. § 1442) because Plaintiffs base liability on activities undertaken at the direction of the federal government. Section 1442(a)(1) provides that removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office" is proper. Jurisdiction under the Federal Officer Removal Statute is afforded a "generous interpretation," *Durham*, 445 F.3d at 1252, and "the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)).

"A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251 (citations omitted). Plaintiffs concede the first element. Mot. 27.

Defendants also satisfy the second and third elements. *First*, there is a clear causal nexus between Plaintiffs' claims and Defendants' conduct "acting under" federal officers, a term that is liberally construed. *See Goncalves*, 865 F.3d at 1245. Defendants engaged in the extraction, production, and sale of fossil fuels, conduct that forms the core of Plaintiffs' allegations, under the supervision, direction, and control of federal officers. *See Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014). Defendants thus "acted under" federal officers. *Goncalves*, 865 F.3d at 1249.

For example, Chevron extracted oil at Elk Hills for the Reserve under the direct supervision and control of the Navy, providing the government with oil it needed for national security in wartime.

---

[24] Plaintiffs' purported disclaimer of damages on federal property cannot defeat federal jurisdiction because they have not "stipulated" not to pursue such damages and Plaintiffs' allegations include federal enclaves. *Cf. Washington v. Monsanto Co.*, 2017 WL 3492132, at *5 (W.D. Wash. July 28, 2017) (declining federal enclave jurisdiction because plaintiff "avowedly does not seek relief for contamination of federal territories, [meaning] none of its claims arise on federal enclaves").

See NOR, Ex. H. This Unit Plan Contract ("UPC"), which President Franklin D. Roosevelt approved and which Standard Oil (a predecessor of Defendant Chevron) signed only under threat of eminent domain condemnation, obligated Standard Oil to produce oil, stating that "the Reserve *shall* be developed and operated" to produce "not less than 15,000 barrels of oil per day" until Standard had received its share, thereafter still producing enough oil to cover Standard's operating costs subject to the Navy's discretion to change the amount. *Id.*, Ex. H §§ 4(b), 5(f) (emphasis added). The UPC's terms show the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the Reserve:

- The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over the development of the entire Reserve and the production of oil therefrom.*" *Id.*, Ex. H, Recitals § 6(d)(i) (emphases added).

- "[The] Navy shall, subject to the provisions hereof, have the exclusive control over the exploration, prospecting, development, and operation of the Reserve[.]" *Id.*, Ex. H § 3(a).

- "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires." *Id.*, Ex. H § 4(a) (emphasis added).

- "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve." *Id.*, Ex. H § 3(b). In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard." *Id.*, Ex. H § 9(a); *accord United States v. Standard Oil Co. of Cal.*, 545 F.2d 624, 628 (9th Cir. 1976) (confirming this arrangement).

- The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production. NOR, Ex. H §§ 4(b), 5(d)(1).

The UPC demonstrates that Defendants' activities under federal officers went far beyond simple compliance with the law or participation in a regulated industry. Indeed, Chevron's Elk Hills activity increased as directed by the federal government in response to the 1970s energy crisis when Congress enacted the Naval Petroleum Reserves Production Act in 1976. *See Chevron U.S.A., Inc. v. United States*, 110 Fed. Cl. 747, 754 (2013). This law "directed" the Secretary of the Navy to produce oil from Elk Hills "at the maximum efficient rate consistent with sound engineering practices

Gibson, Dunn &
Crutcher LLP

for a period not to exceed six years after the date of enactment of such Act."[25]  Pub. L. No. 94-258,

90 Stat. 303 (1976) (codified as amended at 10 U.S.C. § 7422(c)(1)(B)).

In addition, Defendants "acted under" federal officials by extracting and selling oil from

OCSLA leases or strategic petroleum reserve leases.  *See* NOR ¶¶ 58–59; *supra* Section III.D.1.[26]  In

keeping with OCSLA's objective of "expeditious development of OCS resources," *California v.*

*Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981), the Secretary of the Interior is mandated to develop se-

rial leasing schedules "which he determines will best meet national energy needs for the five-year pe-

riod," 43 U.S.C. § 1344(a).  Those leases provide that the lessee-Defendants "*shall*" drill for oil and

gas pursuant to *government approved* exploration plans or face cancellation of the lease.  NOR,

