1  M. Randall Oppenheimer (SBN 77649)
   Dawn Sestito (SBN 214011)
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, California  90071-2899
   Telephone: (213) 430-6000
4  Facsimile: (213) 430-6407
   E-Mail:  roppenheimer@omm.com
5  E-Mail:  dsestito@omm.com

6
   Theodore V. Wells, Jr. (*pro hac vice*)
7  Daniel J. Toal (*pro hac vice*)
   Jaren E. Janghorbani (*pro hac vice*)
8  PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
9  1285 Avenue of the Americas
   New York, New York 10019-6064
10 Telephone: (212) 373-3000
   Facsimile: (212) 757-3990
11 E-Mail:  twells@paulweiss.com
   E-Mail:  dtoal@paulweiss.com
12 E-Mail:  jjanghorbani@paulweiss.com

13 *Attorneys for Defendant*
   *Exxon Mobil Corporation*
14

15              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
16                  **SAN FRANCISCO DIVISION**

17 CITY OF OAKLAND, a Municipal          First Filed Case:  No. 3:17-cv-6011-WHA
   Corporation, and THE PEOPLE OF THE    Related Case:      No. 3:17-cv-6012-WHA
18 STATE OF CALIFORNIA, acting by and
   through Oakland City Attorney, BARBARA J.
19 PARKER,
                                         **DECLARATION OF DAWN SESTITO IN**
20                                       **SUPPORT OF DEFENDANT EXXON**
              Plaintiff and Real Party in **MOBIL CORPORATION'S MOTION TO**
21            Interest,                  **DISMISS FOR LACK OF PERSONAL**
                                         **JURISDICTION**
22        v.
                                         Case No. 3:17-cv-6011-WHA
23 BP P.L.C., a public limited company of
   England and Wales, CHEVRON            <u>HEARING</u>
24 CORPORATION, a Delaware corporation,
   CONOCOPHILLIPS COMPANY, a Delaware    DATE: MAY 24, 2018
25 corporation, EXXONMOBIL
   CORPORATION, a New Jersey corporation, TIME: 8:00 A.M.
26 ROYAL DUTCH SHELL PLC, a public
   limited company of England and Wales, and LOCATION: COURTROOM 12, 19TH FLOOR
27 DOES 1 through 10,
                                         THE HONORABLE WILLIAM H. ALSUP
28            Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CITY AND COUNTY OF SAN
FRANCISCO, a Municipal Corporation, and
THE PEOPLE OF THE STATE OF
CALIFORNIA, acting by and through the San
Francisco City Attorney DENNIS J.
HERRERA,

        Plaintiff and Real Party in
        Interest,

    v.

BP P.L.C., a public limited company of
England and Wales, CHEVRON
CORPORATION, a Delaware corporation,
CONOCOPHILLIPS COMPANY, a Delaware
corporation, EXXONMOBIL
CORPORATION, a New Jersey corporation,
ROYAL DUTCH SHELL PLC, a public
limited company of England and Wales, and
DOES 1 through 10,

        Defendants.

Case No. 3:17-cv-6012-WHA

I, Dawn Sestito, declare as follows:

1.  I am an attorney admitted to practice before the Courts of the State of California and this Court.  I am a partner at O'Melveny & Myers LLP, counsel for Exxon Mobil Corporation ("ExxonMobil") in this litigation.  I make this declaration upon personal knowledge and could and would competently testify to the matters below if called to do so.

2.  I file this Declaration pursuant to Local Civil Rule 7-5 in support of ExxonMobil's Motion to Dismiss for Lack of Personal Jurisdiction, filed concurrently herewith.

3.  Annexed as Exhibit 1 is a true and correct copy of a transcript of the hearing before this Court in this matter on February 8, 2018.

4.  Annexed as Exhibit 2 is a true and correct copy of the Amended Complaint in *City of New York* v. *BP P.L.C., et al.*, No. 18 Civ. 182 (S.D.N.Y.) (ECF No. 80).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and that this declaration was executed on April 19, 2018 in Los Angeles, California.

*/s/ Dawn Sestito*
Dawn Sestito

1

# EXHIBIT 1

PAGES 1 – 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

THE PEOPLE OF THE STATE OF CALIFORNIA,   )
ACTING BY AND THROUGH OAKLAND CITY      )
ATTORNEY BARBARA J. PARKER,              )
                                       )
  PLAINTIFF AND REAL PARTY IN INTEREST, )
                                       )
  VS.                                 ) NO. 17-CV-6011-WHA
                                       )
BP P.L.C., A PUBLIC LIMITED COMPANY OF )
ENGLAND AND WALES, CHEVRON CORPORATION, )
A DELAWARE CORPORATION, CONOCOPHILLIPS )
COMPANY, A DELAWARE CORPORATION, EXXON )
MOBIL CORPORATION, A NEW JERSEY      )
CORPORATION, ROYAL DUTCH SHELL PLC,   )
A PUBLIC LIMITED COMPANY OF ENGLAND   )
AND WALES, AND DOES 1THROUGH 10,     )
                                      ) SAN FRANCISCO,
                                      ) CALIFORNIA
          DEFENDANTS.            ) THURSDAY
                                      ) FEBRUARY 8, 2018
_____)

(RELATED CASE DETAILED ON FOLLOWING PAGE)

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND**

**RECORDING  1:58 P.M. – 2:46 P.M.**

*TRANSCRIBED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR*
*                   RETIRED OFFICIAL COURT REPORTER, USDC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

```
THE PEOPLE OF THE STATE OF CALIFORNIA  )
ACTING BY AND THROUGH THE SAN FRANCISCO )
CITY ATTORNEY DENNIS J. HERRERA,       )
                                       )
  PLAINTIFF AND REAL PARTY IN INTEREST, )
                                       )
VS.                                    ) NO. 17-CV-6012-WHA
                                       )
BP P.L.C., A PUBLIC LIMITED COMPANY OF )
ENGLAND AND WALES, CHEVRON CORPORATION, )
A DELAWARE CORPORATION, CONOCOPHILLIPS )
COMPANY, A DELAWARE CORPORATION, EXXON )
MOBIL CORPORATION, A NEW JERSEY        )
CORPORATION, ROYAL DUTCH SHELL PLC,    )
A PUBLIC LIMITED COMPANY OF ENGLAND    )
AND WALES, AND DOES 1THROUGH 10,       )
                                       )
            DEFENDANTS.                )
_____)
```

**APPEARANCES**

**FOR PLAINTIFFS**          HAGENS BERMAN SOBOL SHAPIRO LLP
                            1280 CENTRE STREET, SUITE 230
                            NEWTON, MASSACHUSETTS 02459
                       **BY:  MATTHEW F. PAWA, ESQUIRE**


                            HAGENS BERMAN SOBOL SHAPIRO LLP
                            1918 EIGHTH AVENUE, SUITE 3300
                            SEATTLE, WASHINGTON 98101
                       **BY:  STEVE W. BERMAN, ESQUIRE**

                            CITY & COUNTY OF SAN FRANCISCO
                            CITY ATTORNEY'S OFFICE
                            1390 MARKET STREET
                            SAN FRANCISCO, CALIFORNIA 94121
                       **BY:  MATTHEW D. GOLDBERG, ESQUIRE**
                            **ERIN BRIANNA BERNSTEIN, ESQUIRE**


(APPEARANCES CONTINUED ON FOLLOWING PAGES)

**APPEARANCES (CONTINUED):**

**FOR PLAINTIFFS**                SF CITY ATTORNEY'S OFFICE
                                  1 DR. CARLTON B. GOODLETT PLACE
                                  SAN FRANCISCO, CALIFORNIA  94102
                             BY:  **ROBB KAPLA, ESQUIRE**


                                  OAKLAND CITY ATTORNEY'S OFFICE
                                  ONE FRANK H. OGAWA PLAZA, 6TH FL.
                                  OAKLAND, CALIFORNIA 94612-1999
                             BY:  **MALIA MCPHERSON, ESQUIRE**


**FOR DEFENDANT**                 GIBSON DUNN & CRUTCHER LLP
**CHEVRON CORPORATION**           333 SOUTH GRAND AVENUE
                                  LOS ANGELES, CALIFORNIA 90071-3197
                             BY:  **THEODORE J. BOUTROUS, JR., ESQUIRE**


**FOR DEFENDANT**                 ARNOLD & PORTER LLP
**BP P.L.C.**                     THREE EMBARCADERO CENTER
                                  10TH FLOOR
                                  SAN FRANCISCO, CALIFORNIA 94111-4024
                             BY:  **JONATHAN W. HUGHES, ESQUIRE**


**FOR DEFENDANT**                 **PAUL WEISS RIFKIND WHARTON & GARRISON**
**EXXON MOBIL**                   1285 AVENUE OF THE AMERICAS
                                  NEW YORK, NEW YORK 10019-6064
                             BY:  **THEODORE WELLS, ESQUIRE**
                                  **JAREN JANGHORBANI, ESQUIRE**


                                  O'MELVENY & MYERS LLP
                                  400 SOUTH HOPE STREET
                                  LOS ANGELES, CALIFORNIA 90071-2899
                             BY:  **DAWN SESTITO, ESQUIRE**


**FOR DEFENDANT**                 JEROME CARY ROTH
**ROYAL DUTCH SHELL**             MUNGER TOLLES & OLSON LLP
                                  560 MISSION STREET, 27TH FLOOR
                                  SAN FRANCISCO, CALIFORNIA 94105-2907
                             BY:  **JEROME CARY ROTH, ESQUIRE**

**APPEARANCES (CONTINUED):**

**FOR DEFENDANT**          MUNGER TOLLES & OLSON LLP
**ROYAL DUTCH SHELL**      350 SOUTH GRAND AVENUE, 50TH FLOOR
                           LOS ANGELES, CALIFORNIA 90071-3426
                    BY:  **DANIEL PAUL COLLINS ESQUIRE**


**FOR DEFENDANT**          KING & SPALDING LLP
**CONOCOPHILLIPS**         1100 LOUISIANA STREET, SUITE 4000
                           HOUSTON, TEXAS 77002
                    BY:  **CAROL MARGARET WOOD, ESQUIRE**
                         **TRACIE JO RENFROE, ESQUIRE**

```
 1   THURSDAY, FEBRUARY 8, 2018                    1:58 P.M.
 2   (TRANSCRIBER'S NOTE: DUE AT TIMES TO COUNSELS' FAILURE TO
 3   IDENTIFY THEMSELVES WHEN SPEAKING, CERTAIN SPEAKER
 4   ATTRIBUTIONS ARE BASED ON EDUCATED GUESS.)
 5                          ---OOO---
 6                         PROCEEDINGS
 7           THE CLERK:   CALLING CIVIL ACTION 17-6011 AND 17-6012,
 8   THE PEOPLE OF THE STATE OF CALIFORNIA VERSUS BP P.L.C., ET AL.
 9           COUNSEL, PLEASE APPROACH THE PODIUM AND STATE YOUR
10   APPEARANCES FOR THE RECORD.
11           MR. HUGHES:   GOOD AFTERNOON, YOUR HONOR.
12           JONATHAN HUGHES OF ARNOLD & PORTER FOR BP.
13           MR. BERMAN:   GOOD AFTERNOON, YOUR HONOR.
14           STEVE BERMAN ON BEHALF OF THE PEOPLE.
15           MR. PAWA:   GOOD AFTERNOON, YOUR HONOR.
16           MATT PAWA ON BEHALF OF THE PEOPLE.
17           MR. BOUTROUS:   GOOD AFTERNOON, YOUR HONOR.
18           THEODORE J. BOUTROUS, JUNIOR, REPRESENTING CHEVRON.
19           MR. GOLDBERG:   GOOD AFTERNOON, YOUR HONOR.
20           MATT GOLDBERG ON BEHALF OF THE PEOPLE.
21           MR. WELLS:   ED WELLS, PAUL WEISS, ON BEHALF OF EXXON
22   MOBILE.
23           MR. KAPLA:   GOOD AFTERNOON, YOUR HONOR.
24           ROBB KAPLA ON BEHALF OF THE PEOPLE.
25           MS. MCPHERSON:   MALIA MCPHERSON ON BEHALF OF THE
```

 1    PEOPLE.

 2           **MR. ROTH:**   JERRY ROTH OF MUNGER TOLLES ON BEHALF OF

 3    ROYAL DUTCH SHELL.

 4           **MS. BERNSTEIN:**   GOOD AFTERNOON.

 5           ERIN BERNSTEIN ON BEHALF OF THE PEOPLE.

 6           **MS. WOOD:**   GOOD AFTERNOON, YOUR HONOR.

 7           CAROL WOOD OF KING & SPALDING REPRESENTING

 8    CONOCOPHILLIPS COMPANY.

 9           **MS. RENFROE:**   GOOD AFTERNOON, YOUR HONOR.

10           TRACIE RENFROE, KING & SPALDING, REPRESENTING

11    CONOCOPHILLIPS COMPANY AND PHILLIPS 66.

12           **MR. JANGHORBANI:**   GOOD AFTERNOON, YOUR HONOR.

13           JAREN JANGHORBANI, PAUL WEISS OF BEHALF OF EXXON

14    MOBIL.

15           **MS. SESTITO:**   GOOD AFTERNOON, YOUR HONOR.

16           DAWN SESTITO, O'MELVENY MYERS ON BEHALF OF EXXON

17    MOBIL.

18           **THE COURT:**   ALL RIGHT.   THANK YOU.

19           **MR. COLLINS:**   GOOD AFTERNOON, YOUR HONOR.   DANIEL

20    COLLINS, MUNGER, TOLLES & OLSON, ALSO ON BEHALF OF ROYAL DUTCH

21    SHELL.

22           **THE COURT:**   ALL RIGHT.   THANK YOU.

23           THIS IS MOTION TO REMAND, CORRECT?

24           SO I THINK THE -- WE OUGHT TO START WITH THE PARTY

25    WHO REMOVED, BECAUSE YOU'RE THE ONE THAT HAS THE BURDEN OF

1     SHOWING THERE'S REMOVAL JURISDICTION.

2              SO I CAN'T -- I DON'T HAVE -- MY HEALTH IS SUFFERING

3     A LOT TODAY.  YOU CAN TELL FROM MY VOICE.  I DO WANT TO GIVE

4     YOU A CHANCE TO MAKE YOUR MAIN POINTS, BUT THIS WILL NOT,

5     UNFORTUNATELY, BE A LONG ARGUMENT.

6              ALL RIGHT.  SO WHO'S GOING TO ARGUE FOR YOUR SIDE?

7              **MR. BOUTROUS:**  I AM, YOUR HONOR.  THEODORE J.

8     BOUTROUS, JUNIOR, FOR CHEVRON.

9              **THE COURT:**  OKAY.  SO WHAT IS THE BEST ARGUMENT THAT

10    YOU'VE GOT FOR REMOVAL JURISDICTION?

11             **MR. BOUTROUS:**  YOUR HONOR, THE BEST ARGUMENT WE HAVE

12    IS THAT THIS CASE, EVEN THOUGH IT'S STYLED AS A STATE PUBLIC

13    NUISANCE CLAIM, IS GLOBAL, IT'S INTERSTATE, IT'S INTERNATIONAL,

14    AND IT REALLY IS A FEDERAL COMMON LAW CLAIM THAT -- IN

15    DISGUISE.  ACTUALLY, ON THE FACE OF THE COMPLAINT, IT'S A

16    FEDERAL COMMON LAW CLAIM BUT IT IS LABELED A STATE CLAIM.

17             THE *AEP* DECISION FROM THE SUPREME COURT SAID THAT

18    WHEN IT'S AN INTERSTATE OR INTERNATIONAL CLAIM, FEDERAL COMMON

19    LAW APPLIES BECAUSE THE STATES CANNOT APPLY THEIR OWN LAW TO

20    MATTERS THAT INVOLVE GLOBAL WARMING.

21             THE NINTH CIRCUIT IN *KIVALINA* SAID THE SAME THING,

22    WITH VERY SIMILAR PUBLIC NUISANCE CLAIMS, THAT FEDERAL COMMON

23    LAW APPLIES BECAUSE THE STATES CAN'T APPLY THEIR LAW TO THIS

24    GLOBAL ACTIVITY.  AND HERE THE CLAIM IS THAT THE OIL COMPANIES'

25    PRODUCTION OF OIL AROUND THE WORLD, AROUND THE GLOBE, AROUND

```
 1    THE UNITED STATES, GOING BACK TO THE BEGINNING OF THE

 2    INDUSTRIAL AGE, BASICALLY, HAS BEEN CONTRIBUTING TO GLOBAL

 3    WARMING WHICH HAS CAUSED THE ICE CAPS IN ANTARTICA AND

 4    GREENLAND TO MELT AND HAVE THE SEA LEVELS RISE.

 5          THAT'S THEIR ALLEGATION, AND THAT IS NOT SOMETHING A

 6    STATE CAN REGULATE.  IT'S FEDERAL.

 7          IN AEP THE SUPREME COURT SAID THAT THAT -- THE GLOBAL

 8    WARMING ISSUES PRESENT NATIONAL AND INTERNATIONAL POLICY

 9    DECISIONS THAT REQUIRE A COMPLEX BALANCING.

10          SO THE COMPLEX BALANCING THAT THE TORT HERE, THE

11    NUISANCE TORT, REQUIRES IS A FEDERAL QUESTION, AND THAT

12    PROVIDES ARISING UNDER JURISDICTION.  EVEN THOUGH THE CLAIM IS

13    LABELED STATE CLAIM, THE NINTH CIRCUIT'S NEW SD DECISION --

14    VERSUS ROCKWELL SAYS THAT --

15          THE COURT:  SAY THAT LAST ONE AGAIN.

16          MR. BOUTROUS:  IT'S NEW, N-E-W, SD V. ROCKWELL.  AND

17    THE RELATED --

18          THE COURT:  WHAT DID THE NINTH CIRCUIT HOLD IN THAT?

19          MR. BOUTROUS:  IN THAT CLAIM THERE WAS A CLAIM THAT

20    WAS LABELED A STATE LAW CLAIM, BUT THE COURT FOUND THAT BECAUSE

21    OF THE NATURE OF THE UNIQUELY FEDERAL INTEREST AND THE NATURE

22    OF THE CLAIM, IT WAS ACTUALLY A FEDERAL CLAIM, AND, THEREFORE,

23    REMOVAL JURISDICTION WAS APPROPRIATE.

24          THE RELATED ARGUMENT --

25          THE COURT:  EVEN THOUGH ON THE FACE OF THE COMPLAINT
```

1    THERE WAS NO REFERENCE TO FEDERAL CLAIMS?

2            **MR. BOUTROUS:**  EXACTLY, YOUR HONOR.

3            AND SO -- AND HERE THE RELATED ARGUMENT IS UNDER THE

4    SUPREME COURT'S *GRABLE* DECISION, AND *GRABLE* HOLDS THAT EVEN IF

5    THE CLAIM IS A STATE CLAIM, IF IT REQUIRES THE COURT TO RESOLVE

6    A FEDERAL QUESTION OR -- AS PART OF THE ANALYSIS, AND OTHER

7    FACTORS ARE MET, THEN THERE'S ALSO ARISING UNDER JURISDICTION

8    UNDER SECTION 1331.  ONE OF THE FACTORS THERE IS TO ENSURE

9    UNIFORMITY WHERE NATIONAL INTERESTS ARE INVOLVED.

10           HERE, AGAIN, AS THE SUPREME COURT SAID IN *AEP*, THE

11   FUNDAMENTAL INQUIRY IS A COMPLEX BALANCING OF OUR

12   ENVIRONMENTAL, ECONOMIC ISSUES, COMPETITIVENESS, NATIONAL

13   SECURITY, IN TERMS OF HOW TO REDUCE GLOBAL EMISSIONS AND

14   ADDRESS CLIMATE CHANGE ISSUES.  THAT'S A VERY COMPLEX ISSUE

15   THAT REQUIRES A BALANCING OF COST AND BENEFIT.

16           HERE, AS A MATTER OF STATE LAW, CALIFORNIA REQUIRES

17   THAT THE REASONABLENESS DETERMINATION BE MADE WHERE A

18   COST/BENEFIT ANALYSIS WOULD APPLY, AND AS ITS PLED ON ITS FACE,

19   PLAINTIFFS WOULD BE ASKING A STATE COURT JUDGE TO MAKE THE

20   FEDERAL BALANCING THAT THE FEDERAL CONGRESS HAS MADE, THE EPA

21   HAS MADE IN THE CLEAN AIR ACT CONTEXT, THEREFORE, THERE'S AN

22   IMPORTANT SUBSTANTIAL FEDERAL ISSUE EMBEDDED IN THE CLAIM.

23           AND THIS COURT IN THE *COUNTY OF SANTA CLARA* CASE

24   APPLIED THE *GRABLE* ANALYSIS, FOUND A FEDERAL ISSUE EMBEDDED,

25   FOUND IT WAS IMPORTANT BECAUSE IT WOULD HAVE AN EFFECT ON A

1     FEDERAL REGULATORY SCHEME.

2             AND THE OTHER ELEMENT OF *GRABLE* IS HOW DOES IT WORK

3     AS A FEDERALISM MATTER, AND HERE WOULD IT OFFEND FEDERALISM FOR

4     THIS COURT TO HEAR A STATE CLAIM IN FEDERAL COURT UNDER THESE

5     CIRCUMSTANCES.  AND WE RESPECTFULLY SUBMIT THE ANSWER --

6             **THE COURT:**  BUT IN THAT *COUNTY OF SANTA CLARA* CASE,

7     THE SUPREME COURT TOOK THAT CASE.  IT WAS *ASTRAZENECA*.  IS THAT

8     THE ONE YOU'RE TALKING ABOUT?

9             **MR. BOUTROUS:**  NO, THIS WAS THE REMOVAL CASE THIS

10    COURT DECIDED, AND IT WAS REMOVED, AND THERE WAS NO QUESTION ON

11    REMOVAL.  AND THERE THE COURT LOOKED AT THE FEDERALISM ISSUES.

12    AND HERE, BECAUSE THIS CASE HAS SO MANY FEDERAL ISSUES FLOWING

13    AROUND IT, THE FEDERAL GOVERNMENT, THE EPA REGULATES EMISSIONS.

14            AS I SAID, THE BALANCING ISSUE IS A FEDERAL ISSUE.

15    NO CALIFORNIA COURT HAS EVER FOUND THAT THE PUBLIC NUISANCE

16    TORT COULD BE APPLIED TO REGULATE GLOBAL WARMING AND INTERSTATE

17    OR INTERNATIONAL ACTIVITY LIKE THIS.  SO THERE WOULD BE NO REAL

18    INTRUSION ON CALIFORNIA'S PREROGATIVES.  AND, OF COURSE, THIS

19    COURT HEARS STATE CROSSCLAIMS FREQUENTLY AND RESPECTS STATE LAW

20    IN THOSE CIRCUMSTANCES.

21            THE OTHER TWO GROUNDS I'LL JUST BRIEFLY TOUCH ON

22    THEM -- MY MIC JUST WENT OUT.

23            **THE COURT:**  I HAVE NO IDEA WHY THAT -- BUT YOU'RE

24    BACK ON LINE.  GO AHEAD.

25            **MR. BOUTROUS:**  (INDISCERNIBLE).

1          **THE COURT:**  NO, NO.  TRY IT AGAIN.  I THINK SOMEHOW

2     WE -- DON'T GO AWAY.

3          **MR. BOUTROUS:**  OKAY.

4          **THE COURT:**  NOW IT SOUNDS LIKE YOU'RE COMING BACK.

5          **MR. BOUTROUS:**  I THINK I'M BACK.  THERE WE GO.

6          **THE COURT:**  ALL RIGHT.

7          **MR. BOUTROUS:**  I'LL FINISH UP WITH TWO QUICK POINTS,

8     YOUR HONOR.

9          THE CLEAN AIR ACT, AS THE COURT KNOWS FROM THE

10    SUPREME COURT'S *AEP* DECISION, THERE THE COURT FOUND THAT

11    CONGRESS, THROUGH THE CLEAN AIR ACT, REGULATES EMISSIONS OF

12    CARBON DIOXIDE AND THAT THAT IS -- FEDERAL COURTS CAN'T APPLY

13    FEDERAL COMMON LAW BECAUSE CONGRESS HAS LEGISLATED IN THAT

14    AREA, AND IT'S -- THAT ANALYSIS, WE BELIEVE, MEANS THAT A STATE

15    COURT CAN'T THEN APPLY STATE PUBLIC NUISANCE LAW, BOTH AS A

16    SUPREMACY CLAUSE MATTER, ALSO BECAUSE THE STATES WOULD BE

17    INTERFERING WITH THIS COMPREHENSIVE REGULATORY SCHEME THAT

18    CONGRESS HAS ENACTED AND THE EPA IS IMPLEMENTING.  SO THERE'S

19    COMPLETE PREEMPTION.  SO, AGAIN, FEDERAL QUESTION JURISDICTION.

20          AND THEN, FINALLY, THE PLAINTIFF'S CLAIMS HERE SWEEP

21    SO BROADLY, YOUR HONOR, THEY ENCOMPASS ALL OF THE PRODUCTION OF

22    OIL ON THE OUTER CONTINENTAL SHELF, REALLY GOING BACK TO THE

23    BEGINNING OF THE INDUSTRIAL AGE, AND THERE'S FEDERAL

24    JURISDICTIONAL STATUTE THAT SAYS IF A MATTER IS CONNECTED WITH

25    OR ARISES FROM OIL PRODUCTION ACTIVITY ON THE OUTER CONTINENTAL

```
 1    SHELF, THERE'S FEDERAL JURISDICTION.
 2              THE COURT:  READ TO ME FROM THE PLEADING, THE
 3    COMPLAINT, THE MOST BROAD, CLEARCUT ALLEGATION THAT YOU THINK
 4    IMPLICATES -- NECESSARILY IMPLICATES FEDERAL COMMON LAW.
 5              MR. BOUTROUS:  I'LL JUST START WITH THE GIST OF THE
 6    COMPLAINT, WHICH IS THIS IS WHY THE -- ON PAGE 1.  THE
 7    COMPLAINT -- THIS IS NOT JUST A -- I'LL READ THE QUOTE AND
 8    EXPLAIN IT.  THIS IS A QUOTE:
 9                        "GLOBAL WARMING IS HERE AND IT'S
10              HARMING OAKLAND NOW."
11              THE COURT:  GLOBAL WARMING IS WHAT?
12              MR. BOUTROUS:  "...HERE AND IT IS HARMING OAKLAND
13              NOW.
14                        "GLOBAL WARMING CAUSES ACCELERATED
15              SEA LEVEL RISE THROUGH THERMAL EXPANSION OF
16              OCEAN WATER AND MELTING OF LAND-BASED ICE.
17              SEA LEVELS ARE RISING AT RATES UNPRECEDENTED
18              IN THE HISTORY OF HUMAN CIVILIZATION DUE TO
19              GLOBAL WARMING.  GLOBAL WARMING-INDUCED SEA
20              LEVEL RISE IS ALREADY CAUSING FLOODING OF
21              LOW-LYING AREAS."
22              AND THEN IT CONTINUES.
23              BACK IN PARAGRAPH 49, I BELIEVE, THE PLAINTIFFS SAY
24    THAT:
25                        "CARBON DIOXIDE FROM FOSSIL FUELS
```

1          HAS A CHEMICAL FINGERPRINT.  THIS IS A

2          CULPRIT."

3          AND SAYS:

4               "PRIMARILY DUE TO THE COMBUSTION OF

5          FOSSIL FUELS, IT'S HIGHER THAN ANY OTHER TIME

6          DURING HUMAN CIVILIZATION, LIKELY HIGHER THAN

7          ANY LEVEL IN MILLIONS OF YEARS.  THE RESULT

8          IS DRAMATIC PLANETARY WARMING."

9          AND THEN BACK IN PARAGRAPH 95 THEY SAY:

10              "DEFENDANTS' CONDUCT CONSTITUTES A

11         SUBSTANTIAL AND UNREASONABLE INTERFERENCE

12         WITH OBSTRUCTION OF PUBLIC RIGHTS AND

13         PROPERTY."

14         AND THAT UNREASONABLE INTERFERENCE -- THEY'RE SAYING

15    THAT THE GLOBAL ACTIVITY OF THESE COMPANIES, GOING BACK TO THE

16    BEGINNING OF CIVILIZATION, INCLUDING INTERSTATE AND

17    INTERNATIONALLY, IS UNREASONABLE, AND THAT IS THE FEDERAL

18    DECISION THAT THE FEDERAL GOVERNMENT HAS MADE THROUGH THE CLEAN

19    AIR ACT, THROUGH AN ARRAY OF FEDERAL STATUTES THAT WE'VE CITED,

20    AND IT'S THE EXACT COMPLEX BALANCING THAT THE SUPREME COURT

21    SAID IS ONE OF INTERNATIONAL AND NATIONAL POLICY.

22         SO I THINK PLAINTIFFS ARE GOING TO SAY THIS IS JUST A

23    SIMPLE NUISANCE CLAIM, THEY ARE JUST TALKING ABOUT SELLING A

24    PRODUCT.  THIS IS ALL ABOUT INTERSTATE AND TRANSBOUNDARY

25    ACTIVITY, AND THE SUPREME COURT IN A NUMBER OF CASES, INCLUDING

1    *TEXAS INDUSTRY*, HAS SAID WHERE THE INTERSTATE AND INTERNATIONAL

2    NATURE OF THE CLAIM MAKES IT SUCH THAT STATE LAW CAN'T APPLY,

3    STATE LAW CAN'T APPLY.  SO THAT'S WHY THIS IS A FEDERAL CASE

4    THAT BELONGS IN FEDERAL COURT.

5               **THE COURT:**  OKAY.

