CITY OF OAKLAND
BARBARA J. PARKER, State Bar #069722
City Attorney
MARIA BEE, State Bar #167716
Special Counsel
ERIN BERNSTEIN, State Bar #231539
Supervising Deputy City Attorney
MALIA MCPHERSON, State Bar #313918
Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Tel.: (510) 238-3601
Fax: (510) 238-6500
Email: ebernstein@oaklandcityattorney.org

Attorneys for Plaintiffs
CITY OF OAKLAND and
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through the Oakland City
Attorney BARBARA J. PARKER
[Other Counsel Listed on Signature Page]

CITY AND COUNTY OF SAN FRANCISCO
DENNIS J. HERRERA, State Bar #139669
City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA, State Bar #238896
Deputy City Attorney
MATTHEW D. GOLDBERG, State Bar
#240776
Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:  (415) 554-4748
Facsimile:  (415) 554-4715
Email: matthew.goldberg@sfcityatty.org

Attorneys for Plaintiffs
CITY AND COUNTY OF SAN FRANCISCO
and PEOPLE OF THE STATE OF
CALIFORNIA, acting by and through the San
Francisco City Attorney
DENNIS J. HERRERA
[Other Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF OAKLAND, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the Oakland City Attorney,<br><br>        Plaintiffs,<br><br>        v.<br><br>BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS, a Delaware corporation, EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,<br><br>        Defendants. | Case No.: 3:17-cv-06011-WHA<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO BP P.L.C.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**<br><br><br>Hearing Date:  May 24, 2018<br>Hearing Time:  8:00 a.m.<br>Courtroom  12 (19th floor)<br>Judge:  Hon. William Alsup |

CHEVRON CORP.,

        Third Party Plaintiff,

v.

STATOIL ASA,

        Third Party Defendant.

---

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the San Francisco City Attorney DENNIS J. HERRERA, <br><br>       Plaintiffs, <br><br>       v. <br><br> BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS, a Delaware corporation, EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10, <br><br>           Defendants. | Case No.: 3:17-cv-06012-WHA <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO BP P.L.C.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** <br><br><br> Hearing Date:  May 24, 2018 <br> Hearing Time:  8:00 a.m. <br> Courtroom  12 (19th floor) <br> Judge:  Hon. William Alsup |

---

CHEVRON CORP.,

        Third Party Plaintiff,

v.

STATOIL ASA,

        Third Party Defendant.

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ...................................................................................................1

II.  FACTUAL BACKGROUND ..................................................................................2

     A.   BP makes the business decision within the BP Group to produce fossil fuels at
          massive levels, taking into account climate change. ....................................2

     B.   BP engages in production, sales and promotion of fossil fuels in California ............4

     C.   BP has contributed to the global warming nuisance, which is causing severe injuries
          to the Cities. ............................................................................6

III. LEGAL STANDARD .............................................................................................6

IV.  ARGUMENT ......................................................................................................7

     A.   This Court has specific jurisdiction over the Cities' claims against BP .....................7

          1.   BP does not challenge that it puposefully directed its activities
               to California. .............................................................................7

          2.   The Cities' claims arise out of or relate to BP's conduct in California. ...........9

          3.   The Lombardo Declaration should be disregarded as inadmissible
               expert testimony……………………………………………………………16

     B.   Exercising personal jurisdiction over BP is reasonable. .........................................18

     C.   Alternatively, the Cities are entitled to jurisdictional discovery. .............................20

V.   CONCLUSION ..................................................................................................21

**Cases**

*In re "Agent Orange" Prod. Liab. Litig.*,
    597 F. Supp. 740 (E.D.N.Y. 1984) ........................................................................... 14

*Adidas Am., Inc. v. Cougar Sport, Inc.*,
    169 F. Supp. 3d 1079 (D. Or. 2016) .......................................................................... 9

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
    874 F.3d 1064 (9th Cir. 2017) ............................................................................. 7, 8

*Bancroft & Masters, Inc. v. August Nat'l, Inc.*,
    223 F.3d 1082 (9th Cir. 2000) .............................................................................. 18

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) ................................................................................ 14

*Brackett v. Hilton Hotels Corp.*,
    619 F. Supp. 2d 810 (N.D. Cal. 2008) .................................................................. 16

*Brayton Purcell LLP v. Recordon & Recordon*,
    606 F.3d 1124 (9th Cir. 2010) ................................................................................ 6

*Bristol-Myers Squibb Co. v. Superior Court*,
    137 S. Ct. 1773 (2017) ......................................................................................... 15

*Burlington Northern & Santa Fe Ry. v. United States*,
    556 U.S. 599 (2009) ............................................................................................. 14

*California Brewing Co. v. 3 Daughters Brewing LLC*,
    2016 WL 1573399 (E.D. Cal. Apr. 19, 2016) ......................................................... 9

*California v. Gold Run Ditch & Mining Co.*,
    4 P. 1152 (Cal. 1884) ........................................................................................... 13

*Chunghwa Telecom Global v. Medcom*,
    2016 WL 5815831 (N.D. Cal. Oct. 5, 2016) ........................................................ 18

*City of Tulsa v. Tyson Foods, Inc.*,
    258 F. Supp. 2d 1263 (N.D. Okla. 2003) ............................................................. 13

*Copart, Inc. v. Sparta Consulting, Inc.*,
    2018 WL 1871414 (E.D. Cal. Apr. 19, 2018) ...................................................... 17

*Cortina v. Bristol-Myers Squibb Co.*,
    2017 WL 2793808 (N.D. Cal. June 27, 2017) ...................................................... 10

*Cox v. City of Dallas*,
  256 F.3d 281 (5th Cir. 2001) ................................................................. 12

*Deflecto, LLC v. Dundas *Jafine Inc.*,
  2015 WL 6755316 (W.D. Mo. Nov. 4, 2015) ................................. 17, 18

*Doe v. Am. Nat'l Red Cross*,
  112 F.3d 1048 (9th Cir. 1997) ............................................................. 15

*Doe v. Unocal Corp.*,
  248 F.3d 915 (9th Cir. 2001) ............................................................... 15

*Dubose v. Bristol-Myers Squibb Co.*,
  2017 WL 2775034 (N.D. Cal. June 27, 2017) ..................................... 10

*Elec. Recyclers Int'l, Inc. v. Calbag Metals Co.*,
  2015 WL 1529490 (E.D. Cal. Apr. 2, 2015) .......................................... 9

*Exxon Mobil Corp. v. Attorney Gen.*,
  2018 WL 1769759 (Mass. Apr. 13, 2018) ............................................ 12

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................ 12

*Hendricks v. New Video Channel America*,
  2015 WL 3636983 (C.D. Cal. June 8, 2015) ........................................ 11

*Holland America Line, Inc. v. Wartsila North America, Inc.*,
  485 F.3d 450 (9th Cir. 2007) ................................................................. 8

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  2008 WL 504098 (N.D. Cal. Feb. 19, 2008) ........................................ 18

*Illinois v. Milwaukee*,
  1973 U.S. Dist. LEXIS 15607 (N.D. Ill. Jan. 1, 1973) ......................... 18

*Illumina, Inc. v. Qiagen NV*,
  2016 WL 3902541 (N.D. Cal. July 19, 2016) ...................................... 20

*Kabo Tool Co. v. Porauto Indus. Co.*,
  2013 WL 5328496 (D. Nev. Sep. 20, 2013) ......................................... 19

