1  Theodore J. Boutrous, Jr. (SBN 132099)
      tboutrous@gibsondunn.com
2  Andrea E. Neuman (SBN 149733)
      aneuman@gibsondunn.com
3  William E. Thomson (SBN 187912)
      wthomson@gibsondunn.com
4  Ethan D. Dettmer (SBN 196046)
      edettmer@gibsondunn.com
5  Joshua S. Lipshutz (SBN 242557)
      jlipshutz@gibsondunn.com
6  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
7  Los Angeles, CA 90071
   Telephone:  213.229.7000
8  Facsimile:  213.229.7520

9  Herbert J. Stern (*pro hac vice*)
      hstern@sgklaw.com
10 Joel M. Silverstein (*pro hac vice*)
      jsilverstein@sgklaw.com
11 STERN & KILCULLEN, LLC
   325 Columbia Turnpike, Suite 110
12 Florham Park, NJ 07932-0992
   Telephone:  973.535.1900
13 Facsimile:  973.535.9664

14 *Attorneys for Defendant Chevron Corporation*
   [*Additional Counsel Listed on Signature Page*]

Neal S. Manne (SBN 94101)
   nmanne@susmangodfrey.com
Johnny W. Carter (*pro hac vice*)
   jcarter@susmangodfrey.com
Erica Harris (*pro hac vice* pending)
   eharris@susmangodfrey.com
Steven Shepard (*pro hac vice*)
   sshepard@susmangodfrey.com
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  713.651.9366
Facsimile:  713.654.6666

15

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

18 CITY OF OAKLAND, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Oakland City Attorney,

Plaintiff and Real Party in Interest,

v.

BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS, a Delaware corporation, EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,

Defendants.

First Filed Case:  No. 3:17-cv-6011-WHA
Related Case:      No. 3:17-cv-6012-WHA

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINTS**

Case No. 3:17-cv-6011-WHA

HEARING

DATE: MAY 24, 2018

TIME: 8:00 A.M.

LOCATION: COURTROOM 12, 19TH FLOOR

THE HONORABLE WILLIAM H. ALSUP

Gibson, Dunn &
Crutcher LLP

1   CITY AND COUNTY OF SAN
    FRANCISCO, a Municipal Corporation, and
2   THE PEOPLE OF THE STATE OF
    CALIFORNIA, acting by and through the San
3   Francisco City Attorney DENNIS J.
    HERRERA,

Case No. 3:17-cv-6012-WHA

4

              Plaintiff and Real Party in
5               Interest,

6      v.

7   BP P.L.C., a public limited company of
    England and Wales, CHEVRON
8   CORPORATION, a Delaware corporation,
    CONOCOPHILLIPS, a Delaware corporation,
9   EXXON MOBIL CORPORATION, a New
    Jersey corporation, ROYAL DUTCH SHELL
10  PLC, a public limited company of England and
    Wales, and DOES 1 through 10,

11

              Defendants.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2    I.     INTRODUCTION ...................................................................................................... 1

3    II.    ARGUMENT ............................................................................................................. 1

4           A.    Plaintiffs' Answers to the Court's Questions Highlight the Flaws in Their Case ........ 1

5           B.    Plaintiffs' Federal Common Law Claims Are Displaced and Untenable .................... 6

6           C.    Plaintiffs Have Failed to Show that Their Claims Are Viable ..................................... 9

7           D.    Plaintiffs' Claims Violate the Separation of Powers .................................................. 14

8    III.   CONCLUSION ......................................................................................................... 15

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Am. Elec. Power Co. v. Connecticut,*

4
    564 U.S. 410 (2011) ............................................................................................6, 7, 14, 15

5

*Amigos Bravos v. BLM,*

6
    816 F. Supp. 2d 1119 (D.N.M. 2001) ........................................................................13

7

*Benefiel v. Exxon Corp.,*
    959 F.2d 805 (9th Cir. 1992)......................................................................................13

8

*Boomer v. Atlantic Cement Company,*

9
    26 N.Y.2d 219 (1970) ................................................................................................13

10

*California v. Gen. Motors Corp.,*
    2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ............................................................3

11

*City of Chicago v. Am. Cyanamid Co.,*

12
    355 Ill. App. 3d 209 (2005)..........................................................................................1

13

*City of Columbia v. Omni Outdoor Adver., Inc.,*

14
    499 U.S. 365 (1991)......................................................................................................5

15

*City of Milwaukee v. NL Indus.,*
    315 Wis. 2d 443 (2008)................................................................................................1

16

*City of Modesto Redev. Agency v. Superior Court,*

17
    119 Cal. App. 4th 28 (2004) .........................................................................................2

18

*City of Modesto v. Dow Chem. Co.,*

19
    19 Cal. App. 5th 130 (2018) .........................................................................................2

20

*City of Seattle v. Monsanto,*
    237 F. Supp. 3d 1096 (W.D. Wash. 2017)...................................................................3

21

*City of St. Louis v. Benjamin Moore & Co.,*

22
    226 S.W. 3d 110 (Mo. 2007) .......................................................................................1

23

*Comer v. Murphy Oil USA, Inc.,*

24
    839 F. Supp. 2d 849 (S.D. Miss. 2012).......................................................................3

25

*County of Oneida v. Oneida Indian Nation,*
    470 U.S. 226 (1985)......................................................................................................6

26

*Cty. of Santa Clara v. Atl. Richfield Co.,*

27
    137 Cal. App. 4th 292 (2006) .......................................................................................2

28

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ........................................................................................5

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008) ........................................................................................7

*Harley v. Merrill Brick Co.*,
   48 N.W. 1000 (Iowa 1891) ............................................................................5

*Ileto v. Glock, Inc.*,
   349 F.3d 1191 (9th Cir. 2003) ....................................................................11

*Jesner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018) ...................................................................................7

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) .......................................................................9

*Kiobel v. Royal Dutch Petroleum Co.*,
   569 U.S. 108 (2013) ........................................................................................8

*Kottle v. Nw. Kidney Ctrs.*,
   146 F.3d 1056 (9th Cir. 1998) ..................................................................4, 5

*In re Lead Paint Litig.*,
   924 A.2d 484 (N.J. 2007) .........................................................................1, 11

*Lockwood Co. v. Lawrence*,
   77 Me. 297 (1885) ........................................................................................13

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ......................................................................................15

*Michigan v. U.S. Army Corps of Eng'rs*,
   758 F.3d 892 (7th Cir. 2014) ..................................................................10, 11

*In re MTBE Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013) .............................................................................3

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................................9

*Nat'l Sea Clammers Ass'n v. New York*,
   616 F.2d 1222 (3d Cir. 1980) .......................................................................14

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
   696 F.3d 849 (9th Cir. 2012) ......................................................................3, 7

*Ohio v. Wyandotte Chem. Corp.*,
   401 U.S. 493 (1971) ........................................................................................7

iii

*Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris Inc.*,
   185 F.3d 957 (9th Cir. 1999).................................................................................13

*People v. Conagra Grocery Prods. Co*,
   17 Cal. App. 5th 51 (2017) ...........................................................................2, 11, 12

