IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF OAKLAND, a Municipal Corporation, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Oakland City Attorney BARBARA J. PARKER,<br><br>Plaintiffs,<br><br>v.<br><br>BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS, a Delaware corporation, EXXON MOBIL CORPORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,<br><br>Defendants<br><br>AND RELATED CASE. | No. C 17-06011 WHA<br><br>and<br><br>No. C 17-06012 WHA<br><br>**ORDER GRANTING MOTION TO DISMISS AMENDED COMPLAINTS** |

**INTRODUCTION**

In these "global warming" actions asserting claims for public nuisance, defendants move to dismiss for failure to state a claim. For the following reasons, the motion is **GRANTED**.

**STATEMENT**

These actions arise out of a vital function of our atmosphere — its thermostat function — that is, keeping the temperature of our planet within a habitable range. The atmosphere hosts water vapor and certain trace gases without which heat at Earth's surface would excessively radiate into space, leaving our planet too cold for life. One of those trace gases is carbon dioxide,

a gas produced by, among other things, animal and human respiration, volcanoes and, more significantly here, combustion of fossil fuels like oil and natural gas. As heat radiates skyward, some of it passes close enough to molecules of carbon dioxide to be absorbed. These molecules then re-radiate the energy in all directions, including back toward Earth's surface. The more carbon dioxide in the air, the more this absorption and re-radiation process warms the surface. It turns out that even trace amounts of carbon dioxide in the air suffice to warm the atmosphere.[1]

The science dates back 120 years. In 1896, building on the findings by Irish scientist (and mountaineer) John Tyndall that carbon dioxide absorbed heat (whereas oxygen and nitrogen did not), Swedish scientist Svante Arrhenius published calculations that connected increases in the air's carbon dioxide with increased global temperatures. Arrhenius, however, had no concern over global warming. Rather, his focus remained solving the mystery of the ice ages and their causes (Amd. Compls. ¶ 76; Svante Arrhenius, *On the Influence of Carbonic Acid in the Air Upon the Temperature of the Ground*, 41 Phil. Mag. & J. Sci. 237 (1896)).[2]

In 1938, scientist Guy Stewart Callendar published graphs plotting the warming of Earth using temperature records from around the world. One graph showed a 0.07 Centigrade rise in the mean temperatures of the planet from 1910 to 1930, while another showed a six to eight-percent rise in carbon dioxide in the air over the same period. Given Tyndall's earlier finding, Callendar concluded that one rise had caused the other, namely that more carbon dioxide had trapped more heat and caused the temperature to rise. Callendar, like Arrhenius, was not alarmed over the possibility of global warming. Guy S. Callendar, *The Artificial Production of Carbon Dioxide and Its Influence on Temperature*, 64 Q. J. Royal Meteorological Soc'y 223 (1938).

---

[1] Our case involves all greenhouse gases, including methane, but "[c]arbon dioxide is by far the most important greenhouse gas" (Amd. Compls. ¶ 74).

[2] In 1859–1861, Tyndall discovered that the main gases in the atmosphere, nitrogen and oxygen, were transparent to infrared radiation but that carbon dioxide was opaque, meaning carbon dioxide absorbed infrared radiation. Tyndall recognized that carbon dioxide kept Earth warmer than would be the case without it. John Tyndall, *On the Absorption and Radiation of Heat by Gases and Vapours, and on the Physical Connexion of Radiation, Absorption, and Conduction*, 151 Phil. Trans. Royal Soc'y London 1 (1861).

In 1957, oceanographer Roger Revelle and chemist Hans Suess published a critique of a then prevailing view that the oceans would absorb excessive airborne carbon dioxide and thus reduce the risk of an atmospheric buildup of carbon dioxide. Referring to the ongoing combustion of fossil fuels and release of carbon dioxide, they concluded: "[h]uman beings are now carrying out a large scale geophysical experiment of a kind that could not have happened in the past nor be reproduced in the future" (Amd. Compls. ¶ 77).

Revelle later obtained funding to measure the buildup of carbon dioxide in the atmosphere, arranging for scientist Charles David Keeling to reside on Mauna Loa in Hawaii to measure and graph the real-time concentrations of carbon dioxide. This project produced the famous Keeling Curve, a graph that shows a steady rise in atmospheric carbon dioxide, year after year, like clockwork (*id.* ¶ 78; *see also* NOAA, EARTH SYSTEMS RESEARCH LABORATORY, GLOBAL MONITORING DIVISION, https://www.esrl.noaa.gov/gmd/ccgg/trends/full.html (last visited June 15, 2018)).