Exs. F, G § 9 (emphasis added); *see also* 30 C.F.R. § 250.180 (noting leases expire at the end of their

primary term unless the lessee is engaged in "drilling, well-reworking, or production in paying quan-

tities").  In addition, DOI leases identify entities to whom operator-Defendants *must* sell oil and gas

(such as small or independent refiners).  NOR, Ex. G. § 15.  The leases further require minimum roy-

alty payments on the total value of oil and gas produced.  *Id.*, Exs. F, G §§ 5–6.  The Strategic Petro-

leum Reserve, which the DOE is required to maintain as insurance against "the short-term conse-

quences of interruptions in supplies of petroleum products," is supported by both monetary and "in-

kind" royalties.  42 U.S.C. §§ 6231(a), 6234, 6240; *see also* Thomson Decl., Ex. 24.

There is thus no question that Defendants assist the government in "produc[ing] an item that it

needs," and "perform[ing] a job that," without them, "the Government itself would have had to per-

form."  *Watson v. Philip Morris Cos., Inc*, 551 U.S. 142, 153–54 (2007).[27]  By aiding federal officials

in exploring for and extracting fossil fuels at both Elk Hills and on the OCS, Defendants assisted the

---

[25] Plaintiffs claim that the Elks Hills UPC requires only "*curtailing* oil" and that it called for "the *re-duction* of fossil fuel production." Mot. 29–30. But this ignores the contract's plain language setting a minimum floor of production and Congress's revisions to the UPC, explained above, which ordered that the reserves be operated at maximum capacity for at least 6 six years, subject to extension.

[26] Plaintiffs' criticism that the leases attached to the NOR are blank form leases is of no moment be-cause they are representative of signed leases.  *See* Couvillion Decl., ¶ 1.

[27] It is irrelevant that Defendants made "voluntary contractual agreements" that place them under control of the federal government. Mot. 27. Under Plaintiffs' theory, the machinists in *Leite* would not have been "act[ing] under" federal officers because they voluntarily chose to work on the naval shipyard and were paid for doing so. But the Ninth Circuit held otherwise. 749 F.3d at 1124.

government in achieving its objectives of, among other things, promoting "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals [and] assure national security." *See Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 291–92 (D.C. Cir. 1988) (citing 43 U.S.C. § 1802).[28]

Moreover, under Plaintiffs' own theory, Defendants' actions taken under a federal officer are causally connected to Plaintiffs' claims, a low hurdle that requires Defendants to "show only that the challenged acts occurred *because of* what they were asked to do by the Government." *Goncalves*, 865 F.3d at 1244 (emphasis in original). Defendants engaged in "exploration, prospecting, development, and producing operations," conduct that Plaintiffs allege caused them harm, because Defendants were "asked to do [so] by the Government."[29] *Id.*; *see also* Compl. ¶¶ 16, 19, 22, 25, 28 (premising liability on defendants "participat[ing] in the process by which fossil fuels, including raw crude oil, are produced, transported, refined, stored, distributed, marketed, and/or sold"). These types of contractual obligations have routinely been found sufficient to support federal officer removal. For example, in *Goncalves*, a private health insurer's contractual obligation to a federal agency to make "reasonable efforts" to pursue known subrogation claims satisfied the causal-connection prong. 865 F.3d at 1245.[30] In *Leite*, the Ninth Circuit found a causal relationship between the plaintiffs' alleged harm—injury from exposure to asbestos used in and around equipment sold to the Navy—and the products provided to the Navy pursuant to a contract. 749 F.3d at 1124. And in *Perez v. Consolidated Tribal Health Project, Inc.*, a causal nexus existed in a slip-and-fall case where a government agency agreement obligated the defendant to maintain and manage its facilities. 2013 WL 1191242, at *3 (N.D. Cal. Mar. 21, 2013).