6               **MR. BOUTROUS:**  THANK YOU.

7               **THE COURT:**  I'LL GIVE YOU A REBUTTAL, BUT LET'S --

8    I'D LIKE TO HEAR WHAT THE OTHER SIDE SAYS.

9               **MR. BOUTROUS:**  THANK YOU, YOUR HONOR.

10              **THE COURT:**  GIVE ME YOUR NAME AGAIN, PLEASE.

11              **MR. PAWA:**  THANK YOU, AGAIN.  MATT PAWA FOR THE

12   PEOPLE, YOUR HONOR.

13              **THE COURT:**  ALL RIGHT.

14              **MR. PAWA:**  YOUR HONOR, FEDERAL COMMON LAW DOES NOT

15   APPLY HERE.  THE VERY CASE THAT THE DEFENDANTS HAVE CITED,

16   *AMERICAN ELECTRIC POWER* AND *KIVALINA*, HAD SUPPLEMENTAL STATE

17   LAW CLAIMS.  THE DISPOSITION IN BOTH *AEP* BY THE U.S. SUPREME

18   COURT AND *KIVALINA* IN THE NINTH CIRCUIT OF THOSE SUPPLEMENTAL

19   STATE LAW CLAIMS IS IRRECONCILABLE WITH THE ARGUMENT THAT YOU

20   JUST HEARD.  IN BOTH CASES THOSE SUPPLEMENTAL STATE LAW CLAIMS

21   WERE PRESERVED TO BE FOUGHT ANOTHER DAY.

22              HOW COULD STATE LAW CLAIMS BE AUTOMATICALLY

23   TRANSMUTED AND TRANSFORMED INTO FEDERAL LAW CLAIMS?  IF THAT

24   WAS THE OUTCOME IN *KIVALINA*.  IN FACT, JUDGE --

25              **THE COURT:**  TELL ME, DESCRIBE THE DETAILS OF THAT

1    CASE AND WHAT HAPPENED ON APPEAL.

2             **MR. PAWA:**  SURE.  THOSE WERE CASES AGAINST DIRECT

3    EMITTERS.  SO *AEP* WAS A SUIT BY EIGHT STATES AGAINST

4    OUT-OF-STATE EMITTERS SEEKING EMISSIONS CAPS.  WE'RE NOT

5    SEEKING ANYTHING OF THE SORT.  WE ARE NOT SEEKING TO ENJOIN

6    ANYONE'S BUSINESS.  WE SAY SO RIGHT IN PARAGRAPH 11 OF THE

7    COMPLAINT.

8             BUT *AEP* WAS A CASE THAT EXPRESSLY INVOKED FEDERAL

9    COMMON LAW ON THE FACE OF ITS COMPLAINT.  SO DID *KIVALINA.*  *AEP*

10   AND *KIVALINA* BOTH EXPRESSLY WERE FILED IN FEDERAL COURT AND

11   PLED UNDER THE WELL-PLEADED COMPLAINT RULE FEDERAL COMMON LAW.

12   THAT'S NOT OUR SITUATION.

13            AND IN BOTH CASES THE U.S. SUPREME COURT AND THE

14   NINTH CIRCUIT SAID THE SUPPLEMENTAL STATE LAW CLAIMS ARE FOR

15   ANOTHER DAY IF YOU LOOK AT JUDGE PRO'S CONCURRENCE IN *KIVALINA*,

16   HE TAKES IT STRAIGHT ON, AND, YOU KNOW, THEY AFFIRM JUDGE

17   ARMSTRONG'S JUDGMENT IN *KIVALINA* IN WHICH THE STATE LAW CLAIMS

18   WERE SAVED TO BE REFILED IN STATE COURT.  THAT WAS COMMANDED --

19   THOSE OUTCOMES WERE COMMANDED BY PRIOR U.S. SUPREME COURT CASE

20   LAW, *OUELLETTE VERSUS INTERNATIONAL PAPER*, AN INTERSTATE

21   POLLUTION CASE.

22            NOW, WE HAVEN'T FILED A TRADITIONAL TRANSBOUNDARY

23   INTERSTATE POLLUTION CASE, BUT ASSUMING WE HAD, ASSUMING WE

24   WERE JUST LIKE *INTERNATIONAL PAPER* AND THESE OTHER CASES THAT

25   THE DEFENDANTS HAD CITED*, INTERNATIONAL PAPER* SAYS STATE LAW

1    APPLIES.

2            **THE COURT:**  SAY THAT LAST SENTENCE.

3            **MR. PAWA:**  *INTERNATIONAL PAPER* SAYS STATE LAW

4    APPLIES.

5            NOW, THERE'S A SUBSEQUENT QUESTION IN *INTERNATIONAL*

6    *PAPER* ABOUT WHICH STATE LAW APPLIES, AND THAT'S A QUESTION OF

7    CONFLICT PREEMPTION.  THAT'S NOT A GROUND FOR REMOVAL.

8            BUT THEIR ENTIRE ARGUMENT, YOUR HONOR, ABOUT FEDERAL

9    COMMON LAW IS UTTERLY IRRECONCILABLE WITH THE OUTCOME IN

10   *INTERNATIONAL PAPER* IN WHICH THE U.S. SUPREME COURT SAID, WE'VE

11   GOT -- WE'VE GOT INTERSTATE POLLUTION, CONGRESS HAS DISPLACED

12   FEDERAL COMMON LAW -- AND, BY THE WAY, THE PARTIES AGREE HERE

13   THAT, AS IN *INTERNATIONAL PAPER*, FEDERAL COMMON LAW IS

14   DISPLACED.  THEY SAID SO IN THEIR NOTICE OF REMOVAL.

15           SO ASSUMING WE'RE ONE OF THESE TRANSBOUNDARY

16   POLLUTION CASES -- AND WE'RE NOT; WE'VE SUED MAKERS OF

17   PRODUCTS -- BUT ASSUMING WE ARE, THAT IS A SITUATION WHERE THE

18   U.S. SUPREME COURT HAS SAID IF FEDERAL COMMON LAW IS DISPLACED,

19   FEDERAL COMMON LAW IS TAKEN AWAY BY CONGRESS -- HERE THE CLEAN

20   AIR ACT AS WE AGREED -- STATE LAW COMES BACK INTO PLAY.

21           THAT IS THE ANSWER TO THEIR ARGUMENT, YOUR HONOR, AND

22   WE COULD STAY HERE ALL DAY TALKING ABOUT VARIOUS ITERATIONS OF

23   FEDERAL COMMON LAW, WHETHER IT APPLIES TO PRODUCTS AS OPPOSED

24   TO TRADITIONAL TRANSBOUNDARY NUISANCE CASES.  BUT THE BOTTOM

25   LINE HERE IS WHERE THE PARTIES HERE AGREE, THAT THE PARTICULAR

1    FEDERAL COMMON LAW DOCTRINE THAT THEY'RE INVOKING,

2    TRANSBOUNDARY POLLUTION, HAS BEEN DISPLACED BY CONGRESS.

3           *INTERNATIONAL PAPER* SAYS STATE COMMON LAW APPLIES,

4    AND THAT'S IT.  ANY FURTHER QUESTION ABOUT WHICH STATE LAW

5    APPLIES, WHETHER IT BE CALIFORNIA OR SOME OTHER LAW, IS

6    CONFLICT PREEMPTION AND DOES NOT GET INTO REMOVAL.

7           **THE COURT:**  WAIT A MINUTE.  SO YOU'RE -- LET'S GO

8    BACK THROUGH THOSE STEPS AGAIN.

9           **MR. PAWA:**  SURE.

10          **THE COURT:**  YOU'RE SAYING THAT CONGRESS ENACTED A

11   STATUTE THAT WOULD DISPLACE FEDERAL COMMON LAW?

12          **MR. PAWA:**  THE CLEAN AIR ACT, YES.

13          **THE COURT:**  ALL RIGHT.

14          AND THEN THE PART I'M MISSING IS, SO WHY DOES THAT

15   MEAN STATE LAW APPLIES, STATE COMMON LAW APPLIES?

16          **MR. PAWA:**  BECAUSE THAT'S THE BACKGROUND PRESUMPTION

17   OF THE ERIE DOCTRINE.  I MEAN, IT ALWAYS APPLIES UNLESS THERE'S

18   SOME VERY UNUSUAL CIRCUMSTANCES THAT WOULD REQUIRE FEDERAL

19   COMMON LAW TO APPLY.

20          AND, YOU KNOW, THE EASIEST WAY, I THINK, TO EXPLAIN

21   IT AND UNDERSTAND THIS, YOUR HONOR, IS TO LOOK AT *MILWAUKEE I,*

22   *MILWAUKEE II*, AND *INTERNATIONAL PAPER*.

23          IN *MILWAUKEE I*, WATER POLLUTION CASE, INTERSTATE

24   POLLUTION, THE U.S. -- FILED IN THE U.S. SUPREME COURT'S

25   ORIGINAL JURISDICTION, THE U.S. SUPREME COURT SAYS FEDERAL

1    COMMON LAW APPLIES; WE'VE GOT INTERSTATE POLLUTION.

2            CASE COMES BACK TO THE COURT EIGHT YEARS LATER AFTER

3    HAVING BEEN REFILED UNDER FEDERAL QUESTION JURISDICTION IN

4    FEDERAL COURT, AND THE U.S. SUPREME COURT SAYS, OH, THERE HAVE

5    BEEN AMENDMENTS TO THE CLEAN AIR ACT -- CLEAN WATER ACT, SORRY,

6    THE CLAIM THAT WE RECOGNIZED BEFORE IS DISPLACED.

7            SEVEN YEARS LATER, 1987, *INTERNATIONAL PAPER* COMES

8    ALONG.  IT'S CLEARLY AN INTERSTATE POLLUTION -- POLLUTION IS

9    COMING FROM NEW YORK INTO VERMONT, AND THE SUPREME COURT SAYS,

10   OKAY, WELL, WE'VE SAID BEFORE IN *MILWAUKEE II* THAT THE FEDERAL

11   COMMON LAW IS DISPLACED SO WHAT LAW APPLIES?  AND THE ANSWER

12   THERE WAS STATE LAW.  THAT'S THE --

13           **THE COURT:**  THAT'S WHAT THE SUPREME COURT SAID?

14           **MR. PAWA:**  THAT'S WHAT THE SUPREME COURT SAID.  AND

15   THAT IS THE ANSWER TO THEIR ARGUMENT, YOUR HONOR.

16           **THE COURT:**  OKAY.  WAIT.  HOLD THAT THOUGHT.  DON'T

17   GO AWAY.

18           LET'S HEAR FROM MR. BOUTROUS.  WHAT DO YOU SAY TO

19   THAT ARGUMENT?

20           **MR. BOUTROUS:**  YOUR HONOR, THAT'S NOT WHAT THE

21   SUPREME COURT SAID, AND, IN FACT, LET ME GO TO THE

22   *INTERNATIONAL PAPER VERSUS OUELLETTE* CASE BECAUSE WHAT COUNSEL

23   IS SAYING IS JUST WRONG.

24           THERE THE COURT SAID THAT IF A STATE LIKE CALIFORNIA

25   APPLIED ITS LAW TO MULTIPLE -- TO INTERSTATE ACTIVITY, THAT

```
 1   WOULD CREATE CHAOS.  AND ALL OUELLETTE SAID WAS A STATE -- IF,

 2   SAY, CALIFORNIA SUED NEVADA FOR SOMETHING -- POLLUTION THAT WAS

 3   COMING FROM NEVADA, THAT NEVADA -- THEY COULD ARGUE THAT NEVADA

 4   LAW APPLIED TO THE IN-SOURCE ACTIVITY.  IT SAYS ABSOLUTELY NOT

 5   COULD A STATE APPLY ITS LAW TO INTERSTATE ACTIVITY.

 6        MILWAUKEE I, THE DISPLACEMENT ISSUE, THE NINTH

 7   CIRCUIT'S NATIONAL AUDUBON CASE THAT WE'VE CITED, IT DIRECTLY

 8   ADDRESSES THIS POINT.  IT SAID FIRST THERE IT FOUND THAT THE

 9   FEDERAL COMMON LAW HAD BEEN DISPLACED, BUT THEN IT NOTED THAT

10   IN SOME INSTANCES OUR FEDERAL SYSTEM, EVEN WHERE THERE'S

11   DISPLACEMENT, IT CAN'T BE THAT CONGRESS DISPLACES FEDERAL COURT

12   BECAUSE IT'S AN ISSUE OF NATIONAL/INTERNATIONAL POLICY AND THE

13   RESPONSE IS, OH, BUT A STATE COURT CAN HEAR IT.  THAT DOESN'T

14   MAKE ANY SENSE, AND THE COURTS HAVEN'T HELD THAT.  HERE'S WHAT

15   NATIONAL --

16             THE COURT:  WAIT, WAIT.

17             MR. BOUTROUS:  YES.

18             THE COURT:  COUNSEL SAID THAT THE SUPREME COURT SAID

19   BECAUSE THE CLEAN WATER ACT HAD BEEN AMENDED, THAT THAT

20   DISPLACED ANY FEDERAL COMMON LAW, AND, THEREFORE, THE SUPREME

21   COURT SAID, AS IT WAS JUST REPRESENTED TO ME, THAT SINCE

22   FEDERAL COMMON LAW NO LONGER APPLIES, IT MUST BE STATE LAW THAT

23   WE APPLY.

24             SO IS THAT THE WAY IT CAME DOWN OR NOT?

25             MR. BOUTROUS:  NO, THAT'S NOT THE WAY IT CAME DOWN.
```

1              **THE COURT:**  WELL, HOW -- ALL RIGHT.

2              **MR. BOUTROUS:**  THE COURT LEFT OPEN THE POSSIBILITY

3   THAT THERE MIGHT BE CERTAIN STATE LAW CLAIMS THAT DIDN'T

4   INVOKE -- THAT WERE NOT INTERSTATE AND DIDN'T CHALLENGE

5   INTERSTATE POLLUTION OR INTERSTATE ACTIVITIES THAT MIGHT BE

6   AVAILABLE UNDER THE -- UNDER STATE LAW.

7              THE COURT CERTAINLY DID NOT SAY THAT BECAUSE FEDERAL

8   LAW WAS DISPLACED IN TERMS OF REGULATING INTERSTATE AND

9   INTERSTATE ACTIVITIES, THEN STATE LAW COULD REGULATE THOSE

10  INTERSTATE ACTIVITIES.  AND *NATIONAL AUDUBON* SAID EVEN AFTER

11  FINDING DISPLACEMENT -- THIS GOES RIGHT TO THIS ISSUE -- SAID

12  THAT EVEN WHERE THERE'S DISPLACEMENT IN FEDERAL LAW, IN SOME

13  INSTANCES OUR FEDERAL SYSTEM DOES NOT PERMIT THE CONTROVERSY TO

14  BE RESOLVE UNDER STATE LAW, EITHER BECAUSE THE AUTHORITIES AND

15  THE DUTIES OF THE UNITED STATES AS SOVEREIGN ARE INTIMATELY

16  INVOLVED, OR BECAUSE THE INTERSTATE NATURE OF THE CONTROVERSY

17  MAKES IT INAPPROPRIATE FOR STATE LAW TO CONTROL.

18             AND THE *COOPER* CASE FROM THE FOURTH CIRCUIT THAT WE

19  CITED, YOUR HONOR, TALKS ABOUT IF ALL THE STATES COULD SUDDENLY

20  START REGULATING EVERYBODY'S SAME ACTIVITIES AROUND THE COUNTRY

21  AND AROUND THE GLOBE, IT WOULD BE CHAOTIC AND IRRATIONAL.

22             I GO BACK TO THE LEFT, THERE'S A VERY NARROW AREA

23  WHERE A STATE CAN REGULATE POLLUTION IN ITS OWN -- THE STATE

24  ITSELF, THE SOURCE.  THAT'S NOT WHAT THEY'RE TALKING ABOUT

25  HERE.

1            THEY'RE ASKING A COURT, A STATE COURT RIGHT NOW --

2   THEY'RE ASKING THIS COURT TO SEND THIS TO STATE COURT SO A

3   STATE COURT CAN DECIDE THAT OIL PRODUCTION ACTIVITIES AROUND

4   THE UNITED STATES IN EVERY STATE ON THE OUTER CONTINENTAL

5   SHELF, AROUND THE WORLD, THAT THEY CLAIM ARE MELTING THE

6   ANTARCTIC AND GREENLAND ICECAPS, THAT A STATE CAN REGULATE THAT

7   AND THE SUPREME COURT HAS NEVER SUGGESTED THAT.  IT'S JUST NOT

8   TRUE.

9            **THE COURT:**  BUT HAS THE SUPREME COURT EVER SAID NO?

10           **MR. BOUTROUS:**  FOR ALL INTENTS AND PURPOSES, THE

11   *OUELLETTE* DECISION SAYS THAT A STATE'S LIMITED TO APPLYING ITS

12   OWN LAW TO THINGS THAT HAPPENED IN THE STATE.  AND HERE,

13   BASICALLY, YOU KNOW, 95 PERCENT OF WHAT THEY'RE TALKING ABOUT

14   IS BEYOND CALIFORNIA'S BOUNDARIES.

15           **THE COURT:**  WHAT HAPPENED IN THE SUPREME COURT CASE,

16   THAT WAS NEW YORK AND VERMONT?

17           **MR. BOUTROUS:**  NEW YORK AND VERMONT, THAT'S THE *AEP*

18   CASE, AND THERE -- IF YOU LOOK, YOUR HONOR, THE PART I READ

19   ABOUT THE PUBLIC NUISANCE ALLEGATION IN THIS CASE --

20           **THE COURT:**  YEAH.

21           **MR. BOUTROUS:**  -- IT MIRRORS THE ALLEGATION IN THAT

22   CASE.

23           **THE COURT:**  BUT WHAT WAS THE RESULT OF THAT?

24           **MR. BOUTROUS:**  THE RESULT WAS THE SUPREME COURT,

25   JUSTICE GINSBURG'S OPINION FOR THE COURT FOUND THAT THE CLEAN

1    AIR ACT, CONGRESS SAID THE CLEAN AIR ACT REGULATES EMISSIONS

2    RELATING TO GLOBAL WARMING AND CLIMATE CHANGE, AND IT WAS AN

3    ELABORATE SCHEME THAT GOVERNED, AND, THEREFORE, FEDERAL COMMON

4    LAW, BECAUSE THOSE WERE ISSUES OF NATIONAL AND INTERNATIONAL

5    POLICY, HAD NO PLACE IN REGULATING THAT.  AND THE JUDGES -- IT

6    WAS SOMETHING THAT CONGRESS AND THE EPA SHOULD REGULATE.

7            SO NOW THEY'RE SAYING, WELL, FEDERAL COURTS CAN'T

8    DECIDE IT BECAUSE IT'S A NATIONAL AND INTERNATIONAL ISSUE OF

9    POLICY BUT A STATE COURT CAN.  THAT'S WRONG.  IT'S THE SAME

10   ISSUE -- THEY'RE ASKING THE STATE COURT TO MAKE THIS FEDERAL

11   BALANCING TO DECIDE IS THE COST OF OIL PRODUCTION, DOES IT

12   OUTWEIGH THE BENEFITS AND SHOULD IT BE --

13           **THE COURT:**  WHAT IS THE TEST UNDER CALIFORNIA LAW FOR

14   NUISANCE?

15           **MR. BOUTROUS:**  THE TEST IS WHETHER THERE'S

16   UNREASONABLE -- THE ACTIVITIES THAT INTERFERE WITH PUBLIC

17   ENJOYMENT OF LANDS.  THAT'S ONE VERSION OF IT.

18           **THE COURT:**  PUBLIC ENJOYMENT?

19           **MR. BOUTROUS:**  AND USE OF LAND AND PROPERTY.

20           **THE COURT:**  AND LAND.  ALL RIGHT.

21           **MR. BOUTROUS:**  AND BAKED INTO THAT IN A RESTATEMENT

22   VERSION IN CALIFORNIA, THE *WILSON* CASE THEY CITE, LAYS IT OUT.

23   IT'S A COST/BENEFIT ANALYSIS.  AND HERE THERE'S, YOU KNOW,

24   ENORMOUS COSTS OR BENEFITS TO OIL PRODUCTION AND FOSSIL FUEL

25   USE.  IT'S HOW OUR CIVILIZATION HAS DEVELOPED TODAY.

1          AND THERE ARE ENVIRONMENTAL EFFECTS, NONE OF THE

2     OTHER ISSUES THAT NEED TO BE BALANCED THERE.  IT'S IMPORTANT

3     FOR OUR NATIONAL SECURITY.  IT'S IMPORTANT FOR ENERGY

4     INDEPENDENT.

5          UNDER THEIR THEORY, A STATE COURT WOULD HAVE TO LOOK

6     AT THOSE FEDERAL INTERESTS AND DETERMINE, NO, THAT'S

7     UNREASONABLE, AND WE'RE GOING TO MAKE IT A TORT, AND WE'RE

8     GOING TO IMPOSE BILLIONS OF DOLLARS BASED ON THIS AMORPHOUS

9     PUBLIC NUISANCE TORT.  THE SUPREME COURT HAS BASICALLY SAID YOU

10    CANNOT DO THAT.

11          **THE COURT:**  OKAY.  LET ME HEAR FROM THE OTHER SIDE A

12    MINUTE.

13          WHAT DO YOU SAY TO THE -- I HAVE A CONCERN.  THAT IS,

14    IF WE ALLOW THIS CASE TO GO TO STATE COURT, THEN ALL 50 STATES

15    COULD HAVE THEIR OWN VERSION OF THIS CASE, AND THE RESULTS

16    MIGHT BE DIFFERENT FROM STATE TO STATE DEPENDING ON HOW THEIR

17    LAW IS WRITTEN FOR NUISANCE.  AND IN SOME STATES THE DEFENDANTS

18    MIGHT WIN, OTHER STATES YOU MIGHT WIN, BUT IT WOULDN'T BE -- IT

19    WOULD NOT BE UNIFORM IS WHAT I'M TRYING TO GET AT.  SO, I'M

20    TROUBLED BY THAT --

21          **MR. PAWA:**  YOUR HONOR?

22          **THE COURT:**  -- PROSPECT.

23          **MR. PAWA:**  THAT WOULD BE -- THAT WOULD BE TRUE IN ANY

24    CASE DEALING WITH ANY KIND OF A PRODUCT THAT'S ALLEGED TO CAUSE

25    TORTIOUS HARM.  AND THE FIFTH CIRCUIT ACTUALLY DIRECTLY

1    ADDRESSED THIS IN A CASE CALLED *JACKSON VERSUS JOHNS MANVILLE*

2    FROM 1985, AN EN-BANC DECISION DEALING WITH ASBESTOS.  AND THEY

3    SAID, WE'VE GOT TENS OF THOUSANDS OF ASBESTOS CASES FILED,

4    HUNDREDS OF THOUSANDS OF MORE CLAIMS ON THE WAY; WE'RE BEING

5    ASKED TO APPLY FEDERAL COMMON LAW BECAUSE THERE WOULD BE TOO

6    MANY DIFFERENT RULINGS IN TOO MANY DIFFERENT STATES, AND WE

7    WOULD HAVE -- WE WOULD HAVE A HODGEPODGE OF LAWS.  AND THE

8    FIFTH CIRCUIT IN THAT CASE SAID THAT IS NOT A, QUOTE, UNIQUELY

9    FEDERAL INTEREST.

10          THE FACT THAT THE STATES MIGHT TREAT CASES AGAINST

11   MANUFACTURERS OF PRODUCTS DIFFERENTLY DOES NOT CREATE THE

12   UNIQUELY FEDERAL INTEREST THAT GIVES RISE TO FEDERAL COMMON

13   LAW.  AND THE SECOND CIRCUIT IN THE *IN RE:  AGENT ORANGE* CASE

14   ALSO REACHED THE SAME DECISION.

15          AND THE NINTH CIRCUIT HAS RELIED ON THE *JACKSON*

16   *VERSUS JOHNS MANVILLE* CASE IN A CASE CALLED *SETTERQUIST* VERSUS

17   (INDISCERNIBLE) ALSO REJECTING FEDERAL COMMON LAW.