*Keeton v. Hustler Magazine*,
  465 U.S. 770 (1984) ................................................................... 1, 9, 10

*Landers v. East Texas Salt Water Disposal Co.*,
  248 S.W.2d 731 (Tex. 1952) ................................................................ 13

*Laub v. United States DOI*,
  342 F.3d 1080 (9th Cir. 2003) ............................................................. 20

iii

*Learjet, Inc. v. Oneok, Inc.*,
   715 F.3d 716 (9th Cir. 2013) .................................................................................. 9

*Macias v. Waste Mgmt. Holdings, Inc.*,
   2014 WL 4793989 (N.D. Cal. Sept. 25, 2014) ...................................................... 20

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
   647 F.3d 1218 (9th Cir. 2011) .......................................................................... 11, 12

*Michie v. Great Lakes Steel Div. Nat'l Steel Corp.*,
   495 F.2d 213 (6th Cir. 1974) ................................................................................ 13

*Milward v. Acuity Specialty Prods. Grp.*,
   969 F. Supp. 2d 101 (D. Mass. 2013) ................................................................... 13

*Morin v. United States*,
   534 F. Supp. 2d 1179 (D. Nev. 2005) ................................................................... 17

*Mytee Prod. Inc. v. HD Prod. Inc.*,
   2009 WL 10672416 (S.D. Cal. Mar. 12, 2009) ..................................................... 17

*North Sister Publ'g, Inc. v. Schefren*,
   2015 U.S. Dist. LEXIS 64637 (D. Or. Apr. 6, 2015) ........................................... 20

*Panavision Int'l, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998) .............................................................................. 18

*Pebble Beach Co. v. Caddy*,
   453 F.3d 1151 (9th Cir. 2006) ................................................................................ 8

*Picot v. Weston*,
   780 F.3d 1206 (9th Cir. 2015) .............................................................................. 12

*Police & Fire Ret. Sys. of City of Detroit v. Watkins*,
   2011 WL 5307594 (E.D. Mich. Nov. 3, 2011) ..................................................... 17

*Richmond Techns., Inc. v. Aumtech Business Solutions*,
   2011 WL 2607158 (N.D. Cal. July 1, 2011) ......................................................... 19

*SA Luxury Expeditions LLC v. Latin Am. for Less, LLC*,
   2014 WL 6065838 (N.D. Cal. Nov. 12, 2014) ...................................................... 20

*Shute v. Carnival*,
   897 F.2d 377 (9th Cir. 1990) ................................................................................ 10

*Sinatra v. National Enquirer, Inc.*,
   854 F.2d 1191 (9th Cir. 1988) .............................................................................. 19

*Sullivan v. Ford*,
   2016 WL 6520174 (N.D. Cal. Nov. 3, 2016) ....................................................... 15

iv

*Terracom v. Valley Nat'l Bank*,
    49 F.3d 555 (9th Cir. 1995) ................................................................................. 15, 16

*The Lockwood Co. v. Lawrence*,
    77 Me. 297 (Me. 1885) ............................................................................................... 13

*United States v. Chem-Dyne Corp.*,
    572 F. Supp. 802 (S.D. Ohio 1983) ........................................................................... 14

*Universal Stabilization Techns., Inc. v. Advanced BioNutrition Corp.*,
    2017 WL 1838955 (S.D. Cal. May 8, 2017). ............................................................ 19

*Velsicol Chem. Corp. v. Rowe*,
    543 S.W.2d 337 (Tenn. 1976) ................................................................................... 13

*Warren v. Parkhurst*,
    92 N.Y.S. 725 (N.Y. Sup. Ct. 1904) .......................................................................... 13

*Wilden Pump & Eng'g Co. v. Versa-Matic Tool, Inc.*,
    1991 WL 280844 (C.D. Cal. July 29, 1991) ........................................................ 10, 11

*Woodyear v. Schaefer*,
    57 Md. 1 (Md. 1881) .................................................................................................. 13

**Statutes**

Outer Continental Shelf Lands Act ................................................................................. 11

**Other Authorities**

Fed. R. Civ. P. 4(k)(1)(A) ................................................................................................. 7

Fed. R. Civ. P. 4(k)(2) ...................................................................................................... 8

Fed. R. Evid. 701 ............................................................................................................ 18

Fed. R. Evid. 702 ....................................................................................................... 16, 18

Restatement (Second) of Torts § 433B(2) ...................................................................... 12

Restatement (Second) of Torts § 840E (1979) ............................................................... 13

Restatement (Second) of Torts § 881 cmt. d .................................................................. 14

Richard Heede, *Tracing Anthropogenic Carbon Dioxide and Methane Emissions to
    Fossil Fuel and Cement Producers, 1854–2010* ......................................................... 6

# I.   INTRODUCTION

BP p.l.c. ("BP") has, during the relevant time period, produced, imported, refined, sold and promoted fossil fuels in California.  Its promotion and sales in California continue to this day.  These California-based actions are substantial and an inextricable part of BP's overall contribution to global warming.  BP does not contest that its in-state business operations constitute purposively directing tortious activity to California.

BP's primary argument against personal jurisdiction – that its California-based contribution to global warming must cause all of the injury to the Plaintiffs ("Cities") – is an incorrect statement of the but-for personal jurisdiction causal standard.  Courts routinely assert jurisdiction where the plaintiff's injury was produced by nationwide conduct that extends into the forum state, without requiring the plaintiff to show that the injury was caused by just the slice that occurred in the forum.  Most notably, in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984), the Supreme Court sustained jurisdiction in a defamation case based on the fact that the defendant had sold a few thousand magazines in New Hampshire even though the injury was caused by the totality of the much greater sales nationwide.  Similarly, courts in this jurisdiction repeatedly have held – in cases where the defendant's overall conduct both in the forum and outside the forum have caused the plaintiff's injury – that the but-for causal test is satisfied regardless of whether the California conduct alone would have produced the injury.  These courts have rejected BP's rigid version of the but-for rule, which would require the California conduct alone to produce the entire injury, as leading to an "absurd result."  The California-based conduct need only be "part" of the overall national (or international) causal chain to satisfy the-but for test.  This approach to personal jurisdiction causation is particularly appropriate here, where causation on the merits is governed by a multiple contributor rule that does not require each defendant's contribution standing alone to cause the nuisance, only that it knows that its contribution is combining with others' to cause the nuisance.

## II.    FACTUAL BACKGROUND

### A.    BP makes the business decision within the BP Group to produce fossil fuels at massive levels, taking into account climate change.

BP is a publicly traded, multinational, vertically integrated oil and gas company that does business in California.  First Amended Complaint ("FAC") ¶ 16.[1]  BP is one of the largest investor-owned fossil fuel corporations in the world as measured by historic production of fossil fuels.  *Id*. ¶¶ 2, 94.  BP acknowledges that it is the ultimate parent company for numerous subsidiaries in the BP group that find and produce oil and gas worldwide, that refine oil into fossil fuel products such as gasoline, and that market and sell oil, fuel and other refined petroleum products, and natural gas worldwide.[2]  BP states in its annual report for 2017 that the BP "group explores for oil and natural gas under a wide range of licensing, joint arrangement and other contractual agreements," but that "[a]ll subsidiary undertakings are controlled by the group."[3]

The BP parent company is the ultimate decisionmaker on the most fundamental decision about the company's core business, *i.e.*, the level of companywide fossil fuels to produce.  BP makes this decision based on a number of factors, including climate change.  BP states in its most recent annual report that it brought "seven major projects in the Upstream [segment, i.e., exploration and production] . . . online and under budget for the portfolio as a whole," and these projects, "along with six we brought online in 2016, have contributed to a 12% increase in our production."[4]  It continued: "That helps to put us on track to deliver 900,000 barrels of new product per day by 2021."[5]  "We also strengthened our portfolio with our most successful year of exploration since 2004, sanctioned three exciting new projects in Trinidad, India and the Gulf of Mexico and added 143% reserves

---

[1] The Cities' first amended complaints are nearly identical; separate citations to each FAC are provided only where necessary.