*People v. Gold Run Ditch & Mining Co.*,
   66 Cal. 138 (1884) ...................................................................................5, 12

*Rhode Island v. Lead Indus. Ass'n, Inc.*,
   951 A.2d 428 (R.I. 2008) ............................................................................1, 12

*Sabater ex rel. Santana v. Lead Indus. Ass'n Inc.*,
   704 N.Y.S. 2d 800 (2000) .................................................................................1

*Sierra Club v. U.S. Def. Energy Support Ctr.*,
   2011 WL 3321296 (E.D. Va. July 29, 2011) ..........................................................12

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004).........................................................................................8

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
   560 U.S. 702 (2010).......................................................................................14

*Tuosto v. Philip Morris USA Inc.*,
   2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) ..........................................................4

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ............................................................................4

*United States v. Standard Oil Co.*
   332 U.S. 301 (1947).........................................................................................8

*Vandevere v. Lloyd*,
   644 F.3d 957 (9th Cir. 2011)...............................................................................14

*Varjabedian v. City of Madera*,
   20 Cal. 3d 285 (1977) ...................................................................................11

*Viner v. Sweet*,
   30 Cal. 4th 1232 (2003) .................................................................................12

*Williams v. Dow Chem. Co.*,
   2004 WL 1348932 (S.D.N.Y. June 16, 2004)...........................................................3

*Woodyear v. Schaefer*,
   57 Md. 1 (1881) ...........................................................................................13

**Statutes**

15 U.S.C. § 45 ..............................................................................................8

15 U.S.C. § 717c-1 .................................................................................................8

15 U.S.C. § 2901 ...................................................................................................9

15 U.S.C. § 2921 ...................................................................................................9

42 U.S.C. § 13401 .................................................................................................8

42 U.S.C. § 15903 .................................................................................................8

42 U.S.C. § 15904 .................................................................................................8

42 U.S.C. § 15909 .................................................................................................8

42 U.S.C. § 15910 .................................................................................................8

42 U.S.C. § 15927 .................................................................................................8

42 U.S.C. § 17301 .................................................................................................8

Cal. Civ. Code § 3482 .........................................................................................11

Cal. Pub. Res. Code § 3106(b) ...........................................................................10

N.J. Rev. Stat. § 13:1M-1 ...................................................................................10

N.Y Gen. Bus. Law § 349 .....................................................................................3

Wash Rev. Code § 78.52.001 ..............................................................................10

Wash Rev. Code § 79.14.020 ..............................................................................10

**Other Authorities**

*California v. EPA*, No. 18-1114, ECF No. 1
     (D.C. Cir. May 1, 2018), .............................................................................15

*California v. General Motors Corp.* No. 07-16908, ECF No. 53-1
     (9th Cir. June 19, 2009) ..............................................................................15

*California v. U.S. Dep't of Interior*, No. 3:17-cv-02376, ECF No. 1
     (N.D. Cal. Apr. 26, 2017) ............................................................................10

*California v. U.S. Dep't of Interior*, No. 4:17-cv-05948, ECF No. 1
     (N.D. Cal. Oct. 17, 2017) ............................................................................10

Law360, *California Drops Appeal of Auto Emissions Suit*,
     https://tinyurl.com/y8vxm58p ......................................................................15

*Structure*, IPCC, https://tinyurl.com/yag9oseu ..................................................4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Treatises**

Restatement (Second) of Torts § 821B ................................................................................9

Restatement (Second) of Torts § 834 ..............................................................................11

**Regulations**

Wash. Admin. Code § 332-12-220 ................................................................................10

Wash. Admin. Code § 332-12-260 ................................................................................10

**Constitutional Provisions**

U.S. Const. amend. I, cl. 6 ................................................................................5

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS – Nos. 17-CV-6011-WHA AND 17-CV-6012-WHA

# I.    INTRODUCTION

Plaintiffs' boundless theory of liability has no precedent in either state or federal law.  Indeed, Plaintiffs concede that no global warming-based nuisance claim has ever survived a motion to dismiss.  In an attempt to avoid a similar fate, Plaintiffs have moved up the supply chain to sue a few of the companies that produce oil and gas, rather than suing greenhouse gas emitters directly.  But that just means Plaintiffs' claims are even more attenuated than those previously rejected.  At bottom, Plaintiffs' claims boil down to the contention that the level of worldwide greenhouse gas emissions is unreasonable.  As such, these claims are barred as a matter of law on multiple grounds.

# II.    ARGUMENT

## A.    Plaintiffs' Answers to the Court's Questions Highlight the Flaws in Their Case

Plaintiffs' answers to this Court's questions confirm that their claims are unprecedented, barred by the First Amendment, and without any judicially recognized limiting principle.

**1.**  Plaintiffs agree that *no* court has ever "sustain[ed] a nuisance theory of liability based on the otherwise lawful sale of a product where the seller financed and/or sponsored research or advertising intended to cast doubt on studies showing that the use of the product would harm public health or the environment at large."  ECF No. 192 at 1.  Plaintiffs compensate for that lack of precedent with volume, citing more than a dozen inapposite nuisance cases that happen to have involved product manufacturers.  Opp. 2–4.  Plaintiffs turn first to California lead-paint cases, where manufacturers and sellers of lead pigment and lead paint were held liable for public nuisance under California law.  Opp. 2 n.3.[1]  As this Court has already recognized, however, the lead-paint litigation has little relevance to Plaintiffs' global warming-based claims because "the alleged nuisance" in that case "was caused by a product's use *in California*," whereas here, Plaintiffs seek to hold Defendants liable for *worldwide* greenhouse gas emissions allegedly resulting, in small part, from Defendants' worldwide fossil-fuel extraction.  ECF No. 116 at 5 n.2.  Moreover, the lead paint manufacturers were held liable because they promoted "lead paint for interior use" while *knowing* that such use was hazardous to

---

[1]   Nuisance claims against lead-paint manufacturers have failed in *every* other jurisdiction.  *See Sabater ex rel. Santana v. Lead Indus. Ass'n Inc.*, 704 N.Y.S. 2d 800 (2000); *City of Chicago v. Am. Cyanamid Co.*, 355 Ill. App. 3d 209 (2005); *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W. 3d 110 (Mo. 2007); *In re Lead Paint Litig.*, 924 A.2d 484 (N.J. 2007); *Rhode Island v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428 (R.I. 2008); *City of Milwaukee v. NL Indus.*, 315 Wis. 2d 443 (2008).

children.  *See Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 309  (2006).  In affirm-

ing the verdict, the California Court of Appeal held that the lead-paint industry had actual knowledge,

as early as the 1930s, "that even a small amount of lead could kill a child," *People v. Conagra Gro-*

*cery Prods. Co.*, 17 Cal. App. 5th 51, 87 (2017), yet nevertheless advertised lead paint for interior

use, *id.* at 93–101.  Here, by contrast, Plaintiffs have not alleged that fossil fuels are poisonous or oth-

erwise injurious to consumers.  Rather, they seek to hold Defendants liable for selling a lawful, use-

ful, and safe product (which Plaintiffs consume in great quantities) because the worldwide use of that

product emits otherwise benign greenhouse gases that, when combined with gases from other sources

and other phenomena over many decades, causes global warming.