From this brief history up to the Sixties, it would be wrong to conclude that scientists had sounded alarm bells for global warming. Arrhenius was more concerned with global cooling than warming. Revelle said a large-scale, one-time experiment was in progress, but he sounded no alarm bells at the time.

But alarm bells over climate change eventually did sound. In 1988, the United Nations established the Intergovernmental Panel on Climate Change ("IPCC"). Its main objective was to prepare — based on the best available scientific information — periodic assessments regarding all aspects of climate change, with a view of formulating realistic response strategies. The IPCC had three working groups: Working Group I assessed the scientific aspects of climate change, Working Group II assessed the vulnerability and adaptation of socioeconomic and natural systems to climate change, and Working Group III assessed the mitigation options for limiting greenhouse gas emissions (Amd. Compls. ¶¶ 82–86).

The IPCC completed its first assessment report in 1990. The report made a persuasive case for anthropogenic interference with the climate system, and each subsequent report (about five to six years apart) incorporated advancements in measurements, observations, and modeling

3

— and each presented a more precise picture of how our climate has changed, and what has changed it. The fifth assessment report, released in 2013, was abundantly clear:

> Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades and millennia. The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, sea level has risen, and the concentrations of greenhouse gases have increased.

The report was also clear as to the cause, stating that it was "extremely likely" that "human influence has been the dominant cause of the observed warming since the mid-20th century" (*ibid.*).[3]

The science acknowledges that causes beyond the burning of fossil fuels are also at work. Deforestation has been and remains a significant contributor to the rise in carbon dioxide. Others include volcanoes and wildfires in greater numbers. Nevertheless, even acknowledging these other contributions, climate scientists are in vast consensus that the combustion of fossil fuels has, in and of itself, materially increased carbon dioxide levels, which in turn has materially increased the median temperature of the planet, which in turn has accelerated ice melt and raised (and continues to raise) the sea level.

In sum, in the last 120 years, the amount of carbon dioxide (and methane) in the air has increased, with most of the increase having come in recent decades. During that time, the median temperature of Earth has increased 1.8 degrees Fahrenheit. Glaciers around the world have been shrinking. Ice sheets over Greenland and Antarctica have been melting. The sea level has risen by about seven centimeters since 1993 (about seven to eight inches since 1900). As our globe warms and the seas rise, coastal lands in Oakland and San Francisco will, without erection of seawalls and other infrastructure, eventually become submerged by the navigable waters of the United States (*id.* ¶¶ 86–90, 124–36).

Defendants Chevron Corporation, Exxon Mobil Corporation, BP p.l.c., Royal Dutch Shell plc, and ConocoPhillips are the five largest investor-owned (as opposed to state-owned) producers of fossil fuels in the world, as measured by the greenhouse gas emissions allegedly generated from the use of the fossil fuels they have produced. They are the first (Chevron),

---

[3] The IPCC anticipates the release of a special report in October 2018 and the sixth assessment report in 2021.

4

second (Exxon), fourth (BP), sixth (Shell) and ninth (ConocoPhillips) largest cumulative producers of fossil fuels worldwide and are collectively responsible for over eleven percent of all carbon dioxide and methane pollution that has accumulated in the atmosphere since the Industrial Revolution (*id.* ¶ 94).

Defendants have allegedly long known the threat fossil fuels pose to the global climate. Nonetheless, they continued to extract and produce them in massive amounts while engaging in widespread advertising and communications campaigns meant to promote the sale of fossil fuels. These campaigns portrayed fossil fuels as environmentally responsible and essential to human well-being and downplayed the risks of global warming by emphasizing the uncertainties of climate science or attacking the credibility of climate scientists (*id.* ¶¶ 95–123).