Plaintiffs wrongly contend that Defendants "simply assert that they 'intend to raise numerous meritorious federal defenses' that are 'more than colorable.'" Mot. 30 (citing NOR ¶ 62). On the

---

[28] *See also, e.g., Ruppel v. CBS Corp.*, 701 F.3d 1176, 1178 (7th Cir. 2012) (reversing remand where private company supplied to the Navy turbines built with asbestos); *Benson v. Russell's Cuthand Creek Ranch, Ltd.*, 183 F. Supp. 3d 795, 802 (E.D. Tex. 2016) (remand denied where authority delegated to a non-profit to construct levee on private land pursuant to the government's easement).

[29] *See* NOR, Exs. G § 9, H § 3(a)–(b).

[30] *See also Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 465–66 (5th Cir. 2016) (finding a causal nexus to plaintiff's strict liability claim where defendant was compelled to use asbestos under its contract with the government and the government exercised control to ensure compliance).

contrary, Defendants have shown a more than colorable defense in the form of federal preemption, most notably pursuant to the Clean Air Act. *See supra* Section III.C; *Goncalves*, 865 F.3d at 1249 (holding that preemption is a colorable defense). Plaintiffs admit this defense is colorable enough to warrant a "day in court." Mot. 11 n.3, 13. It is certainly colorable enough to support federal officer removal, as one of the most important justifications for the doctrine is to have immunities sounding in federal law decided in a federal forum. *Watson*, 551 U.S. at 150.

### E. The Actions Are Removable Under the Bankruptcy Removal Statute

Plaintiffs contend that (1) the suits are not "related to" any bankruptcy case, (2) they have sued Defendants as an exercise of their governmental police powers, and (3) in any event, equitable factors should compel this Court to remand this case. Not so.

The Bankruptcy Removal Statute, 28 U.S.C. § 1452(a), permits removal of "any claim or cause of action in a civil action other than . . . a civil action by a governmental unit to enforce . . . police or regulatory power . . . if such district court has jurisdiction . . . under Section 1334 of this title," which supplies jurisdiction over cases or matters "*related to*" bankruptcy cases, 28 U.S.C. § 1334(b) (emphasis added). As the Ninth Circuit has underscored, "'related to' jurisdiction is very broad, in-cluding nearly every matter directly or indirectly related to [a] bankruptcy." *Sasson v. Sokoloff* (*In re Sasson*), 424 F.3d 864, 868 (9th Cir. 2005) (citations omitted). Actions are removable if they "'could *conceivably* have *any effect* on [an] estate being administered in bankruptcy.'" *In re Fietz*, 852 F.2d at 457 (citation omitted) (emphasis added). Removal is proper even after a bankruptcy plan has been confirmed, where the case "'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.'" *In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013) (citation omitted) (alteration in original).

Here, Plaintiffs' claims will have an impact on a number of bankruptcy proceedings. Defend-ants' Notice of Removal asserts that "there are hundreds of non-joined necessary and indispensable parties" and, thus, "many other Title 11 cases that may be related." NOR ¶ 68. Texaco's bankruptcy was offered "[a]s just one example" of a Chapter 11 plan that would be affected by Plaintiffs' claims. *Id.* ¶ 69. Plaintiffs' broadside attack on the fossil fuel industry will implicate many bankrupt entities

Gibson, Dunn &
Crutcher LLP

in addition to Texaco because the complaint seeks to impose liability for many decades of Defendants' "production and promotion of . . . fossil fuels." Compl. ¶ 95.