18          IT'S SIMPLY INHERENT IN THE ERIE DOCTRINE IN OUR

19   SYSTEM THAT WHEN THERE ARE SIGNIFICANT TORTS THAT INJURE

20   SIGNIFICANT NUMBERS OF PEOPLE IN DIFFERENT PARTS OF THE

21   COUNTRY, THE FEDERALISM ISSUES POINT TOWARDS THE STATES, NOT

22   AGAINST THE STATES.

23          AND, IN FACT, THE *BANK OF AMERICA -- NEVADA VERSUS*

24   *BANK OF AMERICA* CASE SAYS IN NO UNCERTAIN TERMS WHEN A STATE

25   HAS SUED IN ITS OWN COURTS ON BEHALF OF THE PEOPLE, THE RIGHT

1    TO RESIST REMOVAL ARISES IN ITS MOST POWERFUL FORM.  AND, YES,

2    THERE COULD BE UNFAIR COMPETITION CLAIMS OR TORT CLAIMS OF ALL

3    KINDS AGAINST BANK OF AMERICA OR DEFENDANTS ALL OVER THE

4    COUNTRY.  THAT IS NOT A, QUOTE, UNIQUELY FEDERAL INTEREST.

5              **THE COURT:**  BUT HERE'S --

6              **MR. PAWA:**  YES.

7              **THE COURT:**  HERE WE HAVE, UNDER YOUR THEORY -- I KNOW

8    THAT IN CALIFORNIA THERE ARE OPERATIONS THAT -- BUT LET'S SAY

9    YOU HAD A STATE WHERE THERE WAS NO OIL OPERATIONS AT ALL, NO

10   OIL OPERATIONS, BUT BECAUSE OF GLOBAL WARMING IT'S ONLY -- IT'S

11   BEING FLOODED OUT ON ACCOUNT OF THE THINGS YOU DESCRIBED IN

12   YOUR COMPLAINT.

13             SO, I THINK YOUR THEORY WOULD HAVE TO BE THAT EVEN IN

14   THAT SCENARIO, THAT PARTICULAR STATE COULD SUE FOR THE DAMAGE

15   OR SET UP A FUND THAT FLOWS FROM THE POLAR ICECAPS MELTING,

16   RIGHT?  I MEAN, ISN'T THAT -- SO YOUR THEORY IS NOT ACTUALLY

17   TIED TO OPERATIONS IN CALIFORNIA.  IT'S TIED TO GLOBAL EFFECTS

18   THAT IN TURN INJURE OAKLAND AND SAN FRANCISCO.

19             **MR. PAWA:**  WELL, BUT LET ME BE CLEAR THAT OUR CLAIM

20   IS ABOUT THE SELLING OF PRODUCTS AND THE IMPROPER PROMOTION OF

21   PRODUCTS WHICH OCCURS IN ALL 50 STATES.  SO THIS IS NOT SIMPLY

22   A QUESTION OF GREENHOUSE GAS EMISSIONS AND RISING SEA LEVELS.

23             UNDER CALIFORNIA LAW IN THE LEAD PAINT CASE, WE WERE

24   REQUIRED TO AND DID PLEAD THAT THERE WAS MORE THAN SIMPLY

25   SELLING PRODUCT HERE.  THIS WAS SELLING A PRODUCT WITH IMPROPER

1    COMMERCIAL PROMOTION, ADVERTISEMENTS AND MISLEADING STATEMENTS

2    ABOUT THE PRODUCT, AND THAT'S ACTIVITY THAT'S OCCURRED IN ALL

3    50 STATES, SO YES --

4              **THE COURT:**  OKAY.

5              SO WHAT COULD THEY HAVE DONE ON THE DEFENSE SIDE?

6    COULD THEY HAVE HAD IMPROVED ADVERTISING THAT --

7              **MR. PAWA:**  THEY COULD HAVE --

8              **THE COURT:**  WOULD IT -- WHAT WOULD HAVE SATISFIED YOU

9    THAT WOULD HAVE GOTTEN THEM OFF OF THIS HOOK?

10             **MR. PAWA:**  AS WE ALLEGE -- AND WE GO INTO SOME VERY

11   DETAILED KNOWLEDGE ABOUT THE DEFENDANTS' KNOWLEDGE FROM THE

12   EARLY 1980'S, EVEN THE LATE 1970'S, AND EVEN SOME DOCUMENTS WE

13   CITED FROM THE '60'S, THEY COULD HAVE, TO GET THEMSELVES OFF

14   THE HOOK, WHEN THEY BECAME KNOWLEDGEABLE ABOUT GLOBAL WARMING,

15   INSTEAD OF MISLEADING PEOPLE AND DOUBLING DOWN ON FOSSIL FUELS,

16   TO THE POINT THEY HAD BECOME USED AT DANGEROUS LEVELS, WHICH IS

17   WHAT WE HAVE ALLEGED IS TORTIOUS, THEY COULD HAVE USED THEM AT

18   LOWER LEVELS, AND THEY COULD HAVE NOT ENGAGED IN THIS

19   PROMOTIONAL CONDUCT THAT WAS DISHONEST AND MISLEADING.

20             **THE COURT:**  WHAT WAS THE -- GIVE ME THE -- SORRY.

21             GIVE ME AN EXAMPLE OF SOMETHING THAT WAS MISLEADING.

22             **MR. PAWA:**  WELL, FOR EXAMPLE, WE TALK IN THE

23   COMPLAINT, YOUR HONOR, ABOUT THE DEFENDANTS' FORMATION OF THE

24   GLOBAL CLIMATE SCIENCE TASK FORCE WHICH WAS THROUGH THE

25   AMERICAN PETROLEUM INSTITUTE WHICH SAID THAT, YOU KNOW, VICTORY

1    WOULD BE ACHIEVED WHEN THE AMERICAN PEOPLE, QUOTE,

2    UNDERSTAND -- THEY PUT THE WORD UNDERSTAND IN QUOTES -- THAT

3    THE SCIENCE IS, QUOTE, UNCERTAIN.  THEY STOLE A PAGE FROM THE

4    TOBACCO PLAYBOOK.  UNCERTAINTY BECAME THEIR MANTRA.  THEY TOOK

5    OUT ADS IN THE NEW YORK TIMES FLOUTING UNCERTAINTY, MOBIL DID,

6    WHICH IS PART OF EXXON NOW.

7           AND THEY -- THEY'RE STILL ADVERTISING, YOU KNOW, IN A

8    WAY THAT REPRESENTS THAT FOSSIL FUELS ARE ESSENTIAL FOR HUMAN

9    WELL BEING.  AND SO THEY HAVE BEEN AT THIS FOR A LONG TIME.

10   IT'S VERY SIMILAR TO WHAT HAPPENED IN TOBACCO.

11           IN FACT, TWO OF THE SAME SCIENTISTS THAT WERE USED TO

12   DENY TOBACCO WAS HARMFUL WERE HIRED BY AT LEAST SOME OF THE

13   DEFENDANTS TO DENY THAT FOSSIL FUELS WERE HARMFUL OR THAT

14   GLOBAL WARMING WAS A REAL PROBLEM.

15           SO THERE'S A LOT OF ACTIVITY GOING BACK OVER MANY

16   YEARS.  IT GOT VERY INTENSE DURING THE 1990'S AND THE EARLY

17   2000'S WITH THESE FALSE FRONT GROUPS AND THESE ARTIFICIAL TURF

18   GROUPS, AND, YOU KNOW, TRYING TO CONVINCE CONSUMERS THAT FOSSIL

19   FUELS ARE OKAY, FOSSIL FUELS ARE GOOD FOR YOU, AND DON'T WORRY

20   ABOUT GLOBAL WARMING.

21           AND THIS WAS RIGHT AFTER, YOUR HONOR, RIGHT AFTER

22   THEIR OWN INTERNAL SCIENTISTS, AS WE'VE ALLEGED IN THE

23   COMPLAINT, WARNED THEM THAT, QUOTE, CATASTROPHIC HARM COULD BE

24   COMING FROM GLOBAL WARMING.

25           SO THERE'S A LOT THEY COULD HAVE DONE AT THE TIME

1    THEY GOT THE WARNINGS.

2           IF I MAY RESPOND TO A FEW THINGS, UNLESS YOU WOULD

3    LIKE ME TO CONTINUE IN THIS VEIN?

4           **THE COURT:**  I'M JUST THINKING ABOUT WHAT YOU'RE

5    SAYING.  THIS IS A VERY SWEEPING PROPOSITION YOU HAVE.  HAS ANY

6    OTHER COURT APPROVED YOUR THEORY YET?

7           **MR. PAWA:**  WELL, THE SECOND -- THE SECOND CIRCUIT

8    APPROVED IT AS A MATTER OF FEDERAL COMMON LAW, BORROWING

9    LIBERALLY FROM STATE COMMON LAW AND THE (INDISCERNIBLE)

10   STATEMENT OF COURTS IN *AMERICAN ELECTRIC POWER*, THE *AEP* CASE.

11   THERE'S A 150-PAGE OPINION ENDORSING A THEORY SIMILAR TO OURS.

12   IT WAS AGAINST DIRECT EMITTERS OF GREENHOUSE GASSES, SO OURS IS

13   A LITTLE DIFFERENT.  BUT THAT WAS A CASE THAT WAS A HUNDRED

14   PAGES OF WHY IT'S REASONABLE AND POSSIBLE AND LOGICAL TO SUE

15   GREENHOUSE GAS EMITTERS.

16          ALSO THE LEAD PAINT CASE FROM CALIFORNIA, WHICH, YOU

17   KNOW, ON ITS FACE LOOKED LIKE A VERY SWEEPING CASE, INVOLVED

18   DECADES OF MUCH LONGER MISCONDUCT THAN OURS.  IT WENT BACK, I

19   BELIEVE, TO THE 1920'S OR SOMETHING, IN WHICH THE LEAD PAINT

20   PRODUCERS WERE NOT BEING HONEST ABOUT WHAT THEY KNEW, AND THEY

21   WERE SELLING A PRODUCT, AND THEY WERE PROMOTING IT FOR AN

22   IMPROPER PURPOSE, AND THAT INVOLVED, YOU KNOW, DEFENDANTS THAT

23   ENGAGED IN INTERSTATE COMMERCE IN PROBABLY ALL 50 STATES.  AND

24   THAT WAS A CASE THAT WAS JUST RECENTLY AFFIRMED BY A CALIFORNIA

25   COURT OF APPEALS JUST WITHIN THE LAST MONTH OR SO.

1          SO, YEAH, WE HAVE A HISTORY OF -- IN THIS COUNTRY OF

2     SIGNIFICANT TORTS, MASS TORTS, CLASS ACTIONS, WHAT HAVE YOU,

3     THAT GO FORWARD UNDER STATE LAW.  AND WE HAVE AT LEAST ONE

4     OPINION FROM THE SECOND CIRCUIT, ALBEIT UNDER FEDERAL COMMON

5     LAW, SAYING YOU CAN LITIGATE GLOBAL WARMING.

6          THERE'S ALSO A CASE NOT CITED IN THE BRIEFS CALLED

7     *COMER* THAT WAS OVERRULED ON ODD PROCEDURAL GROUNDS THAT ALLOWED

8     STATE COMMON LAW CLAIMS TO SURVIVE A MOTION TO DISMISS BECAUSE

9     OF GLOBAL WARMING AND THE INJURIES OCCURRED FROM HURRICANE

10    KATRINA.

11         **THE COURT:**  ALL RIGHT.  YOU WANTED TO ADD MORE.

12    PLEASE GO AHEAD AND DO THAT.

13         **MR. PAWA:**  YEAH, THEY CITE THE *NEW SD VERSUS ROCK ELL*

14    CASE, YOUR HONOR.  THAT WAS A CASE THAT DEALS WITH A NARROW

15    FEDERAL COMMON LAW EXCEPTION FOR NATIONAL SECURITY.  AND WE'VE

16    CITED IN OUR BRIEFS IN A FOOTNOTE A COUPLE OF CASES THAT SAY,

17    ONE, *NEW SD* IS NO LONGER GOOD LAW, AND, NUMBER TWO, IT DEALS

18    WITH A NARROW EXCEPTION FOR NATIONAL SECURITY.

19         SO ONE OF THOSE CASES WAS *BABCOCK VERSUS CH2M HILL*,

20    EASTERN DISTRICT OF CALIFORNIA, 2013.  AGAIN, IT'S IN A

21    FOOTNOTE IN OUR BRIEF.  BUT THAT *NEW SD* HAS BEEN HELD

22    REPEATEDLY BY THE LOWER COURTS TO BE A NARROW NATIONAL SECURITY

23    EXCEPTION.  THAT'S NOT OUR SITUATION.  SO THEY'RE LEFT WITH

24    REALLY NOTHING THAT ALLOWS THEM TO REMOVE A FEDERAL COMMON LAW

25    CASE.

1          IN FACT, ONE OF THE CASES THEY CITE FOR A DIFFERENT

2     PROPOSITION, THE *IN RE: NSA TELECOMS* CASE, REJECTS THEIR VERY

3     THEORY THAT FEDERAL COMMON LAW ALLOWS FOR REMOVAL.

4          ON *GRABLE*, YOUR HONOR, THEY SAY THAT THERE IS *GRABLE*

5     JURISDICTION HERE BECAUSE THERE'S FEDERAL QUESTIONS SILENTLY

6     PREGNANT THROUGHOUT OUR COMPLAINT, BUT THESE ARE ALL DEFENSES.

7     THEY ARE RAISING FEDERAL QUESTIONS AS DEFENSES.

8          WE DON'T HAVE TO PROVE ANYTHING ABOUT THE NATIONAL

9     ENVIRONMENTAL POLICY ACT NOT MENTIONED IN OUR COMPLAINT,

10    ANYTHING ABOUT THE STRATEGIC PETROLEUM RESERVE NOT MENTIONED IN

11    OUR COMPLAINT, ANYTHING ABOUT THE CLEAN AIR ACT NOT MENTIONED

12    IN OUR COMPLAINT, IN ORDER TO GET JUDGMENT.  WE HAVE TO PROVE

13    AN UNREASONABLE INTERFERENCE WITH RIGHTS OF THE GENERAL PUBLIC.

14    THAT'S A CLASSIC DEFINITION OF A PUBLIC NUISANCE.

15          THEY SAY, AH, WELL, YOU HAVE TO SHOW THAT THERE'S A

16    BALANCE -- YOU HAVE TO SHOW UNDER A BALANCING TEST THAT THE

17    UTILITY OF OUR CONDUCT IS OUTWEIGHED BY THE GRAVITY OF THE

18    HARM.  NOT SO.  THE RESTATEMENT HAS SEVERAL DIFFERENT

19    ALTERNATIVE TESTS.

20          AND THE CALIFORNIA COURT IN THE *WILSON* CASE WE CITED

21    IN OUR BRIEF EMBRACES ONE OF THOSE THAT SAYS, YOU DON'T NEED TO

22    ENGAGE IN BALANCING IF YOU HAVE, QUOTE, SEVERE HARM.

23          SO THE WHOLE IDEA THAT WE'RE TRYING TO TAKE OVER SOME

24    FEDERAL BALANCING TEST WITH A STATE LAW BALANCING TEST, FIRST

25    OF ALL, MISSTATES CALIFORNIA LAW, BUT IT ALSO MISSTATES FEDERAL

1    LAW, BECAUSE THERE'S NO GLOBAL BLESSING IN THE UNITED STATES

2    CODE FOR ENGAGING IN DANGEROUS GLOBAL WARMING CONDUCT, ENGAGING

3    IN MISLEADING CONDUCT AND SPEECH -- COMMERCIAL SPEECH REGARDING

4    THAT CONDUCT.  THERE'S NOTHING IN THE U.S. CODE THAT SAYS GO

5    AHEAD AND MELT THE ICEBERGS, AND THAT WE'VE BALANCED THE HARMS,

6    IT'S OKAY TO DO THIS.

7              I WANT TO BE CLEAR ABOUT ONE THING BECAUSE THE REST

8    OF THESE ARGUMENTS, I THINK, ARE SECONDARY.  I APOLOGIZE.  I'M

9    BACKING UP A LITTLE BIT.

10             YOU ASKED A QUESTION ABOUT, WHAT ABOUT THE NEW YORK

11   AND VERMONT CASE.  I'M SURE THIS WAS AN HONEST MISUNDERSTANDING

12   BY OPPOSING COUNSEL, BUT HE ANSWERED YOU ABOUT THE *AMERICAN*

13   *ELECTRIC POWER* CASE.  FEDERAL COMMON LAW CASE, PLED -- *AEP* WAS

14   PLED UNDER FEDERAL COMMON LAW ON THE FACE OF ITS COMPLAINT IN

15   FEDERAL COURT.  I KNOW.  I HELPED FILE IT.

16             BUT THE NEW YORK AND VERMONT CASE I WAS TALKING ABOUT

17   WAS *OUELLETTE VERSUS INTERNATIONAL PAPER*, AND THE OUTCOME IN

18   THAT CASE WAS THAT STATE LAW APPLIES.

19             NOW, THE DEFENDANTS ARE TRYING TO TAKE YOUR EYE OFF

20   THE BALL BY SAYING, AH, BUT NOT THE STATE LAW OF CALIFORNIA.

21   THAT WAS A SECOND QUESTION IN *OUELLETTE VERSUS INTERNATIONAL*

22   *PAPER*.  IT WAS A CONFLICT PREEMPTION ARGUMENT.  IT DOES NOT

23   GIVE RISE TO REMOVAL.

24             SO THE ONLY QUESTION YOU NEED TO KNOW, THE ONLY

25   ANSWER YOU NEED TO KNOW FROM THE NEW YORK AND VERMONT CASE,

1    *INTERNATIONAL PAPER*, IS THAT STATE LAW WAS APPLIED IN AN

2    INTERSTATE POLLUTION CASE.  THAT IS THE ANSWER ON FEDERAL

3    COMMON LAW.

4            AND THE QUESTION -- THEY TALK ABOUT THE *COOPER* CASE,

5    AND THEY'VE CITED ABOUT TEN CASES IN THEIR BRIEF THAT DEAL WITH

6    CONFLICT PREEMPTION, *NORTH CAROLINA VERSUS COOPER*, ET CETERA,

7    ET CETERA.  THAT IS NOT GROUNDS FOR REMOVAL.

8            **THE COURT:**  IS THERE AN MDL BEING GINNED UP?

9            **MR. PAWA:**  NOT THAT I KNOW OF.

10           **THE COURT:**  OKAY.

11           **MR. PAWA:**  NOT THAT I KNOW OF.

12           **THE COURT:**  OTHER THAN CALIFORNIA, ARE THERE OTHER

13   CASES ALONG THESE LINES ELSEWHERE --

14           **MR. PAWA:**  THE CITY OF NEW YORK FILED UNDER DIVERSITY

15   JURISDICTION BECAUSE IT CAN'T SUE IN THE NAME OF THE PEOPLE, OF

16   COURSE.  IT DOESN'T HAVE CALIFORNIA LAW.  SO NEW YORK CITY

17   FILED UNDER DIVERSITY JURISDICTION IN FEDERAL COURT IN JANUARY.

18           **THE COURT:**  OKAY.  LET ME GIVE SOME TIME TO THE OTHER

19   SIDE, AND THEN I'VE GOT TO BRING IT TO A CLOSE.

20           **MR. BOUTROUS:**  I REALLY APPRECIATE IT, YOUR HONOR.

21           LET ME START, I DID GET MY STATES MIXED UP WITH NEW

22   YORK AND VERMONT, BUT *OUELLETTE* DOES NOT HELP THE PLAINTIFFS

23   HERE.  WHAT *OUELLETTE* HELD WAS THAT NEW YORK -- THAT VERMONT

24   COULD NOT APPLY ITS NUISANCE LAW TO ACTIVITIES OUTSIDE OF

25   VERMONT THAT WERE HAPPENING IN NEW YORK, ONLY NEW YORK LAW

1    COULD APPLY, BECAUSE CHAOS WOULD OCCUR; EVEN IF ONE STATE WERE

2    TO APPLY ITS LAW, THE ACTIVITIES HAPPENING IN OTHER STATES

3    WOULD HAVE AN INTERSTATE EFFECT.

4            SO THINK ABOUT WHAT THEY'RE ASKING TO HAPPEN HERE.

5    THEY'RE ASKING THAT A CALIFORNIA STATE COURT COULD APPLY

6    CALIFORNIA NUISANCE LAW TO ACTIVITIES AND POLLUTION AND

7    EMISSIONS AROUND THE UNITED STATES AND AROUND THE WORLD.

8    *OUELLETTE* SAYS THAT WOULD BE IRRATIONAL AND CHAOTIC.  THAT WAS

9    THE CLEAN WATER ACT.  SAME RESULT UNDER THE CLEAN AIR ACT.  IT

10   IS CLEAR.

11           MR. PAWA HAS RELIED HEAVILY ON THE SECOND CIRCUIT'S

12   *AEP* DECISION, WHICH I DID DESCRIBE.  HE AVOIDED THE FACT --

13   MENTIONING THE FACT THAT IT WAS REVERSED BY THE SUPREME COURT.

14   THE SUPREME COURT HELD IT WAS IMPROPER TO APPLY NUISANCE LAW,

15   FEDERAL NUISANCE LAW, PRECISELY BECAUSE THESE GLOBAL WARMING

16   ISSUES ARE MATTERS OF GLOBAL AND INTERSTATE AND INTERNATIONAL

17   POLICY.

18           IF A FEDERAL COURT CAN'T DECIDE THOSE ISSUES -- THOSE

19   ARE FEDERAL ISSUES -- HOW DO WE AS A NATION BALANCE OUR ENERGY

20   NEEDS, WITH ENVIRONMENTAL CONCERNS, WITH OUR CONCERN FOR THE

21   ENVIRONMENT.  THOSE ARE FEDERAL ISSUES.  JUSTICE GINSBURG SAID

22   IT IN *AEP*, REVERSING THE ONLY DECISION MR. PAWA WAS ABLE TO

23   CITE ON THIS ISSUE.

24           THE NINTH CIRCUIT REVERSED THE *KIVALINA* CASE, WHICH,

25   AGAIN, HAD INVOKED FEDERAL COMMON LAW AND SAID THIS IS -- THE

1    FEDERAL COURT'S NUISANCE LAW DOES NOT FIT HERE, THE CLEAN AIR

2    ACT APPLIES.  AND SAID, ALSO, IF CONGRESS HAS DISPLACED FEDERAL

3    COMMON LAW, IT WOULD BE ANOMALOUS -- I'M PARAPHRASING --

4    ANOMALOUS TO SAY THE ISSUE COULD BE ADJUDICATED IN ANY OTHER

5    FORUM.

6              AND IF I COULD JUST BRIEFLY ADDRESS THIS PROMOTION

7    CLAIM ON SEVERAL FRONTS?

8              FIRST, YOU KNOW, WE STRONGLY DISAGREE WITH THAT

9    CHARACTERIZATION.  BUT AS THE COMPLAINT PLEADS IT, YOUR HONOR,

10   THIS ISN'T SOME NARROW CLAIM ABOUT MISSTATEMENTS.  THEY'RE

11   ARGUING THAT STATEMENTS AND PROMOTION OF FOSSIL FUELS AROUND

12   THE UNITED STATES, AROUND THE WORLD -- THIS IS A FEDERAL GLOBAL

13   SPEECH CASE, AND THEY'RE SAYING THAT CALIFORNIA COULD APPLY ITS

14   PUBLIC NUISANCE LAW TO REGULATE THAT SPEECH AROUND THE COUNTRY

15   GOING BACK DECADES.  AND, AGAIN, I EMPHASIZE WE DISAGREE WITH

16   THE CHARACTERIZATION.  THAT'S A FEDERAL ISSUE IF IT'S ANYTHING.

17             **THE COURT:**  WELL, BUT MAYBE ONLY DEFENSIVELY.

18             **MR. BOUTROUS:**  YES.  ON THAT -- I'M SORRY.

19             **THE COURT:**  GO AHEAD.

20             **MR. BOUTROUS:**  BUT IT -- BUT I JUST WANTED TO GET

21   ACROSS THAT THEY'RE -- EMBEDDED IN THEIR CLAIM -- AGAIN, THIS

22   GOES BACK TO THE FEDERAL COMMON LAW CLAIM, YOUR HONOR.  COUNSEL

23   SAID, WELL, THEY DON'T HAVE TO PROVE COST/BENEFIT ANALYSIS.

24   THE *WILSON* CASE THAT COUNSEL MENTIONED, IT REVERSED AND

25   REMANDED FOR A NEW TRIAL BECAUSE THE TRIAL COURT HADN'T GIVEN A

1    COST/BENEFIT ANALYSIS INSTRUCTION.  IT SAID GIVE THIS DETAILED

2    COST/BENEFIT ANALYSIS INSTRUCTION.

3          THE RESTATEMENT PROVISIONS, THEY ONLY SAY -- THE

4    CAPTIONS ARE ALL, YOU KNOW, COST/BENEFIT, RISK UTILITY.  THEY

5    SAY IN SOME CASES THE HARM IS SO SEVERE, A COURT MIGHT BE ABLE

6    TO RESOLVE THE COST/BENEFIT ANALYSIS, THE REASONABLE ANALYSIS,

7    AS A MATTER OF LAW.  THAT'S EVEN WORSE.

8          SO THEY'RE ARGUING THAT THEY'RE GOING TO GO TO A

9    STATE COURT AND HAVE A STATE COURT DEEM THE FEDERAL

10   GOVERNMENT'S COST/BENEFIT ANALYSIS ABOUT HOW TO BALANCE ENERGY

11   NEEDS AND NATIONAL SECURITY VERSUS ENVIRONMENTAL CONCERNS AS A

12   MATTER OF LAW, DEEM THAT UNREASONABLE AND THAT CONFORMANCE WITH

13   THAT IS UNREASONABLE AS A MATTER OF LAW.

14          **THE COURT:**  BUT SURELY FEDERAL LAW DOESN'T COMPEL THE

15   DEFENDANTS, IF THEY DID IT, TO MAKE MISREPRESENTATION IN THEIR

16   PROMOTIONAL LITERATURE.

17          **MR. BOUTROUS:**  THAT'S NOT WHAT I'M SAYING, YOUR

18   HONOR.  WHAT I'M SAYING IS THEY'RE SEEKING TO REGULATE NATIONAL

19   AND INTERNATIONAL SPEECH.  CALIFORNIA CANNOT DO THAT.  STATE

20   LAW CANNOT DO THAT.

21          AND THAT'S WHY FEDERAL COMMON LAW, IF ANYTHING, WOULD

22   GOVERN THE ALLEGED MISREPRESENTATIONS.  THEIR ARGUMENT IS --

23   AND, YOUR HONOR, YOU MENTIONED SWEEPING.  THEY'RE ARGUING THAT

24   THESE ALLEGED STATEMENTS CAUSED HUMAN BEINGS AROUND THE GLOBE

25   TO USE FOSSIL FUEL MORE.  AND I BET YOU MANY OF THE

```
 1   PLAINTIFFS'-SIDE LAWYERS USED FOSSIL FUEL TO GET HERE WHEN THEY
 2   ARRIVED, SO IT'S NOT SOME OFF-THE-TABLE, YOU KNOW, AS A MATTER
 3   OF LAW NOT BENEFICIAL CONDUCT.
 4           PRESIDENT OBAMA, PRESIDENT CLINTON, PRESIDENT BUSH --
 5           THE COURT:  I'M SURE THEY TOOK MASS TRANSIT.
 6           MR. BOUTROUS:  I THINK THEY'RE STILL BURNING SOME
 7   FOSSIL FUEL SOMEHOW IN THERE, YOUR HONOR.  EVERYTHING WE DO --
 8   THAT'S HOW WE DEVELOPED AS A CIVILIZATION.  IT'S A GLOBAL
 9   ISSUE.
10           PRESIDENT OBAMA SAID IT AND WE QUOTED IT.  THERE'S
11   THE PARIS TREATY.  THERE'S THIS DEBATE ABOUT HOW WE GRAPPLE
12   WITH THIS GLOBAL ISSUE.  IT CAN'T BE DONE WITH DIFFERENT
13   STATES.
14           THE SAME CLAIM IN NEW YORK CHALLENGING THE SAME
15   ACTIVITIES.  IN OUELLETTE, WHICH IS MY FAVORITE CASE -- I URGE
16   YOU, YOU'LL COME DOWN ON MY SIDE, I THINK, IF YOU GO BACK AND
17   READ OUELLETTE.
18           THE COURT:  I'VE GOT TO DO SOME HOMEWORK.
19           MR. BOUTROUS:  I GREATLY --
20           THE COURT:  ALL RIGHT.  I NEED TO ASK YOU -- I WANT
21   TO CHANGE THE SUBJECT TO CASE MANAGEMENT --
22           MR. BOUTROUS:  YES.
23           THE COURT:  -- CONFERENCE NOW.
24           LET'S SAY WE STAY IN FEDERAL COURT.  THAT WOULD BE --
25   THEN IS IT YOUR PLAN TO MOVE TO DISMISS?
```

1          **MR. BOUTROUS:**  YES, YOUR HONOR.