[2] Declaration of Donna Sanker in Support of BP p.l.c.'s Motion to Dismiss (ECF No. 147-2), ¶ 3.

[3] Decl. of Steve W. Berman in Support of Plaintiffs' Response in Opposition to BP p.l.c.'s Motion to Dismiss for Lack of Personal Jurisdiction ("Berman Decl."), Ex. 1 (BP Annual Report and Form 20-F 2017) at 29, 231, filed concurrently herewith.

[4] *Id.* at 9.

[5] *Id.*

2

replacement for the group."[6]  BP submits annual responses to climate change questionnaires from a

non-profit organization called CDP (formerly the Carbon Disclosure Project).[7]  In its 2016 response,

BP publicly stated that its "Board or individual/sub-set of the Board or other committee appointed by

the Board" is the highest level within the company with direct responsibility for climate change.[8]

Climate change is, of course, a major risk to BP's business because fossil fuels emit carbon dioxide

and thus any significant climate change action may have an impact on BP's business.  BP thus

explains:

> As part of BP's annual planning process, we review the principal risks
> and uncertainties to the group.  We identify those as having a high
> priority for particular oversight by the board and its various
> committees in the coming year.  BP manages, monitors and reports on
> the principal risks and uncertainties that can impact our ability to
> deliver our strategy of meeting the world's energy needs responsibly
> while creating long-term shareholder value.  Climate change and
> carbon pricing are explicitly assessed as risk factors.  Our management
> systems, organizational structures, processes, standards, code of
> conduct and behaviours together form a system of internal control that
> governs how we conduct the business of BP and manage associated
> risks.[9]

BP further states: "Strategic climate-related policy and other relevant non-operational risk is assessed

at a group level."[10]  BP in its CDP response also takes responsibility for companywide production of

fossil fuels by calculating the greenhouse gas emissions resulting from the *use of its products* by

consumers based on "BP's total reported production of natural gas, natural gas liquids and refinery

throughputs."[11]  BP as the parent company also takes responsibility for the global corporate family

on the issue of "stranded assets," i.e. the possibility that fossil fuel reserves may become stranded

---

[6] *Id.*  While BP's report states that "[u]nless otherwise stated, the text does not distinguish
between the activities and operations of the parent company and those of its subsidiaries," it is clear
that these statements refer to global companywide positions and production levels on the topics they
discuss – the company's production "portfolio," new production figures for BP companywide, and
reserves replacements for the "group." *Id.* at 299.

[7] https://www.cdp.net/en.

[8] Berman Decl., Ex. 2 (BP Responses to Climate Change 2016 Information Request from Carbon
Disclosure Project) at 1.  BP's response to the Carbon Disclosure questionnaire was on behalf of all
of its segments, including upstream operations. *Id.* at 26.

[9] *Id.* at 2.

[10] *Id.* at 3.

[11] *Id.* at 40.

assets if, prior to the end of their economic life, they no longer can earn an economic return because of climate change: "BP is well aware of the so-called stranded assets debate and is considering it carefully."[12]

BP's chief executive is responsible for maintaining "BP's system of internal control" that is "employed to conduct the business of BP," and BP's CDP response states: "Climate change risks are reviewed through two executive committees - chaired by the group chief executive, and one working group chaired by the executive vice president and group chief of staff, as part of BP's established management structure."[13] BP describes its "risk management procedures with regard to climate change risks and opportunities," as being "[i]ntegrated into multi-disciplinary companywide risk management processes."[14] BP's motion does not contest that it is the ultimate decisionmaker on companywide production of fossil fuels, including as these decisions take into account climate change risks.

**B.      BP engages in production, sales and promotion of fossil fuels in California.**

BP does business in California, including through multiple agents and subsidiaries that do business in California, have been registered to do business for decades and have a designated agent for service of process in California, including BP America Production Company (registered to do business in California since 1975); BP Amoco Chemical Company (1955); BP Corporation North America (1987); BP Exploration (Alaska) Inc. (1974); BP Pipelines (North America) Inc. (2002); BP Products North America Inc. (1960); and Atlantic Richfield Company (1985). FAC ¶ 35.

Atlantic Richfield Company was headquartered in Los Angeles, California from 1972 through 1999. *Id.* Between 1975 and 1999, Atlantic Richfield produced oil and natural gas in California, and transported, marketed and sold fuel and other refined products in California, including to and through ARCO-branded gasoline stations. *Id.* ¶ 36. BP agents and subsidiaries, BP

---

[12] *Id.* at 3.

[13] *Id.* at 2.

[14] *Id.*

Exploration U.S.A. Inc. and BP Exploration Inc., have been listed as operators for approximately 34 oil and gas, and dry gas wells in California. *Id.*

BP through its subsidiary BP Exploration (Alaska) Inc. produces crude oil in Alaska for shipment, in part, to California. *Id.* ¶ 37. Since 1977, BP subsidiaries have produced and shipped Alaskan crude oil to various locations, including California and the Pacific Northwest Coast. *Id.* BP through its subsidiary BP Shipping (USA) shipped approximately 2.56 billion barrels of crude oil into California, from 1975 to 2010. *Id.*

BP, including through its subsidiaries, refined, marketed, and sold fossil fuel products in California. *Id.* ¶¶ 36-41. BP and the other defendants created and operate a common distribution system that moves fungible and commingled gasoline from refineries through pipelines to large terminal storage tanks for delivery to consumers in California (and elsewhere). *Id.* ¶¶ 33, 39. BP, including through its subsidiaries acting as its agents, owned and operated the Carson refinery near Los Angeles from approximately 1966 through 2013 with a refining capacity of approximately 266,000 barrels of crude oil per day, and which BP described in a press release as "one of the largest on the US West Coast." *Id.* ¶ 38. BP acknowledged in a press release announcing the sale of this refinery that it owned "integrated terminals and pipelines" related to the Carson refinery, including the LA basin pipelines system that moved crude oil, fossil fuel products and intermediates to and from the Carson refinery, and also had marketing agreements with retail gasoline station sites in Southern California. *Id.* Through approximately 2013, BP, through its subsidiaries and agents, owned or operated port facilities in California for receipt of crude oil, including Long Beach Port berths 121 and 78 that supplied crude oil to the Carson refinery. *Id.* In a June 3, 2013 press release posted on BP Global's website, Jeff Pitzer, BP's Northwest Fuels Value Chain President stated: "California remains an important state for us and we remain committed to supplying our customers in Northern California and the rest of the Pacific Northwest with the quality fuels they depend on." *Id.*