The state-law cases involving chemical spills (cited at Opp. 2–3 & n.4), are even further

afield.  In *City of Modesto Redevelopment Agency v. Superior Court*, 119 Cal. App. 4th 28 (2004),

the plaintiffs alleged that local dry cleaners had created a nuisance by dumping wastewater contain-

ing toxic cleaning solvents into the public sewer systems.  *Id.* at 33.  The court held that the manufac-

turers of the dry cleaning equipment could be held liable for assisting in the creation of the nuisance

because they "instructed the dry cleaners to set up their equipment to discharge solvent-containing

wastewater into the drains and sewers[] and . . . to dispose of spilled PERC on or in the ground," *id.*

at 41, but it held that solvent manufacturers "who merely placed solvents in the stream of commerce

without warning adequately of the dangers of improper disposal [we]re not liable" for nuisance.  *Id.*

at 43.[2]  Here, Plaintiffs have not alleged that Defendants gave any comparable "instructions" to per-

form inherently unsafe disposal practices that directly cause localized contamination and injury; De-

fendants are alleged only to have placed fossil fuels into the stream of commerce without warning the

public about global warming.  *City of Modesto* had no occasion to address whether nuisance liability

could rest on the novel theory that a defendant sponsored studies casting doubt on the alleged risks of

its products.  Even under California law, such an expansive theory of nuisance is untenable.

Instead of acknowledging the novelty of their claims, Plaintiffs throw together a laundry list

---

[2]   At trial, the *Modesto* plaintiffs produced evidence that the solvent manufacturers also instructed customers to "discharge separator water, which the manufacturers knew to contain PCE, into sewers[.]"  *City of Modesto v. Dow Chem. Co.*, 19 Cal. App. 5th 130, 149–50 (2018).

Gibson, Dunn & Crutcher LLP

of nuisance cases from around the country that purportedly "involv[ed] allegations of improper pro-motion." Opp. 3 & n.5. But the Court asked for no such list, and none of the cited cases are respon-sive to the Court's question.[3] Plaintiffs finally resort to listing nuisance claims against gun and asbes-tos manufacturers that survived motions to dismiss. Opp. 3 n.6. But claims against such manufactur-ers have failed as often as succeeded, *see* Mot. 4 n.2, and are factually distinguishable, *see* Opp. 4.

**2.** Plaintiffs concede that no global warming-based nuisance claim has ever made it past the pleadings. They nevertheless urge this Court to follow the "reasoning" of two vacated decisions with no precedential value. Opp. 4–5 (discussing the Second Circuit's decision in *AEP*, which the Su-preme Court reversed, and the Fifth Circuit's panel opinion in *Comer*, which was vacated for en banc rehearing). This Court asked for *precedent* supporting Plaintiffs' claims, and there is none.

Plaintiffs claim that the Ninth Circuit "rejected" the district court's justiciability ruling in *Ki-valina sub silentio*. Opp. 4; *see id.* at 5 (same argument as to *California v. Gen. Motors Corp.*, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007)). But the Ninth Circuit did no such thing. Rather, it ex-plained that the "district court's dismissal for lack of subject matter jurisdiction . . . may be affirmed 'on any basis fairly supported by the record,'" and, after holding that the plaintiff's federal common law claims were displaced, stated: "We need not, *and do not*, reach any other issue urged by the par-ties." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855, 858 (9th Cir. 2012) (empha-sis added). Thus, the district court opinions in *Kivalina* and *General Motors* remain "good law."[4]

---

[3] Plaintiffs also provide misleading parentheticals for many of the cases they cite (at Opp. 3 n.4). For example, in *In re MTBE Products Liability Litigation*, 725 F.3d 65 (2d Cir. 2013), the court did *not* endorse the theory that nuisance liability could be based on an allegation that the defendant at-tacked government studies. Rather, the court upheld the verdict because the defendant manufactured gasoline containing MTBE and "supplied that gasoline to service stations in Queens," even though it "knew specifically that tanks in the New York City area leaked." *Id.* at 121. Similarly, although the plaintiffs in *City of Seattle v. Monsanto* alleged that the defendant "misled government investigators," the court's discussion of the public nuisance claim does not even mention that allegation—much less rely on it .237 F. Supp. 3d 1096, 1106–07 (W.D. Wash. 2017). And in *Williams v. Dow Chemical Co.*, the court discussed the alleged "'distortion' of scientific research and 'non-disclosure' of mate-rial facts" in the context of denying summary judgment on a claim under Section 349 of the New York General Business Law, which addresses "consumer-oriented deceptive practices," not public nuisance. 2004 WL 1348932, *5–6 (S.D.N.Y. June 16, 2004).

[4] Plaintiffs contend (at Opp. 5) that the vacated Fifth Circuit panel opinion in *Comer* is "persua-sive," but the Mississippi district court that subsequently adjudicated the same claims brought by the same plaintiffs against the same defendants declined to follow the panel's reasoning and instead fol-lowed the district court's decision in *Kivalina*. *See Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d

3.  In an attempt to evade the *Noerr-Pennington* bar, Plaintiffs contend that all of the speech alleged in the Complaint was directed at consumers.  Opp. 5.  Not so.  The Complaint alleges that one Defendant paid certain individuals "millions of dollars . . . to launch repeated attacks on mainstream climate science and IPCC conclusions," and that it paid other "denialist groups" to discredit the "IPCC's 1995 and 2001 conclusions[.]"  FAC ¶¶ 110–11.  The Intergovernmental Panel on Climate Change ("IPCC") was created to provide *governments* with information about climate change, and includes a working group on Mitigation of Climate Change.  *See Structure*, IPCC, https://ti-nyurl.com/yag9oseu.  Thus, although Plaintiffs now run away from their own allegations, there is lit-tle doubt that Defendants' alleged criticism of "IPCC conclusions" would have been directed toward government entities.  Notably, unlike the tobacco cases on which Plaintiffs' rely (at Opp. 6), the Complaint identifies no consumer-targeted advertising campaigns—television commercials, bill-boards, print advertisements, etc.—in which Defendants discussed climate change.[5]  Although Plain-tiffs now "disclaim" any effort to base liability on Defendants' lobbying activities, the allegations in the Complaint show otherwise, and their claims are therefore barred by *Noerr-Pennington*.

Plaintiffs argue that even if Defendants' alleged communications could be considered lobby-ing, it would fall within the "sham" exception to *Noerr-Pennington*.  Opp. 7.  That is wrong.  Alt-hough the "sham" exception can apply to "intentional misrepresentations" *made in litigation*, the Ninth Circuit has clarified that where the defendant is lobbying "the legislature, the sham exception is extraordinarily narrow."  *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1061 (9th Cir. 1998).  As the Su-

---

849, 860–65 (S.D. Miss. 2012) (holding that plaintiffs lacked standing and the claims were not justi-ciable, despite the fact that the vacated panel opinion reached the opposite conclusion on both issues).