In September 2017, Oakland and San Francisco commenced these actions in state court. The original complaints each asserted a single claim for public nuisance under California law. After defendants removed the actions to this district, an order dated February 27, 2018, denied plaintiffs' motions to remand (Dkt. Nos. 1, 134).[4]

Given the international scope of plaintiffs' claims and that the very instrumentality of the anticipated coastal flooding is uniquely federal — namely, the navigable waters of the United States — one threshold issue presented by these cases was whether federal common law should govern (rather than state law). The February 27 order concluded:

> Plaintiffs' claims for public nuisance, though pled as state-law claims, depend on a global complex of geophysical cause and effect involving all nations of the planet (and the oceans and atmosphere). It necessarily involves the relationships between the United States and all other nations. It demands to be governed by as universal a rule of apportioning responsibility as is available. This order does not address whether (or not) plaintiffs have stated claims for relief. But plaintiffs' claims, if any, are governed by federal common law. Federal jurisdiction is therefore proper.

Plaintiffs have since amended their complaints to plead a separate claim for public nuisance under federal common law. The amended complaints also substituted defendant ConocoPhillips for its subsidiary, ConocoPhillips Company, and added the City of Oakland and the City and County of San Francisco as plaintiffs to the federal nuisance claims, among other

---

[4] All docket numbers herein refer to the docket in Case No. 17-cv-06011-WHA.

5

additions. On March 21, to standing room only, counsel and their experts conducted a science tutorial for the undersigned judge. Defendants now move to dismiss the amended complaints for failure to state a claim (Dkt. Nos. 174, 199, 225). This order follows full briefing, oral argument, and supplemental briefing.[5]

**ANALYSIS**

The issue is not over science. All parties agree that fossil fuels have led to global warming and ocean rise and will continue to do so, and that eventually the navigable waters of the United States will intrude upon Oakland and San Francisco. The issue is a legal one — whether these producers of fossil fuels should pay for anticipated harm that will eventually flow from a rise in sea level.

The sole claim for relief is for "public nuisance," a claim governed by federal common law. The specific nuisance is global-warming induced sea level rise. Plaintiffs' theory, to repeat, is that defendants' sale of fossil fuels leads to their eventual combustion, which leads to more carbon dioxide in the atmosphere, which leads to more global warming and consequent ocean rise.

The scope of plaintiffs' theory is breathtaking. It would reach the sale of fossil fuels anywhere in the world, including all past and otherwise lawful sales, where the seller knew that the combustion of fossil fuels contributed to the phenomenon of global warming. While these actions are brought against the first, second, fourth, sixth and ninth largest producers of fossil fuels, anyone who supplied fossil fuels with knowledge of the problem would be liable. At one point, counsel seemed to limit liability to those who had promoted allegedly phony science to deny climate change. But at oral argument, plaintiffs' counsel clarified that any such promotion remained merely a "plus factor." Their theory rests on the sweeping proposition that otherwise

---

[5] At the Court's invitation, the United States submitted an amicus brief on the question of whether or not (and the extent to which) federal common law affords the relief requested by plaintiffs. The Attorneys General of eighteen States also submitted amicus briefs (Dkt. Nos. 224, 236, 245).

6

lawful and everyday sales of fossil fuels, combined with an awareness that greenhouse gas emissions lead to increased global temperatures, constitute a public nuisance.[6]

A public nuisance under federal common law, both sides agree, is an "unreasonable interference with a right common to the general public," as set forth in the Restatement (Second) of Torts § 821B(1) (1979). Putting aside momentarily the important issue of displacement, a successful public nuisance claim therefore requires proof that a defendant's activity unreasonably interferes with the use or enjoyment of a public right and thereby causes the public-at-large substantial and widespread harm. *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) (citing *Missouri v. Illinois*, 200 U.S. 496, 521 (1906)).

No plaintiff has ever succeeded in bringing a nuisance claim based on global warming. But courts that have addressed such claims, as well as the parties here, have turned to the Restatement to analyze whether the common law tort of nuisance can be applied in this context.[7]

Section 821B of the Restatement sets forth three tests for whether an interference with a public right is unreasonable:

> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>
> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

To be held liable for a public nuisance, a defendant's interference with a public right can either be intentional, or unintentional and otherwise actionable under principles controlling liability for negligence, recklessness, or abnormally dangerous activities. Restatement § 821B

---

[6] This clarification seems to have been aimed at avoiding the *Noerr-Pennington* doctrine and other free speech issues inherent in predicating liability on publications designed to influence public policy. *See E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

[7] Although plaintiffs analogize these actions to earlier lawsuits against "Big Tobacco," only one court has ever sustained a public nuisance theory against a tobacco company. *Evans v. Lorillard Tobacco Co.*, No. 04-2840A, 2007 WL 796175 (Mass. Super. Ct. Feb. 7, 2007). Every other court to reach the issue, however, has rejected a public nuisance theory. *See, e.g.*, *Allegheny Gen. Hosp. v. Phillip Morris*, 228 F.3d 429, 446 (3d Cir. 2000); *Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 972–73 (E.D. Tex. 1997).