Any liability created for "production and promotion" of "fossil fuels" will not, and cannot, be limited to the named Defendants. The California Supreme Court in "*American Motorcycle* [*Ass'n v. Superior Court*, 20 Cal. 3d 578 (1978),] held . . . that plaintiffs should no longer have the unilateral right to determine which defendant or defendants should be included in an action." *Evangelatos v. Superior Court*, 44 Cal. 3d 1188, 1197 (1988). As a result, the named Defendants possess claims for equitable indemnity against all others engaged in the "production and promotion" of fossil fuels. There are hundreds of such companies, and a substantial number are now, or have previously been, in bankruptcy—thus exposing their estates to liability.[31] Two such companies—Arch Coal and Peabody Energy—are defending against indistinguishable claims in parallel litigation and have already sought relief from the courts administering their bankruptcy proceedings. *See* Mot. for Order Enforcing Discharge, *In re Arch Coal, Inc.*, No. 16-40120 (Bankr. E.D. Mo. Oct. 4, 2017), ECF No. 1598; Mot. for Order Enforcing Discharge, *In re Peabody Energy Corp.*, No. 16-42529 (Bankr. E.D. Mo. Aug. 28, 2017), ECF No. 3362. As Peabody successfully argued, Plaintiffs' claims are irreconcilable with the "implementation, consummation, execution, [and] administration of [Peabody's] confirmed plan." *In re Wilshire*, 729 F.3d at 1289; Mem. Op., *In re Peabody Energy Corp.*, No. 16-42529 (Bankr. E.D. Mo. Oct. 24, 2017), ECF No. 3514. This action is thus "related to" those cases and therefore removable. *See, e.g.*, *Parke v. Cardsystems Sols., Inc.*, 2006 WL 2917604, at \*4 (N.D. Cal. Oct. 11, 2006) ("[R]ecent case law suggests that the possibility of indemnification or contribution by the debtor, even in the absence of a formal indemnification agreement, constitutes a conceivable effect so as to trigger 'related to' jurisdiction under Section 1452.").

Plaintiffs assert that even if their claims *are* "related to" a bankruptcy proceeding, the Court lacks jurisdiction because this litigation was brought "to protect public safety and welfare." Mot. 33. But the exemption for government exercises of police power "is intended to be given a narrow construction" and does not apply where an action "primarily seeks to protect the government's pecuniary interest" or seeks money to pad local budgets rather than vindicate public rights—which is precisely

---

[31] *See* Thomson Decl., Ex 25.

Gibson, Dunn &
Crutcher LLP

what the instant case does. *City & Cty. of S.F. v. PG&E Corp.*, 433 F.3d 1115, 1124 & n.9 (9th Cir. 2006). A March 2015 memorandum authored by counsel-of-record Matthew Pawa, shopping this lawsuit to prospective plaintiffs by touting the pecuniary gain that governments could reap, is telling: "Potential Global Warming Lawsuit for California *to Recover Global Warming Damages*." Thomson Decl., Ex. 26 (emphasis added). Mr. Pawa's memo attempts to persuade putative plaintiffs of imminent profits, positing that the money could be used for all manner of unrelated public infrastructure projects. Mr. Pawa notes, for example, that California could use climate-change litigation to "pay for . . . improvements" to the state water system even though "some portion of these costs may be unrelated to global warming." *Id.* at 2–3.

Under these circumstances, Plaintiffs are most aptly described as "seek[ing] to protect the government's pecuniary interest," *PG&E Corp.*, 433 F.3d at 1124, and asserting a claim in the nature of a "private right[]" of contribution or indemnity rather than "effectuat[ing any] public policy," *id.* at 1125. Although couched as an "equitable" remedy, Plaintiffs seek a multi-billion dollar "fund" they can use for selected infrastructure projects.

Finally, the Court should decline Plaintiffs' invitation to abstain under so-called equitable principles pursuant to 28 U.S.C. § 1452(b). The Supreme Court has cautioned that "[i]n the main, federal courts are obliged to decide cases within the scope of federal jurisdiction." *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013). Plaintiffs rely on the assertion that their claims are creatures of state law, as well as on supposed "comity" concerns. Mot. 35. These arguments do not support the abdication of jurisdiction over a case with potentially worldwide impacts, and no legitimate comity interest would be served by remand.

## IV. CONCLUSION

For the foregoing reasons, and those set forth in Defendants' Notice of Removal, the Court should deny Plaintiffs' motion to remand.

December 18, 2017                                                  Respectfully submitted,

Gibson, Dunn & Crutcher LLP

By: **/s/ Jonathan W. Hughes

Jonathan W. Hughes (SBN 186829)
ARNOLD & PORTER KAYE SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
E-mail: jonathan.hughes@apks.com

Matthew T. Heartney (SBN 123516)
John D. Lombardo (SBN 187142)
ARNOLD & PORTER KAYE SCHOLER
LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail: matthew.heartney@apks.com
E-mail: john.lombardo@apks.com

Philip H. Curtis (*pro hac vice*)
Nancy Milburn (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8383
Facsimile: (212) 715-1399
E-mail: philip.curtis@apks.com
E-mail: nancy.milburn@apks.com