2          **THE COURT:**  ALL RIGHT.  SO YOUR PLAN WOULD BE -- I'VE

3    SEEN THIS ENOUGH.  CONVINCE ME THAT IT'S FEDERAL COMMON LAW,

4    AND THEN YOU MOVE ON TO FEDERAL COMMON LAW AND SAY THERE'S NO

5    SUCH CAUSE OF ACTION.

6          **MR. BOUTROUS:**  THAT WOULD BE ONE --

7          **THE COURT:**  THAT'S WHAT YOU'RE GOING TO DO.

8          **MR. BOUTROUS:**  WELL, IN PART.  AND THE *STANDARD OIL*

9    DECISION -- AND *AEP* ESSENTIALLY DID THAT, YOUR HONOR.  THE

10   *STANDARD OIL* DECISION THAT'S CITED IN *AEP* WAS A CASE WHERE THE

11   SUPREME COURT SAID THE FIRST INQUIRY IS WHAT LAW GOVERNS, AND

12   THERE IT WAS WHETHER THE U.S. COULD GET INDEMNITY FOR INJURY IN

13   AN ACCIDENT TO A U.S. SOLDIER.  THE COURT SAID THAT'S A FEDERAL

14   LAW QUESTION.  THAT'S WHAT WE'RE HERE TODAY ARGUING.  THESE ARE

15   FEDERAL QUESTIONS.

16         THEN IT WENT TO THE SECOND ISSUE ON THE MERITS, AND

17   IT DETERMINED THERE'S NO FEDERAL CLAIM AND SO --

18         **THE COURT:**  THEN THEY'RE JUST OUT OF LUCK.  IN OTHER

19   WORDS, IT GOES FROM -- THE STATE LAW IS DISPLACED, AND THERE'S

20   NO FEDERAL CLAIM, THEREFORE, THEY LOSE.

21         **MR. BOUTROUS:**  WELL, THERE ARE OTHER REMEDIES, YOUR

22   HONOR, I MEAN, THROUGH THE EPA, PETITIONING THE EPA, AND

23   THROUGH ENFORCEMENT ACTIONS, AND THROUGH PUBLIC POLICY DEBATES,

24   AT LEAST IN TERMS OF GLOBAL WARMING.  WE RECOGNIZE THERE ARE

25   ISSUES HERE, YOUR HONOR, BUT THEY'RE NATIONAL, INTERNATIONAL

1    ISSUES.

2           ALSO -- I'LL JUST PREVIEW -- WE WOULD ARGUE -- IF THE

3    COURT REMOVED ON *GRABLE* GROUNDS AND THE STATE CLAIM WAS BEFORE

4    THE COURT, WE WOULD ARGUE, AGAIN, THAT, YOU KNOW, THAT THE

5    STATE CLAIM CAN'T GO FORWARD.  FOREIGN AFFAIRS DOCTRINE, STATE

6    LAW GROUNDS.  SO WE WOULD MOVE TO DISMISS.

7           BUT THAT IS VERY COMMON.  IN *AEP* THE SUPREME COURT'S

8    DECISION THAT I DESCRIBED BEFORE THAT REVERSED THE SECOND

9    CIRCUIT DECISION MR. PAWA MENTIONED, THE COURT FIRST SAID, WHAT

10   LAW GOVERNS?  AND THEY SAID IT'S AMBIENT -- IT'S INTERSTATE AIR

11   POLLUTION.  WE CAN'T BORROW STATE LAW BECAUSE THIS INVOLVES

12   THINGS HAPPENING ALL OVER THE UNITED STATES; SO WE LOOK AT THAT

13   ISSUE, BUT WE'RE NOT GOING TO EVEN DECIDE WHETHER THERE'S A

14   CLAIM BECAUSE IT'S DISPLACED.  SO THEY DID SAY FEDERAL LAW

15   APPLIES, AND NOW WE'RE GOING TO SAY THERE'S NO FEDERAL CLAIM.

16          SO I THINK, YOU KNOW, IT IS A COMMON APPROACH, AND WE

17   THINK THIS IS THE RIGHT COURT TO HEAR THESE ISSUES.  WE WOULD

18   MOVE QUICKLY.  I THINK WE COULD HAVE A STIPULATION ON FILE IN

19   30 DAYS.

20          **THE COURT:**  LET ME ASK YOU THIS.  WE WON'T TAKE TOO

21   MUCH MORE TIME.  BUT IF THE CASE STAYS HERE, WHEN DO YOU WANT

22   TO TRY THE CASE?  IN OTHER WORDS, A TRIAL.

23          **MR. BOUTROUS:**  IF YOU DENY OUR MOTIONS -- I THINK THE

24   PLAINTIFFS CAN SPEAK FOR THEMSELVES.  THEY'RE ASKING FOR, LIKE,

25   TWO YEARS OF DISCOVERY AND, YOU KNOW, THIS MASSIVE DISCOVERY.

```
 1   I DON'T THINK THAT WOULD BE NECESSARY FOR A TRIAL LIKE THIS.  I

 2   THINK IT WOULD BE A VERY DIFFICULT CASE, YOU KNOW, TO TRY, BUT

 3   WE WOULD SAY TO YOUR HONOR, IF YOU WANT TO KEEP US HERE, GIVE

 4   US A SHOT AT OUR MOTION TO DISMISS, AND IF YOU SAY, TRY THE

 5   CASE, WE'LL TRY IT ON WHATEVER SCHEDULE YOU SAY.

 6           THE COURT:  WHEN DO YOU WANT THE TRIAL?

 7           MR. PAWA:  OUR CASE MANAGEMENT STATEMENT IS ATTACHED

 8   AS EXHIBIT A.

 9           THE COURT:  I APOLOGIZE.  I'VE BEEN VERY BUSY LATELY

10   IN ANOTHER CASE.

11           MR. PAWA:  (INDISCERNIBLE).

12           THE COURT:  I HAVE NOT DONE AS MUCH HOMEWORK AS I

13   NORMALLY WOULD.  BUT WHEN WOULD YOU LIKE TO TRY THE CASE?

14           MR. PAWA:  ABOUT 2-1/2 YEARS.

15           THE COURT:  OH, COME ON.  THAT'S CRAZY.  WHY WOULD

16   YOU TAKE SO LONG?

17           MR. PAWA:  WE HAVE FIVE DEFENDANTS.  WE HAVE DECADES

18   OF CONDUCT AND KNOWLEDGE TO PROBE.  SO WE THINK IT'S GOING TO

19   BE A FAIRLY HEAVY, INTENSIVE DEPOSITION AND DOCUMENT

20   (INDISCERNIBLE).

21           THE COURT:  MAYBE.  OKAY.

22           I WILL JUST FILL OUT THIS -- HAVE YOU DONE YOUR

23   INITIAL DISCLOSURES?

24           MR. BOUTROUS:  WE HAD AGREED THAT UNTIL THE COURT

25   RULED ON THE MOTION TO REMAND, WE WOULD NOT DO THEM.  SO WE'LL
```

1   BE READY TO GO IF THE COURT SAYS IT'S KEEPING THE CASE.

2           **THE COURT:**  ALL RIGHT.  I'M NOT GOING TO GO THROUGH

3   ALL THESE DATES BECAUSE WE HAVE SOME OTHER FISH TO FRY BEFORE.

4   SO -- BUT I MIGHT JUST GIVE YOU A TRIAL DATE IN THE CMO WHEN IT

5   COMES OUT.

6           IF I KEEP THE CASE HERE, WHEN ARE YOU GOING TO FILE

7   YOUR MOTION TO DISMISS?

8           **MR. BOUTROUS:**  THIRTY DAYS FROM THE DATE OF THE

9   COURT'S ORDER ON THE MOTION TO REMAND.

10          **THE COURT:**  WHY DO THEY ALWAYS SAY 30 DAYS?

11          **MR. BOUTROUS:**  TWENTY?

12          **THE COURT:**  IT'S GOT TO BE A MULTIPLE OF SEVEN.

13          **MR. BOUTROUS:**  TEN.  THAT'S TRUE.

14          **THE COURT:**  TEN AND THIRTY DON'T COUNT.

15          **MR. BOUTROUS:**  HOW ABOUT 21?

16          **THE COURT:**  TWENTY-ONE.  OKAY.  THAT'S GOOD.  THAT

17  WORKS.

18          **MR. BOUTROUS:**  I'LL TAKE 21.

19          **THE COURT:**  OTHERWISE IT WILL FALL ON THE WEEKEND.

20  THAT'S LIKE ASKING FOR A TRIAL IN DECEMBER.  YOU KNOW THE JUDGE

21  IS NOT GOING TO WANT TO DO THAT.

22          **MR. BOUTROUS:**  I AGREE.  I SHOULD HAVE FIGURED THAT

23  OUT DURING MY CAREER.  NOW I WILL FOLLOW THAT RULE FROM NOW ON.

24          **THE COURT:**  THERE YOU GO.  ALL RIGHT.

25          OKAY.  I WILL GIVE YOU ONE LAST WORD, AND THEN WE GOT

1    TO MOVE ON TO MY NEXT CASE.  DID YOU WANT TO SAY ANYTHING MORE

2    ON REMAND AND REMOVAL?

3            **MR. PAWA:**  I THINK WE SAID WHAT WE NEED TO SAY, YOUR

4    HONOR.

5            **THE COURT:**  ALL RIGHT.  MOST EXCELLENT.

6            THANK YOU, COUNSEL.

7            (PROCEEDINGS ADJOURNED AT 2:46 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **CERTIFICATE OF TRANSCRIBER**

2

3          I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

4     TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF

5     THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE

6     U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE

7     PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE

8     ABOVE MATTER.

9          I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR,

10    RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN

11    WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT

12    FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE

13    ACTION.

14

15                      _JMColumbini_

16              JOAN MARIE COLUMBINI

17                 FEBRUARY 12, 2018

18

19

20

21

22

23

24

25

*JOAN MARIE COLUMBINI, CSR, RPR*
*RETIRED OFFICIAL COURT REPORTER, USDC*
*510-367-3043*

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

CITY OF NEW YORK,

                                      Plaintiff,

                  -against-

BP P.L.C.; CHEVRON CORPORATION;
CONOCOPHILLIPS; EXXON MOBIL CORPORATION;
and ROYAL DUTCH SHELL PLC,

                                Defendants.

------------------------------------------------------------------------ x

**AMENDED COMPLAINT**

Case No. 18-cv-182-JFK

# TABLE OF CONTENTS

I.  Introduction ................................................................................................ 1

II.  Parties ...................................................................................................... 7

    A.  Plaintiff .............................................................................................. 7

    B.  Defendants .......................................................................................... 8

    C.  Defendants' connections to New York. ........................................... 10

III.  Jurisdiction and Venue ......................................................................... 23

IV.  Climate Change Impacts on New York City ....................................... 24

V.  Fossil Fuels Are the Primary Cause of Climate Change ..................... 36

VI. Defendants Have Produced Massive Quantities of Fossil Fuels—and Have Continued to Do So Even as Climate Change Has Become Gravely Dangerous ................. 41

VII. Defendants Had Full Knowledge that Fossil Fuels Would Cause Catastrophic Harm ........ 43

VIII. Despite Their Early Knowledge that Climate Change Posed Grave Threats, Defendants Promoted Fossil Fuels for Pervasive Use, While Denying or Downplaying These Threats ................. 51

    A.  Defendants engaged in an overt public relations campaign intended to cast doubt on climate science and promote their products. .................. 51

    B.  Defendants directly promoted fossil fuels. .................................... 58

  IX.  The City Is Expending Substantial Funds, and Will Continue to Do So, to Protect Itself Against Climate Change .................. 62

  X.  Defendants' Conduct Is Ongoing, and Is Causing Continuous and Recurring Injuries to the City .................. 67

As a First Cause of Action – Public Nuisance ........................................... 68

As a Second Cause of Action – Private Nuisance ..................................... 70

As a Third Cause of Action – Trespass ..................................................... 72

Jury Trial Demanded ................................................................................. 73

Relief Requested ....................................................................................... 73

i

Plaintiff the City of New York ("City"), by its attorney Zachary W. Carter, Corporation Counsel of the City of New York, brings this action sounding in public nuisance, private nuisance, and trespass against Defendants BP p.l.c. ("BP"), Chevron Corporation ("Chevron"), ConocoPhillips ("ConocoPhillips"), Exxon Mobil Corporation ("Exxon"), and Royal Dutch Shell plc ("Shell") (collectively, "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.    This lawsuit is based upon the fundamental principle that a corporation that makes a product causing severe harm when used exactly as intended should shoulder the costs of abating that harm.  Defendants here produced, marketed, and sold massive quantities of fossil fuels—primarily oil and natural gas—despite knowing that the combustion and use of fossil fuels emit greenhouse gases ("GHG pollution" or "GHGs"), primarily carbon dioxide ("CO2"). Defendants have also known for decades that GHG pollution accumulates and remains in the atmosphere for up to hundreds of years, where it traps heat, a process commonly referred to as "climate change" or "global warming," and that this process would cause grave harm. Defendants continue to this day to produce, market, and sell massive amounts of fossil fuels and plan to continue doing so for decades into the future; their past and ongoing conduct causes and continually exacerbates global warming and all of its impacts, including hotter temperatures, longer and more severe heat waves, extreme precipitation events including heavy downpours, rising sea levels, and other severe and irreversible harms.

2.    Defendants' past and ongoing actions are harming New York City now:  the City already has suffered damage from climate change, including inundation, erosion, and regular tidal flooding of its property.  The City now faces further imminent threats to its property, its infrastructure, and the health and safety of its residents.  In this litigation, the City seeks to shift

1

the costs of protecting the City from climate change impacts back onto the companies that have done nearly all they could to create this existential threat.

3.      Defendants are the five largest, investor-owned producers of fossil fuels in the world, as measured by the cumulative carbon and methane pollution generated from the use of their fossil fuels, according to published, peer-reviewed research.[1]  Defendants are collectively responsible, through their production, marketing, and sale of fossil fuels, for over 11% of all carbon and methane pollution from industrial sources that has accumulated in the atmosphere since the dawn of the Industrial Revolution.  Additionally, Defendants are also responsible for leading the public relations strategy for the entire fossil fuel industry, downplaying the risks of climate change and promoting fossil fuel use despite the risks.  It is a myth that everyone is responsible for climate change and therefore that no one is responsible.  Recent research demonstrates that just 100 fossil fuel producers are responsible for 62% of all GHG emissions from industrial sources since the dawn of the Industrial Revolution and for 71% of emissions since 1988, that over 90% of these emissions are attributable to the fossil fuels that they produce and sell (rather than emit from their own operations), and that most of these emissions have occurred since 1988.

4.      Defendants knew decades ago that the fossil fuel products they produce and sell were altering the atmosphere and would cause a dire global warming problem.  They acted on this knowledge to protect their own infrastructure and assets, and yet they told the public a very different story.  According to recently disclosed documents, by the late 1970s or early 1980s, if not earlier, Defendants knew that averting dangerous climate change required reducing the use of

---

[1] Richard Heede, *Tracing Anthropogenic Carbon Dioxide and Methane Emissions to Fossil Fuel and Cement Producers, 1854–2010*, CLIMATIC CHANGE, Jan. 2014.

their fossil fuel products. At that time, scientists working either directly for Defendants or advising Defendants through an industry-wide consulting arrangement warned Defendants in stark terms that fossil fuel use risked "catastrophic" harm from global warming over the coming decades. The oil and gas industry even formed a "CO2 and Climate Task Force" in the late 1970s—a group that included representatives from each of the Defendants. At a 1980 meeting, this Task Force received a scientific warning that global warming would cause catastrophic harms, found that reductions in fossil fuel usage would result in the "immediate problem being considerably eased," questioned the long-term "future of fossil fuel use," and discussed internally "the technical implications of energy source changeover."

5. However, disregarding the findings of their own internal scientists and scientific consultants, Defendants re-committed themselves to fossil fuel exploration, production, marketing, and sales over the ensuing decades. The significant majority of emissions resulting from fossil fuels produced and marketed by Defendants occurred after Defendants became aware of the consequences of climate change. The majority of emissions resulting from fossil fuels produced and marketed by the fossil fuel industry have occurred since 1988, by which time the Defendants knew that their fossil fuel products were causing a buildup of GHG pollution in the atmosphere that would cause dangerous global warming.

6. But in an effort to protect their market, Defendants orchestrated a campaign of deception and denial regarding climate change. Defendants sponsored publicity campaigns using front groups and paid "scientific" mouthpieces—including some of the same scientists that the tobacco industry had used to downplay the risks of cigarettes—to discredit the mainstream scientific consensus on global warming and downplay the risks of climate change. Defendants also employed large-scale, sophisticated advertising campaigns to promote pervasive fossil fuel

use, conducted either directly or through surrogates like their main U.S. trade association, the American Petroleum Institute ("API"), and to portray fossil fuels as environmentally responsible—a campaign that continues to this day.

7. Defendants are not only quantitatively different from other contributors to climate change given their massive and dangerous levels of fossil fuel production over many years—they are also qualitatively different from other contributors to climate change because of their in-house scientific resources, early knowledge of climate change impacts, commercial promotions of fossil fuels as beneficial despite their knowledge to the contrary, efforts to protect their fossil fuel market by downplaying the risks of climate change, and leadership roles in the API and other organizations that undertook a communications strategy for the fossil fuel industry. In this coordinated effort to discredit the science, which began in earnest during the 1990s and has continued in a subtler form even in recent years, Defendants and their agents and advocates have made the alleged "uncertainty" of climate science their constantly-repeated mantra. The purpose of this campaign of deception and denial was to increase sales and protect market share. It succeeded, and Defendants have profited enormously as a result.

8. Meanwhile, Defendants relied upon their knowledge about climate change science to protect their own business assets from expected rising seas and melting permafrost by incorporating climate change science into their engineering standards for construction of their pipelines, offshore oil platforms, and other projects.

9. To this day, Defendants continue to exacerbate global warming by producing and selling massive quantities of fossil fuels and marketing these fuels as environmentally beneficial—despite a scientific consensus that global warming has entered a critically dangerous phase. And they have continued in recent years to misleadingly tell the public that the science of

4

global warming is uncertain; as recently as 2016, Defendants' main U.S. trade association, the

API, falsely referred to global warming on its website as "possible manmade warming." While

Defendants pay lip service to global warming and offer minimal steps toward reducing the

carbon footprint from their own operations as window dressing, their multi-decade business

plans are based upon more of the same: exploration, production, and sale of fossil fuels at levels

that are utterly inconsistent with keeping global warming from exceeding a 3.6 degrees

Fahrenheit ("°F") (2 degrees Celsius ("°C")) increase over pre-industrial levels, an amount of

warming that is commonly accepted as a point beyond which the most dangerous and even

catastrophic consequences of climate change cannot be prevented, much less a 2.7°F (1.5°C)

increase, which is the widely adopted target necessary to avoid dangerous global warming

impacts. The City has committed to reducing its own emissions in line with this 2.7°F goal.

10. The very climate disruption and injuries that Defendants' scientists and

consultants warned them about decades ago have now arrived. Climate change is here and is

harming New York City. The temperature in the City is rapidly increasing, sea levels are rapidly

rising, coastal storms are causing increased flooding, and extreme precipitation events are

increasing throughout the Northeastern United States. Studies by the New York City Panel on

Climate Change ("NPCC"), a body of more than a dozen independent leading climate and social

scientists, demonstrate that global warming is already causing the City to suffer increased hot

days, flooding of low-lying areas, increased shoreline erosion, and higher threats of catastrophic

storm surge flooding even more severe than the flooding from Hurricane Sandy. Because there

is a lag between emission of greenhouse gases and global warming impacts, these harms will

continue and worsen in coming years, as previously emitted greenhouse gases from Defendants'

products further heat the atmosphere. As the City has emphasized in its plans to deal with the

inevitable impacts, New York City is "particularly vulnerable to the effects of climate change" because it is built primarily on islands and has 520 miles of coastline.[2]  Indeed, Mayor Bill de Blasio has declared that the City faces "an existential threat posed by climate change."[3]

11.     The City is taking action now to protect public safety, public health, and City property and infrastructure from the ravages of climate change through an extensive series of resiliency measures.  For example, the City is implementing programs to protect vulnerable residents during increasingly severe heat waves, which already kill more New Yorkers each year than all other natural disasters combined.  The City has begun to reinforce its coastline and elevate its infrastructure within the floodplain, and to pursue a vast array of additional measures to protect public health and welfare and avoid or minimize damage to City property from climate change.  The City is spending billions of dollars on these resiliency measures.

12.     The City must take many more resiliency actions to more fully protect the public and City property and services as the climate marches toward an overheated state that, according to all scientific data, will be unprecedented in the history of human civilization.  To deal with what the future will inevitably bring, the City must build sea walls, levees, dunes, and other coastal armament, and elevate and harden a vast array of City-owned structures, properties, and parks along its coastline.  For example, the City must enlarge existing storm and wastewater storage facilities and install additional facilities and associated pumping facilities and infrastructure to prevent flooding in low-lying areas that are vulnerable to rising seas and increasingly severe downpours.  These are long-term design and construction projects that must

---

[2] CITY OF NEW YORK, ONE NEW YORK: THE PLAN FOR A STRONG AND JUST CITY 166, *available at* http://www.nyc.gov/html/onenyc/downloads/pdf/publications/OneNYC.pdf.
[3] *Id.* at 3.

6

be built to last for decades, often up to fifty years or more. The City must take these actions as soon as possible in order to protect public health and safety and City property and infrastructure. The costs of these largely unfunded projects run to many billions of dollars and far exceed the City's resources.

13.     This egregious state of affairs is no accident. Defendants' actions in producing, marketing, and selling fossil fuels for decades and at ever more dangerous levels while knowing of the harm that was substantially certain to result constitutes an unlawful public and private nuisance and an illegal trespass upon City property. The City brings such claims against Defendants in this action and seeks: (1) a money judgment for the costs already incurred by the City to protect City infrastructure and property, and to protect the public health, safety, and property of its residents from the effects of climate change; (2) a money judgment for the costs of actions the City is currently taking, and needs to take to protect City infrastructure and property, and to protect the health, safety, and property of its residents from the impacts of climate change; and (3) an equitable order ascertaining the damages and granting an injunction to abate the public nuisance and trespass that would become effective if Defendants fail to pay the court-determined damages for the past and permanent injuries inflicted.

14.     The City does not seek to impose liability on Defendants for their direct emissions of greenhouse gases, and does not seek to restrain Defendants from engaging in their business operations.

## II.     PARTIES

### A.     Plaintiff

15.     Plaintiff the City of New York is a municipal corporation organized under the laws of the State of New York, with its principal place of business located at City Hall, New York, New York. The City is responsible for the public health, safety, and welfare of its more

7

than 8.5 million residents and the millions of additional people who work in or visit New York City each day.

**B.    Defendants**

16.    Defendant BP is a public limited company incorporated in England and Wales with its headquarters in London, England, doing business in New York State.  BP is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas, and fossil fuel products.  On information and belief, Amoco Corporation (which merged into a predecessor of BP in approximately 1998), Atlantic Richfield Company (which merged into a predecessor of BP in approximately 2000), and BP America Inc. (a BP subsidiary that BP describes in an SEC filing as its "chief representative in the US" and "our agent in the US") were members of the API at all relevant times.[4]

17.    Defendant Chevron is a Delaware corporation with its principal place of business located at 6001 Bollinger Canyon Road, San Ramon, California, doing business in New York State.  Chevron is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas, and fossil fuel products.  On information and belief, Chevron has been a member of the API at all relevant times.

18.    Defendant ConocoPhillips is a Delaware corporation with its principal place of business located at 600 North Dairy Ashford, Houston, Texas, doing business in New York State.  ConocoPhillips is a multinational oil and gas company that produces, markets, and sells oil and natural gas and for many years also refined and sold finished oil products.  On

---

[4] *See* BP P.L.C., ANNUAL REPORT AND FORM 20-F 2016 59, 290, *available at* https://www.sec.gov/Archives/edgar/data/313807/000119312517112384/d248481d20f.htm.

information and belief, Conoco Inc. and Phillips Petroleum Company (the two companies which merged to become ConocoPhillips in 2002) were members of the API at all relevant times.

19.     Defendant Exxon is a New Jersey corporation with its principal place of business located at 5959 Las Colinas Boulevard, Irving, Texas, doing business in New York State.  Exxon is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas, and fossil fuel products and, as recently as 2009 produced, marketed, and sold coal.  On information and belief, Exxon Company (an Exxon subsidiary) and Mobil Corporation (which merged into Exxon Corporation to form Defendant Exxon Mobil Corporation in 1999) were members of the API at all relevant times.