BP Global's website currently states that "BP's marketing and trading business has provided energy products and services to California since 1984" and that "[t]oday, the business markets enough natural gas in California to meet the needs of every home in the state's four largest

metropolitan areas: Los Angeles, San Francisco, Riverside and San Diego." *Id.* ¶ 40. It adds that "BP markets enough natural gas in California to meet the energy needs of 6.9 million households." *Id.* And it states that "BP has a significant presence in hundreds of communities across California through gas stations and convenience stores" and that its "footprint includes more than 280 ARCO-licensed and ARCO-branded stations." *Id.* BP also exercises control over gasoline product quality and specifications at these ARCO-branded stations. *Id.* ¶ 39. In addition to these current ARCO stations, BP previously owned and/or operated numerous BP-branded stations in California, and also exercised control over gasoline product quality and specifications at those former gas stations in California. *Id.* BP offers credit cards to consumers through its interactive website to promote sales of gasoline and other products at its branded gasoline stations. *Id.*

**C.  BP has contributed to the global warming nuisance, which is causing severe injuries to the Cities.**

BP, through its fossil fuel business, knowingly has contributed, and continues to contribute, to the global warming nuisance. *Id.* ¶¶ 2, 34, 92, 94(d), 95, 104. BP is the fourth largest cumulative producer of fossil fuels worldwide in history and is responsible for over 2 percent of total atmospheric greenhouse gases ("GHGs") from industrial sources. *Id.* ¶ 94.[15] Defendants are collectively responsible through their production, marketing and sale of fossil fuels for over 11% of all GHG pollution from industrial sources; more than half of current pollution levels from defendants' fossil fuels is attributable to production since 1980. *Id.* ¶¶ 92, 94(b-c). Global warming has caused and continues to cause accelerated sea level rise in San Francisco Bay and the adjacent ocean with severe, and potentially catastrophic, consequences for the Cities and their residents. *Id.* ¶¶ 125, 130-31.

### III.  LEGAL STANDARD

The Cities need make only a *prima facie* showing of jurisdictional facts to satisfy their burden of demonstrating jurisdiction over BP, in the absence of an evidentiary hearing.[16] The Court

---

[15] *See* Table 3 of Richard Heede, *Tracing Anthropogenic Carbon Dioxide and Methane Emissions to Fossil Fuel and Cement Producers, 1854–2010*, Climactic Change, Jan. 2014, cited in FAC at ¶ 101 n.71.

[16] *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010).

must take uncontroverted allegations in the complaints as true, and resolve any factual conflicts and draw all reasonable inferences in favor of the Cities.[17]

## IV. ARGUMENT

**A.     This Court has specific jurisdiction over the Cities' claims against BP.**

Under Rule 4(k)(1)(A), this Court applies California's long-arm statute to determine the Court's jurisdiction over a party, which authorizes jurisdiction to the full extent constitutionally permitted.[18]  To exercise jurisdiction, three requirements must be met: 1) the defendant must purposefully direct its activities toward the forum; 2) the claim must arise out of or relate to the defendant's forum-related activities; and 3) the exercise of jurisdiction must be reasonable, *i.e.*, comport with fair play and substantial justice.[19]  If the Cities meet the first two requirements, the burden shifts to BP to present a compelling case that the exercise of jurisdiction would be unreasonable.[20]

### 1.     BP does not challenge that it purposefully directed its activities to California.

Although BP claims that "[n]one of the requirements for exercising specific jurisdiction is met here," it does not challenge purposeful direction.[21]  The Cities satisfy the purposeful direction requirement because they allege numerous intentional acts purposefully directed at, and indeed performed in, California, including:[22]

- BP makes the companywide decision to produce massive amounts of fossil fuels, including taking into account climate change risks.  BP directs its subsidiaries to operationally carry out this companywide directive in California by producing crude oil in Alaska that it ships to California, and directing its subsidiaries to substantially participate in the refining, marketing, and sales of fossil fuel products in California;

- BP subsidiary and agent Atlantic Richfield Company located its headquarters in Los Angeles, California and between 1975 and 1999 it extracted oil and natural gas in

---

[17] *Id.*

[18] *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1067 (9th Cir. 2017).

[19] *Id.* at 1068.

[20] *Id.* at 1068-69.

[21] BP states that "solely for purposes of this motion it will assume that all fossil fuel production in California or the United States by any indirect subsidiary may be imputed to BP p.l.c."  Br. 2.

[22] *See supra* Section II.

7

California, and transported, marketed and sold fuel and other refined products in California, including to and through ARCO-branded gasoline stations;

- BP Shipping (USA) shipped approximately 2.56 billion barrels of crude oil into California, from 1975 to 2010;

- BP Global's website currently states that "BP has a significant presence in hundreds of communities across California through gas stations and convenience stores" and that its "footprint includes more than 280 ARCO-licensed and -branded stations," that "BP's marketing and trading business has provided energy products and services to California since 1984," that "[t]oday, the business markets enough natural gas in California to meet the needs of every home in the state's four largest metropolitan areas: Los Angeles, San Francisco, Riverside and San Diego," and that "BP markets enough natural gas in California to meet the energy needs of 6.9 million households."

These contacts amply support purposeful direction.

Alternatively, the Court may exercise jurisdiction over BP under Rule 4(k)(2), the federal long-arm statute, which permits the Court to aggregate BP's contacts with the United States as a whole instead of a particular state forum.[23] A defendant that seeks to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed.[24] Otherwise, the Court may exercise jurisdiction over the defendant if the claim arises under federal law and the Court's exercise of personal jurisdiction comports with due process.[25] This Court has determined that the Cities' nuisance claims "are necessarily governed by federal common law"[26] (which the Cities treat as law of the case while preserving all objections), and BP has not identified any court in the United States in which it would submit to jurisdiction.

BP's extensive contacts with the United States—fossil fuel production, marketing and sales, and its extensive advertising and communications to promote pervasive use of its fossil fuel products —directly contribute to global warming and the rising sea levels that cause the Cities' injuries. For example, BP began producing oil at Prudhoe Bay in Alaska in 1977, and has shipped it to various

---

[23] *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1158 (9th Cir. 2006).

[24] *Holland America Line, Inc. v. Wartsila North America, Inc.*, 485 F.3d 450, 461 (9th Cir. 2007).

[25] *Axiom Foods*, 874 F.3d at 1072.

[26] ECF No. 134 at 3 in 3:17-cv-06012-WHA.

8

ports around the world.[27]  BP's website states: "BP . . . operates the entire Greater Prudhoe Bay area, which . . . produces around 55 percent of Alaska's oil and gas, and in 2016 it averaged nearly 281,000 barrels of oil equivalent each day," and that "BP also owns interests in seven other North Slope oil fields, including Alaska's newest oil and gas field, Point Thomson."[28]  In addition to Alaska and California, its website indicates that BP conducts significant fossil fuel production, marketing and sales business in Colorado, Illinois, Indiana, Louisiana, New Jersey, New Mexico, Ohio, Oklahoma, South Carolina, Washington, and Wyoming.[29]

> ### 2. The Cities' claims arise out of or relate to BP's conduct in California.

The second prong of the personal jurisdiction test involves a causal analysis.  The Ninth Circuit has adopted a but-for test:  "Under the 'but for' test, 'a lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action.'"[30]  Courts do not apply this test "stringently."[31]  BP argues that the Cities cannot satisfy this requirement because BP's production, sales and promotion of fossil fuels in California did not by themselves cause *all* of the Plaintiffs' injuries.  But where the plaintiff's injuries have been caused by the totality of national conduct, personal jurisdiction exists if the defendant undertook some of this conduct within the forum.

For example, in *Keeton v. Hustler Magazine, Inc.*, the Supreme Court held that a court could exercise personal jurisdiction over a non-resident tortfeasor even though "the bulk of the harm done

---

[27] FAC ¶ 42.