[5]  In *Tuosto v. Philip Morris USA Inc.*, 2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007), the court held that *Noerr-Pennington* barred claims based on the defendant's statements to Congress but did not bar fraud claims "related to [the defendant's] advertisements and statements to consumers."  *Id.* at *6, 16.  The plaintiff alleged for example, that the defendant took out a "full-page newspaper adver-tisement that appeared in 448 newspapers across the United States" titled "A Frank Statement to Cig-arette Smokers."  *Id.* at *2.  Here, Plaintiffs have not identified any allegedly misleading statements made widely to consumers.  Plaintiffs also cite (at Opp. 6) *United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009), but the court in that case rejected *Noerr-Pennington* immunity be-cause the defendant's misleading statements "were intended to defraud consumers."  *Id.* at 1124.  Plaintiffs here have not pleaded fraud, much less alleged facts showing any customer was defrauded.

preme Court has explained, "[a] 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 380 (1991) (citations omitted).  Here, the only plausible reading of Plaintiffs' allegations is that Defendants were attempting to influence federal and state regulators by calling the IPCC reports into question.  The "sham" exception does not apply.[6]

**4.**  Straining to find a limiting principle for their boundless theory of liability, Plaintiffs dredge up nuisance cases from the 19th Century holding a brick manufacturer liable for smoke damage caused to an adjacent property from its operations, and holding a mining company liable for dumping thousands of cubic yards of mining debris daily into a river and causing the riverbed to rise.  Opp. 7.  Neither of those cases is analogous (or even remotely similar) to these, and Plaintiffs do not explain how either case would limit liability against other contributors to global warming.[7]

Plaintiffs contend (at Opp. 7) that proximate cause principles can be used to distinguish Defendants from other contributors, but Plaintiffs' theory of liability itself depends on stretching proximate cause past the breaking point.  *See* Mot. 19–22; *infra* at 12–13.  Each Defendant is responsible for only a small fraction of worldwide fossil-fuel production, and even that production does not directly cause greenhouse gas emissions, global warming, or rising sea levels—indeed, some of the extracted product is made into plastics and other consumer items that are not combusted.  The alleged link between Defendants' conduct and any alleged injuries resulting from global warming is far too

---

[6]   Plaintiffs also miss the mark when they analogize the *Noerr-Pennington* doctrine to the First Amendment's protection of commercial speech.  Opp. 7.  The *Noerr-Pennington* "doctrine is a direct application of the Petition Clause," *Kottle*, 146 F.3d at 1059; *see* U.S. Const. amend. I, cl. 6, and does not rest on the commercial speech doctrine.  The Petition Clause protects all lobbying efforts directed at obtaining government action, even "where the private party 'deliberately deceived the public and public officials.'"  *City of Columbia*, 499 U.S. at 383 (quoting *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961)).

[7]   In *Harley v. Merrill Brick Co.*, 48 N.W. 1000 (Iowa 1891), a brick manufacturer was held liable for smoke damage to an adjacent property because the works "discharged great quantities of thick, black, smoke, soot, and gas," and "if smoke, soot, and gas came from any other source, it was in such small quantities as not to be annoying."  *Id.* at 1002.  In *People v. Gold Run Ditch & Mining Co.*, 66 Cal. 138 (1884), a mining operation was enjoined because it discharged "at least six hundred thousand cubic yards" of debris into the American river every year, which, in combination with other debris, raised the riverbed by 10 to 12 feet.  *Id.* at 144–45.

Gibson, Dunn & Crutcher LLP

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS – Nos. 17-CV-6011-WHA AND 17-CV-6012-WHA

attenuated to satisfy traditional proximate cause principles.  Given Plaintiffs' radical theory of causa-
tion, their assurance that proximate cause will bar future lawsuits against "trivial" contributors rings
hollow.[8]

B.    **Plaintiffs' Federal Common Law Claims Are Displaced and Untenable**

<u>Clean Air Act.</u>  The Supreme Court has squarely "h[e]ld that the Clean Air Act and the EPA
actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide
emissions from fossil-fuel fired power plants" because "the Act 'speaks directly' to emissions of car-
bon dioxide." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*").  Plaintiffs
(and their amici) contend that this case is not about emissions at all, but rather about the "production
and sales of fossil fuels," to which the CAA does not speak "*directly*."  Opp. 9; ECF No. 236-1 at 13.
That argument cannot be squared with the allegations in the Amended Complaints, which assert that
"emissions of greenhouse gases from the fossil fuels [Defendants] produce[] combine[] with the
greenhouse gas emissions from fossil fuels produced by the other Defendants . . . to result in danger-
ous levels of global warming with grave harms for coastal cities[.]"  FAC ¶¶ 140, 145; *see also id.*
¶ 92 ("The cumulative greenhouse gases in the atmosphere attributable to each Defendant has in-
creased the global temperature and contributed to sea level rise, including in Oakland.").  To show
that Defendants contributed to the alleged nuisance, Plaintiffs would first need to show that *those*
*emissions* caused a nuisance.  But "federal judges" are not at liberty to determine "what amount of
carbon-dioxide emissions is 'unreasonable'" because "Congress delegated to EPA the decision
whether and how to regulate carbon-dioxide emissions[.]"  *AEP*, 564 U.S. at 426, 428.  That "delega-
tion" "displaces federal common law" remedies for all claims predicated on greenhouse gas emis-
sions.  *Id.* at 426.

Contrary to Plaintiffs' assertion (at Opp. 9), *County of Oneida v. Oneida Indian Nation*, 470
U.S. 226 (1985), is not "instructive."  There, the Court held that the Nonintercourse Act of 1793 did
not displace a federal common-law cause of action for violation of Indians' possessory rights to land

---

[8]  Plaintiffs' argument (at Opp. 8) that Defendants are unique because they have "in-house scien-
tific resources" is a red herring.  The basic science behind Plaintiffs' allegations has been known for
decades, and countless entities have produced or used carbon-based fuels during that time while also
expressing "uncertainty" about global warming.

because "[o]nly two sections of the Act . . . involve Indian lands at all," *id.* at 237–38, and those sections merely provided that transfers of such land could be made only by treaty and that illegal settlement on Indian land could be punished by fine and imprisonment. *Id.* at 238. The Act also provided "no remedial provision" and it did not address the "restor[ation] [of] unlawfully conveyed land to the Indians." *Id.* By contrast, the CAA directs EPA to "establish standards of performance for emission of pollutants," "provides multiple avenues for enforcement," and allows "States and private parties [to] petition for a rule-making[.]" *AEP*, 564 U.S. at 424–25.

Similarly, in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), the Court rejected Exxon's contention that the CWA "preempts punitive damages, but not compensatory damages, for economic loss" because "nothing in the statutory text points to *fragmenting the recovery scheme* this way[.]" *Id.* at 489 (emphasis added). Here, "Congress has acted to occupy the entire field" of greenhouse gas regulation and has thus "displace[d] any previously available federal common law action," which "means displacement of [all] remedies." *Kivalina*, 696 F.3d at 857.