7

cmt. e. Where, as alleged here, the interference is intentional, "it must also be unreasonable." *Ibid.* This determination, in turn, involves "the weighing of the gravity of the harm against the utility of the conduct," guidance for which is set forth in Sections 826 through 831 of the Restatement. *Ibid.* If the interference was unintentional, the principles governing negligence, recklessness, or abnormally dangerous activities also "embody in some degree the concept of unreasonableness." *Ibid.*

The commentary to Sections 826 through 831 explain, among other things, that "in determining whether the gravity of the interference with the public right outweighs the utility of the actor's conduct, it is necessary to consider the extent and character of the interference, the social value that the law attaches to it, the character of the locality involved and the burden of avoiding the harm placed upon members of the public." *Id.* at § 827 cmt. a. Relatedly, in evaluating the utility of the conduct, "it is necessary to consider the social value that the law attaches to the primary purpose of the conduct, the suitability of the conduct to the character of the locality and the impracticality of preventing or avoiding the invasion." *Id.* at § 828 cmt. a.

With respect to balancing the social utility against the gravity of the anticipated harm, it is true that carbon dioxide released from fossil fuels has caused (and will continue to cause) global warming. But against that negative, we must weigh this positive: our industrial revolution and the development of our modern world has literally been fueled by oil and coal. Without those fuels, virtually all of our monumental progress would have been impossible. All of us have benefitted. Having reaped the benefit of that historic progress, would it really be fair to now ignore our own responsibility in the use of fossil fuels and place the blame for global warming on those who supplied what we demanded? Is it really fair, in light of those benefits, to say that the sale of fossil fuels was unreasonable?

This order recognizes but does not resolve these questions, for there is a more direct resolution from the Supreme Court and our court of appeals, next considered.[8]

---

[8] Another problem involves timing. Although plaintiffs allege that global warming has already caused sea level rise, Oakland and San Francisco have yet to build a seawall or other infrastructure for which they seek reimbursement. The United States Army Corps of Engineers has already proposed projects to address the problem and is likely to help protect plaintiffs' property and residents. Oakland and San Francisco may

8

1. **DISPLACEMENT.**

The Supreme Court has held that the Clean Air Act and the EPA's authority thereunder to set emission standards have displaced federal common law nuisance claims to enjoin a defendant's emission of greenhouse gases. *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410 (2011) ("*AEP*"). In *Kivalina*, our court of appeals extended the Clean Air Act displacement rule to claims for damages based on an oil producer's *past* emissions. 696 F.3d 849. In other words, Congress has vested in the EPA the problem of greenhouse gases and has given it plenary authority to solve the problem at the point of emissions.

Here, by contrast, defendants stand accused, not for their own emissions of greenhouse gases, but for their sale of fossil fuels to those who eventually burn the fuel. Is this distinction enough to avoid displacement under *AEP* and *Kivalina*? The harm alleged by our plaintiffs remains a harm caused by fossil fuel *emissions*, not the mere extraction or even sale of fossil fuels. This order holds that, were this the only distinction, *AEP* and *Kivalina* would still apply. If an oil producer cannot be sued under the federal common law for their own emissions, *a fortiori* they cannot be sued for someone else's.

The amended complaints, however, add another dimension not addressed in *AEP* or *Kivalina*, namely that the conduct and emissions contributing to the nuisance arise *outside* the United States, although their ill effects reach *within* the United States. Specifically, emissions from the use of defendants' fossil fuels abroad send greenhouse gases into our atmosphere, warm our globe, melt its ice, raise sea levels, and, via the navigable waters of the United States, threaten coastal flooding in Oakland and San Francisco. The February 27 order concluded that because plaintiffs' nuisance claims centered on defendants' placement of fossil fuels into the flow of international commerce, and because foreign emissions are out of the EPA and Clean Air Act's reach, the Clean Air Act did not necessarily displace plaintiffs' federal common law claims.