*Attorneys for Defendant*
*BP P.L.C.*

By: /s/ Theodore J. Boutrous

Theodore J. Boutrous, Jr. (SBN 132099)
Andrea E. Neuman (SBN 149733)
William E. Thomson (SBN 187912)
Ethan D. Dettmer (SBN 196046)
Joshua S. Lipshutz (SBN 242557)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
E-mail: tboutrous@gibsondunn.com
E-mail: aneuman@gibsondunn.com
E-mail: wthomson@gibsondunn.com
E-mail: edettmer@gibsondunn.com
E-mail: jlipshutz@gibsondunn.com

Herbert J. Stern (*pro hac vice*)
Joel M. Silverstein (*pro hac vice*)
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
Florham Park, NJ 07932-0992
Telephone: (973) 535-1900
Facsimile: (973) 535-9664
E-mail: hstern@sgklaw.com
E-mail: jsilverstein@sgklaw.com

Neal S. Manne (SBN 94101)
Johnny W. Carter (*pro hac vice*)
Erica Harris (*pro hac vice*)
Steven Shepard (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
E-mail: nmanne@susmangodfrey.com
E-mail: jcarter@susmangodfrey.com
E-mail: eharris@susmangodfrey.com
E-mail: sshepard@susmangodfrey.com

*Attorneys for Defendant*
*CHEVRON CORPORATION*

| | |
|---|---|
| By: **/s/ *Megan R. Nishikawa* | By: **/s/ *Dawn Sestito* |
| Megan R. Nishikawa (SBN 271670)<br>KING & SPALDING LLP<br>101 Second Street, Suite 2300<br>San Francisco, California 94105<br>Telephone: (415) 318-1200<br>Facsimile: (415) 318-1300<br>Email:  mnishikawa@kslaw.com | M. Randall Oppenheimer (SBN 77649)<br>Dawn Sestito (SBN 214011)<br>O'MELVENY & MYERS LLP<br>400 South Hope Street<br>Los Angeles, California  90071-2899<br>Telephone: (213) 430-6000<br>Facsimile: (213) 430-6407<br>E-Mail:  roppenheimer@omm.com<br>E-Mail:  dsestito@omm.com |
| Tracie J. Renfroe (*pro hac vice*)<br>Carol M. Wood (*pro hac vice*)<br>KING & SPALDING LLP<br>1100 Louisiana Street, Suite 4000<br>Houston, Texas 77002<br>Telephone: (713) 751-3200<br>Facsimile: (713) 751-3290<br>Email:  trenfroe@kslaw.com<br>Email:  cwood@kslaw.com | Theodore V. Wells, Jr. (*pro hac vice*)<br>Daniel J. Toal (*pro hac vice*)<br>Jaren E. Janghorbani (*pro hac vice*)<br>PAUL, WEISS, RIFKIND, WHARTON &<br>GARRISON LLP<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>Telephone: (212) 373-3000<br>Facsimile: (212) 757-3990<br>E-Mail:  twells@paulweiss.com<br>E-Mail:  dtoal@paulweiss.com<br>E-Mail: jjanghorbani@paulweiss.com |
| Justin A. Torres (*pro hac vice*)<br>KING & SPALDING LLP<br>1700 Pennsylvania Avenue, NW<br>Suite 200<br>Washington, DC 20006-4707<br>Telephone: (202) 737 0500<br>Facsimile: (202) 626 3737<br>Email: jtorres@kslaw.com | *Attorneys for Defendant*<br>*EXXON MOBIL CORPORATION* |
| *Attorneys for Defendant*<br>*CONOCOPHILLIPS COMPANY* | |

Gibson, Dunn &
Crutcher LLP

By: **/s/ Daniel P. Collins

Daniel P. Collins (SBN 139164)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
E-mail: daniel.collins@mto.com

Jerome C. Roth (SBN 159483)
Elizabeth A. Kim (SBN 295277)
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
E-mail: jerome.roth@mto.com
E-mail: elizabeth.kim@mto.com

*Attorneys for Defendant*
*ROYAL DUTCH SHELL PLC*

** Pursuant to Civ. L.R. 5-1(i)(3), the electronic signatory has obtained approval from this signatory