20.     Defendant Shell is a public limited company incorporated in England and Wales with its headquarters in The Hague, Netherlands, doing business in New York State.  Shell is a multinational, integrated oil and gas company that explores for, produces, refines, markets, and sells oil, natural gas, and fossil fuel products.  On information and belief, Shell Oil Company was a member of the API at all relevant times, including the 1980s in particular.  Shell Oil Company is Defendant Shell's main U.S. subsidiary; its president is Defendant Shell's "U.S. Country Chair."[5]

21.     Each Defendant has controlled and continues to control all relevant decisions regarding fossil fuel production, fossil fuel reserves, fossil fuel promotion, and climate policy for their respective corporate families—indeed, these are some of the primary functions that Defendants have performed for their subsidiaries.  This control is illustrated by the activities and statements by Defendants described herein.  These include advertisements and statements by

---

[5] *Our Leaders*, SHELL U.S., https://www.shell.us/about-us/who-we-are/our-leaders.html (last visited Jan. 9, 2018).

9

each Defendant promoting its company-wide production of fossil fuels, and by Defendants'

public statements acknowledging their control of company-wide production levels, reserves, and

climate policy. For example, Defendants—and not their subsidiaries—annually submit reports

to the Carbon Disclosure Project addressing their group-wide climate change policies and

actions.[6] Each Defendant, through its employees and/or agents, also controls the process by

which its fossil fuels, including raw crude oil and natural gas, are produced, transported, refined,

stored, distributed, marketed, and/or sold to consumers by and through its subsidiaries.

22.    As a result of Defendants' control over all relevant decisions regarding fossil fuel

production, fossil fuel reserves, fossil fuel promotion, and climate policy, Defendants are

responsible for their subsidiaries' past and current production and promotion of fossil fuel

products and future plans regarding production and promotion.

23.    Defendants have at all relevant times controlled and acted through their

subsidiaries as their agents concerning the conduct alleged in this complaint.

C.    **Defendants' connections to New York.**

24.    Defendants have contributed to the temperature increases and global warming

induced sea level rise now affecting New York City. These impacts constitute severe harm now

and a threat of future catastrophic harm.

25.    Each Defendant, directly and through its subsidiaries and agents, substantially

participates in the process by which raw crude oil is extracted from the ground, refined into fossil

---

[6] *See, e.g.*, BP Responses to Climate Change 2016 Information Request from Carbon Disclosure
Project at 1; Chevron Corporation Responses to Climate Change 2016 Information Request
from Carbon Disclosure Project at 2; ConocoPhillips Responses to Climate Change 2016
Information Request from Carbon Disclosure Project at 2; Exxon Mobil Corporation Responses
to Climate Change 2016 Information Request from Carbon Disclosure Project at 1; Royal Dutch
Shell Responses to Climate Change 2016 Information Request from Carbon Disclosure Project at
2; *available at* https://www.cdp.net/en/companies.

fuel products, including finished gasoline products, and delivered, marketed, and sold to New York State residents for use. For example, and as described in more detail below, Defendants intentionally created a fungible and commingled gasoline product in order to be able to utilize a common distribution system that moved gasoline from refineries through pipelines to terminals (large storage tanks). Pipelines and trucks then transport gasoline from terminals to undergrounds storage tanks at retail stations where it is sold to consumers. A petroleum products terminal facility consists of one or more very large aboveground storage tanks for fossil fuel products, including gasoline. A terminal facility is an important part of the distribution chain to supply fossil fuel products, including gasoline, from a refinery to end consumers, including consumers in New York State. Defendants created this distribution system because it was more efficient and cost effective for them to distribute gasoline from refineries to retail gasoline stations. As described below, Defendants substantially participated in this gasoline distribution process by refining raw crude oil into finished gasoline at refineries, supplying gasoline into pipelines, removing gasoline from pipelines at certain storage facilities or placing gasoline into trucks for transport to retail sites, and/or storing gasoline in underground storage tanks at retail gasoline stations.

26. All of the Defendants' long-standing and extensive contacts with New York State, described below, have furthered and supported their production, marketing, and sale of massive quantities of fossil fuels and fossil fuel products, which has injured, and continues to injure, New York City.

27. BP does business in New York State, including through its subsidiaries and agents. Atlantic Richfield Company, one of BP's predecessors, was headquartered in New York State until 1972, when it moved to California. BP's agent and subsidiary Atlantic Richfield

11

Company does business in New York State, has designated an agent for service of process in

New York State, and has been registered to do business in New York State since 1985. BP's

agent and subsidiary BP Products North America Inc. does business in New York State, has

designated an agent for service of process in New York State, and has been registered to do

business in New York State since 1933. BP's agent and subsidiary BP America Inc. does

business in New York State, has designated an agent for service of process in New York State,

and has been registered to do business in New York State since 1978.

28.     BP's website maintains a page of "BP Amoco Stations Near Me" for New York

listing numerous BP-branded gasoline stations in New York State, including stations located in

New York City. BP exercises control over gasoline product quality and specifications at BP-

branded retail stations. BP-branded retail stations display the trademark of BP and can only sell

gasoline that contains BP's proprietary additives—the additives that distinguish otherwise

fungible gasoline as gasoline that can be sold at BP-branded retail stations. Upon information

and belief, BP has entered into contracts with operators of BP-branded retail stations in New

York State, and/or distributors, that, among other things, have required these operators to sell

only BP-branded gasoline, and for supply of certain volumes of BP-branded gasoline to BP-

branded stations. BP offers credit cards to consumers on its interactive website to promote sales

of gasoline and other products at its branded gasoline stations, including BP-branded retail

stations in New York State. BP promotes gasoline sales by offering consumers, through its

interactive website, "cent-per-gallon rewards" for using BP credit cards that effectively discount

gasoline sold at BP stations, including BP-branded retail stations in New York State.

29.     BP, including through its subsidiaries acting as its agents, owned and operated the

Texas City refinery in Texas from approximately 1999-2013. The Texas City refinery supplied

gasoline to the New York Harbor area, and a substantial amount was supplied to New York

State, where it was sold and consumed by New York State residents.  BP, including through its

subsidiaries and agents Amoco Corporation and/or BP Products North America, Inc., owned and

operated numerous gasoline terminals in New York State for decades that stored hundreds of

thousands of barrels of gasoline, including in Brooklyn (from approximately the late 1960s to

2016), Inwood (from approximately 1979 to 1993), Mt. Vernon (from approximately 1979 to

1999), and Oceanside (from approximately 1979 to 1983).  The BP terminal in Brooklyn had a

petroleum product storage capacity of nearly 6 million gallons.  BP has entered into contracts

regarding the supply of gasoline into and out of its gasoline terminals in New York State, and the

supply of gasoline into and out of third-party gasoline terminals in New York State.  BP, through

its agents and subsidiaries, has leased real property in New York State, for purposes relating to

the marketing and sale of fossil fuel products.

   30. Chevron does business in New York State, including through its subsidiaries and

agents.  Chevron's agent and subsidiary Chevron U.S.A. Inc. does business in New York State,

has designated an agent for service of process in New York State, and has been registered to do

business in New York State since 1936.  Chevron, through its subsidiaries, owns and operates a

refinery in Pascagoula, Mississippi, that, upon information and belief, supplies gasoline to the

New York Harbor area, and a substantial amount was and continues to be supplied to New York

State, where it is sold and consumed by New York State residents.  Chevron offers credit cards

to consumers through its interactive website to promote sales of gasoline and other products at its

branded gasoline stations.  Chevron promotes gasoline sales on its interactive web site by

offering consumers three cents per gallon in fuel credits "every fill-up, every time at Chevron

and Texaco stations."  Chevron has used New York advertising firms to promote fossil fuel

products, including the Chevron advertisements described in Section VIII, below. Chevron, through its subsidiaries and agents, owned and operated numerous gasoline terminals in New York State that stored hundreds of thousands of barrels of gasoline, including in Gulfport (from approximately 1979 to 1986), Johnson City (from approximately 1979 to 1986), Oceanside (from approximately 1979 to 1986), Rensselaer (from approximately 1979 to 1986), Rochester (from approximately 1979 to 1986), Syracuse (from approximately 1979 to 1986), and Utica (from approximately 1979 to 1986). Chevron has entered into contracts regarding the supply of gasoline into and out of its gasoline terminals in New York State, and the supply of gasoline into and out of third-party gasoline terminals in New York State.

31.     ConocoPhillips does business in New York State, including through its subsidiaries and agents. ConocoPhillips' earliest predecessor, Continental Oil & Transportation Company, which later became the Continental Oil Company, had its headquarters in New York City from 1964 through approximately 1972. ConocoPhillips, through its subsidiaries, produces oil in the Bakken formation in North Dakota. On information and belief, this crude oil is loaded onto railroad cars and shipped to locations including Albany, New York, where it is then loaded onto barges for delivery to refineries. As of 2014, Albany received approximately 20% to 25% of the Bakken crude oil rail exports. ConocoPhillips, including through its subsidiaries acting as its agents, previously owned and operated four refineries that supplied gasoline to the New York Harbor area, and a substantial amount was supplied to New York State, where it was sold and consumed by New York State residents: the Bayway refinery in New Jersey (from approximately 1993 to 2012), the Trainer refinery in Pennsylvania (from approximately 1997 to 2011), the Sweeny refinery in Texas (from approximately 1947 to 2012), and the Lake Charles refinery in Louisiana (from approximately 1941 to 2012). In or around 1999, Tosco Corporation, a

14

predecessor to ConocoPhillips, bought approximately 1,740 retail gasoline stations from Exxon, including approximately 235 retail gasoline stations in New York State. ConocoPhillips, through its subsidiaries and agents, continued to operate the stations as Exxon-branded stations through approximately 2008. ConocoPhillips has entered into lease agreements with Exxon for real property in New York State, and upon information and belief, this real property relates to the marketing and sale of fossil fuel products. ConocoPhillips entered into petroleum product exchange and/or throughput agreements relating to third-party petroleum product terminals located in New York State, including: Exxon's terminal in Albany; the Motiva Enterprises LLC terminal in Brooklyn; the Northville Industries Corporation terminal in Holtsville; Exxon's terminal in New Windsor; Warex Cargo Terminal's terminal in New Windsor; two Warex Terminals Corporation's terminals in Newburgh; and the NOCO Energy Corporation terminal in Tonawanda. Such agreements generally allow a company to supply and/or receive petroleum products from a terminal that they do not own. ConocoPhillips owned and operated a petroleum product terminal in Riverhead, New York through 2012 that handled crude oil and refined petroleum products. The Riverhead terminal was comprised of nearly two dozen holding tanks and could store almost 5 million barrels of oil on 280 acres. It was one of the largest facilities of its kind in the United States, and its offshore docking platform for extremely large crude oil tankers was the only one of its kind on the East Coast.

32. Exxon does business in New York State, including through its subsidiaries and agents. Exxon Mobil Corporation has designated an agent for service of process in New York State, and has been registered to do business in New York State since 1950 (it was known at that time as Standard Oil Company).

15

33.     For decades, both Mobil Corporation and Exxon Corporation—the two entities that merged in 1999 to form what is now ExxonMobil Corporation—were headquartered in New York State.  Between 1957 and 1987, Mobil Corporation was headquartered in New York City, which means that during the time period when Defendants learned about the causes and consequences of climate change and decided to produce, market, sell, and promote fossil fuels despite this knowledge, Mobil Corporation was making such decisions in New York State.

34.     Defendant Exxon is responsible for the pre-merger conduct of Mobil Corporation with respect to all relevant issues herein, and the contacts of Mobil are attributable to Exxon.

35.     Similarly, Exxon Corporation was headquartered in New York State from the 1880s through 1989.  During this time, Exxon Corporation made the decision to produce, market, sell, and promote fossil fuels from New York State, including several decades when it made that decision from New York State in spite of its knowledge of the consequences of continued fossil fuel use for the climate.  Defendant Exxon is, similarly, responsible for that conduct, and these contacts are attributable to it.  In sum, throughout the 1960s, 1970s, and 1980s, Defendant Exxon's primary predecessor companies learned about the consequences of continued and unabated fossil fuel use in New York State office buildings, and made the decision to continue producing, refining, marketing, and selling those fossil fuels from New York State.

36.     A substantial amount of Exxon's crude oil and refined products are used in New York State.  For example, Exxon, through its subsidiaries, owns and operates gasoline refineries in Baton Rouge, Louisiana; Baytown, Texas; and Beaumont, Texas.  Exxon supplies gasoline from those three refineries to the New York Harbor area via the Colonial Pipeline and other related pipelines, and a substantial amount is supplied to New York State, where it is sold and consumed by New York State residents.  Exxon previously owned the Bayway gasoline refinery

16

in Linden, New Jersey until approximately 1993, and the Paulsboro refinery in New Jersey until 1997.  Both the Bayway and Paulsboro refineries supplied substantial amounts of gasoline to New York State.  Exxon, through its subsidiaries, produces oil in the Bakken formation in North Dakota.  On information and belief, this crude oil is loaded onto railroad cars and shipped to locations including Albany, New York, where it is then loaded onto barges for delivery to refineries.  There also are numerous Exxon-branded gasoline stations in New York State, including in New York City.  Exxon exercises control over gasoline product quality and specifications at Exxon-branded retail stations.  Exxon-branded retail stations carry the trademark of Exxon and can only sell gasoline that contains Exxon's proprietary additives—the additives that distinguish otherwise fungible gasoline as gasoline that can be sold at Exxon-branded retail stations.  Exxon has entered into contracts with operators of Exxon-branded retail stations in New York State, and/or distributors, that, among other things, have required these operators to sell only Exxon-branded gasoline, and for supply of certain volumes of Exxon-branded gasoline to Exxon-branded stations.  Exxon owned numerous gasoline terminals in New York State that stored hundreds of thousands of barrels of gasoline, including terminals in Albany at 50 Church Street (through approximately 2007), Binghamton  (through approximately 2006), Buffalo at 625 Elk Street (from approximately the 1880s to 2005), Glenwood Landing (through approximately 2007), Inwood at 464 Doughty Boulevard (through approximately 2007), Rochester (through approximately 2006), Ithaca, Newburgh, New Windsor at 1281 River Road, Staten Island at 4101 Arthur Kill Road, and the Syracuse terminal at 6700 Herman Road in Warners, New York.  Exxon used these terminals to store and distribute fossil fuel products, including gasoline.  After Exxon sold the Glenwood Landing and Inwood terminals, it entered into long-term throughput contracts with the new owner to continue using the terminals.  Many

17

of these terminals had the capacity to store hundreds of thousands of barrels of fossil fuel products, including, for example: Albany (approximately 737,000 barrels), Glenwood Landing (approximately 104,000 barrels), Inwood (approximately 326,000 barrels), and Newburgh (approximately 403,000 barrels). Exxon has entered into contracts regarding the supply of gasoline into and out of its gasoline terminals in New York State, and the supply of gasoline into and out of third-party gasoline terminals in New York State. Exxon entered into petroleum product exchange and/or throughput agreements relating to third-party petroleum product terminals located in New York State, including the Northville Industries Corporation terminal in Holtsville, the Warex Cargo Terminal in New Windsor, the Warex Terminals Corporation's terminal in Newburgh, and the NOCO Energy Corporation terminal in Tonawanda. Exxon also previously owned the Paulsboro NJ/PA/NY pipeline system through approximately 2005, consisting of 472 miles of pipeline serving Exxon's petroleum product terminals located in New York State and other areas. The pipeline delivered refined fossil fuel products to locations within New York State, and other places. Exxon's extensive refining, storage, marketing, and sales of fossil fuel products in New York State is also demonstrated by Exxon's numerous legacy environmental contamination sites in New York State.

37. Exxon, including through its predecessor entities, has also carried out substantial fossil fuel operations in New York State throughout the relevant time period, including, for example:

    a. Refining operations in the Greenpoint neighborhood of Brooklyn, New York that continued through 1968, and which had a daily refining capacity of at least 33,000 barrels; and

    b. Refining operations in Buffalo, New York, which had a daily refining capacity of more than 40,000 barrels (at their peak), and which took place for almost 90 years, from approximately 1892 to 1981. The Buffalo refinery was Mobil's oldest refinery in the United States, and encompassed approximately 90 acres, including

both a refinery for fossil fuel products and storage facilities. Exxon Mobil Corporation owns the property encompassing the oil refinery.

38.     Exxon offers credit cards to consumers, through its interactive website, to promote sales of gasoline and other products at its branded gasoline stations, including Exxon-branded retail stations in New York State. Exxon promotes gasoline sales by offering consumers discounts off every gallon of Synergy™ gasoline at Exxon™ or Mobil™ stations, including at Exxon-branded retail stations in New York State. On information and belief, Exxon also has used New York advertising firms to promote fossil fuel products. Exxon has leased real property in New York State to ConocoPhillips, and upon information and belief, this real property relates to the marketing and sale of fossil fuel products. Exxon also owns property in New York State, including property that has been used for refining and marketing of fossil fuel products.

39.     Shell does business in New York State, including through its subsidiaries and agents. Shell's agent and subsidiary Shell Oil Company had an office in New York City at least as early as 1939, and had its headquarters in New York City from 1949 to 1970. Shell Oil Company does business in New York State, has designated an agent for service of process in New York State, and has been registered to do business in New York State since 1936. Shell's agent and subsidiary Motiva Enterprises LLC does business in New York State, has designated an agent for service of process in New York State, and has been registered to do business in New York State since 1998. Shell's agent and subsidiary Motiva Company does business in New York State, has designated an agent for service of process in New York State, and has been registered to do business in New York State since 2002. Shell's agent and subsidiary Equilon Enterprises LLC does business in New York State, has designated an agent for service of process in New York State, and has been registered to do business in New York State since 1998.

19

40.     Shell, including through its subsidiaries acting as its agents, owns and operates three refineries that supply gasoline to the New York Harbor area, and a substantial amount is supplied to New York State, where it is sold and consumed by New York State residents.  Shell, through its subsidiaries, partially owns and operates a refinery in Deer Park, Texas, where crude oil is refined into finished fossil fuel products, including gasoline, that are supplied to the New York Harbor area, and a substantial amount was and continues to be supplied to New York State, where it is sold and consumed by New York State residents.  Shell has also owned and operated the Norco refinery in Louisiana, from 1929 to the present, and the Convent refinery in Louisiana, from 1988 to the present, both of which supply gasoline to the New York Harbor area, and a substantial amount of this gasoline was and continues to be supplied to New York State, where it was sold and consumed by New York State residents.  Shell previously owned and operated the Port Arthur refinery in Texas from 2002 to 2017, which also supplied gasoline to the New York Harbor area, and a substantial amount of this gasoline was supplied to New York State where it was sold and consumed by New York State residents.

41.     There are numerous Shell-branded gasoline stations in New York State, including in New York City.  Shell exercises control over gasoline product quality and specifications at Shell-branded retail stations.  Shell-branded retail stations carry the trademark of Shell and can only sell gasoline that contains Shell's proprietary additives—the additives that distinguish otherwise fungible gasoline as gasoline that can be sold at Shell-branded retail stations.  Upon information and belief, Shell has entered into contracts with operators of Shell-branded retail stations in New York State, and/or distributors, that, among other things, have required these operators to sell only Shell-branded gasoline, and for supply of certain volumes of Shell-branded gasoline to Shell-branded stations.  In 2006, Shell agents and subsidiaries Shell Oil Products US

20

and Motiva Enterprises LLC more than doubled their presence in the New York City area with the rebranding of 59 BP retail gasoline stations as Shell stations   At the time, a news publication reported that Shell stated: "By signing supply agreements with the retail operators of the 59 sites in New York City, we are reinforcing our goal of becoming a preferred fuels supplier by doubling our presence in that market."  It also reported that Larry Burch, Vice President of Retail for Shell Oil Products US, stated: "With the conversion of the BP stations in the greater New York City area, we are doubling the Shell brand presence and the availability of our quality fuels" and that "Shell is dedicated to providing New York motorists with a convenient, consistent and quality fuel experience each and every time they stop at a Shell station."  The re-branded Shell stations were projected to sell 70 million gallons of Shell gasoline annually, and that once the stations were switched over from BP to Shell, Shell would have a total of 75 gasoline stations in New York City.  Shell offers credit cards to consumers on its interactive website to promote sales of gasoline and other products at its branded gasoline stations, including Shell-branded retail stations in New York State.  Shell promotes gasoline sales by offering consumers, through its interactive website, twenty-five cents off every gallon of Shell fuel for the first two months after they open an account.

42.     In 2010, Shell acquired (through its purchase of a smaller producer known as East Resources) natural gas acreage in New York State.  At the time, Shell described the purchased assets as the "premier shale gas play in the Northeast U.S."[7]  While New York State at present prohibits high-volume hydrofracking of natural gas, on information and belief, Shell continues to own and/or control this acreage for future potential exploitation.

---

[7] Chris V. Nicholson, *Shell Buying an Oil and Gas Firm for $4.7 Billion*, N.Y TIMES, May 28, 2010, *available at* http://www.nytimes.com/2010/05/29/business/global/29shell.html.

43.     Shell's subsidiary and agent, Shell Pipeline Company, LP, is a part-owner of the Colonial Pipeline, which begins in the Gulf Coast area and supplies substantial quantities of gasoline to the northeastern United States, including New York State.  Shell, through its subsidiaries and agents, owned and operated gasoline terminals in New York State for decades that stored hundreds of thousands of barrels of gasoline, including in Brooklyn at 1 North 12th Street (from approximately 1979 to 1998), Brooklyn at 25 Paidge Avenue (from approximately 1979 through at least 2006), Lawrence at 74 East Avenue (from approximately 1979 through at least 2006), and Inwood at 200 Roger Avenue (from approximately 1979 to 1989).  Shell entered into petroleum product exchange and/or throughput agreements relating to third-party petroleum product terminals located in New York State, including CITGO Petroleum Corporation's terminal located in Glenmont, the Warex Cargo Terminal in New Windsor, and the Warex Terminals Corporation's terminal in Newburgh.  Shell has entered into contracts regarding the supply of gasoline into and out of its gasoline terminals in New York State, as well as the supply of gasoline into and out of third-party gasoline terminals in New York State.  Shell, through its agents and subsidiaries, owns property in New York State that, upon information and belief, relates to the marketing and sale of fossil fuels.

44.     The Defendants also have additional contacts with New York State, including by and through API, which was headquartered in New York until at least 1969.  On information and belief, the Defendants—including through their predecessor entities—met in, sent information to, and jointly discussed the role of fossil fuels in bringing about climate change in New York State.  For example:

   a. A 1968 report—which was commissioned on behalf of Defendants and which traced rising $CO_2$ concentrations to fossil fuel use—was delivered to API in New York; and

22

b. Even after API moved its headquarters to Washington, D.C., API and its members continued to meet and share information in New York State. For example, members of its "$CO_2$ and Climate Task Force," including representatives from Exxon, Chevron, and BP (or their predecessor entities), met in New York in 1980 to discuss the causes and consequences of climate change.

45.     By contributing to the public nuisance, private nuisance, and trespass causing global warming injuries, all Defendants have committed tortious acts both within and without the State of New York causing injury to persons or property within the State of New York.

46.     All Defendants expect or should reasonably expect their tortious acts to have consequences in the State of New York. Such consequences include increasing the concentration of GHGs, including carbon dioxide, as well as global warming injuries, including accelerated sea level rise and heat impacts.

47.     All Defendants derive substantial revenue from interstate or international commerce. Defendants' revenues are largely, if not wholly, interstate and international in nature in that they derive their revenues from operations located in multiple states and countries. In 2016, BP reported revenues of over $33 billion, Chevron reported sales and other operating revenues of over $110 billion, ConocoPhillips reported sales and other operating revenues of over $23 billion, Exxon reported sales and other operating revenues of over $218 billion, and Shell reported revenues of over $233 billion.

### III.     JURISDICTION AND VENUE

48.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of New York for purposes of diversity jurisdiction while Defendants are citizens of California, Delaware, New Jersey, Texas, and foreign countries England and the Netherlands. The amount in controversy exceeds $75,000, exclusive of interest and costs.

49.     Venue is proper under 28 U.S.C. § 1391(b), because a substantial part of the
events and omissions giving rise to the claims occurred in this district, and because a substantial
part of the property that is the subject of the action is situated in this district.

## IV.     CLIMATE CHANGE IMPACTS ON NEW YORK CITY

50.     Climate change is happening now and is injuring New York City.  Because of the
past and continuing conduct of Defendants and other fossil fuel companies that have followed
Defendants' lead, and because recent and current emissions remain in the atmosphere for up to
hundreds of years, more extreme and injurious impacts are unavoidable.  Climate change impacts
will continue and will be exacerbated well into the future.[8]

51.     The year 2016 was the hottest in modern recorded history, 2015 was the second-
hottest year on record, and 2014 was the third hottest; preliminary reports indicate that 2017 is
on track to join the top three.  Sixteen of the hottest years on record have all occurred since the
year 2000.  These recent, record-breaking years are part of a long-term trend:  since 1970, each
of the four decades has been hotter than the one that preceded it, and the last three decades have
been hotter than any decade since 1850, when thermometer records began.  The United States'
most recent National Climate Assessment, a periodic review of the science and impacts in the
United States of climate change, issued in November 2017, states that the period 1901 to 2016
"is now the warmest in the history of modern civilization."[9]

52.     Global warming is most commonly expressed in terms of a global average
temperature change.  Until recently, the global average temperature was quite stable over the past

---

[8] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE ("IPCC"), CLIMATE CHANGE 2013, THE
PHYSICAL SCIENCE BASIS 1033, *available at* https://www.ipcc.ch/pdf/assessment-
report/ar5/wg1/WG1AR5_Chapter12_FINAL.pdf.
[9] DONALD J. WUEBBLES ET AL., *2017: Executive Summary*, *in* CLIMATE SCIENCE SPECIAL
REPORT: FOURTH NATIONAL CLIMATE ASSESSMENT, VOLUME I (2017), *available at*
https://science2017.globalchange.gov/chapter/executive-summary/.

10,000 years. However, the global average temperature has increased over the last century by 1.8°F (1°C)—an extraordinarily rapid and unprecedented rate of change not seen in thousands of years of human history. Most of this warming has occurred since 1970. GHG pollution from the burning of fossil fuels is the dominant cause. By way of comparison, the global average temperature at the depths of the last ice age 20,000 years ago was only about 7°F to 11°F cooler than today, a time when New York City was buried under the Laurentide Ice Sheet. Thus, differences of just a few degrees in global average temperature constitute dramatic changes to our climate, and are the difference between our current climate, an ice age, and the catastrophic changes that global warming threatens to bring in the future. The following graph from the 2017 U.S. National Assessment shows the increase in global average temperature since 1880 with the corresponding buildup of carbon dioxide pollution in the atmosphere:[10]

---

[10] John Walsh et al., *2014: Ch. 2: Our Changing Climate*, in
CLIMATE CHANGE IMPACTS IN THE UNITED STATES: THE THIRD NATIONAL CLIMATE ASSESSMENT
Fig. 2.2 (J. M. Melillo et al., eds., 2014), *available at*
https://nca2014.globalchange.gov/report/our-changing-climate/observed-change#graphic-16678.



53.     The recent, rapid rate of temperature increase compared to the last 2,000 years is

shown in the following graph from an article published in the peer-reviewed literature[11] that the

federal government relies upon in a website explaining climate change:[12]

---

[11] Shaun A. Marcott et al., *A Reconstruction of Regional and Global Temperature for the Past 11,300 Years*, 339 SCIENCE 1198, *available at* http://science.sciencemag.org/content/339/6124/1198.
[12] Michon Scott, *What's the Hottest Earth Has Been "Lately"?*, NOAA (Sept. 17, 2014), https://www.climate.gov/news-features/climate-qa/what%E2%80%99s-hottest-earth-has-been-%E2%80%9Clately%E2%80%9D.