[28] *Id.*

[29] *Id.*

[30] *Learjet, Inc. v. Oneok, Inc.*, 715 F.3d 716, 742 (9th Cir. 2013) (quoting *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 894 (9th Cir. 1996)), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591, 191 L. Ed. 2d 511 (2015).

[31] *Adidas Am., Inc. v. Cougar Sport, Inc.*, 169 F. Supp. 3d 1079, 1085, 1092–93 (D. Or. 2016) (test "should not be narrowly applied; rather, the requirement is merely designed to confirm that there is some nexus between the cause of action and defendant's contact with the forum"; sustaining jurisdiction where defendant's infringing product was purchased over the web by only three people in the forum) (quotation marks omitted); *California Brewing Co. v. 3 Daughters Brewing LLC*, 2016 WL 1573399, at *6 (E.D. Cal. Apr. 19, 2016) ("Despite its apparently strict language, many district courts in the Ninth Circuit have not applied the 'but for' test stringently"); *Elec. Recyclers Int'l, Inc. v. Calbag Metals Co.*, 2015 WL 1529490, at *4 (E.D. Cal. Apr. 2, 2015) ("Despite the apparently strict language of the but-for test, the Ninth Circuit has not applied the [but-for] test stringently.").

9

to [the plaintiff] occurred outside" the state.[32]  In *Keeton*, the defendant publisher was sued in New Hampshire by a plaintiff seeking "nationwide damages" for allegedly libelous statements made in the national publication.[33]  Even though New Hampshire represented only a tiny fraction of the defendant's national sales, and even though the libelous reports were apparently investigated, written, edited, or produced elsewhere, the Court held that the defendant's actions in "carrying on a 'part of its general business' in New Hampshire . . . is sufficient to support jurisdiction when the cause of action arises out of the very activity being conducted, in part, in New Hampshire."[34]

Subsequent cases have continued to make clear that the defendant's forum-based activities need not cause the entire harm.  For example, in *Dubose v. Bristol-Myers Squibb Co*., a resident of South Carolina sued foreign corporations in California for failure to warn and fraudulent misrepresentation with respect to a drug product that the defendants had tested at clinical trials in California and many other states.[35]  The court, applying the Ninth Circuit's but-for test and upholding jurisdiction, rejected the defendants' argument that there is a numerical threshold for in-state conduct when the injury is caused by conduct spread across many jurisdictions:

> What would that threshold be?  If 25 percent of the clinical trials were conducted in California, would that be enough?  50 percent?  75 percent?  The point is that our existing case law provides no basis for imposing an arbitrary cut-off, and the Court is disinclined to fashion a new barrier to the exercise of its jurisdiction from whole cloth.[36]

The court held that since the California clinical trials were "*part of* the unbroken chain of events leading to plaintiff's injury" they did not have to be the sole cause of the injury.[37]  Similarly, in *Wilden Pump & Engineering Co. v. Versa-Matic Tool, Inc.*, a California plaintiff sued a

---

[32] 465 U.S. 770, 780 (1984).

[33] *Id*. at 775.

[34] *Id*.; *see also Shute v. Carnival*, 897 F.2d 377, 386 (9th Cir. 1990) (upholding personal jurisdiction where defendant had advertised in forum state but had no offices, employees or assets in the forum).

[35] 2017 WL 2775034 (N.D. Cal. June 27, 2017).  The *Dubose* court simultaneously issued an identical ruling in a companion case brought by a New York plaintiff.  *Cortina v. Bristol-Myers Squibb Co.*, 2017 WL 2793808 (N.D. Cal. June 27, 2017).

[36] 2017 WL 2775034 at *4.

[37] *Id*. at *3 (emphasis added).

10

Pennsylvania manufacturer for patent infringement and the manufacturer's sales of the product to California were only one to three percent of its annual sales. The court rejected an interpretation of the but-for test that would require just the California sales to cause the injury as leading to an "absurd result."[38]

Copyright cases have reached the same result. In *Mavrix v. New Video Channel America*, the Ninth Circuit upheld specific jurisdiction where the defendant's website largely "court[ed] a national audience" but also had "specific ties" to California.[39] And in *Hendricks v. New Video Channel America*, the court held that defendants' promotion and distribution of the copyrighted material in California satisfied the causal relationship test, even though the defendants' conduct had occurred nationwide. Like *Wilden Pump*, the court interpreted the but-for test to avoid the "absurd result" that California conduct contributing to a California injury could not give rise to specific personal jurisdiction where the nature of the claim involved the defendant's nationwide injurious conduct.[40] These cases demonstrate that personal jurisdiction exists where a large and harmful course of conduct extends into the forum state; forum conduct alone need not cause the injury.[41]

Here, BP engages or has engaged during the relevant time period in substantial in-state conduct to produce, sell and promote its fossil fuels. Its website even "offers credit cards to consumers … to promote sales of gasoline and other products at its branded gasoline stations, including BP-branded retail stations in the United States," and upon information and belief, formerly did so for BP-branded retail stations in California, much like the website in *Mavrix* was the but-for cause of injuries merely by making copyrighted photographs "accessible to users" in

---

[38] 1991 WL 280844, at *4 (C.D. Cal. July 29, 1991).

[39] 647 F.3d 1218, 1222 (9th Cir. 2011).

[40] 2015 WL 3616983, at *7 & n.11 (C.D. Cal. June 8, 2015).

[41] And while BP accuses the Cities of taking a contrary position in their motion to remand, Br. 12, the Cities have in fact been consistent: their claims are "not dependent on any one subset of defendants' fossil fuel production activities" but stem from all of the conduct. ECF No. 64 at 25:24 in 3:17-cv-06012-WHA. In fact, it is defendants that have contradicted themselves by arguing that a but-for jurisdictional test under the Outer Continental Shelf Lands Act ("OCSLA") was satisfied by virtue of the fact that "some portion of [the Cities'] injuries – i.e. some amount of sea level rise – is attributable to" the subset of Defendants fossil fuel production on the OCS and thus "would not have occurred absent Defendant's operations on the [outer continental shelf]." ECF No. 92 at 31:13-19 in 3:17-cv-06011-WHA.

11

California.[42]  This conduct is another causal factor in the Cities' injuries, insofar as the nuisance was caused both by production and by activities promoting additional consumption – promotions aimed in part at California, one of the largest markets for fossil fuels in the country.  BP has numerous BP-branded franchises in the United States (and also formerly in California) over which it exercises substantial contractual control with respect to promotion of fossil fuels.  *Exxon Mobil Corp. v. Attorney Gen.*, 2018 WL 1769759, at *4-6 (Mass. Apr. 13, 2018) (upholding personal jurisdiction over Exxon based upon its advertising of its fossil fuel products in Massachusetts, its interactive web site allowing consumers to locate over 300 Exxon branded gas stations in the state, and Exxon's control over the promotion of its products in the state by way of a master franchise agreement).

Moreover the personal jurisdiction analysis "depends, to a significant degree, on the specific type of tort … at issue"[43]—which in this case is nuisance.  Nuisance has a well-established causal standard applicable in multiple tortfeasor cases that emphatically does not require the plaintiff to untangle which molecules came from where.  Nuisance liability only requires that a defendant "contributes" to the nuisance.  *Cox v. City of Dallas*, 256 F.3d 281, 292 n.19 (5th Cir. 2001).  In a tort case involving multiple contributors to a nuisance where the pollution has mixed together, there is an indivisible injury and the plaintiff need only demonstrate that each defendant "contributed" to the nuisance.  The law emphatically does not put the plaintiff to the impossible burden of untangling which molecules came from where.  Indeed, the burden of apportionment is on the defendant.[44]  And it is no defense that the defendant's conduct by itself would not have caused the harm, even when there are a great many contributors.  So long as the defendant is aware that its conduct combines with that of others to create the harm, the defendant may be held liable.  Environmental cases involving multiple contributors to an indivisible pollution problem are textbook examples of this principle.