**Foreign Emissions.** Plaintiffs argue that their federal common law claims should be allowed to proceed because they are based, in part, on foreign conduct not regulated by the CAA. Opp. 10–12. But they have not identified a single case in which federal common law has been used to abate a nuisance where the allegedly tortious conduct occurred overseas.[9] As the Supreme Court reiterated just last month, "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1403 (2018). Those concerns are front and center here, where Plaintiffs are attempting to impose massive liability through a federal common law action against both foreign and domestic Defendants for lawful overseas conduct, some of which was undertaken in cooperation with foreign governments. The Court should decline Plaintiffs' invitation to create such a novel and disruptive private cause of action in the absence of any "legislative judgment" approving such action. *Id.* at 1402.

Plaintiffs contend (at Opp. 11) that the presumption against extraterritoriality is not instructive

---

[9]   In *Ohio v. Wyandotte Chemicals Corp.*, (cited at Opp. 11 n.19), the Supreme Court declined to exercise jurisdiction over an alleged nuisance claim against several defendants, one of which was a foreign company, and thus did not apply federal common law to that defendant's extraterritorial conduct. 401 U.S. 493, 505 (1971).

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS – Nos. 17-cv-6011-WHA and 17-cv-6012-WHA

in determining the scope of a federal court's common-law power. But the canon "'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord,'" *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013), and that principle should apply equally to judge-made federal common law. It would be nonsensical to apply a presumption that federal legislation "governs domestically," while allowing federal common law to "rule the world." *Id.*; *see Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004) ("the general practice has been to look for legislative guidance before exercising innovative authority over substantive law").[10]

**Production.** Congress has enacted numerous laws that speak directly to the reasonableness of oil and gas production and expressly encourage fossil fuel production through financial incentives and other means. *See, e.g.*, Energy Policy Act of 2005, 42 U.S.C. §§ 15903, 15904, 15909(a), 15910(a)(2)(B). Plaintiffs respond that these statutes—some of which they concede "touch upon the subject of climate change"—do not "speak directly" to their claims because they do not provide a "regulatory and remedial scheme" to address global warming. Opp. 12–13. But fossil fuel production itself does not cause global warming—greenhouse gas emissions are the alleged "culprit," FAC ¶ 88—so it is unsurprising that these statutes do not provide a remedial scheme for global warming. Those statutes do make clear, however, that Congress has decided *not* to address global warming concerns by limiting fossil fuel extraction. Indeed, the fact that Congress has sought "to reduce . . . [the] environmental impacts (including emissions of greenhouse gases) of energy production," 42 U.S.C. § 13401(3) (2001), while also making it the "policy of the United States" to develop "oil shale, tar sands, and other unconventional fuels," 42 U.S.C. § 15927 (2005), shows that Congress has displaced any federal common action seeking to label fossil-fuel extraction itself a nuisance.

**Promotion.** Nor can Plaintiffs maintain their action on the ground that Defendants' "promotion" of lawful products caused a nuisance. Numerous statutes, including the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), the Energy Policy Act of 2005, 15 U.S.C. § 717c-1, and the Energy

---

[10] To be sure, federal common law may govern in lieu of state law where "interstate and international disputes implicat[e] the conflicting rights of States or our relations with foreign nations," Opp. 11 (citation omitted), but that does not mean that the governing federal common law standards will provide a remedy for injuries caused by extraterritorial conduct. *Cf. United States v. Standard Oil Co.*, 332 U.S. 301, 309–10, 316–17 (1947) (holding that federal common law governed but that no remedy was available because Congress had not "act[ed] to establish the liability").

Independence and Security Act of 2007, 42 U.S.C. § 17301, directly address misleading representations in the energy sector. Mot. 14–15. Plaintiffs do not contend otherwise, but instead misstate the test for displacement by claiming that it can only be found when the statute addresses the exact same question with a precise level of granularity that captures every aspect of the plaintiff's particular cause of action. Opp. at 13. This flawed argument for evading displacement is especially troubling where, as here, the additional claims threaten to chill core First Amendment speech. Although Plaintiffs point (at Opp. 14) to several cases holding that *fraud* is not protected by the First Amendment, Plaintiffs do not allege fraud (nor could they on these pleadings). *Cf. Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (dismissing for lack of particularity). In fact, their allegations include core speech on important public policy matters. FAC ¶ 103 (accusing Defendants of "downplaying global warming risks" and "emphasizing the uncertainties of climate science"). The First Amendment protects such speech. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

## C. Plaintiffs Have Failed to Show that Their Claims Are Viable

**Authorized Conduct.** Plaintiffs' federal common law claims also fail because Defendants' conduct "is fully authorized by statute, ordinance or administrative regulation[.]" Restatement § 821B cmt. f. Plaintiffs contend (at Opp. 16) that Defendants' conduct is not authorized because Congress has "established a general federal policy to avoid dangerous global warming." But Defendants' allegedly tortious *conduct* is the extraction, production, and sale of fossil fuels, and Plaintiffs do not dispute that numerous federal, state, and local statutes authorize *that* conduct. *See* Mot. 13, 17–18. Moreover, neither of the statutes Plaintiffs cite expresses a federal policy of avoiding global warming by crippling fossil-fuel production.[11] On the contrary, they demonstrate that Congress has been aware of the risk of man-made global warming since the 1970s and yet has continued to authorize (and encourage) fossil-fuel production.

---

[11] The National Climate Program Act of 1978 "establish[ed] a national climate program" to "assist the Nation and the world to understand and respond to natural and man-induced climate processes[.]" Pub. L. No. 95-367, § 3 (codified at 15 U.S.C. § 2901 et seq.). The Global Change Research Act of 1990 established a national research program "aimed at understanding and responding to global change, including the cumulative effects of human activities and natural processes on the environment[.]" Pub. L. No. 101-606 (codified at 15 U.S.C. § 2921 et seq.).

1    California also authorizes Defendants' conduct, declaring it "the policy of this state" to max-

2    imize fossil-fuel production.  Cal. Pub. Res. Code § 3106(b).  Indeed, California receives *hundreds of*

3    *millions* of dollars yearly in royalties from fossil-fuel extraction and sued the federal government

4    *twice* last year to protect those royalties.  *See California v. U.S. Dep't of Interior*, No. 3:17-cv-02376,

5    ECF No. 1 ¶ 13 (N.D. Cal. Apr. 26, 2017) ("Since 2008, California has received an average of $82.5

6    million annually in royalties from federal mineral extraction"); *California v. U.S. Dep't of Interior*,

7    No. 4:17-cv-05948, ECF No. 1 (N.D. Cal. Oct. 17, 2017).  California's amicus brief cites a handful of

8    statutes limiting oil and gas extraction in certain locations—such as "along the California coast"—

9    and encouraging a decrease in fossil fuel consumption.  ECF No. 236-1 at 9–11.  But Plaintiffs have

10   not alleged that any of Defendants' extraction occurred where it was unauthorized, and California's

11   desire to reduce its own emissions has no bearing on whether Defendants' conduct is author-

12   ized.  Moreover, California remains an avid consumer of Defendants' products (and thus a substantial

13   emitter of greenhouse gases), which it uses to power its fleet of automobiles and provide electricity

14   for its government buildings, schools and universities, jails and prisons, and other critical state infra-