---

eventually incur expense over and above federal outlays, but that is neither certain nor imminent. If and when those expense items are actually incurred, defendants will still be in business and will be good for any liability. Requiring them to pay now into an anticipatory "abatement fund" would be like walking to the pay window before the race is over.

9

Nevertheless, these claims are foreclosed by the need for federal courts to defer to the legislative and executive branches when it comes to such international problems, as now explained.

### 2. INTERFERENCE WITH SEPARATION OF POWERS AND FOREIGN POLICY.

The Supreme Court has given us caution in formulating new claims under federal common law. *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). *Sosa* and earlier decisions "cast doubt on the authority of courts to extend or create private causes of action even in the realm of domestic law, where [the Supreme Court] has 'recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases.'" *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018) (citing *Sosa*, 542 U.S. at 727). The Supreme Court has also "remain[ed] mindful that it does not have the creative power akin to that vested in Congress." *AEP*, 564 U.S. at 422. One consideration weighing in favor of judicial caution is where "modern indications of congressional understanding of the judicial role in the field have not affirmatively encouraged greater judicial creativity." *Sosa*, 542 U.S. at 728.

As explained above, plaintiffs' claims require a balancing of policy concerns — including the harmful effects of greenhouse gas emissions, our industrialized society's dependence on fossil fuels, and national security. Through the Clean Air Act, Congress "entrust[ed] such complex balancing to the EPA in the first instance, in combination with state regulators." *AEP*, 564 U.S. at 427. And, not long ago, the problem wasn't too much oil, but too little, and our national policy emphasized the urgency of reducing dependence on foreign oil. In enacting the Energy Policy Act of 1992, for example, Congress expressed that it was "the goal of the United States in carrying out energy supply and energy conservation research and development . . . to strengthen national energy security by reducing dependence on imported oil." 42 U.S.C. § 13401. In our industrialized and modern society, we needed (and still need) oil and gas to fuel power plants, vehicles, planes, trains, ships, equipment, homes and factories. Our industrial revolution and our modern nation, to repeat, have been fueled by fossil fuels.

In light of *AEP*, plaintiffs shift their focus to sales of fossil fuels worldwide, beyond the reach of the EPA and the Clean Air Act. This shift to foreign lands, however, runs counter to another cautionary restriction, the presumption against extraterritoriality. The Supreme Court has

cautioned that where recognizing a new claim for relief under federal common law could affect foreign relations, courts should be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa,* 542 U.S. at 727. In *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), the Supreme Court held that the principles underlying the presumption against extraterritoriality also constrain courts considering claims brought under the Alien Tort Statute. The presumption "serves to protect against unintended clashes between our laws and those of other nations" and "helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Id.* at 115–16 (citations and internal quotation marks omitted). While courts "typically apply the presumption to discern whether an Act of Congress regulating conduct applies abroad," *Kiobel* recognized that "the danger of unwarranted judicial interference in the conduct of foreign policy is magnified" where "the question is not what Congress has done but instead what courts may do." *Id.* at 116. And where a claim "reaches conduct within the territory of another sovereign," concerns of "unwarranted judicial interference" in foreign policy "are all the more pressing." *Id.* at 117. Importantly, "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Jesner*, 138 S. Ct. at 1403.

Here, plaintiffs seek to impose liability on five companies for their production and sale of fossil fuels worldwide. These claims — through which plaintiffs request billions of dollars to abate the localized effects of an inherently global phenomenon — undoubtedly implicate the interests of countless governments, both foreign and domestic. The challenged conduct is, as far as the complaints allege, lawful in every nation. And, as the United States aptly notes, many foreign governments actively support the very activities targeted by plaintiffs' claims (USA Amicus Br. at 18). Nevertheless, plaintiffs would have a single judge or jury in California impose an abatement fund as a result of such overseas behavior. Because this relief would effectively allow plaintiffs to govern conduct and control energy policy on foreign soil, we must exercise great caution.