54.     According to the federal government's 2017 U.S. National Assessment, by the end of the century, U.S. warming is projected to be approximately 3°F (1.67°C) to 5°F (2.78°C) for lower emissions scenarios involving substantial reductions in emissions, and 5°F (2.78°C) to 10°F (5.56°C) for higher emissions scenarios that assume continued increases in emissions.[13] This range of GHG pollution and correlating temperature increase is depicted in the following set of graphs from the 2017 National Assessment (with "RCP" standing for "representative concentration pathways," *i.e.*, the future GHG pollution levels):[14]

---

[13] John Walsh et al., *2014: Ch. 2: Our Changing Climate*, *in* CLIMATE CHANGE IMPACTS IN THE UNITED STATES: THE THIRD NATIONAL CLIMATE ASSESSMENT 29 (J. M. Melillo et al., eds., 2014), *available at* https://nca2014.globalchange.gov/report/our-changing-climate/recent-us-temperature-trends#narrative-page-16566.

[14] DONALD J. WUEBBLES ET AL., *supra* note 9, at Fig. 3.  The RCPs are standard greenhouse gas concentrations adopted by the IPCC for its fifth Assessment Report ("AR5").  They are based on greenhouse gas concentration trajectories in the atmosphere, and incorporate different assumptions about emissions over the coming decade.



55.    With sustained warming in the upper end of the range, the polar ice sheets in Greenland and the West Antarctic would be committed to a long-term, irreversible process of disintegration, eventually resulting in thirty feet or more of sea level rise.[15]

56.    The current rate of global warming presents a serious risk of dangerous and potentially catastrophic harms and is on track to exceed a warming of 3.6°F (2°C) within several decades, which is commonly accepted as a point beyond which the most dangerous and even catastrophic consequences of global warming cannot be prevented.  The City has recognized that keeping global warming from exceeding a target of 2.7°F (1.5°C) increase is needed for "preventing the worst projected climate impacts, both locally and globally,"[16] and that in all

---

[15] IPCC, CLIMATE CHANGE 2014: IMPACTS, ADAPTATION, AND VULNERABILITY, SUMMARY FOR POLICYMAKERS 12 n. 35, *available at* http://www.ipcc.ch/pdf/assessment-report/ar5/wg2/ar5_wgII_spm_en.pdf (Greenland – between 1 to 4 ° C additional warming; 7 meters sea level rise); Jonathan L. Bamber et al., *Reassessment of the Potential Sea-Level Rise from a Collapse of the West Antarctic Ice Sheet*, 324 SCIENCE 901-03 (2009), *available at* http://science.sciencemag.org/content/324/5929/901 (West Antarctic -- 3 meters sea level rise).
[16] CITY OF NEW YORK, 1.5 ° C, ALIGNING NEW YORK CITY WITH THE PARIS CLIMATE AGREEMENT (Sept. 2017), *available at*

28

events keeping global warming below 3.6°F (2°C) is a "critical goal."[17] For this reason, the City

has committed, through issuance of Executive Order 26 of 2017 and via a collaborative effort

with other cities, to do its part to reduce its emissions to a level consistent with the goal of

keeping the global average temperature increase below 2.7°F (1.5°C).

57.     According to the NPCC, the expert committee convened by the City to provide

scientific advice, guidance, and projections on climate change and relied upon by the City in its

sustainability and resiliency efforts, climate change is already affecting New York City. The

average annual temperature in New York City has increased at a rate of 0.79°F per decade over

the last 30 years. The NPCC also reported that extreme precipitation events have increased by

approximately 70% in the Northeastern United States from 1958 to 2011. Sea level rise in New

York City has averaged 1.2 inches per decade (total of 1.1 feet) since 1900, nearly twice the

observed global rate of 0.5 to 0.7 inches per decade over a similar time period, and has risen

more quickly in New York City in recent decades. While some of this relative sea level rise is

attributable to land subsidence, approximately 60% is driven by climate-related factors.

58.     The NPCC projects dramatic impacts on New York City in the future.

Considering the NPCC's projections, the City has recognized that "[r]ising sea levels, increased

temperatures and precipitation, and a growing likelihood of more intense storms pose unique

---

http://www1.nyc.gov/assets/sustainability/downloads/pdf/publications/1point5-
AligningNYCwithParisAgrmtFORWEB.pdf.
[17] City of New York, Office of the Mayor, Exec. Order No. 26, Climate Action Executive Order
(June 2, 2017), *available at* http://www1.nyc.gov/assets/home/downloads/pdf/executive-
orders/2017/eo_26.pdf.

challenges to a coastal city like ours."[18]  It also has recognized that heat "presents a unique

challenge to New York City."[19]

59.     The NPCC makes both "middle range" and "high end" projections.  Middle range

projections are those in the 25th to 75th percentile of possible outcomes, *i.e.*, 25% of the

outcomes are at or below the lower end of the range, and 75% of the outcomes are at or below

the upper end of the range.  High end projections are those for which 90% of the outcomes are at

or below the outcome.  Middle range projections show that local average temperatures will

increase over the 1971-2000 baseline period by 2.0 to 2.8°F by the 2020s, 4.0 to 5.7°F by the

2050s, 5.3 to 8.8°F by the 2080s, and 5.8 to 10.3°F by 2100.[20]  This understates the human-

driven/fossil fuel warming impact because the baseline period itself (*i.e.* 1971 to 2000) includes a

period of significant human-induced warming.  Under the "high end" projections, local average

temperatures are expected to increase by 3.2°F by the 2020s, 6.6°F by the 2050s, 10.3°F by the

2080s, and 12.1°F by 2100.[21]

60.     The projections also show that heat waves will become more frequent and more

intense.  The NPCC's "middle range" projections show that the number of days above 90°F in

New York City will increase from eighteen days per year in the baseline period (1971-2000) to

twenty-six to thirty-one days per year in the 2020s, to thirty-nine to fifty-two days per year in the

2050s, and forty-four to seventy-six days per year in the 2080s.  Again, these projections

understate the warming impact from fossil fuels because the baseline period itself includes

---

[18] CITY OF NEW YORK, supra note 2, at 216.

[19] *Id*. at 222.

[20] NEW YORK CITY PANEL ON CLIMATE CHANGE 2015 REPORT CHAPTER 1: CLIMATE
OBSERVATIONS AND PROJECTIONS 29 (2015), *available at*
http://onlinelibrary.wiley.com/doi/10.1111/nyas.12586/epdf.

[21] *Id.* at 30.

significant human-induced warming.  The "high end" estimates show temperatures at or above 90°F for thirty-three days per year by the 2020s, for fifty-seven days by the 2050s, and for eighty-seven days by the 2080s.[22]  Put differently, by the 2050s, today's worst heat waves are expected to become ordinary summer days.

61.     Heat has a direct impact on total daily deaths, with most heat-related deaths occurring on the same day or shortly after exposure to heat.  Without mitigation, hotter summers projected for 2020 could cause an estimated 30% to 70% increase in heat-related deaths, or about 110 to 260 additional heat-related deaths per year on average in New York City.  The health consequences of global warming disproportionately affect the City's most vulnerable populations—the elderly, children, and low-income communities who already experience elevated instances of cardiovascular and respiratory diseases.

62.     Global warming exacerbates extreme precipitation, including heavy downpours, because a warmer atmosphere holds more moisture than a cool one, and extreme precipitation from a saturated atmosphere is greater than precipitation from a drier atmosphere.  Extreme precipitation events are expected to increase in frequency, intensity, and duration.  Comparing the "high end" estimates to the 1971-2000 baseline, the number of days in New York City with rainfall at or above two inches is projected to increase by as much as 67% by the 2020s and the number of days with rainfall at or above four inches is projected to increase by as much as 67% by the 2020s and 133% by the 2080s.[23]  This, again, understates the fossil fuel-caused warming impact because the baseline period itself includes human-induced warming.

---

[22] *Id.* at 31.
[23] *Id.*

63.     An increase in flooding and other climate impacts is expected to impact the City's water supply system by increasing turbidity and eutrophication in the City's reservoirs and their tributaries, necessitating changes to components of water supply operations and drinking water treatment in the future.  Climate change threatens to increase the frequency of droughts that would diminish the water available to fill the City's upstate reservoirs.  Climate extremes also harm City trees and park flora.

64.     The City is exceptionally vulnerable to sea level rise, because its 520-mile coastline is longer than the coastlines of Boston, Los Angeles, Miami, and San Francisco combined, and because New York City has a large floodplain that is home to more than 218,000 New Yorkers, a floodplain that is already likely larger than any other city in the United States, and is growing in size due to global warming-induced sea level rise.  The City's waterfront is among its greatest assets, but it is being harmed by global warming and is under dire threat from continued warming due to past and continuing GHG pollution.

65.     Global warming-induced sea level rise is expected to be higher in areas surrounding New York City than in many other parts of the world.  According to the NPCC's "high end" projection, the sea level surrounding the City is expected to rise above the 2000-2004 baseline level (which already includes climate-change related sea level rise) by ten inches by the 2020s, by thirty inches by the 2050s, by fifty-eight inches by the 2080s, and by seventy-five inches—more than six feet—by 2100.[24]  Even the "middle range" projections are dire:  four to eight inches by the 2020s, eleven to twenty-one inches by the 2050s, eighteen to thirty-nine

---

[24] NEW YORK CITY PANEL ON CLIMATE CHANGE 2015 REPORT CHAPTER 2: SEA LEVEL RISE AND COASTAL STORMS 41 (2015), *available at* http://onlinelibrary.wiley.com/doi/10.1111/nyas.12593/epdf.

inches by the 2080s, and twenty-two to fifty inches by 2100. Even without storms, this sea level

rise threatens low-lying areas of the City—for example, by the 2050s approximately forty-three

miles of the City's coastline (including many residential neighborhoods) could be at risk of daily

or weekly tidal inundation, even during non-storm conditions. And a sea level rise of six feet

would put parts of all five boroughs —including portions of the Financial District, Red Hook,

and the vast majority of Coney Island and the Rockaways—under water. The City also owns

significant infrastructure and numerous facilities along the coast, including roads, bridges, parks,

waste transfer stations, and over a dozen wastewater treatment plants, that are at grave risk from

sea level rise.

      66.    Along with sea level rise will come frequent flooding. It is "virtually certain" that

sea level rise will lead to coastal flooding in New York City that is more frequent and more

intense.[25] According to the NPCC's "high end" estimate, by the 2080s, what would today be

considered a 100-year flood (*i.e.*, a flood that has a 1% chance of occurring in any given year)

could have as high as a 12% chance of occurring in any given year, and this flooding could be as

much as 4.8 feet higher than today's 100-year flood because of sea level rise. Even the middle

range projections show that a 100-year flood is between two and five times as likely to occur in

any given year by 2080, and that the flood will be 1.5 to 3.3 feet higher than today's 100-year

flood because of sea level rise.[26] More recent research published in 2017 indicates that the flood

threat to the City is likely to be even worse. According to this research, what would ordinarily

be considered a 100-year flood will be likely to occur more than six times per year by 2100 in

---

[25] CITY OF NEW YORK, BUILDING A STRONGER, MORE RESILIENT NEW YORK 40-42 (2013),
*available at* http://s-media.nyc.gov/agencies/sirr/SIRR_singles_Hi_res.pdf.
[26] NEW YORK CITY PANEL ON CLIMATE CHANGE, *supra* note 24, at 41.

the City, or approximately once every two months, under a future with continued high emissions of GHG pollution.[27]  Under this same scenario, the 500-year flood—a truly massive flood that today would be associated with an apocalyptic storm—would be likely to occur in the City approximately every 18 months.[28]

67.     The impacts of this flooding would be catastrophic.  By the 2020s under the NPCC's "high end" projections, the area that could be flooded in a 100-year storm would expand to 59 square miles, encompassing approximately 88,000 buildings and much of the City's international airport.[29]  By the 2050s, with more than 2.5 feet of sea level rise, the City's 100-year floodplain would expand to 72 square miles, or nearly a quarter of the City, and would include approximately 114,000 buildings, 97% of the City's power generation, 20% of its hospital beds, a large share of its public housing, and 10% of its overall population.[30]  This is significantly more than the fifty-one square miles flooded during Hurricane Sandy.  The map below shows the areas that are at risk of flooding from a 100-year storm under the NPCC's "high end" sea level rise projections within reasonable scientific uncertainty ranges:

---

[27] Maya K. Buchanan et al., *Amplification of Flood Frequencies with Local Sea Level Rise and Emerging Flood Regimes*, ENVTL. RES. LETT. S-11 (2017), *available at* http://iopscience.iop.org/1748-9326/12/6/064009/media/ERL_12_6_064009_suppdata.pdf.
[28] *Id.*
[29] NYC OFFICE OF EMERGENCY MANAGEMENT, 2014 NYC HAZARD MITIGATION PLAN 243-44 (2014), *available at* http://www.nyc.gov/html/oem/downloads/pdf/hazard_mitigation/plan_update_2014/final_draft_nyc_hmp.pdf.  These projections are based on the 2013 Preliminary Work Maps, a set of maps developed by FEMA in preparation for the promulgation of the 2015 Preliminary Flood Maps, which are now being revised by FEMA.
[30] *Id.* at 243-44.



68.     The global warming-induced sea level rise caused by past fossil fuel consumption

is an irreversible condition on any relevant time scale:  it will last hundreds or even thousands of

years.  Temperature increases from GHG emissions take decades to manifest themselves because

the oceans warm slowly.  And once the temperature increases are fully realized, they are

essentially irreversible.  Time lags and inertia in the climate system mean that impacts will

become more severe for years in the future due to past and continuing GHG pollution.  Future

35

emissions will create long-term impacts that are even more dramatic, particularly now that the planet's natural buffering (such as ocean uptake of carbon that would otherwise be in the atmosphere) has begun to decline in efficacy.  As the NPCC put it, "sea level rise is projected to accelerate into the 22nd century even if heat-trapping GHG concentrations stabilize later this century."[31]  Defendants' current, continuing, and planned production of fossil fuels into the future will further exacerbate global warming, accelerate sea level rise, and require greater and more costly projects and actions to protect the City.

## V.     FOSSIL FUELS ARE THE PRIMARY CAUSE OF CLIMATE CHANGE

69.     Climate science clearly demonstrates that humans—and the burning of fossil fuels—are causing these changes to the climate.  According to the Intergovernmental Panel on Climate Change ("IPCC"), "the leading international scientific authority on climate change" as even Exxon has admitted, it is "extremely likely" (*i.e.*, 95-100% certain) that "human influence has been the dominant cause of the observed warming since the mid-20th century."[32]  Man-made climate change affects every aspect of the climate system.  According to the IPCC, "[h]uman influence has been detected in warming of the atmosphere and the ocean, in changes in the global water cycle, in reductions in snow and ice, in global mean sea level rise, and in changes in some climate extremes."[33]  The NPCC findings are in agreement with what the NASA Goddard Institute for Space Studies has described as the "numerous international and national reports" that recently "have concluded that human activities are changing the climate, leading to

---

[31] NEW YORK CITY PANEL ON CLIMATE CHANGE, *supra* note 24, at 42.
[32] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE 2014: SYNTHESIS REPORT 47 (2014), *available at* http://www.ipcc.ch/pdf/assessment-report/ar5/syr/SYR_AR5_FINAL_full_wcover.pdf.
[33] *Id.*

increased vulnerability and risk."[34]  Similarly, NASA's website states that a "scientific consensus" exists that "[c]limate-warming trends over the past century are extremely likely due to human activities," noting agreement among more than 97% of climate scientists and "most of the leading scientific organizations," including the American Association for the Advancement of Science, the American Geophysical Union, the American Meteorological Society, the American Physical Society, the Geological Society of America, and the National Academy of Sciences, as well as a large number of international scientific societies.[35]

70.     And the science also shows that fossil fuel combustion is the primary driver of climate change.  Carbon dioxide emitted from fossil fuel combustion bears a chemical fingerprint that differentiates it from natural sources of carbon dioxide.  Thus, it is a scientific certainty that the current increase in carbon dioxide in the atmosphere is caused by fossil fuel pollution, and that natural processes, including human and animal exhalation, are not a cause of the problem. Atmospheric levels of carbon dioxide, a greenhouse gas, have increased by 40% since the pre-industrial era.  These concentrations are now higher than at any time in the last three million years.  As the IPCC has confirmed, this unprecedented increase in carbon dioxide levels constitutes "[t]he largest contribution" to climate change of any source, and comes "primarily from fossil fuel emissions."[36]  The National Academy of Sciences has also confirmed that "the

---

[34] *Publication Abstracts: Horton et al. 2015*, NAT'L AERONAUTICS & SPACE ADMIN., https://pubs.giss.nasa.gov/abs/ho00600i.html (last visited Jan. 9, 2018) (citations omitted).
[35] *Scientific Consensus: Earth's Climate is Warming*, NAT'L AERONAUTICS & SPACE ADMIN, https://climate.nasa.gov/scientific-consensus/ (last visited Jan. 9, 2018).
[36] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE 2013, THE PHYSICAL SCIENCE BASIS, SUMMARY FOR POLICYMAKERS 11, 13, *available at* https://www.ipcc.ch/pdf/assessment-report/ar5/wg1/WG1AR5_SPM_FINAL.pdf.

rise in CO2 is largely from combustion of fossil fuels."[37]  Warming from greenhouse gases has a

signature, including a differential warming of the upper and lower levels of the atmosphere, that

rules out natural explanations for climate change.  According to the federal government's Fourth

National Climate Assessment, "human activities, especially emissions of greenhouse gases, are

the dominant cause of the observed warming since the mid-20th century."[38]  The 2017

Assessment stated that there is a "*likely* human contribution of 93%–123% of the observed

1951–2010 change" in warming, with the range above 100% indicating that natural processes

would have produced a cooling effect but were overwhelmed by man-made global warming.[39]

"Likely" is a term defined by the US National Climate Assessment as a 66%-100% chance of

being true.

71.     In addition, atmospheric concentrations of methane, another important greenhouse

gas emitted through fossil fuel use, are 150% higher than in pre-industrial times, and higher than

any time in the last 800,000 years.

72.     The basic facts of the greenhouse effect have been known for a long time.  In

1896, Svante Arrhenius, a Nobel-prize winning scientist, published calculations projecting

temperature increases that would be caused by burning fossil fuels.[40]  By 1957, scientists at the

Scripps Research Institute published a warning in peer-reviewed literature that global warming

"may become significant during future decades if industrial fuel combustion continues to rise

---

[37] THE ROYAL SOCIETY & THE NATIONAL ACADEMY OF SCIENCES, CLIMATE CHANGE: EVIDENCE
AND CAUSES 6, 8 (2014), *available at* http://dels.nas.edu/resources/static-assets/exec-office-
other/climate-change-full.pdf.
[38] WUEBBLES ET AL., *supra* note 9, at 1.
[39] *Id.* at 14.
[40] Svante Arrhenius, *On the Influence of Carbonic Acid in the Air Upon the Temperature of the
Ground*, 41 PHIL. MAG. & J. OF SCIENCE 237, 237-76 (1896), *available at*
http://www.rsc.org/images/Arrhenius1896_tcm18-173546.pdf.

exponentially" and that "[h]uman beings are now carrying out a large scale geophysical experiment" on the planet.[41]  By 1960, published data established that carbon dioxide concentrations in the atmosphere were in fact rising.[42]  In 1965, the President's Science Advisory Committee reported that "[p]ollutants have altered on a global scale the carbon dioxide content of the air,"[43] and that the effects "could be deleterious from the point of view of human beings."[44]  The report stated that fossil fuel combustion is "measurably increasing the atmospheric carbon dioxide" and concluded that humans are "conducting a vast geophysical experiment" due to their massive fossil fuel consumption.[45]  In 1979, the National Academy of Sciences, which is charged with providing independent scientific advice to the United States government, concluded that there was "incontrovertible evidence" that carbon dioxide levels were increasing in the atmosphere as a result of fossil fuel use, and predicted that a doubling of atmospheric carbon dioxide would cause a probable increase in global average surface temperatures of 3ºC, or 5.4ºF.[46]  In 1988, NASA scientist Dr. James E. Hansen testified to the

---

[41] Roger Revelle & Hans E. Suess, *Carbon Dioxide Exchange between Atmosphere and Ocean and the Question of an Increase of Atmospheric CO2 During the Past Decades*, 9 TELLUS 18, 18-27 (1957), *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.2153-3490.1957.tb01849.x/epdf.

[42] Charles D. Keeling, *The Concentration and Isotopic Abundances of Carbon Dioxide in the Atmosphere*, 12 TELLUS 200, 200-203 (1960), *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.2153-3490.1960.tb01300.x/epdf.

[43] PRESIDENT'S SCIENCE ADVISORY PANEL, RESTORING THE QUALITY OF OUR ENVIRONMENT 1 (Nov. 1965), *available at* http://dge.stanford.edu/labs/caldeiralab/Caldeira%20downloads/PSAC,%201965,%20Restoring%20the%20Quality%20of%20Our%20Environment.pdf.

[44] *Id.* at 126-27.

[45] *Id.* at 113, 126.

[46] *See* CARBON DIOXIDE AND CLIMATE: A SCIENTIFIC ASSESSMENT, REPORT OF AN AD HOC STUDY GROUP ON CARBON DIOXIDE AND CLIMATE TO THE CLIMATE RESEARCH BOARD, ASSEMBLY OF MATHEMATICAL AND PHYSICAL SCIENCES, NATIONAL RESEARCH COUNCIL vii, 16 (1979), *available at* https://www.nap.edu/catalog/12181/carbon-dioxide-and-climate-a-scientific-assessment.

U.S. Senate that "the greenhouse effect has been detected, and it is changing our climate now."[47] In 1990, an international collaboration of scientists working under the auspices of the Stockholm Environment Institute to provide information to assist the work of the IPCC issued a report finding that "[a]n absolute temperature limit of 2.0 º C can be viewed as an upper limit beyond which the risks of grave damage to ecosystems, and of non-linear responses, are expected to increase rapidly." In 1990, the IPCC reported that increasing CO2 concentrations from human activity "will enhance the greenhouse effect, resulting on average in an additional warming of the Earth's surface,"[48] and would cause substantial sea level rise.[49] By 1995, the IPCC had identified "a discernible human influence on global climate," *i.e.*, a global temperature change caused by GHG pollution, that was already occurring. The IPCC confirmed this finding in 2001, and it was reviewed and confirmed again that same year by the U.S. National Academy of Sciences.[50] Upon information and belief, Defendants have maintained scientific staffs for decades who have kept track of the climate science as these warnings and conclusions have been issued.

---

[47] *Greenhouse Effect and Global Climate Change: Hearing Before the Comm. on Energy and Natural Resources* 40 (1988) (statement of Dr. James Hansen, Director, NASA Goddard Institute for Space Studies), *available at* https://www.scribd.com/doc/260149292/Transcript-of-pivotal-climate-change-hearing-1988.

[48] INTERGOVERNMENTAL PANEL ON CLIMATE CHANGE, CLIMATE CHANGE: THE IPCC SCIENTIFIC ASSESSMENT, POLICYMAKERS SUMMARY xi (1990), *available at* https://www.ipcc.ch/ipccreports/far/wg_I/ipcc_far_wg_I_spm.pdf.

[49] *Id.*

[50] NATIONAL ACADEMY OF SCIENCES, COMMISSION ON GEOSCIENCES, ENVIRONMENT & RESOURCES, CLIMATE CHANGE SCIENCE: AN ANALYSIS OF SOME KEY QUESTIONS 1 (2001), *available at* https://download.nap.edu/cart/download.cgi?record_id=10139.

## VI. DEFENDANTS HAVE PRODUCED MASSIVE QUANTITIES OF FOSSIL FUELS—AND HAVE CONTINUED TO DO SO EVEN AS CLIMATE CHANGE HAS BECOME GRAVELY DANGEROUS

73.     For many years, Defendants have produced massive quantities of fossil fuels, including oil and natural gas.  They have done so by extracting raw fossil fuels from the ground, refining and processing the raw fuels into forms that can be combusted, and marketing these products to consumers.

74.     When combusted, these fossil fuels emit carbon dioxide.  Additionally, one of Defendants' primary fossil fuel products, natural gas, is composed of methane, which is the second largest GHG contributor to global warming and which, as Defendants know, routinely escapes into the atmosphere from facilities operated by Defendants' customers and other fuel consumers.

75.     Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere.  However, because of their rapid and widespread global dispersal, greenhouse gas emissions from each of Defendants' fossil fuel products are present in the atmosphere in New York State.

76.     Defendants are substantial contributors to the climate change that is causing injury to the City and thus are jointly and severally liable.  Defendants' cumulative production of fossil fuels over many years makes each Defendant among the top sources of GHG pollution in the world.  Upon information and belief, Defendants are, respectively, the first (Chevron), second (Exxon), fourth (BP), sixth (Shell), and ninth (ConocoPhillips) largest cumulative producers of fossil fuels worldwide from the mid-nineteenth century to present; most of Defendants' GHG pollution from the use of their fuels has occurred since 1980.

77.     Individually and collectively, Defendants' production, marketing, sale, and promotion of fossil fuel products are responsible for climate change impacts which harm New York City.

78.     Defendants have in the last ten years or more produced large amounts of unconventional, high carbon-intensity fossil fuels—*i.e.*, fuels that are responsible for more carbon emitted per unit of energy than other fuels, and that therefore contribute disproportionately to global warming.  For example, Chevron, Exxon, BP, and ConocoPhillips produce significant amounts of fossil fuels from tar sands in Canada.  Shell, until recently, was also responsible for significant tar sands production.  Exxon has publicly promoted tar sands production as "a significant, secure energy source for the United States," and ConocoPhillips has said this production is "a significant part of the world's energy future."[51]

79.     Defendants' conduct will continue to cause ongoing and increasingly severe harm to the City because Defendants are committed to a business model of massive fossil fuel production that they know causes a gravely dangerous rate of climate change.  The following graph from a 2015 study published in the peer-reviewed scientific literature demonstrates that the actions of Defendants BP, Shell, and Exxon dramatically diverge from those necessary to protect human safety and welfare.

---

[51] *Canadian Oil Sands*, EXXON, http://aboutnaturalgas.com/en/current-issues/oil-sands/canadian-oil-sands/overview (last visited Jan. 9, 2018); *Oil Sands*, CONOCOPHILLIPS CANADA, http://www.conocophillips.ca/our-operations/oil-sands/Pages/default.aspx (last visited Jan. 9, 2018).