---

[42] FAC ¶ 39; *Mavrix*, 647 F.3d at 1228.

[43] *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (analyzing purposeful direction element); *cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (courts may not "raise the standing hurdle higher than the necessary showing for success on the merits in an action").

[44] Restatement (Second) of Torts § 433B(2).

12

Three seminal cases long ago established the principle that those who substantially contribute to a nuisance are liable, even when there are very large numbers of others who also contribute to the indivisible pollution problem.[45]  This principle is now set forth in the Restatement and has been followed in many modern cases.  As the Restatement notes, "the fact that other persons contribute to a nuisance is not a bar to the defendant's liability for his own contribution."[46]  This is true even if each defendant's contribution to the nuisance, standing alone, would not subject him to liability – a common fact pattern in pollution cases involving multiple polluters.[47]  Prosser and Keeton state the same rule:

> A number of courts have held that acts which individually would be innocent may be tortious if they thus combine to cause damage, in cases of pollution . . . .  The explanation is that the standard of reasonable conduct applicable to each defendant is governed by the circumstances, including the activities of the other defendants.[48]

This causation principle in multiple-tortfeasor cases where there is indivisible environmental injury is widely accepted.[49]  In a recent opinion, Judge Posner, writing for the *en banc* Seventh Circuit, summarized the law:

---

[45] *See California v. Gold Run Ditch & Mining Co.*, 4 P. 1152, 1156 (Cal. 1884) (defendant's pollution alone would not have caused injury given the "vast amount" of mining previously and currently undertaken on the river by numerous others but defendant still liable for contributing to the nuisance); *Woodyear v. Schaefer*, 57 Md. 1, 9 (Md. 1881) ("It is no answer to a complaint of nuisance that *a great many others* are committing similar acts of nuisance upon the stream.") (emphasis added); *The Lockwood Co. v. Lawrence*, 77 Me. 297 (Me. 1885) (same).

[46] Restatement (Second) of Torts § 840E (1979); *see also id.* § 875.

[47] *Id.* § 840E cmt. b; *see also Milward v. Acuity Specialty Prods. Grp.*, 969 F. Supp. 2d 101, 111 n.5 (D. Mass. 2013) (defendant's product by itself need not be a sufficient cause of the harm).

[48] Prosser & Keeton § 52; *see also id.* § 88B ("One may pollute a stream to some extent without any harm, but if several do the same thing the plaintiff's use of the stream may be destroyed.  It has been held consistently in these cases that each defendant is liable.").

[49] *See, e.g., Michie v. Great Lakes Steel Div. Nat'l Steel Corp.*, 495 F.2d 213, 215-18 (6th Cir. 1974); *City of Tulsa v. Tyson Foods, Inc.*, 258 F. Supp. 2d 1263, 1297 (N.D. Okla. 2003) ("[W]here there are multiple tortfeasors and the separate and independent acts of codefendants 'concurred, commingled and combined' to produce a single indivisible injury for which damages are sought, each defendant may be liable even though his/her acts alone might not have been a sufficient cause of the injury."), *vacated by settlement*, 2003 U.S. Dist. LEXIS 23416 (N.D. Okla. July 16, 2003); *Velsicol Chem. Corp. v. Rowe*, 543 S.W.2d 337, 343 (Tenn. 1976); *Landers v. East Texas Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952); *Warren v. Parkhurst*, 92 N.Y.S. 725, 727 (N.Y. Sup. Ct. 1904) (where "the act of one defendant would not so contaminate the stream that the plaintiff could complain of him" each is liable because "while each defendant acts separately, he is acting at the same time in the same manner as the other defendants, knowing that the contributions

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> Even if the amount of pollution caused by each party would be too slight to warrant a finding that any one of them had created a nuisance (the common law basis for treating pollution as a tort), "pollution of a stream to even a slight extent becomes unreasonable [and therefore a nuisance] when similar pollution by others makes the condition of the stream approach the danger point. The single act itself becomes wrongful because it is done in the context of what others are doing." Keeton et al., supra, § 52, p. 354. . . . If "each [defendant] bears a like relationship to the event" and "each seeks to escape liability for a reason that, if recognized, would likewise protect each other defendant in the group, thus leaving the plaintiff without a remedy," the attempt at escape fails; each is liable. *Id.*, § 41, p. 268.[50]

This principle also has been applied in cases decided under federal common law. For example, in *Illinois v. Milwaukee*, after the Supreme Court remitted the parties to federal district court, the plaintiff proved a case involving eutrophication caused not only by the six municipal defendants' sewage facilities but by thousands if not millions of "non-point" sources of nitrogen and phosphorous, such as farms and airborne sources, that were spread over the entire watershed of Lake Michigan across multiple states and two sovereign nations.[51] The defendants argued that the vast number of contributors defeated liability but the district court disagreed and held the defendants liable: "If defendants' argument were to be adopted, it would be impossible to impose liability on any polluter."[52] In short, the standard for causation on the merits in this multiple tortfeasor case

---

by himself and the others acting in the same way will result necessarily in the destruction of the plaintiff's property."), *aff'd*, 93 N.Y.S. 1009 (App. Div. 1905), *aff'd*, 78 N.E. 579 (N.Y. 1906); *see also In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 823 (E.D.N.Y. 1984) ("In the pollution and multiple crash cases, the degree to which the individual defendant's actions contributed to an individual plaintiff's injuries is unknown and generally unascertainable," yet "all defendants have been held liable").

[50] *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 696-97 (7th Cir. 2008); *accord* Restatement (Second) of Torts § 881 cmt. d ("It is also immaterial that the act of one of them by itself would not constitute a tort if the actor knows or should know of the contributing acts of the others.").

[51] *See* 1973 U.S. Dist. LEXIS 15607, at *15 (N.D. Ill. 1973).

[52] *Id.* at *20-21, *aff'd in rel. part and rev'd in part on other grounds*, 599 F.2d 151 (7th Cir. 1979), *vacated on other grounds,* 451 U.S. 304 (1981). Federal courts apply this indivisible injury rule as a matter of federal common law gap filling under CERCLA in cases that, like air or water pollution, typically involve very large numbers of contributors to hazardous waste sites. *See Burlington Northern & Santa Fe Ry. v. United States*, 556 U.S. 599, 613–15 (2009) (adopting federal common law approach of "seminal" decision in *United States v. Chem-Dyne Corp.*, 572 F. Supp. 802 (S.D. Ohio 1983)).

14

informs the personal jurisdiction analysis and is at odds with BP's interpretation of the but-for test that would require all of the Cities' injuries to be caused solely by a subset of BP's activities.

BP relies principally on *Doe v. American National Red Cross*, where the plaintiff sued multiple Arizona defendants as well a non-resident FDA administrator, claiming that these defendants contributed to her husband contracting AIDS from a blood transfusion he received at an Arizona hospital.[53] The court concluded that the plaintiff's claims did not arise from the federal defendant's contacts with the forum because the federal officer had not "engaged in affirmative conduct allowing or promoting the transaction of business in Arizona," nor controlled distribution of blood products.[54] Here, however, BP has engaged in affirmative acts in the forum causing the Cities' injuries – producing oil and natural gas in California, producing oil in Alaska and shipping it to California, owning and operating a gasoline refinery in California for over forty years, and owning port facilities for receipt of crude oil in California.