15   structure.  After pursuing a decades-long policy of maximizing fossil-fuel production, and enjoying

16   the financial rewards of such production as well as the economic and social benefits of consuming the

17   product, California should not be heard to argue that such conduct is an unauthorized public nui-

18   sance.  Nor should Washington or New Jersey, which similarly encourage fossil-fuel production as a

19   matter of policy.  *E.g.*, Wash. Rev. Code §§ 78.52.001, 79.14.020; Wash. Admin Code §§ 332-12-

20   220, 332-12-260; N.J. Rev. Stat. § 13:1M-1

21   Plaintiffs' reliance on *Michigan v. U.S. Army Corps of Engineers*, 758 F.3d 892 (7th Cir.

22   2014), is misplaced.  In *Michigan*, the Seventh Circuit held that the government's challenged con-

23   duct—allowing invasive species to pass through waterways controlled by the Corps of Engineers—

24   was not fully authorized by statute.  *Id.* at 903.  In rejecting the Corps' argument that its conduct was

25   authorized, the court "assume[d] that the statutes on which [the government] rel[ies] authorize [it] to

26   create and maintain a navigable waterway between the Mississippi River and Lake Michigan."  *Id.*

27   The Court explained that "[i]f the States' complaint alleged that the existence of a navigable water-

28   way between the River and Lake was itself a nuisance, their claim indeed would be foreclosed by the

1   'fully authorized' exception." *Id.*  But because the States had instead alleged that the specific manner

2   in which the government was operating the waterway "made it possible for the Asian carp to pass

3   from the Mississippi to the Great Lakes," the suit could proceed.  *Id.*  Here, unlike in *Michigan*,

4   Plaintiffs have not alleged that the *manner in which* Defendants extracted fossil fuels caused a nui-

5   sance.  Rather, their theory is that extraction *itself* creates a nuisance.  Accordingly, their "claim[s]

6   [are] indeed foreclosed by the 'fully authorized exception.'" *Id.*[12]

7       Although Plaintiffs rely (at Opp. 16) on California Civil Code section 3482, that section is not

8   applicable to federal common law claims.  And in any event, section 3482 *would* immunize Defend-

9   ants' conduct because both the federal government and state legislature have "contemplated the doing

10  of the very act which occasions the [alleged] injury"—*e.g.*, extracting fossil fuels.  *Varjabedian v.*

11  *City of Madera*, 20 Cal. 3d 285, 291 (1977).

12      **Control.**  Plaintiffs' nuisance claims cannot proceed under federal common law because De-

13  fendants had no control over fossil fuels at the time they were combusted by third parties around the

14  world and emitted greenhouse gases.  *See* FAC ¶ 2.  Plaintiffs concede that Defendants exercised no

15  such control, but contend (at Opp. 17) that Restatement § 834 "obviates the control requirement."

16  That is incorrect.  Indeed, the California Court of Appeal's recent decision in *ConAgra* (cited at Opp.

17  18 n.39) distinguished out-of-state decisions rejecting similar claims against lead-paint manufacturers

18  precisely *because* those courts applied the Restatement's control requirement.  For example,  the

19  court distinguished a New Jersey case because it relied "on the Restatement" and "found that only a

20  tortfeasor 'in control of the nuisance' could be held liable for public nuisance, and the paint manufac-

21  turers lacked such control."  *ConAgra*, 17 Cal. App. 5th at 163 (citing *In re Lead Paint Litig.*, 924

22  A.2d at 484).  The court similarly distinguished a decision by the Rhode Island Supreme Court,

---

23

24      [12]  The Ninth Circuit's decision in *Ileto v. Glock, Inc.*, 349 F.3d 1191 (9th Cir. 2003), rested on a
    similar distinction.  The alleged nuisance was "not premised on the legal manufacture and design of

25  the guns or the sale of guns to individuals who are legally entitled to purchase them[,]" but "on the
    defendants' actions in creating an illegal secondary market for guns by purposefully over-saturating

26  the legal gun market in order to take advantage of re-sales to distributors that they knew or should
    [have] know[n] w[ould] in turn sell to illegal buyers."  *Id.* at 1214.  As the court explained, "the fact

27  that a certain occupation or business can be performed in a legal manner does not prevent [it] from
    becoming a nuisance when [it] is performed in a manner that unreasonably infringes on a public

28  right."  *Id.* (citing omitted).  Here, Plaintiffs have not alleged that Defendants extracted fossil fuel in a
    manner other than that authorized by statute.

which applied the Restatement and dismissed the complaint because it "failed to 'allege any facts that would support a conclusion that defendants were in control of the lead pigment at the time it harmed Rhode Island's children.'" *Id.* (quoting *Lead Indus. Ass'n*, 951 A.2d at 455)). The *ConAgra* court held that unlike New Jersey and Rhode Island, "[c]ontrol is not required in California for a public nuisance action." *Id.* at 164. California's rejection of the control requirement was thus a departure from the Restatement, not an application of it.

In any event, Plaintiffs do not identify a single case in which a court applying federal common law to a nuisance claim has rejected the control requirement when adjudicating an interstate pollution dispute, and this Court should not abandon a traditional element of the law of nuisance.

**Causation.** Plaintiffs agree (at Opp. 13:14, 19 n.41, 21:11) that the Restatement's "substantial factor" test is applicable to their nuisance claims, but they cannot satisfy it. That test requires a plaintiff to show either that the "harm would not have occurred" but for the defendant's wrongful conduct, or that the wrongful conduct was a "concurrent independent cause of the harm" that was "sufficient in the absence of the other[] [causes] to bring about the harm." *Viner v. Sweet*, 30 Cal. 4th 1232, 1240, 1241 (2003) (citing Restatement § 432). Here, Plaintiffs do not allege that global warming would not have occurred absent Defendants' activities, or even that its effects would have been lessened. Rather, they concede that nearly 90% of emissions from industrial sources (to say nothing of non-industrial sources) are *not* attributable to Defendants' products. *Id.* ¶ 94(c). In short, Plaintiffs' alleged injuries would have occurred even if Defendants had not produced any fossil fuels.[13]

Ignoring the substantial factor test, Plaintiffs argue that they need only allege that Defendants *contributed* to global warming. Opp. 19. Plaintiffs cite several common-law pollution cases holding that all parties contributing to a nuisance can be held liable. Opp. 19 nn.41–45. But those cases, unlike this one, involved discrete sets of polluters who together caused localized nuisances, such that it was possible to hold each polluter liable either directly or through contribution.[14] None of those

---

[13] No fact-finding is required to recognize that other fossil fuel producers—such as OPEC members who have voluntarily limited output for decades—would have increased production in Defendants' absence. *Cf. Sierra Club v. U.S. Def. Energy Support Ctr.*, 2011 WL 3321296, at *5 (E.D. Va. July 29, 2011) (dismissing for failure to allege facts showing that "a reduction in the amount of greenhouse gases emitted by producers . . . would not have been offset by increased emissions elsewhere").