Global warming is already the subject of international agreements. The United States is also engaged in active discussions with other countries as to whether and how climate change should be addressed through a coordinated framework (*ibid.*). The Montreal Protocol on Substances that Deplete the Ozone Layer, signed by 197 countries to eliminate chlorofluorocarbons (CFCs), demonstrates that global cooperation can work, even if getting there remains difficult. Everyone has contributed to the problem of global warming and everyone will suffer the consequences — the classic scenario for a legislative or international solution.

This order fully accepts the vast scientific consensus that the combustion of fossil fuels has materially increased atmospheric carbon dioxide levels, which in turn has increased the median temperature of the planet and accelerated sea level rise. But questions of how to appropriately balance these worldwide negatives against the worldwide positives of the energy itself, and of how to allocate the pluses and minuses among the nations of the world, demand the expertise of our environmental agencies, our diplomats, our Executive, and at least the Senate. Nuisance suits in various United States judicial districts regarding conduct worldwide are far less likely to solve the problem and, indeed, could interfere with reaching a worldwide consensus.

Plaintiffs argue against this result on several grounds. *First*, plaintiffs argue that adjudication of plaintiffs' claims would not infringe on the role of the political branches because the undersigned judge need not weigh or consider the social utility of defendants' conduct. The commentary to Section 826 of the Restatement explains that in some scenarios harm may be "so severe" that the conduct becomes unreasonable "as a matter of law," and that in such situations monetary recovery is available "regardless of the utility of the activity in the abstract." Restatement § 826 cmt. b. Plaintiffs similarly rely on Section 829A, which provides:

> An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if the harm resulting from the invasion is severe and greater than the other should be required to bear without compensation.

Plaintiffs claim that the harm alleged in these actions is "undeniably severe" such that global warming constitutes a nuisance as a matter of law. But in *AEP*, the Supreme Court addressed public nuisance claims based on similar allegations of harm, and nonetheless cautioned that policy questions concerning global warming require an "informed assessment of competing

12

interests" and that "[a]long with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." 564 U.S. at 427.

Plaintiffs next cite to Section 821B, comment i (entitled "Action for damages distinguished from one for injunction") which provides:

> In determining whether to award damages, the court's task is to decide whether it is unreasonable to engage in the conduct without paying for the harm done. Although a general activity may have great utility it may still be unreasonable to inflict the harm without compensating for it. In an action for injunction the question is whether the activity itself is so unreasonable that it must be stopped. It may be reasonable to continue an important activity if payment is made for the harm it is causing, but unreasonable to continue it without paying.

This question of reasonableness nevertheless falls squarely within the type of balancing best left to Congress (or diplomacy). Judge Martin Jenkins rejected a similar argument in *People of the State of California v. General Motors Corp.*, No. 06-cv-05755, 2007 WL 2726871 (N.D. Cal. Sept. 17, 2007). There, the State of California sued several automakers for contributing to global warming. California argued that because it sought damages, resolution of its federal common law public nuisance claim would not require the district court to determine whether the defendants' actions had been unreasonable, but rather whether the interference suffered by California was unreasonable. *Id.* at *8. Judge Jenkins disagreed that this distinction would allow him to avoid making policy determinations, explaining that "regardless of the relief sought, the Court is left to make an initial decision as to what is unreasonable in the context of carbon dioxide emissions." *Ibid.* So too here.

Finally, plaintiffs point to Section 826, which provides:

> An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if (a) the gravity of the harm outweighs the utility of the actor's conduct, or (b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible.

Plaintiffs claim that they can be compensated pursuant to subsection (b), which does not require weighing the utility of defendants' conduct. The commentary to this section is clear, however, that "[i]f imposition of this financial burden would make continuation of the activity not feasible, the weighing process for determining unreasonableness is similar to that in a suit for injunction."