The graph compares BP, Exxon, and Shell's projections of worldwide total future GHG emissions[52]—projections upon which they make long-term business plans—to the International Energy Agency ("IEA") 450 trajectory. The IEA 450 emissions trajectory line shown in this graph represents the emissions reductions that would be necessary in the future to prevent global warming from exceeding a 2ºC increase over the pre-industrial temperature, which, as stated above, is commonly accepted as a point beyond which the most dangerous and even catastrophic consequences of climate change cannot be prevented.[53] Upon information and belief, all Defendants base their long-term business plans upon similar projections.

## VII. DEFENDANTS HAD FULL KNOWLEDGE THAT FOSSIL FUELS WOULD CAUSE CATASTROPHIC HARM

80. For decades, Defendants have known that their fossil fuel products pose risks of "severe" and even "catastrophic" impacts on the global climate through the work and warnings

---

[52] In gigatons of carbon per year.
[53] Peter C. Frumhoff et al., *The Climate Responsibilities of Industrial Carbon Producers*, 132 CLIMATIC CHANGE 157, 167 (2015), *available at* https://link.springer.com/article/10.1007/s10584-015-1472-5.

of their own scientists and/or through their trade association, the API. Defendants, large and sophisticated companies devoted to researching significant issues relevant to fossil fuels, also were aware of significant scientific reports on climate change science and impacts at the time they were issued. Yet each Defendant decided to continue its conduct and commit itself to massive fossil fuel production. This deliberate decision placed company profits ahead of human safety, well-being, and property, and foisted onto the public the costs of abating and adapting to climate change.

81.     The API is a national trade association that represents the interests of America's oil and natural gas industry, including foreign-based companies that produce and market fossil fuels in the United States.

82.     Beginning in the 1950s, the API began warning its members that fossil fuels pose a grave threat to the global climate. The API's warnings to Defendants included the following:

    a.   In 1951, the API launched a project to research air pollution from petroleum products that examined the fossil fuel fingerprint of carbon dioxide emissions to determine the amount of atmospheric GHG pollution from fossil fuels.

    b.   In 1968, a scientific consultant retained by the API reported that carbon dioxide emissions were "almost certain" to produce "significant" temperature increases by 2000, and that these emissions were almost certainly attributable to fossil fuels. The report warned:

> If the Earth's temperature increases significantly, a number of events might be expected to occur including the melting of the Antarctic ice cap, a rise in sea levels, warming of the oceans and an increase in photosynthesis. . . . It is clear that we are unsure as to what our long-lived pollutants are doing to our environment; however, there seems to be no doubt that the potential damage to

our environment could be severe . . . [T]he prospect for the future must be of serious concern.[54]

c.   Between 1979 and 1983, the API and Defendants, their predecessors, and/or agents formed a task force to monitor and share climate research, initially called the "CO2 and Climate Task Force" and later renamed the "Climate and Energy Task Force" ("Task Force").  The API kept and distributed meeting minutes to Task Force members.  Task Force members included, in addition to API representatives, scientists from Amoco (a predecessor to BP); Standard Oil of California, Texaco, and Gulf Oil Corp. (predecessors to Chevron); Exxon Research and Engineering and Mobil (predecessors to or subsidiaries of current Exxon); Shell; and others.  In 1980, the Task Force invited Dr. J.A. Laurman, a "recognized expert in the field of CO2 and climate," to make a presentation.  Dr. Laurman's written presentation informed the Task Force that there was a "SCIENTIFIC CONSENSUS ON THE POTENTIAL FOR LARGE FUTURE CLIMATIC RESPONSE TO INCREASED CO2 LEVELS." He further informed the Task Force that, though the exact temperature increases were difficult to predict, the "physical facts agree on the probability of large effects 50 years away."  He warned the Task Force of a 2.5°C (4.5°F) global temperature rise by 2038, which would likely have "MAJOR ECONOMIC CONSEQUENCES" and a 5°C (9°F) rise by 2067, which would likely produce "GLOBALLY CATASTROPHIC EFFECTS."  He also suggested that, despite lack of certainty,

---

[54] ELMER ROBINSON & R.C. ROBBINS, SOURCES, ABUNDANCE, AND FATE OF GASEOUS ATMOSPHERIC POLLUTANTS, SRI Project PR-6755, prepared for American Petroleum Institute, at 109-110, *available at* https://www.smokeandfumes.org/#/documents/document16.  In 1972, API members, including Defendants, received a summary of this report.  AMERICAN PETROLEUM INSTITUTE, ENVIRONMENTAL RESEARCH: A STATUS REPORT (Jan. 1972), *available at* http://files.eric.ed.gov/fulltext/ED066339.pdf.

"THERE IS NO LEEWAY" in the time for acting. API minutes show that the Task

Force discussed topics including "the technical implications of energy source

changeover," "ground rules for energy release of fuels and the cleanup of fuels as

they relate to CO2 creation," and researching "the Market Penetration Requirements

of Introducing a New Energy Source into World Wide Use." The Task Force even

asked the question "what is the 50 year future of fossil fuels?"[55]

    d. In March 1982, an API-commissioned report estimated the average

increase in global temperature from a doubling of atmospheric concentrations of CO2

and projected, based upon computer modeling, global warming of between 2°C and

3.5°C (3.6°F and 6.3°F). The report projected potentially "serious consequences for

man's comfort and survival," and noted that "the height of the sea level can increase

considerably."[56]

83. On information and belief, Defendants were aware of the industry Task Force and

API findings described above, which were distributed by the API to its members. Each

Defendant (or its predecessor) was a member of the API at relevant times, or had a subsidiary

that was a member of the API at relevant times. Each subsidiary passed on information it

learned from the API on climate change to its parent Defendant (or Defendant's predecessor) and

acted as the agent for its parent company, which remained in charge of setting overall production

levels in light of climate change and other factors.

---

[55] CO2 and Climate Task Force, Minutes of Meeting, 1-2 & Attachment B (1980) (emphasis in original), *available at* http://insideclimatenews.org/sites/default/files/documents/AQ-9%20Task%20Force%20Meeting%20%281980%29.pdf.

[56] AMERICAN PETROLEUM INSTITUTE, CLIMATE MODELS AND CO2 WARMING: A SELECTIVE REVIEW AND SUMMARY (March 1982), *available at* https://assets.documentcloud.org/documents/2805626/1982-API-Climate-Models-and-CO2-Warming-a.pdf.

84.     On information and belief, each Defendant was also actually aware (at the time they were made) of public statements on climate change described above, including the 1979 National Academy of Science findings and Dr. Hansen's 1988 testimony.  Because these statements were centrally relevant to Defendants' ongoing investment of billions of dollars in fossil fuel production and billions of dollars in profits, and because Defendants employed many experts charged with evaluating climate change and other energy and regulatory trends, Defendants were in a superior position to appreciate the threat described in these statements. Defendants' representatives attended congressional hearings on climate change beginning as early as the late 1970s.

85.     In addition to the API information, some of Defendants produced their own internal analyses of climate change.  For example, newly disclosed documents demonstrate that Exxon knew in the late 1970s and early 1980s that its products posed a "catastrophic" threat to the global climate, and that fossil fuel use would have to be significantly reduced to avoid severe harm.

86.     Exxon management was informed by its scientists in 1977 that there was an "overwhelming[]" consensus that fossil fuels were responsible for atmospheric carbon dioxide increases.  The presentation summarized a warning from a recent international scientific conference that "IT IS PREMATURE TO LIMIT USE OF FOSSIL FUELS BUT THEY SHOULD NOT BE ENCOURAGED."  The scientist presenting the material warned management, "Present thinking holds that man has a time window of five to ten years before the need for hard decisions regarding changes in energy strategies might become critical."[57]

---

[57] Memorandum from J.F. Black, Products Research Division, Exxon Research and Engineering Co., to F.G. Turpin, Vice President, Exxon Research and Engineering Co. (June 6, 1978),

87.     In a 1979 Exxon internal memo, an Exxon scientist calculated that 80% of fossil fuel reserves would need to remain in the ground and unburned to avoid greater than a doubling of atmospheric carbon dioxide.[58]

88.     In a 1981 internal Exxon memo, a scientist and director at the Exxon Research and Engineering Company, Roger Cohen, warned that "it is distinctly possible" that CO2 emissions from Exxon's fifty-year Corporate Planning Department scenario of fossil fuel use "will later produce effects which will indeed be catastrophic (at least for a substantial fraction of the earth's population)."[59]

89.     A year later, the same scientist wrote another memo to Exxon headquarters, which reported on a "clear scientific consensus" that "a doubling of atmospheric CO2 from its pre-industrial revolution value would result in an average global temperature rise of $(3.0 \pm 1.5)$ °C [2.7 °F to 8.1 °F]."  The clear scientific consensus was based upon computer modeling, a technique Exxon would later publicly attack over a period of decades as unreliable and uncertain in an effort to undermine public confidence in climate science.  The memo continued: "There is unanimous agreement in the scientific community that a temperature increase of this magnitude

---

available at https://insideclimatenews.org/system/files_force/documents/James%20Black%201977%20Presentation.pdf?download=1.

[58] Memorandum from W.L. Ferrall to R. L. Hirsch, Exxon Research and Engineering Co. (Oct. 16, 1979), at 5, available at http://insideclimatenews.org/sites/default/files/documents/CO2%20and%20Fuel%20Use%20Projections.pdf.

[59] Memorandum from R. W. Cohen to W. Glass, Exxon Research and Engineering Co. (Aug. 18, 1981), available at http://insideclimatenews.org/sites/default/files/documents/%2522Catastrophic%2522%20Effects%20Letter%20%281981%29.pdf.

would bring about significant changes in the earth's climate, including rainfall distribution and alterations in the biosphere."[60]

90.     In November 1982, an Exxon internal report to management warned that "substantial climatic changes" could occur if the average global temperature rose "at least 1 °C [1.8 °F] above [1982] levels," and that "[m]itigation of the 'greenhouse effect' would require major reductions in fossil fuel combustion."  The report then warned Exxon management that "there are some potentially catastrophic events that must be considered," including the risk that "if the Antarctic ice sheet which is anchored on land should melt, then this could cause a rise in sea level on the order of 5 meters."  The report included a graph demonstrating the expected future global warming from the "CO2 effect" demonstrating a sharp departure from the "[r]ange of natural fluctuations."[61]  This graph is attached as Exhibit 1.

91.     By 1983, Exxon had created its own climate models, which confirmed the main conclusions from the earlier memoranda.  Starting by at least the mid-1980s, Exxon used its own climate models and governmental models to gauge the impact that climate change would have on its own business operations.  Exxon and other major oil and gas companies, including Mobil and Shell, subsequently took actions to protect their own business assets based on these modeling results, including raising the decks of offshore platforms, protecting pipelines from increasing coastal erosion, and designing helipads, pipelines, and roads in the warming Arctic.[62]  In 1994, for example, Shell, Exxon, Conoco, and other oil and gas companies included climate change

---

[60] Memorandum from M. B. Glaser to R. W. Cohen et al. (Nov. 12, 1982), at 2, 12-13, 28, *available at* https://insideclimatenews.org/sites/default/files/documents/1982%20Exxon%20Primer%20on%20CO2%20Greenhouse%20Effect.pdf.

[61] *Id.*

[62] Amy Lieberman & Susanne Rust, *Big Oil Braced for Global Warming While it Fought Regulations*, L.A. TIMES, Dec. 31, 2015, *available at* http://graphics.latimes.com/oil-operations/.

projections in their design of a natural gas pipeline leading from a North Sea offshore platform to the German coastline. In other words, the oil and gas industry, including Defendants, were engaging in climate change adaptation and resiliency measures decades ago, at the very same time they were pursuing a campaign designed to convince the public that the science was too uncertain to warrant fossil fuel reductions. These are precisely the same kinds of climate change adaptation and resiliency measures—elevating and hardening infrastructure to protect against sea level rise—that the City must now undertake in order to protect itself.

92.     Exxon's early research and understanding of the climate change impacts of its business was not unique among Defendants. For example, at least as far back as 1970, Defendants Shell and BP began funding scientific research in England to examine the possible future climate changes from greenhouse gas emissions. Shell produced a film on climate change in 1991, in which it admitted that there had been a "marked increase [in global temperatures] in the 1980s" and that the increase "does accord with computer models based on the known atmospheric processes and predicted buildup of greenhouse gases." It acknowledged a "serious warning" that had been "endorsed by a uniquely broad consensus of scientists" in 1990. In the film, Shell further admitted that by 2050 continued emissions of greenhouse gases at high levels would cause a global average temperature increase of 1.5 to 4°C (2.7 to 7.2°F); that one meter of sea level rise was likely in the next century; that "this could be disastrous;" and that there is a "possibility of change faster than at any time since the end of the ice age, change too fast, perhaps, for life to adapt without severe dislocation."[63]

---

[63] *Royal Dutch Shell, Climate of Concern* (1991), *available at* https://www.youtube.com/watch?v=0VOWi8oVXmo.

## VIII.  DESPITE THEIR EARLY KNOWLEDGE THAT CLIMATE CHANGE POSED GRAVE THREATS, DEFENDANTS PROMOTED FOSSIL FUELS FOR PERVASIVE USE, WHILE DENYING OR DOWNPLAYING THESE THREATS

93.     Defendants have extensively promoted fossil fuel use in two ways.  First, Defendants misled the public about climate change by over-emphasizing the uncertainties of climate science despite their knowledge that the fundamental science of climate change was well established and amply sufficient to warrant reductions in fossil fuel usage, including by using paid denialist groups and individuals.  Defendants' campaign inevitably and intentionally encouraged fossil fuel consumption at levels that were (as Defendants knew) certain to severely harm the public.  Second, Defendants promoted fossil fuels through frequent advertising, including promotions claiming that consumption at current and even expanded levels is "responsible" or even "respectful" of the environment.  These promotions encouraged continued fossil fuel consumption at levels that Defendants knew would harm the public.

### A.     Defendants engaged in an overt public relations campaign intended to cast doubt on climate science and promote their products.

94.     Notwithstanding Defendants' early knowledge of climate change, Defendants have engaged in advertising and communications campaigns intended to promote their fossil fuel products by downplaying the harms and risks of climate change.  Initially, the campaign tried to show that climate change was not occurring or was not caused by Defendants' products.  More recently, the campaign has sought to minimize the risks and harms from climate change.  The campaign's purpose and effect has been to help Defendants continue to produce fossil fuels and sell their products on a massive scale.  This campaign was executed in large part by front groups funded by Defendants, either directly or through the API, and through statements made by Defendants directly.

51

95.     One front group was the Global Climate Coalition ("GCC").  The GCC operated between 1989 and 2002.  Its members included the API and predecessors or subsidiaries of Defendants, with such subsidiaries acting as Defendants' agents.  On information and belief, these members included BP America Inc. (a BP subsidiary that BP identifies as its U.S. agent); Amoco Corporation and the Atlantic Richfield Company (predecessors of BP); Texaco Inc. (a predecessor of Chevron) as well as Chevron itself; Phillips Petroleum (a predecessor of ConocoPhillips) and later ConocoPhillips itself; Exxon and its predecessors; and Shell Oil Company (Shell's main U.S. subsidiary).  William O'Keefe, former president of the GCC, was also a former executive of the API; the first GCC director was an executive employed by Phillips Petroleum.

96.     The GCC spent millions of dollars on campaigns to discredit climate science, including $13 million on one advertising campaign alone.  In this campaign, the GCC distributed a video to hundreds of journalists claiming that carbon dioxide emissions would increase crop production and feed the hungry people of the world.

97.     However, internal GCC documents admitted that their "contrarian" climate theories were unfounded.  In December 1995, the GCC's Science and Technology Advisory Committee ("GCC-STAC"), whose members included employees of Mobil Oil Corporation (an Exxon predecessor) and the API, drafted a primer on the science of climate change for GCC members.  The primer concluded that the GCC's contrarian theories "do not offer convincing arguments against the conventional model of greenhouse gas emission-induced climate change."[64]  Faced with this inconvenient conclusion, at its next meeting in January 1996 the

---

[64] Global Climate Coalition, Science and Technology Advisory Committee, Primer on Climate Change Science (Jan. 18, 1996), at 16, *available at*

GCC-STAC decided simply to drop this seven-page section of the report. For years afterward, the GCC and its members continued to tout their contrarian theories about climate change, even though the GCC had admitted internally these arguments were invalid.

98.    In February 1996, an internal GCC presentation stated that a doubling of carbon dioxide levels over pre-industrial concentrations would occur by 2100 and cause "an average rate of warming [that] would probably be greater than any seen in the past 10,000 years." The presentation noted "potentially irreversible" impacts that could include "significant loss of life."[65]

99.    Certain Defendants also funded another front group in the 1990s, the Global Climate Science Communications Team ("GCSCT"). GCSCT members included Exxon, Chevron, and the API. A 1998 GCSCT task force memo outlined an explicit strategy to invest millions of dollars to manufacture uncertainty on the issue of climate change, directly emulating a similar disinformation campaign by the tobacco industry. The memo stated: "*Victory Will Be Achieved When*," among other things, "*Average citizens 'understand' (recognize) uncertainties in climate science*," public "*recognition of uncertainty becomes part of the 'conventional wisdom*.'" and the "*Media 'understands' (recognizes) uncertainties in climate science*."[66] The plan stated that progress would be measured by the percentage of news articles that raise questions about climate change.

---

https://www.ucsusa.org/sites/default/files/attach/2015/07/Climate-Deception-Dossier-7_GCC-Climate-Primer.pdf.
[65] John Kinsman, Edison Electric Institute, Global Climate Change Science – Overview of Recent Developments (Feb. 13, 1996).
[66] Global Climate Science Communications: Action Plan (Apr. 3, 1998), *available at* https://assets.documentcloud.org/documents/784572/api-global-climate-science-communications-plan.pdf.

100.    Defendant Exxon played a lead role in the campaign of deception and denial. Exxon paid researchers and front groups to create uncertainties about basic climate change science and used denialist groups to attack well-respected scientists.  These were calculated business decisions by Exxon to undermine climate change science and bolster production of fossil fuels.  Between 1998 and 2014, Exxon paid millions of dollars to organizations to promote disinformation on climate change.  During the early- to mid-1990s, Exxon directed some of this funding to Dr. Fred Seitz, Dr. Fred Singer, and/or Seitz and Singer's Science and Environmental Policy Project ("SEPP") in order to launch repeated attacks on mainstream climate science and IPCC conclusions, even as Exxon scientists participated in the IPCC process.  Dr. Seitz and Dr. Singer were not climate scientists.  Dr. Seitz, Dr. Singer, and SEPP had previously been paid by the tobacco industry to create doubt in the public mind about the hazards of smoking.

101.    In 2000, Exxon took out an advertisement, one among a series of advertisements, on the Op-Ed page of the *New York Times* entitled "Unsettled Science."  The advertisement claimed that "scientists remain unable to confirm" the proposition that "humans are causing global warming."[67]  This was six years after the IPCC had confirmed the causal link between planetary warming and anthropogenic greenhouse gas emissions and eighteen years after Exxon itself had admitted in a 1982 internal memoranda to corporate headquarters that there was "a clear scientific consensus" that greenhouse gas emissions would cause temperatures to rise.

102.    Exxon also used denialist groups to attack well-respected scientists.  In response to the IPCC's historic conclusion in 1995 that humans were causing global warming, Exxon funded a group that launched a vicious smear attack on Dr. Benjamin Santer, the lead IPCC

---

[67] ExxonMobil, Unsettled Science, *available at* https://assets.documentcloud.org/documents/705605/xom-nyt-2000-3-23-unsettledscience.pdf.

scientist in charge of this finding. Dr. Santer was a MacArthur Fellow working in California at the Lawrence Livermore National Laboratory. An Exxon-funded scientist, Dr. Fred Seitz, who formerly had worked for R.J. Reynolds and founded organizations to deny tobacco science, published a *Wall Street Journal* op-ed that falsely claimed that Dr. Santer had violated IPCC protocol in changing a draft version of the report—a claim subsequently refuted by the IPCC chairman.[68] Nonetheless, Dr. Seitz and another scientist funded by Exxon, Dr. Fred Singer (who also had been a tobacco denier, infamous for attacking EPA's draft secondhand smoke rule as "junk science"), launched a dizzying array of attacks on Dr. Santer that to this day remain alive and well on the web. In short, Exxon funded a smear campaign that misleadingly convinced the public that the IPCC's historic causal conclusion was the subject of legitimate scientific controversy. It did so even though Exxon participated in the IPCC process through its scientists—a point that Exxon recently highlighted as evidence that it supposedly has always been in the scientific mainstream.

103. In the early 2000s, Exxon again attacked a respected scientist, Dr. Michael Mann. Dr. Mann had published a paper in peer-reviewed literature of what has come to be known as the "hockey stick" graph, which shows modern temperature sharply diverting from the temperatures of the last 1,000 years, and which was relied on by the IPCC in its 2001 report for its strengthened finding that humans were causing global warming, a report in which Exxon scientists participated. In response to the IPCC's causal finding, Exxon sponsored its own bogus scientific research by paying $120,000 over the course of two years (2003–2004) to the Fraser Institute, a Canadian organization that specializes in climate denialism. Senior Fraser Institute

---

[68] *See* Susan K. Avery et al., Special Insert: An Open Letter to Ben Santer (July 25, 1996), *available at* http://www.realclimate.org/docs/BAMS_Open_Letter.pdf.

Fellow Dr. Ross McKitrick and a co-author then published a supposed refutation of Dr. Mann's "hockey stick" graph.[69] Dr. McKitrick was an economist, not a scientist, and his co-author was a mining company executive. In 2003, the McIntyre and McKitrick paper was rushed into print, without peer review and, in a departure from the standard scientific practice, without offering Dr. Mann and his co-authors an opportunity to respond prior to publication. The McIntyre and McKitrick paper was subsequently debunked,[70] but the smear of Dr. Mann's work remains available on the web today and continues to be cited by climate deniers.[71] Exxon's promotion by deception thus lives on.

104. One of Defendants' most frequently used denialists has been an aerospace engineer named Dr. Wei Hock Soon. Between 2001 and 2012, various fossil fuel interests, including Exxon and the API, paid Dr. Soon over $1.2 million. Dr. Soon was the lead author of a 2003 article that argued that the climate had not changed significantly. The article was widely promoted by other denial groups funded by Exxon, including via "Tech Central Station," a website supported by Exxon. Soon published other bogus "research" in 2009, attributing climate change to solar activity, for which Exxon paid him $76,106. This 2009 grant was made several years after Exxon had publicly committed not to fund climate change deniers.

---

[69] Stephen McIntyre & Ross McKitrick, *Corrections to the Mann et al. (1998) Proxy Database and Northern Hemispheric Average Temperature Series*, 14 ENERGY & ENVIRONMENT 751 (2003), *available at* http://stephenschneider.stanford.edu/Publications/PDF_Papers/mcintyre_02.pdf.

[70] *See, e.g.*, *False Claims by McIntyre and McKitrick Regarding the Mann et al. (1998) Reconstruction*, REALCLIMATE (Dec. 4. 2004), http://www.realclimate.org/index.php/archives/2004/12/false-claims-by-mcintyre-and-mckitrick-regarding-the-mann-et-al-1998reconstruction/.

[71] *Hockey Stick, 1998-2005, R.I.P.*, WORLD CLIMATE REPORT (Mar. 3, 2005), http://www.worldclimatereport.com/index.php/2005/03/03/hockey-stick-1998-2005-rip/; Anthony Watts, *McIntyre and McKitrick to Receive Award*, WATTS UP WITH THAT? (June 14, 2010), https://wattsupwiththat.com/2010/06/14/mcintyre-and-mckitrick-to-receive-award/.

105.    As noted above, in 1982 Exxon's scientific staff had relied on climate models to conclude that there was a "clear scientific consensus" on projected future climate change and starting shortly thereafter Exxon relied upon these projections to protect its own business assets.[72]  But that did not stop Exxon from engaging in a long effort to discredit the climate models as unreliable.  For example, in 1999, former CEO Lee Raymond stated at an annual Exxon meeting that future climate "projections are based on completely unproven climate models, or, more often, on sheer speculation."[73]  In a 2005 corporate citizenship report, even as Exxon admitted "the risk that greenhouse gas emissions may have serious impacts justifies taking action" (action it still has not taken), it still attacked the climate models in an effort to discredit the basic causal connection between its products and climate change:  "gaps in the scientific basis for theoretical climate models and the interplay of significant natural variability make it very difficult to determine objectively the extent to which recent climate changes might be the result of human actions."[74]  This was several years after the IPCC's 2001 report concluding that human-induced warming had been detected, a report in which Exxon scientists participated.  Exxon has recently kept up the attacks on the models:  in May 2015, at Exxon's annual shareholder meeting, then-CEO Rex Tillerson misleadingly stated:  "What if everything we do it turns out our models were really lousy and we achieved all of our objectives and it turned out the planet behaved differently because the models just weren't good enough to predict it?"

---

[72] *See also* Geoffrey Supran & Naomi Oreskes, *Assessing ExxonMobil's Climate Change Communications (1977-2014)*, 12 ENVTL. RES. LETT. (2017), *available at* http://iopscience.iop.org/article/10.1088/1748-9326/aa815f/pdf.

[73] Sara Jerving et al., *What Exxon Knew About the Earth's Melting Arctic*, L.A. TIMES, Oct. 9, 2015, *available at* http://graphics.latimes.com/exxon-arctic/.

[74] EXXONMOBIL CORPORATION, 2005 CORPORATE CITIZENSHIP REPORT 23.

106.     Until recently, the API's website referred to climate change as "possible man-made warming" and claimed that the human contribution is "uncertain."[75]  The API removed this statement from its website in 2016 when journalistic investigations called attention to the API's misleading statements on climate change and its participation in the climate change Task Force during the late 1970s and early 1980s.

107.     Similarly, until recently Exxon's website continued to emphasize the "uncertainty" of climate change science and impacts: "current scientific understanding provides limited guidance on the likelihood, magnitude, or time frame" of events like temperature extremes and sea level rise.[76]  Exxon's insistence on crystal-ball certainty was clear misdirection, since Exxon knew at this time that the fundamentals of climate science were well settled and that climate change presented a clear and present danger.

**B.     Defendants directly promoted fossil fuels.**

108.     Despite their knowledge that fossil fuels cause severe climate change injuries, Defendants continue to promote massive fossil fuel use.  Defendants promote fossil fuels through advertisements that laud fossil fuels as "responsible" and "respectful" to the environment, identify fossil fuels as the only way to sustain modern standards of living, and promote sales of fossil fuels without qualification.  The API also promotes the benefits of fossil fuel products on behalf of Defendants and its other members.  Defendants' message to consumers is that fossil fuels may continue to be burned in massive quantities without risking significant harm.

---

[75] *Formerly found at* http://www.api.org/policy-and-issues/policy-items/environment/climate_change.

[76] *Formerly found at* http://corporate.exxonmobil.com/en/current-issues/climatepolicy/meeting-global-needs/managing-climate-change-business-risks.

109.     Defendants continue to bombard the public and consumers with these advertisements, which build on the decades of misleading statements on climate change described above.  Defendants' advertisements have included the following:

a.      Exxon's "Lights Across America" website advertisement states that natural gas is "helping dramatically reduce America's emissions,"[77] even though natural gas is a fossil fuel causing widespread planetary warming and harm, and the use of natural gas competes with wind and solar, which have no greenhouse gas emissions.

b.      A Shell website promotion states: "We are helping to meet the world's growing energy demand while limiting CO2 emissions, by delivering more cleaner-burning natural gas."[78]

c.      BP touts natural gas on its website as "a vital lower carbon energy source" and as playing a "crucial role" in a transition to a lower carbon future.[79]

d.      Chevron's website tells the public that "we produce safe, reliable energy products for people around the world."[80]  Chevron also says in its advertising that "[o]il and natural gas will continue to fulfill a significant portion of global energy demand for decades to come − even in a carbon-constrained scenario."[81]  A prior Chevron

---

[77] *ExxonMobil, Lights Across America* (2015) (at 0:46), *available at* https://www.youtube.com/watch?v=tMu1CBjXfq4&list=PLirXIHj7zayYGaExiTp_B4t6gqTtkGf 9A&index=6_.

[78] *Transforming Natural Gas*, SHELL UNITED STATES, http://www.shell.us/energy-and-innovation/transforming-natural-gas.html (last visited Jan. 1, 2018).

[79] BP SUSTAINABILITY REPORT 2016, *available at* https://www.bp.com/content/dam/bp/en/corporate/pdf/sustainability-report/group-reports/bp-sustainability-report-2016.pdf; http://www.bp.com/energytransition/shifting-towards-gas.html.

[80] *Products and Services*, CHEVRON, https://www.chevron.com/operations/products-services (last visited Jan. 1, 2018).

[81] *Managing Climate Change Risks*, CHEVRON, https://www.chevron.com/corporate-responsibility/climate-change/managing-climate-risk.

advertisement that is still available on the web, and that was never disavowed by Chevron promotes Chevron fossil fuels on a massive scale by stating that "our lives demand oil."[82]

      e.      ConocoPhillips promotes its fossil fuel products by stating that it "responsibly suppl[ies] the energy that powers modern life."[83]

110.    Defendants BP and Exxon have also used long-term energy forecasts and similar reports as advocacy pieces to promote their products under the guise of expert, objective "analysis." These forecasts have repeatedly sought to justify heavy reliance on fossil fuels by overstating the cost of renewable energy.

111.    Defendants' energy forecasts are aimed in substantial part at consumers and are promoted to the public through their respective websites and other direct media. Exxon continues to promote its annual "Outlook for Energy" reports in videos currently available on the internet. But Exxon's energy "analyses" are self-serving means of promoting fossil fuels and undercutting renewable energy and clean technologies. For example, Exxon has misleadingly claimed in a recent forecast that natural gas is a cheaper way to reduce carbon dioxide emissions than wind or solar power. Similarly, BP has claimed that solar and wind power will be more expensive in 2050 than natural gas or coal—even though wind and solar are *already* cheaper than natural gas or coal in some circumstances and their prices are dropping precipitously. Exxon and BP also have understated in recent "forecasts" the expected market share of electric vehicles, even though electric vehicle technology has taken off, prices have dropped, and GM announced (in 2015) that it was investing billions in electric cars because the "future is electric."

---

[82] *Chevron, Human Energy* (2009), *available at* https://www.youtube.com/watch?v=-KyjTGMVTkA.

[83] *Formerly found at* http://www.conocophillips.com/who-we-are/our-company/spirit-values/responsibility/Pages/the-changing-energy-landscape.aspx.

112.    Defendants' energy forecast reports also promote their fossil fuel products by warning consumers of supposed downsides to reducing fossil fuel use and carbon dioxide emissions.  For example, Exxon's most recent report claims that the costs of carbon dioxide reductions are "ultimately borne by consumers and taxpayers."[84]

113.    These reports by BP and Exxon, and a similar one by Shell, predict massive increases in fossil fuel use over roughly the next 15 years.  These reports are part of a larger strategy of "mak[ing] the case for the necessary role of fossil fuels," as BP's chief executive stated in a moment of candor in 2015.[85]

114.    Yet this "case for the necessary role" is a recipe for disaster—as one of Defendants has now finally admitted.  On November 28, 2017, Shell finally acknowledged the importance of "keeping the rise in global temperatures below 2 degrees C," and also acknowledged that this "means that, *over time*, we as society must stop adding to the stock of greenhouse gases in the atmosphere," *i.e.*, a phase down of fossil fuels to net zero emissions.  But, critically, Shell did not say when this should occur.  While Shell also announced on the same day that it would be reducing the carbon footprint of its energy products by "around" half by 2050, Shell in fact was merely agreeing to reduce the carbon "intensity" of its mix of energy products (*i.e.*, the carbon emissions per unit of energy).  Shell has said nothing to alter the fact that its total fossil fuel production and sales, and hence the total GHG pollution from its products, may well, and likely will, go up in absolute terms.  Shell's announcement is too little and too late to avert the climate change impacts that already are occurring, and that will

---

[84] EXXONMOBIL, 2017 OUTLOOK FOR ENERGY: A VIEW TO 2040 31 (2017).

[85] Bob Dudley, BP, 2015 Annual General Meeting: Group Chief Executive (Apr. 16, 2015), *available at* http://www.bp.com/en/global/corporate/media/speeches/2015-annual-general-meeting-group-chief-executive.html.

inevitably grow worse over the coming decades based in substantial part upon Shell and other Defendants' past and continuing conduct and future business plans.

115.    On December 11, 2017, Exxon filed a notice with the U.S. Securities & Exchange Commission that it "has decided to further enhance the Company's disclosures" consistent with a 2017 shareholder proposal requesting that Exxon more fully disclose the impacts of climate change policies on its business, and stated that it "will seek to issue" disclosures on "energy demand sensitivities, implications of two degree Celsius scenarios, and positioning for a lower-carbon future" in the "near future."[86]  Shareholders have been calling on Exxon to make further detailed disclosures on how climate change will impact its business for years.  Exxon's brief announcement—which says nothing about reducing oil and gas production—will do nothing to avert climate change impacts that already are occurring, and that will inevitably grow more severe based upon Exxon and other Defendants' past and continuing conduct and future business plans.

116.    The bottom line is that Defendants continue to double down on the production of massive amounts of oil and natural gas, and encourage consumers to use unlimited amounts of fossil fuel products, despite having known for decades that this conduct was substantially certain to cause grave harm, including by putting coastal cities like New York City on the front lines of climate disaster.

## IX.  THE CITY IS EXPENDING SUBSTANTIAL FUNDS, AND WILL CONTINUE TO DO SO, TO PROTECT ITSELF AGAINST CLIMATE CHANGE

117.    Given New York City's particular vulnerability to climate change, the City has been forced to take proactive steps to protect itself and its residents from its dangers and impacts.

---

[86] Exxon, Regulation FD Disclosure to the United States Securities and Exchange Commission, *available at* https://www.sec.gov/Archives/edgar/data/34088/000003408817000057/r8k121117.htm.

118.    The City's first formal planning endeavor occurred with the issuance in 2007 of "PlaNYC: A Greener, Greater New York," a pioneering effort to accommodate a growing population, enhance the quality of life for all New Yorkers, and plan for climate change. PlaNYC included a recommendation that the City convene the NPCC, which the City did.  The analysis and commitments contained in PlaNYC are now embodied in "OneNYC: The Plan For A Strong And Just City," which incorporates equity considerations into the foundation set forth in PlaNYC to consider how to make the City more resilient and sustainable.

119.    The City made a further unprecedented commitment to climate adaption and resiliency in the aftermath of Hurricane Sandy, when it launched a $20 billion-plus multilayered investment program in climate resiliency across all five boroughs.[87]  These first steps of the City's resiliency effort will take many years to complete, and include constructing levees and seawalls, elevating City facilities and streets, waterproofing and hardening City infrastructure, and modifying or reconstructing sewers and stormwater infrastructure to handle additional stormwater and adapt to interference with outfalls from sea level rise.

120.    For example, the East Side Coastal Resiliency Project, currently budgeted at $760 million, is designed to protect Manhattan's lower east side neighborhoods from flood risk due to coastal storms and sea level rise by constructing a 2.4 mile-long barrier along the City's East River.  The Two Bridges Project, currently budgeted at $203 million, will extend that protection

---

[87] *Mayor Announces New Resiliency Guidelines to Prepare City's Infrastructure and Buildings for Effects of Climate Change* (Apr. 28, 2017), http://www1.nyc.gov/office-of-the-mayor/news/271-17/mayor-new-resiliency-guidelines-prepare-city-s-infrastructure-buildings-for.

south to the Brooklyn Bridge.  A barrier to be constructed along the southeast shore of Staten

Island will protect some of the communities most devastated by Hurricane Sandy.[88]

121.    The City is undertaking Cool Neighborhoods NYC, a comprehensive program to

keep City communities safe in extreme heat, at a cost of over $100 million to the City; multiple

resiliency measures implemented by Health + Hospitals, the City's public health care network,

with over $100 million of City funds; and the Raised Shorelines Program, which will elevate

shorelines throughout the City to protect low-lying areas, at a City budget of $100 million to

fund 9 initial sites, among 91 identified.  To protect the City's solid waste-management program

from sea level rise and storm surge, the City hardened two marine transfer stations and raised

platforms in one of them.  Many such City projects have not yet been fully funded.

122.    In addition to these already-identified and commenced resiliency efforts, the City

must promptly take a wide array of more robust measures to make the City more resilient and

protect the public and City property from the dire threat of climate change.  Indeed, the coastal

flood protection projects initiated after Sandy largely protect areas of the City that were flooded

during that storm, but do not protect other low-lying areas of the City that are vulnerable to

flooding from storms that can come from other directions, such as northwest Queens and the

Bronx.  The City must build sea walls, levees, dunes, and other coastal armaments and must

elevate, solidify, and adapt a vast array of City-owned structures, properties, and parks along its

whole coastline, not only the stretches flooded by Sandy.  The City must enlarge existing storm

and wastewater storage facilities and install additional new facilities, as well as associated

infrastructure and pumping facilities, to prevent flooding in low-lying areas that are vulnerable to

rising seas or could potentially be overwhelmed by increasingly severe downpours.  Making the

---

[88] CITY OF NEW YORK, *supra* note 25, at 283-87.

City's storm and wastewater infrastructure more robust will, in certain locations, require building high-level storm sewers and modifying other related infrastructure.

123.     The City owns and maintains dozens of parks located partially or entirely on the shoreline (including the Hudson River and the East River estuaries).  These include Rockaway Beach and Boardwalk, with 7 miles of City-owned beach and 5.5 miles of boardwalk; Coney Island Beach and Boardwalk, consisting of 399 acres with almost 3 miles of coastline; Franklin D. Roosevelt Boardwalk and Beach, with 2.5 miles of coastline; Pelham Bay Park; Ferry Point Park's Wolfe's Pond Park; Flushing Meadows-Corona Park; the Battery; and Riverside Park. These are just some of the City-owned properties threatened by rising sea levels and higher storm surges, and many are being hardened or will need to be hardened against these threats in the near future.

124.     Addressing climate change hazards means that the City has to change the way it designs and builds City capital projects, and requires the City to fund modifications and additional protections.  The City has developed preliminary Climate Resiliency Design Guidelines ("Guidelines") to provide an approach for using forward-looking climate data in the design of City capital projects.  The Guidelines will help ensure that the City's investments in buildings and infrastructure are more resilient to climate change hazards, including rising sea levels and changes in extreme precipitation and heat.[89]  These Guidelines are needed to protect the City from extreme weather associated with climate change and threats such as sea level rise. Although preliminary, the Guidelines are already influencing design decisions.  For example, the

---

[89] CITY OF NEW YORK, MAYOR'S OFFICE OF RECOVERY & RESILIENCY, PRELIMINARY CLIMATE RESILIENCY DESIGN GUIDELINES (2017), *available at* http://www1.nyc.gov/assets/orr/images/content/header/ORR_ClimateResiliencyDesignGuidelines_PRELIMINARY_4_21_2017.pdf.

Department of Environmental Protection, which builds and operates the City's water and wastewater infrastructure, is now using the Guidelines to inform the design of their infrastructure to be resilient in a changing climate.

125.    Because of the severe public health impacts of extreme weather that will worsen with climate change, the City has launched a number of public health preparedness programs to reduce the public health impacts to its citizens from heat waves, sea level rise, and coastal storms.  The City is spending millions of dollars on programs to help vulnerable City residents stay safe during dangerous weather emergencies that will be exacerbated by climate change, and expects these programs will need to grow exponentially in the future because they are critical to saving lives during heat waves and other climate change-related hazards.

126.    The City has also increased its efforts to plan temporary protections against climate change-related risks.  In 2016, the City's Department of Emergency Management and the Mayor's Office of Recovery and Resiliency launched the Interim Flood Protection Measures program, a multi-million dollar program that provides for the temporary installation and deployment of protective measures, such as HESCO barriers and water-filled tubes, in low-lying areas and adjacent to vulnerable City assets to reduce overland flooding from coastal flood events.  These programs will need to expand, and will become more costly, as the floodplains continue to grow as a result of climate change.

127.    The costs of all these measures will only increase as climate change worsens. Most these projects are long-term design and construction projects—and they must be built to last for several decades, often as long as fifty years or more.  The design and construction of these projects must begin now in order to complete them in time to protect the safety, health, and welfare of City residents and municipal property and infrastructure from the increasing dangers

66

of climate change, given the pace of global warming.  The City is seeking the additional costs incurred in taking actions that, without climate change, would not have been necessary, could have been deferred or postponed, or would have otherwise been less costly.  The cost of needed resiliency projects runs to many billions of dollars.

128.    As noted, Defendants themselves have been taking climate change impacts into account when planning for and building their own operations and infrastructure, the same thing that the City now must do.  Exxon has stated that since its operations may be disrupted by "severe weather events" and "natural disasters," to protect business assets such as its offshore production facilities, coastal refining operations, and petrochemical plants in vulnerable areas, its designs should account for the "engineering uncertainties that climate change and other events may potentially introduce."[90]  Chevron also takes into account potential risks to its operations and assets, including "storm severity and frequency" and "sea level rise" to "plan for their resiliency."[91]  Likewise, ConocoPhillips has warned that it could incur increased expenses for its assets and operations if there are "significant changes in the Earth's climate, such as more severe or frequent weather conditions."[92]  Defendants thus recognize that protecting infrastructure and operations from climate change is necessary and entails additional planning and costs than would otherwise be required.  In the same way, the City seeks to be able to more fully protect itself from climate change impacts to which Defendants have substantially contributed.

## X.  DEFENDANTS' CONDUCT IS ONGOING, AND IS CAUSING CONTINUOUS AND RECURRING INJURIES TO THE CITY

129.    Defendants' conduct is causing a continuous encroachment upon and interference with the City's property.  For example, areas of the City that were once above the mean high tide

---

[90] Exxon Mobil Corporation, Form 10-K for the Fiscal Year Ended Dec. 31, 2016, at 4.
[91] Chevron Corporation, Form 10-K for the Fiscal Year Ended Dec. 31, 2016, at 20.
[92] ConocoPhillips, Form10-K for the Fiscal Year Ended Dec. 31, 2016, at 25.

line now experience regular tidal inundation. This sea level rise will inevitably grow worse, regularly inundating additional City-owned property, and eventually portions of coastal areas owned by the City may be continuously submerged.

130. Defendants' conduct is also causing recurring harms to the City. These harms include encroachments upon and interferences with the City's property from higher storm surges and more intense storms, as well as injuries to public health resulting from more frequent and more intense heat waves and flooding. These recurring harms will also grow worse and more frequent in the future.

131. Defendants' conduct that has caused and is causing these harms to City property and public health has also been continuous and ongoing. As described above, Defendants continue to produce, market, distribute, and sell fossil fuels in massive quantities; to promote fossil fuel consumption in these massive quantities; and to downplay the threat posed by climate change. This ongoing conduct will cause increasingly severe injuries to the City, including new and more significant continuous encroachments upon and interferences with City property, and increasingly severe threats to public health.

## AS A FIRST CAUSE OF ACTION – PUBLIC NUISANCE

132. The City realleges and reaffirms each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

133. Defendants' production, marketing, and sale of massive quantities of fossil fuels, and their promotion of pervasive use of these fossil fuels, have caused, created, assisted in the creation of, maintained, and/or contributed to the current and threatened climate change impacts on the City described above. These impacts are indivisible injuries, and include but are not limited to harms to the safety, health, and welfare of City residents and to the City's property and infrastructure from sea level rise, increased flooding and storm surge, higher temperatures,

greater heat waves, and increases in the frequency and intensity of precipitation. Defendants' conduct continues to cause, create, assist in the creation of, maintain, and/or contribute to these impacts.

134.    The City has suffered injuries beyond those of the community at-large. For example, the City has the primary responsibility to elevate, harden, and/or adapt existing municipally-owned infrastructure (much of it on City-owned property) damaged or threatened by climate change, including roads, pumping stations, beaches, parks, sewers, aqueducts, marine transfer stations, and wastewater treatment facilities. The City also has the primary responsibility to build new infrastructure to protect its residents from climate change. The City also protects public hospitals and medical facilities and funds programs to protect New Yorkers from the health consequences of climate change. Each Defendant has at all relevant times been aware, and continues to be aware, that the inevitable emissions of greenhouse gases from the fossil fuels it produces combine with the greenhouse gas emissions from fossil fuels produced by the other Defendants, among others, to result in dangerous levels of global warming with grave harms, including the harms to coastal cities like New York. Defendants have promoted the use of fossil fuels at unsafe levels with knowledge of the hazard that such use would create. Defendants' conduct has been the actual and proximate cause of harm to New York City. Defendants' conduct, individually and collectively, has been a substantial factor in causing climate change in New York City, which has caused (and will continue to cause) sea level rise, increased flooding, more frequent and extreme weather events, temperature increases, and the other impacts described above. These injuries are the foreseeable result of Defendants' conduct and Defendants were substantially certain at the relevant times that they would occur as a result of their conduct.

135. Defendants continue to produce, market, and sell massive quantities of fossil fuels, and, as they know, the use of their fossil fuel products continues to emit greenhouse gases and exacerbate global warming and the City's injuries. Defendants' actions are causing recurring, intermittent, continuous, and/or ongoing harm to the City, including flooding and erosion of City property.

136. Defendants' conduct constitutes a substantial and unreasonable interference with and obstruction of public rights and property, including the public rights to health, safety, and welfare of a considerable number of people who reside in and visit New York City. The safety and property of these people and the safety of municipal property have been harmed, are being harmed, and will be harmed in the future by sea level rise, increased storm surge flooding, extreme heat, and other climate change impacts.

137. Defendants are jointly and severally liable to the City for committing a public nuisance.

138. The City is entitled to relief as set forth below.

### AS A SECOND CAUSE OF ACTION – PRIVATE NUISANCE

139. The City realleges and reaffirms each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

140. Defendants' production, marketing, and sale of massive quantities of fossil fuels, and their promotion of pervasive use of these fossil fuels, have caused, created, assisted in the creation of, maintained, and/or contributed to the current and threatened climate change impacts on the City described above. These impacts are indivisible injuries, and include harms to City property from sea level rise, increased flooding, higher temperatures, increased costs to protect the City's water supply, and increases in the frequency and intensity of precipitation.

70

Defendants' conduct continues to cause, create, assist in the creation of, maintain, and/or contribute to these impacts.

141.    Each Defendant has at all relevant times been aware, and continues to be aware, that the inevitable emissions of greenhouse gases from the fossil fuels it produces combines with the greenhouse gas emissions from fossil fuels produced by the other Defendants, among others, to result in dangerous levels of global warming with grave harms for coastal cities like New York City.  Defendants have promoted the use of fossil fuels at unsafe levels even though they should have known, and in fact have known for many years, of the hazard that such use would create.

142.    Defendants' conduct has been the actual and proximate cause of harm to New York City.  Defendants' conduct, individually and collectively, has been a substantial factor in causing climate change in New York City, which has caused (and will continue to cause) sea level rise, increased flooding, temperature increases, and the other impacts described above. These injuries are the foreseeable result of Defendants' conduct and Defendants were substantially certain at the relevant times that they would occur as a result of their conduct.

143.    Defendants continue to produce, market, and sell massive quantities of fossil fuels, and, as they know, the use of their fossil fuel products continues to emit greenhouse gases and exacerbate global warming and the City's injuries.  Defendants' actions are causing recurring, intermittent, continuous, and/or ongoing harm to the City, including flooding and erosion of City property.

144.    Defendants' conduct constitutes a substantial and unreasonable interference with the City's rights to the use and enjoyment of its property.  City-owned property has been harmed,

is being harmed, and will continue to be harmed in the future by sea level rise, increased storm surge flooding, extreme heat, and other climate change impacts.

145.    Defendants are jointly and severally liable to the City for committing a private nuisance.

146.    The City is entitled to relief as set forth below.

## AS A THIRD CAUSE OF ACTION – TRESPASS

147.    The City realleges and reaffirms each and every allegation set forth in all the preceding paragraphs as if fully stated herein.

148.    Defendants have intentionally produced, marketed, and sold massive quantities of fossil fuels, and promoted their pervasive use, despite their knowledge that such fuels would lead to climate change-related injuries, including sea level rise.  The City has not granted permission to Defendants to engage in this conduct – *i.e.*, to intentionally produce, market, and sell massive quantities of fossil fuels, and promote their pervasive use, all with knowledge by Defendants that doing so would lead to climate change-related injuries (including sea level rise).

149.    Defendants' conduct was substantially certain to result in the invasion of property owned by the City, without permission or right of entry, by way of increased heat, sea level rise, storm surge flooding, and flooding from increased intensity and frequency of precipitation. These invasions are now occurring, and will continue to occur onto additional City-owned property in the future.  The City has not granted permission to Defendants to engage in these invasions of the City's property, and the invasions were otherwise unjustified.

150.    Defendants' conduct, individually and collectively, was a substantial factor in causing global warming impacts, including accelerated sea level rise, increased flooding, increased storm inundation, and increased intensity and frequency of precipitation, and was the actual and proximate cause of the invasion of the City's property.

72

151. Defendants continue to produce, market, and sell massive quantities of fossil fuels, and, as they know, the use of their fossil fuel products continues to emit greenhouse gases and exacerbate global warming and the City's injuries. The City has not granted permission to Defendants to engage in this conduct – *i.e.*, to intentionally produce, market, and sell massive quantities of fossil fuels, and promote their pervasive use, all with knowledge by Defendants that doing so would lead to climate change-related injuries (including sea level rise). Defendants' actions are causing recurring, intermittent, continuous, and/or ongoing harm to the City, including flooding and erosion of City property.

152. Defendants' conduct constitutes a continuing, unauthorized intrusion and a continuing trespass onto the City's property. Defendants' continued trespass has caused, and will continue to cause, substantial damage to the City. The City has not granted permission to Defendants to engage in these intrusions and trespasses on the City's property, which are otherwise unjustified.

153. The City is entitled to relief as set forth below.[93]

## JURY TRIAL DEMANDED

154. Plaintiff demands a trial by jury for all issues triable by jury.

## RELIEF REQUESTED

**WHEREFORE**, the City respectfully requests a judgment against all Defendants awarding the City:

1. Compensatory damages in an amount according to proof, for the costs already incurred by the City to protect City infrastructure and property, and to protect the public health, safety, and property of its residents from the impacts of climate change;

---

[93] The City does not seek equitable relief or damages with respect to any federal land under any of its causes of action.

73

2.      Compensatory damages in an amount according to proof, of the costs of actions

the City is currently taking and needs to take to protect City infrastructure and property, and to

protect the public health, safety, and property of its residents from the impacts of climate change;

3.      An equitable order ascertaining the damages and granting an injunction to abate

the public nuisance and trespass that would not be effective unless Defendants fail to pay the

court-determined damages for the past and permanent injuries inflicted;

4.      Costs and disbursements of this action as permitted by law;

5.      Attorneys' fees as permitted by law;

6.      Pre- and post-judgment interest as permitted by law; and

7.      Such other relief as this Court deems just and proper.


Dated:          March 16, 2018
                New York, New York


                                ZACHARY W. CARTER
                                Corporation Counsel of the City of New York
                                Attorney for Plaintiff
                                100 Church Street
                                New York, New York 10007
                                (212) 356-2070


                                By:      /s/ Susan E. Amron
                                    Susan E. Amron, samron@law.nyc.gov
                                    Kathleen C. Schmid, kschmid@law.nyc.gov
                                    Sarah Kogel-Smucker, skogel@law.nyc.gov
                                    Margaret C. Holden, maholden@law.nyc.gov
                                        (admitted *pro hac vice*)
                                    Noah Kazis, nkazis@law.nyc.gov
                                        (admitted *pro hac vice*)


*Of Counsel*

STEVE W. BERMAN (admitted *pro hac vice*)
steve@hbsslaw.com
EMERSON HILTON (admitted *pro hac vice*)

emersonh@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Ave. Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

MATTHEW F. PAWA
mattp@hbsslaw.com
BENJAMIN A. KRASS (admitted *pro hac vice*)
benk@hbsslaw.com
WESLEY KELMAN
wesk@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1280 Centre Street, Suite 230
Newton Centre, Massachusetts 02459
Telephone: (617) 641-9550
Facsimile: (617) 641-9551

CHRISTOPHER A. SEEGER
STEPHEN A. WEISS
DIOGENES P. KEKATOS
CSeeger@seegerweiss.com
SWeiss@seegerweiss.com
DKekatos@seegerweiss.com
**SEEGER WEISS LLP**
77 Water Street
New York, New York 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799



Exhibit 1:  "Range of Global Mean Temperature From 1850 to the Present with the Projected
               Instantaneous Climatic Response to Increasing CO2 Concentrations"

Source:  M.B. Glasser, Memo for Exxon management (Nov. 12, 1982), pp. 1, 28

# EXXON RESEARCH AND ENGINEERING COMPANY

P.O. BOX 101, FLORHAM PARK, NEW JERSEY 07932

M. B. GLASER
Manager
Environmental Affairs Programs

Cable: ENGREXXON, N.Y.

November 12, 1982

CO$_2$ "Greenhouse" Effect

82EAP 266

TO:  See Distribution List Attached

Attached for your information and guidance is briefing
material on the CO$_2$ "Greenhouse" Effect which is receiving increased
attention in both the scientific and popular press as an emerging
environmental issue.  A brief summary is provided along with a more
detailed technical review prepared by CPPD.

The material has been given wide circulation to Exxon
management and is intended to familiarize Exxon personnel with the
subject.  It may be used as a basis for discussing the issue with
outsiders as may be appropriate.  However, it should be restricted
to Exxon personnel and not distributed externally.

Very truly yours,

*M. B. Glaser*

M. B. GLASER

MBG:rva

Attachments

H. N. WEINBERG

NOV 15 1982

Case 3:17-cv-06011-WHA Document 187-1 Filed 03/16/18 Page 302 of 127

## Figure 9

Range of Global Mean Temperature From 1850 to the Present
with the Projected Instantaneous Climatic Response to
Increasing $CO_2$ Concentrations.