*Doe v. Unocal Corp.*, also cited by BP, is inapposite because the sole basis asserted for exercising jurisdiction there was a contract defendant executed with a resident corporation, the contract was not negotiated or executed in California, not governed by California law, and had nothing to do with California.[55] *Sullivan v. Ford Motor Co.*, is likewise distinguishable because the truck that was the subject of the plaintiff's product liability claim was constructed and purchased out-of-state and the tailgate that caused the injury was made by a third party, therefore there was no causal connection between the defendant's substantial presence in California and the plaintiff's claim.[56] Similarly, in *Bristol-Myers Squibb Co. v. Superior Court*, the plaintiffs brought a product defect claim in California, but their purchase, use and injury from the product all occurred elsewhere, and the product was also designed and manufactured outside California.[57] In *Terracom v. Valley National Bank*, the link was too tenuous between the plaintiff's claim of negligent investigation

---

[53] 112 F.3d 1048, 1051-52 (9th Cir. 1997).

[54] *Id.*

[55] *Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001).

[56] 2016 WL 6520174, at *1-3 (N.D. Cal. Nov. 3, 2016).

[57] ___U.S.___ , ___, 137 S. Ct. 1773, 1781 (2017).

against the non-resident bank and its execution of a certificate of sufficiency in support of the bond surety, when the bank had *no knowledge* that the certificate would be used in a federal works project in California.[58]  BP also relies on *Brackett v. Hilton Hotels Corp.*, but that case held that the claim did arise out of the forum contacts because the defendant acquired plaintiff's copyrighted artwork "from this district."  619 F. Supp. 2d 810, 818 (N.D. Cal. 2008).

### 3. The Lombardo declaration should be disregarded as inadmissible expert testimony.

The Lombardo Declaration is not relevant to the Court's analysis of personal jurisdiction because BP does not challenge that it purposefully directed itself at the forum and the Cities need not prove that BP's forum-related conduct is the sole or even primary cause of their injuries.  The Court also should disregard the declaration as improper expert testimony by an attorney with no apparent expertise in the highly technical, scientific issues upon which he attests.

In a peer-reviewed study, Richard Heede and others concluded that BP is the fourth largest cumulative producer of fossil fuels worldwide from the mid nineteenth century to present.  FAC ¶ 94(b) & n.71.  Without providing any basis to explain why he is qualified to engage in a highly technical scientific analysis to calculate BP's alleged contribution to greenhouse gas emissions, global temperature increases and global sea level rise increases, Lombardo purports to do just this.  ECF No. 184-2 ¶ 10.  Lombardo claims to have "replicated Heede's approach and logic for this motion, with adjustments," purportedly to correct errors in Heede's study.  *Id.* ¶¶ 6, 9.  He purports to have "updated Heede's analysis," made "adjustments" to the time period and geographic territory used for Heede's study, used "linear interpolation" where certain data was not available, "estimated" Atlantic Richfield's California natural gas production volumes for certain years using "national sales data," and made "assumptions" to "estimate" BP's purported total U.S. production of fossil fuels, among other adjustments and assumptions.  Lombardo claims to have relied on numerous scientific and other sources not referenced in the amended complaints and attaches almost 400 pages of exhibits to his declaration.[59]

---

[58] 49 F.3d 555, 557 (9th Cir. 1995).

[59] *See, e.g.,* Exs. 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18; *see also, e.g.,* ¶¶ 21-24.

16

But an expert witness must be "qualified to testify" by "knowledge, skill, experience, training, or education."[60] "In assessing whether an expert has the appropriate qualifications, the court considers whether the expert offers some special knowledge, skills, experience, training or education on the subject matter of the testimony contemplated."[61] "If an expert is not qualified to render an opinion on a particular question or subject, it follows her opinion cannot assist the trier of fact as to that particular question or subject."[62]

Courts routinely exclude attorney-experts on substantive areas outside their legal profession.[63] For example, in *Police & Fire Retirement Systems of City of Detroit v. Watkins*, the district court held inadmissible the proffered expert testimony by an attorney about the valuation of companies, carbon credits and related topics:

> Mr. Watkins is a lawyer. He does not have an advanced degree-or any degree-in business economics or accounting, nor is he a member of any professional organizations that establish mandatory standards for business valuations. He has no training in environmental science or carbon emissions that would qualify him to analyze or valuate carbon credits. He has not published any articles on asset valuation, and has never testified as an expert witness.[64]

Similarly, in *Deflecto, LLC v. Dundas *Jafine Inc.*, a patent case, the plaintiff sought to have an attorney testify regarding venting technologies; while the attorney had some experience in the subject matter, the court held that he was not qualified because "most if not all of his experience in

---

[60] *Copart, Inc. v. Sparta Consulting, Inc.*, 2018 WL 1871414, at *13 (E.D. Cal. Apr. 19, 2018); Fed. R. Evid. 702.

[61] *Copart*, 2018 WL 1871414, at *13.

[62] *Id.*

[63] *See Police & Fire Retirement Systems of City of Detroit v. Watkins*, 2011 WL 5307594, at *3 (E.D. Mich. Nov. 3, 2011) (rejecting proposed attorney expert testimony: "an attorney who may develop some functional prowess in presenting a technical defense does not himself become a qualified *expert*."); *Mytee Prod. Inc. v. HD Prod. Inc.*, 2009 WL 10672416, at *3 (S.D. Cal. Mar. 12, 2009) (excluding proposed expert testimony by attorney regarding potential risk of injury from air movers and related topics because opinions are based upon "matters beyond his stated expertise"); *cf. Deflecto, LLC v. Dundas *Jafine Inc.*, 2015 WL 6755316, at *1 (W.D. Mo. Nov. 4, 2015) ("Unless a patent lawyer is also a qualified technical expert, his testimony on these kinds of technical issues is improper and thus inadmissible.") (quotation omitted); *Morin v. United States*, 534 F. Supp. 2d 1179, 1185 (D. Nev. 2005) (even a "lawyer is not by general education and experience qualified to give an expert opinion on every subject of the law") (quotation omitted), *aff'd*, 244 F. App'x 142 (9th Cir. 2007).

[64] 2011 WL 5307594, at *3.

HVAC, heating, ventilating, cooling, and venting was done as an attorney, not as an engineer."[65] Lombardo's proposed testimony should be rejected for the same reasons here – he has no qualifications in the relevant scientific disciplines.

Lombardo's testimony also is inadmissible as lay opinion testimony. Such testimony must not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. This requirement "was added in 2000 to prevent litigants from skirting the *Daubert* standard or the expert disclosure guidelines by introducing expert opinion testimony as lay opinion testimony."[66] Because attorney Lombardo purports to base his testimony on scientific, technical or other specialized knowledge, it is also inadmissible as lay opinion testimony.[67]

**B.      Exercising personal jurisdiction over BP is reasonable.**

Once Plaintiffs establish the first two elements of specific jurisdiction, the burden shifts to BP to present a "compelling case" establishing that the exercise of jurisdiction is unreasonable.[68]

BP correctly identifies the seven factors courts in the Ninth Circuit apply to determine whether the exercise of jurisdiction would be reasonable,[69] but BP does not meet its "heavy burden to present a compelling case that the exercise of jurisdiction is unreasonable."[70]

**The extent of the defendant's purposeful interjection into the forum state**

BP itself is the ultimate decision-maker for companywide fossil fuel production levels, including taking into account climate change, and purposefully injected itself into the State of California by engaging in (or authorizing) nuisance-inducing conduct, including directing its

---

[65] *Deflecto*, 2015 WL 6755316, at *2.

[66] *Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 504098, at *3 (N.D. Cal. Feb. 19, 2008); *see also* Fed. R. Evid. 701, notes to 2000 amendments (rule meant to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing").

[67] The Cities reserve all rights to further object to this purported expert testimony, to further seek its exclusion, and to present their own expert evidence at the appropriate time.

[68] *Bancroft & Masters, Inc. v. August Nat'l, Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000).

[69] *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).

[70] *Chunghwa Telecom Global v. Medcom*, 2016 WL 5815831, at *6 (N.D. Cal. Oct. 5, 2016).

subsidiaries to operationally carry out in California BP's decision to produce massive amounts of fossil fuels.

### The burden on the defendant in defending in the forum

The burden of defending in the State of California is not heavy, given BP's responsibility for companywide fossil fuel production levels and that its subsidiaries have conducted substantial, ongoing business in the State of California for decades that has contributed to Plaintiffs' injuries.[71] "[M]odern advances in communications and transportation have significantly reduced the burden of litigating in another country."[72] [T]o present a 'compelling case' against jurisdiction, [BP] must do more than simply claim, without elaboration, that litigation in a distant country presents an unreasonable burden."[73]

### The extent of the conflict with the sovereignty of the defendant's state

Other than to register an abstract objection to the exercise of personal jurisdiction over a U.K.-based company, BP has not identified any substantive conflicts with the sovereignty of its resident country.

### The forum state's interest in adjudicating the dispute

"California has an interest in protecting its residents [.]"[74] That interest is particularly strong in this case because Plaintiffs bring claims, in part, in their sovereign capacities to adjudicate injuries to Plaintiffs, their residents, and the public.

---

[71] *Kabo Tool Co. v. Porauto Industrial Co.*, 2013 WL 5328496, at *7 (D. Nev. Sep. 20, 2013) ("While jurisdiction in Nevada may not be as convenient to the defendants, it does not present an unreasonable burden. The defendants have been conducting business in Nevada for over 10 years. If the defendants have the ability to sufficiently conduct business, they also have the ability to defend their actions in Nevada.").

[72] *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988).

[73] *Richmond Techns., Inc. v. Aumtech Business Solutions*, 2011 WL 2607158, at *7 (N.D. Cal. July 1, 2011) (finding the exercise of jurisdiction over defendants from India to be reasonable when "Defendants have not alleged that litigation in California would present a serious financial or physical hardship, nor have they suggested that India or some other state has a greater interest in the litigation or would provide a more efficient forum for resolving the dispute.").

[74] *Universal Stabilization Techns., Inc. v. Advanced BioNutrition Corp.*, 2017 WL 1838955, at *6 (S.D. Cal. May 8, 2017).

19

**The most efficient judicial resolution of the controversy**

California is the most efficient forum, given that the injuries alleged occurred in this state as well as some of the injury-inducing conduct.

**The importance of the forum to the plaintiff's interest in convenient and effective relief**

California offers convenient and effective relief for Plaintiffs' nuisance claims; BP has not identified any court that would be more effective or convenient.

**The existence of an alternative forum**

BP has not identified an alternative forum. If the United Kingdom is considered an alternate forum, any inconvenience to BP of litigating in California would merely be transferred to Plaintiffs, who would still be litigating in this Court against defendant Chevron Corporation. This factor favors Plaintiffs.[75]

**C.   Alternatively, the Cities are entitled to jurisdictional discovery.**

In the alternative, to the extent that the Court may not be inclined to deny BP's motion outright, the Cities should be allowed jurisdictional discovery.[76] Discovery would be appropriate, for example, regarding BP's role as the ultimate decisionmaker with respect to levels of companywide production of fossil fuels, its control over global climate policies, and its decisions to have its subsidiaries and agents carry out decisions regarding fossil fuel production and climate policies in California. If the Court considers the Lombardo Declaration and the multiple external sources on which he purports to rely, to be relevant to this motion, the Cities request permission to take expert discovery of Mr. Lombardo.

---

[75] *See, e.g., North Sister Publ'g, Inc. v. Schefren*, 2015 U.S. Dist. LEXIS 64637, at *16 (D. Or. Apr. 6, 2015).

[76] *See, e.g., Laub v. United States DOI*, 342 F.3d 1080, 1093 (9th Cir. 2003); *Illumina, Inc. v. Qiagen NV*, 2016 WL 3902541, at *4-5 (N.D. Cal. July 19, 2016); *SA Luxury Expeditions LLC v. Latin America for Less, LLC*, 2014 WL 6065838, at *2 (N.D. Cal. Nov. 12, 2014); *Macias v. Waste Mgmt. Holdings, Inc.*, 2014 WL 4793989, at *3 (N.D. Cal. Sept. 25, 2014).

# V. CONCLUSION

Because BP's oil and gas business has a direct nexus with Plaintiffs' nuisance allegations, BP's forum contacts related to the nuisance.

Dated: May 3, 2018

Respectfully submitted,

** /s/ *Erin Bernstein*

BARBARA J. PARKER (State Bar #069722)
City Attorney
MARIA BEE (State Bar #167716)
Special Counsel
ERIN BERNSTEIN (State Bar #231539)
Supervising Deputy City Attorney
MALIA MCPHERSON (State Bar #313918)
Attorney
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Tel.: (510) 238-3601
Fax: (510) 238-6500
Email: ebernstein@oaklandcityattorney.org

Attorneys for Plaintiffs
CITY OF OAKLAND and
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through Oakland City Attorney
BARBARA J. PARKER

** Pursuant to Civ. L.R. 5-1(i)(3), the electronic filer has obtained approval from this signatory.

** /s/ *Matthew D. Goldberg*

DENNIS J. HERRERA, State Bar #139669
City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
ROBB W. KAPLA, State Bar #238896
Deputy City Attorney
MATTHEW D. GOLDBERG, State Bar #240776
Deputy City Attorney
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Tel.: (415) 554-4748
Fax.: (415) 554-4715
Email: matthew.goldberg@sfcityatty.org

Attorneys for Plaintiffs
CITY AND COUNTY OF SAN FRANCISCO and
PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through San Francisco City Attorney

21

DENNIS J. HERRERA

    ** Pursuant to Civ. L.R. 5-1(i)(3), the electronic
filer has obtained approval from this signatory.

*/s/ Steve W. Berman*
STEVE W. BERMAN (*pro hac vice*)
steve@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Ave. Suite 3300
Seattle, Washington 98101
Tel.: (206) 623-7292
Fax: (206) 623-0594

SHANA E. SCARLETT (State Bar #217895)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, California 94710
shanas@hbsslaw.com
Tel.: (510) 725-3000
Fax: (510) 725-3001

MATTHEW F. PAWA (*pro hac vice*)
mattp@hbsslaw.com
BENJAMIN A. KRASS (*pro hac vice*)
benk@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1280 Centre Street, Suite 230
Newton Centre, Massachusetts 02459
Tel.: (617) 641-9550
Fax: (617) 641-9551

*Of Counsel Attorneys for Plaintiffs*