[14] *See, e.g.*, *Gold Run Ditch & Mining*, 4 P. at 1156 (several mines dumping debris in a river together

1  cases suggests it is proper to hold five cherry-picked defendants responsible for a *global* problem that

2  billions of independent actors have contributed to over many decades.[15]

3     Plaintiffs argue they have established proximate cause because their alleged injuries "are their

4  own," not "derivative of injury suffered by another," and because "much of [Defendants'] harmful

5  conduct is recent and ongoing." Opp. 21. But Plaintiffs' alleged injuries are derivative because they

6  resulted from the intervening conduct of millions of third parties. And Defendants' conduct, even

7  their recent and ongoing conduct, "did not directly cause any injury." *Benefiel v. Exxon Corp.*, 959

8  F.2d 805, 807 (9th Cir. 1992); *see also Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip*

9  *Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (explaining there must be a "direct relationship be-

10 tween the injury and the alleged wrongdoing"). It is also a "uniformly accepted principle[] of tort

11 law" that a plaintiff must "prove more than that the defendant's action triggered a series of other

12 events that led to the alleged injury." *Benefiel*, 959 F.2d at 807. That principle bars Plaintiffs' claims

13 because Defendants' allegedly wrongful conduct, taken by itself, "created a situation harmless unless

14 acted upon by other forces." *See id.* at 807 (quoting Restatement § 433(b)).[16]

15     **Relief is Unavailable.** Plaintiffs concede that no court has ever awarded an "abatement fund"

16 under federal common law. Opp. 22. Instead, they cite two outlier state-law cases, only one of

17 which even involved an abatement fund. Opp. 22 n.52.[17] They also contend damages are available

18 under federal common law, but rely on a vacated opinion for that proposition. Opp. 22 n.53 (citing

19
20 caused a nuisance, but "[n]o other mine contribute[d] annually more detritus to the river than the de-
   fendant"); *Woodyear v. Schaefer*, 57 Md. 1, 10 (1881) (holding that all upstream discharges, including
21 from defendant's slaughterhouse, had to be stopped to abate the nuisance); *Lockwood Co. v. Lawrence*,
   77 Me. 297, 309-10 (1885) (nuisance was "the combined result[]" of waste deposited in a river by
   several sawmills, each of whom were parties).

22 [15] Plaintiffs argue (at Opp. 19) that any "pollution" of even the "slight[est] extent becomes unrea-
23 sonable [and therefore a nuisance] when similar pollution by others makes the condition . . . approach
   the danger point," but then seek to distinguish *Amigos Bravos v. BLM*, 816 F. Supp. 2d 1119 (D.N.M.
24 2001), which dismissed for lack of causation, on the ground that the annual leases in that case "threat-
   ened an annual contribution to global warming of only .0009%," Opp. 20. Plaintiffs cannot have it
25 both ways. Either the substantial factor test bars Plaintiffs' claims against Defendants, or every fos-
   sil-fuel producer and greenhouse-gas emitter is a substantial factor contributing to Plaintiffs' injuries.

26 [16] Even if the independent actions of third parties combusting fossil fuels for transportation, elec-
   tricity, or heat were "foreseeable event[s]," Opp. 22, the causal chain leading from Defendants' pro-
27 duction of fossil fuels to Plaintiffs' alleged injuries is far too attenuated to impose liability.

28 [17] *See Boomer v. Atlantic Cement Company*, 26 N.Y.2d 219, 228 (1970) ("permanent damages").

1    *Nat'l Sea Clammers Ass'n v. New York*, 616 F.2d 1222 (3d Cir. 1980), *vacated*, 453 U.S. 1 (1981)).

2        Although Plaintiffs contend they are not seeking to "punish" Defendants, they are seeking

3    "billions" of dollars to abate rising sea levels for which Defendants are only minimally responsible

4    even *under Plaintiffs' own theory*. FAC ¶¶ 8, 136. Plaintiffs' assertion that the abatement fund

5    would not punish Defendants in excess of the harm they have "actually caused" is thus false.[18]

6    **D.    Plaintiffs' Claims Violate the Separation of Powers**

7        In *AEP*, the Court warned against "setting emissions standards by judicial decree under fed-

8    eral tort law." 564 U.S. at 427. It explained that "[t]he appropriate amount of regulation in any par-

9    ticular greenhouse gas-producing sector cannot be prescribed in a vacuum: as with other questions of

10   national or international policy, informed assessment of competing interests is required. Along with

11   the environmental benefit potentially achievable, our Nation's energy needs and the possibility of

12   economic disruption must weigh in the balance." *Id.* Plaintiffs breezily assert (at Opp. 23) that these

13   competing interests can be ignored because Defendants' conduct is unreasonable as a matter of law.

14   Opp. 23 & n.56 (citing Restatement § 829A). But *AEP* forecloses that argument. There, the plain-

15   tiffs also "alleged that public lands, infrastructure, and health were at risk from climate change," and

16   "that climate change would destroy habitats for animals and rare species of trees and plants on land

17   the [plaintiff] trust owned and conserved." 564 U.S. at 418–19. Despite those allegations of "severe"

18   environmental harm, the Court held that to adjudicate the plaintiffs' nuisance claims a judge would

19   have to "determine, in the first instance, what amount of carbon-dioxide emissions is 'unreasona-

20   ble.'" *Id.* at 428. But that "complex balancing"—weighing the utility of Defendants' conduct against

21   the alleged harm—cannot be undertaken by courts because "Congress designated an expert agency,

22   here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions." *Id.* at 427–28.

23       The need for federal control over these "complex" "national" policy issues is underscored by

24   the dueling state amicus briefs. ECF Nos. 224-1, 236-1. Other than California, none of these states

25   has an interest in "shifting the costs of abating sea level rise" from Bay Area taxpayers to Defendants,

26

27   _____

     [18] Plaintiffs argue (at Opp. 23) that *Eastern Enterprises v. Apfel* is inapplicable to nuisance claims,
28   but "[i]t would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it
     to do by legislative fiat." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S.
     702, 714 (2010) (plurality); *see also Vandevere v. Lloyd*, 644 F.3d 957, 964 n.4 (9th Cir. 2011).

1    FAC ¶ 11.  But Indiana and its 14 sister states *do* have an interest in preventing Plaintiffs from crip-

2    pling the fossil fuel industry through a multi-billion dollar judgment.  *See* ECF No. 224 at 2–3.  And

3    the fact that California, Washington, and New Jersey believe this case implicates their interest in pro-

4    tecting their "residents and the environment" from climate change-related harm (ECF No. 236 at 2)

5    puts the lie to Plaintiffs' contention that this case is not about "restrain[ing] defendants from engaging

6    in their business operations."  Opp. 1.  Curbing fossil-fuel production—in the hope of reducing

7    greenhouse gas emissions—is the whole point of this litigation.

8            But California, especially, should know that nuisance claims are not an appropriate vehicle for

9    addressing global warming.  In *General Motors*, the State appealed the district court's dismissal of its

10   global warming-based nuisance claims but then, in the wake of *Massachusetts v. EPA*, 549 U.S. 497

11   (2007), *voluntarily dismissed* its appeal, acknowledging the EPA's authority to regulate greenhouse

12   gas emissions.  *See* No. 07-16908, ECF No. 53-1 at 2 (9th Cir. June 19, 2009).  As then-Attorney

13   General Jerry Brown publicly stated, the appeal was no longer necessary because "[t]he EPA and the

14   federal government are now on the side of reducing greenhouse gases and are taking strong measures

15   to reduce emissions from vehicles."  Law360, *California Drops Appeal of Auto Emissions Suit*,

16   https://tinyurl.com/y8vxm58p.  California apparently disagrees with the regulatory decisions EPA has

17   made since then, but if California is "dissatisfied with the outcome of EPA's rulemaking" in this area,

18   the "recourse under federal law is to seek Court of Appeals review" of the EPA's regulations.  *AEP*,

19   564 U.S. at 427.  Indeed, California and several other states have recently filed such a petition for re-

20   view challenging an EPA decision lowering vehicle emissions standards.  *California v. EPA*, No. 18-

21   1114 (D.C. Cir. May 1, 2018), ECF No. 1.  Challenges to federal regulations, not ad-hoc nuisance

22   suits against the regulated industry, are the appropriate way for California, other states, and local gov-

23   ernments to affect national environmental policies.

24                        **III.    CONCLUSION**

25           For the foregoing reasons, the Court should grant the Motion and dismiss these actions.

26

27

28

1   May 10, 2018                                    Respectfully submitted,

2

3   By: **/s/ Jonathan W. Hughes          By: /s/ Theodore J. Boutrous

4   Jonathan W. Hughes (SBN 186829)      Theodore J. Boutrous, Jr. (SBN 132099)
    ARNOLD & PORTER KAYE SCHOLER         Andrea E. Neuman (SBN 149733)
5   LLP                                  William E. Thomson (SBN 187912)
    Three Embarcadero Center, 10th Floor  Ethan D. Dettmer (SBN 196046)
    San Francisco, California  94111-4024  Joshua S. Lipshutz (SBN 242557)
6   Telephone: (415) 471-3100            GIBSON, DUNN & CRUTCHER LLP
    Facsimile: (415) 471-3400            333 South Grand Avenue
7   E-mail:  jonathan.hughes@apks.com    Los Angeles, CA 90071
                                         Telephone: (213) 229-7000
8   Matthew T. Heartney (SBN 123516)     Facsimile: (213) 229-7520
    John D. Lombardo (SBN 187142)        E-mail:  tboutrous@gibsondunn.com
9   ARNOLD & PORTER KAYE SCHOLER         E-mail:  aneuman@gibsondunn.com
    LLP                                  E-mail:  wthomson@gibsondunn.com
10  777 South Figueroa Street, 44th Floor  E-mail:  edettmer@gibsondunn.com
    Los Angeles, California  90017-5844   E-mail:  jlipshutz@gibsondunn.com
11  Telephone: (213) 243-4000
    Facsimile: (213) 243-4199            Herbert J. Stern (pro hac vice)
12  E-mail: matthew.heartney@apks.com    Joel M. Silverstein (pro hac vice)
    E-mail: john.lombardo@apks.com       STERN & KILCULLEN, LLC
13                                       325 Columbia Turnpike, Suite 110
    Philip H. Curtis (pro hac vice)      Florham Park, NJ 07932-0992
14  Nancy Milburn (pro hac vice)         Telephone: (973) 535-1900
    ARNOLD & PORTER KAYE SCHOLER         Facsimile: (973) 535-9664
15  LLP                                  E-mail:  hstern@sgklaw.com
    250 West 55th Street                 E-mail:  jsilverstein@sgklaw.com
16  New York, NY 10019-9710
    Telephone: (212) 836-8383            Neal S. Manne (SBN 94101)
17  Facsimile: (212) 715-1399            Johnny W. Carter (pro hac vice)
    E-mail:  philip.curtis@apks.com      Erica Harris (pro hac vice)
18  E-mail:  nancy.milburn@apks.com      Steven Shepard (pro hac vice)
                                         SUSMAN GODFREY LLP
19                                       1000 Louisiana, Suite 5100
    Attorneys for Defendant              Houston, TX 77002
20  BP P.L.C.                            Telephone: (713) 651-9366
                                         Facsimile: (713) 654-6666
21                                       E-mail:  nmanne@susmangodfrey.com
                                         E-mail:  jcarter@susmangodfrey.com
22                                       E-mail:  eharris@susmangodfrey.com
                                         E-mail:  sshepard@susmangodfrey.com
23

24                                       Attorneys for Defendant
                                         CHEVRON CORPORATION
25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS – Nos. 17-CV-6011-WHA AND 17-CV-6012-WHA

By: **/s/ Carol M. Wood

Megan R. Nishikawa (SBN 271670)
KING & SPALDING LLP
101 Second Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
Email: mnishikawa@kslaw.com

George R. Morris (SBN 249930)
KING & SPALDING LLP
601 S. California Ave, Suite 100
Palo Alto, CA 94304
Telephone: (650) 422-6718
Facsimile: (650) 422-6800
Email: gmorris@kslaw.com

Tracie J. Renfroe (*pro hac vice*)
Carol M. Wood (*pro hac vice*)
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, Texas 77002
Telephone: (713) 751-3200
Facsimile: (713) 751-3290
Email: trenfroe@kslaw.com
Email: cwood@kslaw.com

Justin A. Torres (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 200
Washington, DC 20006-4707
Telephone: (202) 737 0500
Facsimile: (202) 626 3737
Email: jtorres@kslaw.com

*Attorneys for Defendant*
*CONOCOPHILLIPS*

By: **/s/ Dawn Sestito

M. Randall Oppenheimer (SBN 77649)
Dawn Sestito (SBN 214011)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
E-Mail: roppenheimer@omm.com
E-Mail: dsestito@omm.com


Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Jaren E. Janghorbani (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
E-Mail: twells@paulweiss.com
E-Mail: dtoal@paulweiss.com
E-Mail: jjanghorbani@paulweiss.com

*Attorneys for Defendant*
*EXXON MOBIL CORPORATION*

1    By: **/s/ Daniel P. Collins

2    Daniel P. Collins (SBN 139164)
     MUNGER, TOLLES & OLSON LLP
3    350 South Grand Avenue
     Fiftieth Floor
4    Los Angeles, California 90071-3426
     Telephone: (213) 683-9100
5    Facsimile: (213) 687-3702
     E-mail: daniel.collins@mto.com
6
     Jerome C. Roth (SBN 159483)
7    Elizabeth A. Kim (SBN 295277)
     MUNGER, TOLLES & OLSON LLP
8    560 Mission Street
     Twenty-Seventh Floor
9    San Francisco, California 94105-2907
     Telephone: (415) 512-4000
10   Facsimile: (415) 512-4077
     E-mail: jerome.roth@mto.com
11   E-mail: elizabeth.kim@mto.com

12
     *Attorneys for Defendant*
13   *ROYAL DUTCH SHELL PLC*

14   ** Pursuant to Civ. L.R. 5-1(i)(3), the elec-
     tronic signatory has obtained approval from
15   this signatory

16

17

18

19

20

21

22

23

24

25

26

27

28