13

Restatement § 826 cmt. f. In these actions alone, two plaintiffs seek billions of dollars each in the form of an abatement fund. It seems a near certainty that judgments in favor of the plaintiffs who have brought similar nuisance claims based on identical conduct (let alone those plaintiffs who have yet to file suit) would make the continuation of defendants' fossil fuel production "not feasible." This order accordingly disagrees that it could ignore the public benefits derived from defendants' conduct in adjudicating plaintiffs' claims. In the aggregate, the adjustment of conflicting pros and cons ought to be left to Congress or diplomacy.[9]

*Second*, plaintiffs point to the Court of Appeals for the Second Circuit's decision in *AEP*, where the court held that a global-warming nuisance claim did not present non-justiciable political questions, a conclusion affirmed by an equally-divided Supreme Court. *AEP*, 564 U.S. at 420 n.6. As previously explained, however, *AEP* addressed different claims. To be sure, the Second Circuit disagreed that it had been asked "to fashion a comprehensive and far-reaching solution to global climate change, a task that arguably falls within the purview of the political branches." *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 325 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011). But in doing so, the court highlighted that the plaintiffs there sought only to limit emissions from six domestic coal-fired electricity plants, and that "[a] decision by a single federal court concerning a common law of nuisance cause of action, brought by domestic plaintiffs against domestic companies for domestic conduct, does not establish a *national or international* emissions policy (assuming that emissions caps are even put into place)." *Ibid.* (emphasis in original). Here, the claims are plainly not so limited.

*Third*, plaintiffs argue that *Sosa* and its progeny are not instructive because those decisions arose in the context of the Alien Tort Statute. The Alien Tort Statute simply provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. §

---

[9] The parties have identified seven similar actions brought by cities and counties across the country. *Cty. of San Mateo v. Chevron Corp., et al.*, No. 17-cv-4929 (N.D. Cal.); *City of Imperial Beach v. Chevron Corp., et al.*, No. 17-cv-4934 (N.D. Cal.); *Cty. of Marin v. Chevron Corp., et al.*, No. 17-cv-4935 (N.D. Cal.); *Cty. of Santa Cruz v. Chevron Corp., et al.*, No. 18-cv-450 (N.D. Cal.); *City of Santa Cruz v. Chevron Corp., et al.*, No. 18-cv-458 (N.D. Cal.); *City of Richmond v. Chevron Corp., et al.*, No. 18-cv-732 (N.D. Cal.); *City of New York v. BP P.L.C., et al.*, No. 18-cv-182 (S.D.N.Y.); *King Cty. v. BP P.L.C.*, et al., No. 18-2-11859-0 (Sup. Ct. King Cty., Wash.).

14

1350. "The statute provides district courts with jurisdiction to hear certain claims, but does not expressly provide any causes of action." *Kiobel*, 569 U.S. at 114–15. This grant of jurisdiction is "read as having been enacted on the understanding that the common law would provide a cause of action for [a] modest number of international law violations." *Sosa*, 542 U.S. at 724. Federal courts may therefore "recognize private claims [for such violations] under federal common law." *Id.* at 732. The broader point made by the Supreme Court in these decisions is that federal courts should exercise great caution before fashioning federal common law in areas touching on foreign affairs. For the reasons explained above, such concerns of caution are squarely presented here. The federal common law claims must be dismissed.

\* \* \*

The foregoing disposes of the federal common law claims in their entirety. The amended complaints also assert a state law claim for public nuisance. For the reasons stated in the February 27 order denying remand, however, plaintiffs' nuisance claims must stand or fall under federal common law. Accordingly, plaintiffs' state law claims must also be dismissed.

**CONCLUSION**

It may seem peculiar that an earlier order refused to remand this action to state court on the ground that plaintiffs' claims were necessarily governed by federal law, while the current order concludes that federal common law should not be extended to provide relief. There is, however, no inconsistency. It remains proper for the scope of plaintiffs' claims to be decided under federal law, given the international reach of the alleged wrong and given that the instrumentality of the alleged harm is the navigable waters of the United States. Although the scope of plaintiffs' claims is determined by federal law, there are sound reasons why regulation of the worldwide problem of global warming should be determined by our political branches, not by our judiciary.

In sum, this order accepts the science behind global warming. So do both sides. The dangers raised in the complaints are very real. But those dangers are worldwide. Their causes are worldwide. The benefits of fossil fuels are worldwide. The problem deserves a solution on a more vast scale than can be supplied by a district judge or jury in a public nuisance case. While it

remains true that our federal courts have authority to fashion common law remedies for claims based on global warming, courts must also respect and defer to the other co-equal branches of government when the problem at hand clearly deserves a solution best addressed by those branches. The Court will stay its hand in favor of solutions by the legislative and executive branches. For the reasons stated, defendants' motion to dismiss is **GRANTED**.

**IT IS SO ORDERED.**

Dated: June 25, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE